**LATHAM & WATKINS LLP**
One Newark Center, 16th floor
Newark, New Jersey 07101-3174
Telephone: 973-639-1234
Facsimile: 973-639-7298

*Attorneys for Defendant Corporation of the President of The*
*Church of Jesus Christ of Latter-day Saints*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID V. AMES,<br><br>            Plaintiff,<br><br>v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, a/k/a the "MORMON CHURCH," and WILLIAM SCOTT HANSON, individually,<br><br>            Defendants. | Civil Action No. 06-CV-3441 (WJM) (MF) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT, CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS' MOTION FOR SUMMARY JUDGMENT DISMISSING PLAINTIFF'S COMPLAINT IN ITS ENTIRETY OR, IN THE ALTERNATIVE, STRIKING PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ................................................................................................5

    I.      THE ORGANIZATION OF THE MORMON CHURCH ....................................5
    II.    THE 1986-87 ALLEGATIONS AGAINST SCOTT HANSON............................6
    III.   SCOTT HANSON'S ABUSE OF PLAINTIFF DAVID AMES ..........................9
          A.     Scott Hanson's Travel 1988 – 1997...................................................9
          B.     Scott Hanson's Introduction to David Ames ...............................10
          C.     Chris and Kathy Ames' Knowledge that Scott Hanson Was a
                  Threat to Their Son and Their Failure to Take Steps to Protect
                  Their Son.....................................................................................11
          D.     The Events Leading to Scott Hanson's Arrest in July 2000 .....................15

ARGUMENT .....................................................................................................................17

    I.      THE SUMMARY JUDGMENT STANDARD.....................................................17
    II.    THE CHURCH'S ALLEGED FAILURE TO WARN WAS NOT THE
          PROXIMATE CAUSE OF THE SEXUAL ABUSE BY SCOTT
          HANSON, BECAUSE NEGLECT BY PLAINTIFF'S PARENTS WAS A
          SUPERCEDING AND INTERVENING CAUSE .................................................18
    III.   IN THE ALTERNATIVE, PLAINTIFF'S DEMAND FOR PUNITIVE
          DAMAGES SHOULD BE STRICKEN..............................................................23
          A.     The Legal Standard for Punitive Damages Under New Jersey Law .........23
          B.     The Undisputed Facts Here Preclude, As a Matter of Law, Any
                  Award of Punitive Damages ....................................................................25

CONCLUSION...................................................................................................................30

## **<u>TABLE OF AUTHORITIES</u>**

### **FEDERAL CASES**

<u>Page</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................................17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................17

*Doe v. Holy See*,
    434 F. Supp. 2d 925 (D. Or. 2006) ...................................................................25

*Kane v. U-Haul International, Inc.*,
    218 Fed. Appx. 163 (3d Cir. 2007)..............................................................24, 27

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................17

*Peck v. Ford Motor Co.*,
    603 F.2d 1240 (7th Cir. 1979) ...........................................................................19

*United States v. DePeri*,
    778 F.2d 963 (3d Cir. 1985), *cert. denied*, 475 U.S. 1110 (1986)....................29

*United States v. Sallins*,
    993 F.2d 344 (3d Cir. 1993)...............................................................................29

### **STATE CASES**

*Caputzal v. The Lindsay Co.*,
    48 N.J. 69 (1966) .........................................................................................18, 19

*Daniel v. State, Department of Transportation*,
    239  N.J. Super. 563 (App. Div. 1990) ...............................................................18

*DiGiovanni v. Pessel*,
    55 N.J. 188 (1970) ..............................................................................................24

*Doe v. Boys Clubs of Greater Dallas, Inc.*,
    907 S.W.2d 472 (Tex. 1995)...............................................................................20

*Jensen v. Schooley's Mountain Inn, Inc.*,
    216 N.J. Super. 79 (App. Div. 1987) *certif. denied*, 108 N.J. 181 (1987).........19

*Lynch v. Schaleninger,*
   162 N.J. 209 (2000) ........................................................................22

*McLaughlin v. Rova Farms, Inc.,*
   56 N.J. 288 (1970) ..........................................................................24

*Meyer v. Board of Education, Middletown Township,*
   9 N.J. 46 (1952) ..............................................................................22

*Morril v. Morril,*
   104 N.J.L. 557 (1928) ....................................................................22

*Nappe v. Anschelewitz, Barr, Ansell & Bonello,*
   97 N.J. 37 (1984) ............................................................................24

*Parks v. Pep Boys,*
   282 N.J. Super. 1 (App. Div. 1995) ...............................................29

*Pavlova v. Mint Management Corp.,*
   375 N.J. Super. 397 (App. Div. 2005) ...........................................24

*Sacci v. Metaxas,*
   355 N.J. Super. 499 (App. Div. 2002) .....................................19, 20

*Scafidi v. Seiler,*
   119 N.J. 93 (1990) ..........................................................................18

*Yun v. Ford Motor Co.,*
   143 N.J. 162 (1996) ........................................................................19

## STATUTES

N.J.S.A. §2A:15-5.10...........................................................................23

N.J.S.A. §2A:15-5.12...............................................................4, 23, 24

## RULES

Fed. R. Civ. P. 56................................................................................17

Fed. R. Evid. 403 ...............................................................................10

Fed. R. Evid. 803(8)(B) ......................................................................29

**MISCELLANEOUS**

*American Heritage Dictionary of the English Language* (4th ed. 2000)........................................7

*W. Prosser, Handbook on the Law of Torts* §2 (2d ed. 1955) .....................................................24

## PRELIMINARY STATEMENT

Defendant Corporation of the President of The Church of Jesus Christ of Latter-day Saints (the "Church" or the "Mormon Church") submits this memorandum in support of its motion for summary judgment dismissing Plaintiff's Complaint in its entirety or, in the alternative, striking Plaintiff's claim for punitive damages.

Plaintiff David Ames seeks to hold the Church liable for sexual abuse perpetrated against him by William Scott Hanson ("Scott Hanson"). The abuse occurred in New Jersey between December 1998 and July 2000. David was 12-13 years old; Scott Hanson was then between 36 and 38 years old. This case does not involve clergy abuse or a church cover-up of abuse. Scott Hanson was never a member of the clergy of the Mormon Church or a person of prominence within the denomination. As an adult, Scott Hanson was an ordinary member of the Church with an on-again, off-again record of attendance. David was also a member. Scott Hanson never abused David on Church property or in connection with any Church function or position. Most of the abuse took place at David's home while his parents were in the house. Their common membership in the Church, however, had little or nothing to do with Scott Hanson's abuse of David Ames. That abuse arose from their families' friendship and the Ames parents' shocking failure to protect their son.

Plaintiff's claim against the Church appears to rest on the assertion that the Church should have banned Scott Hanson from any position involving youths or warned Plaintiff's parents that he was a risk to their son. That assertion is based on events that occurred in Utah over a decade before Scott Hanson abused David Ames in New Jersey. In 1986, a Utah prosecutor charged Scott Hanson with two felony counts of sexual abuse. The prosecutor later dropped both charges, accepted a guilty plea to a misdemeanor that by definition did not amount

1

to sexual abuse, agreed to a sentence of probation, and did not require Scott Hanson to register as a sex offender.

Concerned about the safety of his own congregation, Scott Hanson's then local Church leader, Bishop Robert O. Hansen, conducted his own independent investigation.  He interviewed all of the boys in his congregation (15-25 in total, including his own son) who had dealt with Scott Hanson, spoke to the bishop of the principal alleged victim, and, among other steps, monitored developments in the criminal proceedings.  His investigation revealed no credible evidence of abuse.  Moreover, Bishop Hansen learned that Scott Hanson had been evaluated by two mental health professionals, each of whom concluded that he showed no pedophiliac tendencies.  In short, Bishop Hansen reached essentially the same conclusion as the prosecutor – namely, that Scott Hanson was not guilty of sexual abuse, did not pose a risk to minor boys, and did not need to be registered as a sex offender.  Nevertheless, Plaintiff, with 20/20 hindsight, claims the Church was negligent for not permanently banning Scott Hanson's involvement with Church youth or not issuing a nationwide warning about him to millions of its members.

Even assuming, for purposes of this motion only, that a Church clergyman in Utah was negligent in 1986-87, that does not make the Church liable for Scott Hanson's sexual abuse of David twelve years later in New Jersey.  The causal link to the Church's alleged negligence ten or more years earlier was most certainly broken by the superseding negligence of David Ames' parents.  Discovery has revealed that David's parents not only knew that Scott Hanson was engaged in obviously improper conduct with their son before the actual abuse occurred, but that they repeatedly approved and even facilitated unmistakably inappropriate contacts between Scott Hanson and David over a period of many months.

2

Specifically, prior to the abuse, David's parents repeatedly allowed Scott Hanson to sleep in David's own bed in the Ames home despite David's express complaint to his father that he was uncomfortable with the arrangement and with how Scott Hanson was touching him.  At first, David's father acknowledged the problem and the risk of abuse (none had occurred yet), even instructing David's mother not to allow Scott Hanson to sleep at the Ames home again.  But nothing changed.  For the next 18 months, David's parents allowed Scott Hanson to sleep time and again at their home in the same bed with David – bizarrely, at times, David's father even slept in the same bed with Scott Hanson and David.  According to David, starting in December 1998 Scott Hanson sexually abused him nearly every time they slept together at the Ames' home.  Moreover, David's parents frequently allowed him to sleep at Scott Hanson's home, camp overnight with Hanson, and even to accompany him alone on a business trip and then a vacation – all of which resulted in further abuse.  Even after David's mother learned that the New Jersey Division of Youth and Family Services ("DYFS") was investigating Scott Hanson's inappropriate relationship with David, she still allowed him to sleep with her son, which again resulted in abuse.  David's mother continued to facilitate the abuse until less than a week before Scott Hanson was arrested.

Obviously, Scott Hanson is primarily to blame for his abuse of David Ames.  But as between the Church and David Ames' parents, their acts of clear, direct, indisputable negligence - - not the remote and tenuous allegations of Church negligence over a decade earlier in Utah - - were, as a matter of law, the proximate cause of the abuse.  New Jersey law has long recognized that proximate causation is not limitless.  As a matter of law, sound public policy and simple fairness, at some point the permissible chain of causation ends because the effect of the defendant's alleged negligence has exhausted itself and/or because of the intervening or

superseding negligence of a third party.  That is plainly the case here.  David Ames' parents had far more specific and current information than the Church could ever have provided about the risk Scott Hanson posed to their son.  Despite that knowledge, they not only failed to stop Hanson from abusing David, they provided him with opportunity after opportunity to do so.  David's parents, not the Church, are the proximate cause of that abuse.

If the Court decides not to dismiss Plaintiff's Complaint in its entirety, the Court should nevertheless grant summary judgment striking Plaintiff's demand for punitive damages.  By statute in New Jersey, punitive damages may only be awarded if the plaintiff proves by clear and convincing evidence that the defendant's acts or omissions were "actuated by actual malice or accompanied by a wanton and willful disregard" for the likely consequences.  N.J.S.A. §2A:15-5.12.  Proof of any degree of negligence, including gross negligence, is not sufficient for an award of punitive damages.  *Id.*

This is not a case where a church knew that the perpetrator had sexually abused a minor in secret and took steps to hide that fact or to provide the abuser with further opportunities to victimize others by silently transferring him to another congregation or position.  The accusations concerning Scott Hanson were the subject of public proceedings reported in the press in 1986-87.  The Church did not ignore those allegations or assume they were unfounded.  Quite the contrary, Bishop Hansen conducted his own thorough investigation that reached essentially the same conclusion as Utah law enforcement.  This is powerful and undisputed evidence of Bishop Hansen's good faith in addressing this issue.  As a matter of law, that precludes any potential finding of maliciousness or willful and wanton disregard on the Church's part.  Punitive damages cannot be awarded in this case.

## STATEMENT OF FACTS[1]

## I.   THE ORGANIZATION OF THE MORMON CHURCH

Local Mormon congregations are organized into wards.  A ward typically consists of about 250-500 members.  (*See* Affidavit of Paul A. Rosenthal, Esq. sworn to March 24, 2008, Ex. 1, Leland Howell ("L. Howell") Dep., Tr. 9.)[2]  Wards are led by a bishopric, consisting of a bishop and two counselors.  (*See id.*, L. Howell Dep., Tr. 16-17.)  The members of the bishopric are a volunteer, lay clergy:  bishops and their counselors typically serve for approximately 5 years; they are not paid nor are they professionally trained or educated.  The lay members of the bishopric have families and secular jobs.  (*Id.* at 31.)

Observant members of the Church are routinely "called" to serve in a variety of roles, such as Sunday School teacher or scout leader or Elder's Quorum President.  (Ex. 2, 1998 Church Handbook of Instructions, Book 1, Ch. 6, p. 37 at COP00000055-67, at 55.)  In addition, all observant male members over the age of 14 are assigned in pairs to serve as "home teachers" for another family in the ward.  Home teachers are expected to make appointments to visit their assigned family once a month in order to deliver a spiritual message and to determine if the family has any spiritual or secular needs for which the ward could provide assistance.  (Ex. 3, Richard Myers ("R. Myers") Dep., Tr. 31-32.)

Multiple wards (usually between 5 and 12) are organized into a stake.  (Ex. 1, L. Howell Dep., Tr. 10-11.)  Stakes are supervised by a Stake President and his two counselors, who are also lay clergy members with families and secular jobs.  (*Id.* at 11, 31.)

---

[1]   Many of the facts set forth below are not essential to the resolution of this motion.  They are provided as background, to put into context the dispositive facts, which are discussed in Sections II and III B and C, *infra.*

[2]   All cited deposition transcript pages and documents are submitted as exhibits to the Rosenthal Affidavit.  For the sake of brevity, citations in the text will refer to the "Ex." designation only.

The Church also has a number of leadership levels above the Stake presidency, leading to the First Presidency, consisting of the President and his two counselors, who jointly preside over the worldwide Church.  (*Id*. at 11-15.)

## II.   THE 1986-87 ALLEGATIONS AGAINST SCOTT HANSON

Scott Hanson was born into the Church.  He grew up as a practicing Mormon in Orem, Utah in the Orem 27th Ward.  (Ex. 4, Scott Hanson ("S. Hanson") Dep., Tr. 53-56, 80.)  He was described by one of his bishops as "an outstanding, outstanding young man, . . . [h]e would be exceptional, stand out above others."  (Ex. 5, John Wudel ("J. Wudel") Dep., Tr. 126-127.)

Following his freshman year at Brigham Young University ("BYU"), Scott Hanson did an 18-month mission on behalf of the Church in Colombia.  (Ex. 4, S. Hanson Dep., Tr. 74.)  He then returned to BYU, from which he graduated in 1987.  (*Id.* at 79-81.)  While in college and for a time thereafter, Hanson was very active in the Boy Scouts.  (*Id.* at 62-64.)  Scott Hanson achieved the rank of Eagle Scout and was a member of the Order of Arrow, a service organization for the Boy Scouts.  (*Id.* at 63; Ex. 1, L. Howell Dep., Tr. 54.)

In 1986, Scott Hanson became engaged to JoLynn Schill.  (Ex. 4, S. Hanson Dep., Tr. 91.)  In October 1986, a 14-year old boy Scott Hanson met through a Boy Scout Camp allegedly asserted that Scott Hanson had sexually abused and attempted to sodomize him.  (*Id.* at 94; Ex. 6, Information, UTAHUC00000001-02.)  Subsequently, there were allegations that Hanson had sexually abused JoLynn Schill's 9 year-old brother while sleeping over at the Schill home. (Ex. 4, S. Hanson Dep., Tr. 97-98.)  JoLynn Schill ended the engagement as a result of those allegations.  (Ex. 7, JoLynne Schill Britsch ("J. Britsch") Dep., Tr. 58.)

On November 11, 1986, Scott Hanson was questioned by the police.  (Ex. 8, Hearing Transcript, at UTAHPROS00000063-110, at 65-66.)  Within a day or two, he met with the bishop of the Orem 27th Ward, Robert O. Hansen.  (Ex. 9, Robert O. Hansen ("R. Hansen") Dep.,

Tr. 8-10.)  In that meeting, Scott Hanson denied touching any boys in a sexually inappropriate way.  (*Id.* at 12-13.)  Bishop Hansen did not pre-judge Scott Hanson's guilt or innocence; rather, he decided to conduct his own investigation of the allegations, without interfering with the criminal process.  (Ex. 9, R. Hansen Dep., Tr. 26-27.)  In the meantime, he disqualified Scott Hanson for holding any Church positions involving youths.  (Ex. 9, R. Hansen Dep., Tr. 24.)

On November 19, 1986, the Utah County Prosecutor filed a criminal information against Scott Hanson, charging him with two felony counts, attempted forcible sodomy and aggravated sexual abuse of a child. (Ex. 6, Information, UTAHUC00000001-2.)  That information was publicly reported in the media.  (Ex. 7, J. Britsch Dep., Tr. 34; Ex. 9, R. Hansen Dep., Tr. 77-78.)

While the criminal process was ongoing, Bishop Hansen interviewed 15-25 teenage boys in the Orem 27th Ward who had dealt with Scott Hanson through scouting or otherwise, including Bishop Hansen's own son.  (Ex. 9, R. Hansen Dep., Tr. 45-46, 87.)  None of those boys reported any inappropriate conduct by Scott Hanson. (*Id.* at 107-08.)  In addition, Bishop Hansen spoke to the bishop for the ward in which the boy who allegedly accused Scott Hanson of attempted sodomy resided.  That bishop reported that the boy had suspect credibility and had recanted his allegations.  (*Id.* at 29, 41, 113-114.)  Bishop Hansen also called the bishop for the Schills' ward but never received a return call.  (Ex. 9, R. Hansen Dep., Tr. 29-30.)

Bishop Hansen also met regularly with Scott Hanson and, on multiple occasions, with his attorney, Robert Moody.  (Ex. 9, R. Hansen Dep., Tr. 12, 63.)  He learned from Moody that Scott Hanson had been examined by both a psychologist and a psychiatrist, who had administered, among other tests, a plethysmograph exam.[3]  Moody informed Bishop Hansen that the two

---

[3]     A plethysmograph is "[a]n instrument that measures variations in the size of an organ or body part on the basis of the amount of blood passing through or present in the part."  The American Heritage Dictionary of the English Language (4th ed. 2000).  Penile

mental health professionals had concluded that Scott Hanson showed no pedophiliac tendencies. (*Id.* at 123-25.)

On or about October 8, 1987, the Utah County Prosecutor dismissed the attempted sodomy charge and entered into a plea bargain with Scott Hanson, pursuant to which the felony charge of sexual abuse of a minor was also dismissed and Scott Hanson agreed to plead guilty to a misdemeanor, lewdness involving a child.  (Ex. 11, Statement of Plea Agreement, UTAHUC00000131-133.)  By definition, that misdemeanor lewdness charge did not amount to sexual abuse:

> (1) A person is guilty of lewdness involving a child if the person under circumstances not amounting to rape of a child, object rape of a child, sodomy upon a child, sexual abuse of a child, or an attempt to commit any of these offenses, performs an act of sexual intercourse or sodomy, exposes his or her genitals or private parts, masturbates, engages in trespassory voyeurism, or performs any other act of gross lewdness, under circumstances which he or she should know will likely cause affront or alarm, to, on, or in the presence of another who is under 14 years of age.
>
> (2) Lewdness involving a child is a class A misdemeanor.

(Ex. 12, Utah Code Annotated § 76-9-702.5 (1983) (emphasis added).)

Bishop Hansen understood that Scott Hanson was pleading "no contest" to the misdemeanor lewdness charge in order to put the episode behind him and to put an end to the expensive legal fees being paid by his parents.  (Ex. 9, R. Hansen Dep., Tr. 143.)

Scott Hanson was sentenced on November 20, 1987 to eighteen months probation, on the condition that he avoid organized activities with youths during his probationary period and receive therapy as directed by a court-appointed mental health professional.  (Ex. 13, Judgment

---

plethysmograph tests are "utilized to make subjective determinations about an individual's psychological condition with regard to certain sexual disorders and deviant behavior in the male."  Ex. 10, Deborah H. Rulo, *Can We Identify the Sexual Predator by Use of Penile Plethysmography?*, *available at* http://forensic-evidence.com/site/Behv_Evid/BeE00005_2.html (abstract and condensed version only).

and Order of Probation, UTAHUC00000138-40.)  Scott Hanson's Judgment and Order of

Probation did not require him to register as a sex offender.  (*Id.*)  With the Court's knowledge

and permission, Scott Hanson then moved to Dallas, Texas to accept a job with the American

Arbitration Association.  (Ex. 4, S. Hanson Dep., Tr. 138.)  On July 5, 1988, Scott Hanson

married the former Kami Moulton.  (Ex. 14, Kami Hanson ("K. Hanson") Dep., Tr. 19.)

Following his investigation and the conclusion of the criminal proceedings, Bishop

Robert Hansen concluded that, in his judgment, Scott Hanson had not engaged in child sexual

abuse.  (Ex. 9, R. Hansen Dep., Tr. 196.)  Accordingly, Bishop Hansen consulted with his

ecclesiastical superior, Stake President Bruce Olsen, and they jointly decided not to convene a

Church court or to impose any discipline upon Scott Hanson.  (Ex. 9, R. Hansen Dep., Tr. 246;

Ex. 15, Bruce Olsen ("B. Olsen") Dep., Tr. 37.)

## III.    SCOTT HANSON'S ABUSE OF PLAINTIFF DAVID AMES

### A.    Scott Hanson's Travel 1988 – 1997

Between 1988 and the fall of 1997, Scott and Kami Hanson lived in at least eight

different locations.[4]  Each time, they moved either in order for Scott Hanson to pursue an MBA

at Purdue University or for him to obtain a new job.[5]  The Hansons were only intermittently

active in the Church during the 1988-97 time period.  Until 1996-97 when they were living in

---

[4]     Between 1988 and 1997, Scott and Kami Hanson lived in: Dallas, Texas; Lafayette,
Indiana; Reston, Virginia; Beaumont, Texas; Salado, Texas; Ft. Madison, Iowa;
Waukesha, Wisconsin; and Hackettstown, New Jersey.  *See* n. 6 below.

[5]     Scott Hanson moved to Lafayette, Indiana to attend graduate school at Purdue.  (Ex. 4, S.
Hanson Dep., Tr. 539.)  The Hansons then moved to Reston, Virginia when Scott Hanson
was hired by Mobil  Corporation.  (*Id.* at 148.)  Scott Hanson was promoted twice by
Mobil, requiring him to relocate to Beaumont and then Salado, Texas.  (*Id.* at 150-51,
154.)  When Scott received a job with increased seniority at Dial Corporation, the
Hansons moved to Ft. Madison, Iowa.  (*Id.* at 157-58.)  Scott Hanson then obtained a
management position with Ameritech and moved to Waukesha, Wisconsin.  (*Id.* at 162.)
Finally, Scott was hired by M&M Mars, Inc. and the Hansons moved to Hackettstown,
New Jersey.  (*Id.* at 178-79.)

Waukesha, Wisconsin, Scott Hanson held no Church callings that involved him in youth activities.  (Ex. 4, S. Hanson Dep., Tr. 379-80.)  In Waukesha, Scott Hanson served for a short time as "a teacher's quorum advisor which was basically a Sunday school teacher" for the fourteen to sixteen year old boys.  (Ex. 4, S. Hanson Dep., Tr. 576.)

There is no evidence that Scott Hanson sexually abused any boys prior to moving to Waukesha.  In 2003, Scott Hanson was criminally charged in Wisconsin and in New Jersey with sexually abusing a Waukesha youth.  He pled guilty to certain of those charges and was sentenced in Wisconsin to a lengthy prison term to be served consecutively after the conclusion of his New Jersey prison term.  (Ex. 16, Plea Hearing Transcript for William S. Hanson, Dec. 17, 2003, WISCRIM00000109-134, at 113, lines 13 to 23.)[6]  There is no evidence that the Church was given any information from any source of any improper activities with youths by Scott Hanson during the 1988-97 period.

In the fall of 1997, Scott Hanson accepted a position in the Human Resources Department of M&M Mars, Inc. in Hackettstown, New Jersey.  He moved to Hackettstown and was joined shortly thereafter by his wife Kami and then two year old son, Isaac.  (Ex. 4, S. Hanson Dep., Tr. 195.)  The Hanson family then joined the Church's Ledgewood Second Ward. (*Id.* at 195-96.)

**B.      Scott Hanson's Introduction to David Ames**

In early 1998, Scott Hanson was called to serve as a leader in the Ledgewood Second Ward's Blazer program, a Church scouting activity for 11 year old boys.  He volunteered to drive

---

[6]     Evidence of Scott Hanson's abuse of that Wisconsin youth should be inadmissible in this proceeding as irrelevant.  Even if there were any probative value to such evidence, its potential to prejudice the Church unfairly would render it inadmissible under Fed. R. Evid. 403.  We mention that evidence here only to provide background context to the Court.

David Ames, then 11 years old, to the weekly Blazer meeting.  (Ex. 17, David Ames ("D. Ames")  Dep., Tr. 79-81.)

Within a few days after the first Blazer meeting Scott Hanson and David Ames attended together, Scott Hanson invited David Ames to help with some yard work and other chores at the Hanson home.  With his parents' permission, David accepted.  Within a few days after that, Scott Hanson invited David Ames to go camping.  Again, with his parents' permission, David accepted.  (*See* Ex. 17, D. Ames Dep., Tr. 100-01.)

At some point, Scott Hanson and a companion were assigned to be the home teachers for the Ames family.  (Ex. 18, Christopher G. Ames ("C. Ames") Dep., Tr. 29.)  By that time, the Hansons were already friendly with the Ames family.  (Ex. 17, D. Ames Dep., Tr. 89.)  David Ames believes that Kami Hanson was assigned as Scott Hanson's home teaching companion. (Ex. 17, D. Ames Dep., Tr. 88.)

Scott Hanson never sexually abused David Ames on Church property or in connection with any Blazer activity or home teaching visit.  (*See, e.g.,* Ex. 17, D. Ames Dep., Tr. 89, 123.)

### C.  Chris and Kathy Ames' Knowledge that Scott Hanson Was a Threat to Their Son and Their Failure to Take Steps to Protect Their Son

Although the Hansons lived only 1-1½ miles from the Ames home, beginning in September 1998, Scott Hanson began frequently sleeping over at the Ames home.  Even though there were multiple other places he could have slept, Scott Hanson always slept in the same bed with David Ames.  (*See* Ex. 19, Kathleen Ames ("K. Ames") Dep., Tr. 85; Ex. 17, D. Ames Dep., Tr. 105-06.)  Moreover, he regularly slept up against David in the so-called "spooning" position, with the front of his body pressed against the back of David's.  (*e.g.,* Ex. 17, D. Ames Dep., Tr. 105; Ex. 18, C. Ames Dep., Tr. 51.)  David Ames' parents and siblings observed Scott

Hanson and David Ames in that position on numerous occasions.  (Ex. 17, D. Ames Dep., Tr. 113-14; *see also* Ex. 18, C. Ames Dep., Tr. 66-67.)

In September 1998 - - several months *before* Scott Hanson first actually touched David Ames' genital area - - David Ames complained to his father, Chris Ames that he was "uncomfortable" with the way Scott Hanson was sleeping in the same bed with him and touching him.  (Ex. 17, D. Ames Dep., Tr. 108-10.)  As David Ames explained at his deposition, the reason he went to his father was that he wanted his father to put a stop to Scott Hanson sleeping in his bed and touching him in a way that made him uncomfortable - - but his father did nothing in response.

> Q.  When you told your father that you were uncomfortable with the way in which Scott was sleeping in the same bed with you, that conversation that occurred in September 1998, did you expect your father to do something about it?
>
> A.  I didn't know what to expect.
>
> Q.  Did you want your father to do something about it?
>
> A.  Probably.  That's why I told him.
>
> Q.  Did you want your father to put a stop to it?
>
> A.  I guess, yes.
>
> Q.  Did you want your father to tell Scott not to sleep in the same bed with you and touch you in a way that made you uncomfortable?
>
> A.  Yes.
>
> Q.  Did he do any of those things?
>
> A.  Not that I was aware of.

(Ex. 17, D. Ames Dep., Tr. 110-11.)

By his own admission, Chris Ames knew the significance of David's September 1998 complaint.  Indeed, Chris Ames testified that he immediately asked his son if Scott had "touched

12

you where he shouldn't".  (Ex. 18, C. Ames Dep., Tr. 60.)  At his deposition, Chris Ames

claimed that he told both his wife and Scott Hanson that he did not want Scott Hanson sleeping

at the Ames home any more.  (Ex. 18, C. Ames Dep., Tr. 71-72.)  But Scott Hanson continued to

sleep at the Ames house, in the same bed with David Ames.  By Chris Ames' own admission, he

did nothing effective to stop Scott Hanson from sleeping with David Ames.

> Q.   But he did continue to sleep in your house, didn't he?
>
> A.   I believe so, yes.
>
> Q.   Did you pick up the phone and call the ward bishop to tell
>       him that David was uncomfortable with the way Scott was
>       sleeping in the same bed with him?
>
> A.   No.
>
> Q.   Did you pick up the phone and call the New Jersey
>       Division of Youth and Family Services about Scott at that
>       time?
>
> A.   I didn't know the degree, no, of what was going on.
>
> Q.   The answer to my question, did you call DYFS at that
>       time?
>
> A.   No.
>
> Q.   Did you call the police?
>
> A.   No.
>
> Q.   Did you call Kami Hanson?
>
> A.   No.

(Ex. 18, C. Ames Dep., Tr. 72.)

Even worse, David Ames' parents time and again enabled Scott Hanson's sexual abuse of

their son.  For example, on multiple occasions, David Ames went into his father's room to get

away from Scott Hanson, who nevertheless followed David to Chris Ames' room, where the

three of them would sleep in the same bed.  (Ex. 17, D. Ames Dep., Tr. 120-21.)  Aware of

David's discomfort with Scott Hanson sleeping next to him, Chris Ames arranged it so that he slept in between David and Scott Hanson.  In the middle of the night, Scott Hanson would insert himself next to David.  And still David Ames' parents did not forbid Scott Hanson to see their son or at least order him not to sleep with their son.  (Ex. 18, C. Ames Dep., Tr. 74-77.)

Beginning in December 1998, Scott Hanson sexually abused David Ames "almost every time" he slept over at the Ames home.  (Ex. 17, D. Ames Dep., Tr. 115-16.)  That occurred "multiple times a month" between December 1998 and July 2000.  (*Id.* at 115.)  And those were far from the only occasions that David Ames' parents provided Scott Hanson the opportunity to sleep with, and sexually abuse, their son.  Besides the scores of times he did so in the Ames home, one or both of the Ames parents also gave permission for Scott Hanson

- to take David on numerous overnight camping trips, where Scott Hanson sexually abused David (Ex. 17, D. Ames Dep., Tr. 129-30; Ex. 18, C. Ames Dep., Tr. 87-88; Ex. 19, K. Ames Dep., Tr. 67, 86);[7]

- to have David sleep over at the Hanson home, where Scott Hanson sexually abused David (Ex. 17, D. Ames Dep., Tr. 116-17; Ex. 18, C. Ames Dep., Tr. 83; Ex. 19, K. Ames Dep., Tr. 67);

- to take David on a multi-day "business" trip to Toronto, Canada, where Scott Hanson sexually abused David (Ex. 17, D. Ames Dep., Tr. 133; Ex. 19, K. Ames Dep., Tr. 102-03); and

- to take David on a multi-day cruise to the Bahamas (without Kami or Isaac Hanson), during which Scott Hanson sexually abused David (Ex. 17, D. Ames Dep., Tr. 135-36; Ex. 19, K. Ames Dep., Tr. 106-07).

The Church was not informed of <u>any</u> of these activities.  (Ex. 18, C. Ames Dep., Tr. 72, ; Ex. 19, K. Ames Dep., Tr. 100.)

---

[7]    Chris Ames was well aware, from his own experience in the Church, that Church-sponsored camping trips always involved multiple adults and multiple boys.  (Ex. 18, C. Ames Dep., Tr. 27.)

### D.     The Events Leading to Scott Hanson's Arrest in July 2000

In January 2000, Scott and Kami Hanson separated, with Kami Hanson returning to her parents in Utah.  (Ex. 14, K. Hanson Dep., Tr. 13.)  Scott Hanson told their ward bishop, James Braby, that Kami had committed adultery.  (Ex. 20, James Braby ("J. Braby") Dep., Tr. 8.)

In March 2000, Bishop Braby spoke to Kami Hanson by telephone about her marital issues.  In that conversation, Kami Hanson told Bishop Braby for the first time that she suspected that Scott Hanson had an inappropriate relationship with David Ames.  (Ex. 14, K. Hanson Dep., Tr. 133, 136; Ex. 20, J. Braby Dep., Tr. 9-10.)  Bishop Braby promptly called the Church's Helpline (instituted in 1995) and was advised to counsel Kami Hanson to report her suspicions to the New Jersey Department of Youth and Family Services ("DYFS").  (Ex. 20, J. Braby Dep., Tr. 13-14; Ex. 21, May 10, 1995 Letter from The Presiding Bishopric, COP00000549-52, at 549.)  He did so in several telephone conversations with Kami Hanson.  (Ex. 20, J. Braby Dep., Tr. 79.)  Also, in mid-March, Bishop Braby warned Kathy Ames that Scott Hanson's relationship with her son was not healthy and that there were suspicions that he might be sexually abusing David.  (Ex. 20, J. Braby Dep., Tr. 76-77; Ex. 19, K. Ames Dep., Tr. 122-23.)  According to Kathy Ames herself, Bishop Braby even showed her Scott Hanson's 1987 misdemeanor lewdness plea bargain.  (Ex. 19, K. Ames Dep., Tr. 132.)  Notwithstanding that warning, Kathy Ames took no steps to eliminate, or even reduce, David's interaction with Scott Hanson.  To the contrary, she continued to allow them to sleep together in the Ames home and elsewhere.  (Ex. 19, K. Ames Dep., Tr. 112, 129-30.)

In early April 2000, Kami Hanson, at the urging of Bishop Braby and her own therapist in Utah, reported her suspicions about Scott Hanson and David Ames to DYFS.  (Ex. 14, K. Hanson Dep., Tr. 272-73.)  Kathy Ames was interviewed by DYFS - - but did not report any concerns or suspicions about Scott Hanson's relationship with her son.  (Ex. 19, K. Ames Dep.,

Tr. 128-29; Ex. 22, Jeff Kline ("J. Kline") Dep., Tr. 51-53.)  DYFS also interviewed David Ames

and Scott Hanson, both of whom denied that their relationship was inappropriate in any way.

(Ex. 4, S. Hanson Dep., Tr. 270; Ex. 17, D. Ames Dep., Tr. 156; Ex. 22, J. Kline Dep., Tr. 85.)

On or about June 13, 2000, DYFS closed its investigation without making any findings of

inappropriate conduct.  (Ex. 22, J. Kline Dep., Tr. 115.)  Bishop Braby strongly urged Kami

Hanson not to let the matter drop.  As Kami Hanson testified, Bishop Braby went after Scott

Hanson "with a vengeance", "it was just like a mission for him," and he had "the best interests of

David [Ames] at heart".  (Ex. 14, K. Hanson Dep., Tr. 136, 286.)

Kami Hanson then convinced Chris Ames, who had separated from his wife in May 2000

and was living apart, to confront David.  (Ex. 14, K. Hanson Dep., Tr. 278-79.)  On or about July

18, 2000, David Ames told his father that he had been repeatedly sexually abused by Scott

Hanson.  On July 19, 2000, Chris, Kathy and David Ames reported Scott Hanson to the police.

(Ex. 18, C. Ames Dep., Tr. 107-09.)  Within days, Scott Hanson was arrested.  (Ex. 4, S. Hanson

Dep., Tr. 281.)

The last time Scott Hanson sexually molested David Ames was the weekend before the

Ames family went to the police.  Kathy Ames, David and his sister Christine helped Scott

Hanson move to a new apartment in New Brunswick, New Jersey.  They then stayed overnight in

that apartment and slept on the living room floor, with Kathy and Christine Ames on one side of

the room and David Ames and Scott Hanson sleeping together on the other side.  According to

David, Scott Hanson groped him repeatedly during that night.  (Ex. 17, D. Ames Dep., Tr. 159-

60.)

In 2001, Scott Hanson pled guilty to multiple counts of sexually abusing David Ames.

He was sentenced to 30 years in prison.  (Ex. 4, S. Hanson Dep., Tr. 322; Ex. 23, Amended

Judgment of Conviction of William S. Hanson, NJWCP00000603-610.)  He is presently

incarcerated in the Adult Diagnostic and Treatment Center at Avenel, New Jersey.  (Ex. 4, S.

Hanson Dep., Tr. 4.)

## ARGUMENT

## I.   THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where, as here, "there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The party requesting summary

judgment bears the burden of proving that no genuine issue of material fact exists.  *See*

*Matsushita Elec. Indus. Co., Ltd.  v. Zenith Radio Corp*., 475 U.S. 574, 586 n.10 (1986).  Once

the movant has carried its burden of establishing the absence of a genuine issue of material fact,

"its opponent must do more than simply show that there is some metaphysical doubt as to

material facts."  *Id*. at 586.  The party opposing summary judgment "must come forward with

'specific facts showing that there is a *genuine issue for trial*.'"  *Id*. at 587 (emphasis in original,

quoting Fed. R. Civ. P. 56(3)).  The mere existence of some evidence in support of the non-

moving party, however, will not be sufficient for denial of a motion for summary judgment;

there must be enough evidence to enable a finder of fact reasonably to find for the non-moving

party on that issue.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Here, the Church is entitled to summary judgment as a matter of law dismissing

Plaintiff's Complaint with prejudice because any alleged negligence by the Church in not

banning Scott Hanson from youth related activities or not advising parents like the Ames of Scott

Hanson's 1987 Utah misdemeanor lewdness guilty plea was not the proximate cause of Scott

Hanson's abuse to David Ames.  Any alleged negligence on the part of the Church was long

since superceded by the inexplicable neglect of Chris and Kathy Ames, who, by their own

admission repeatedly enabled Scott Hanson's abuse of their son, granting him permission to sleep with David in their home, in the Hanson home, on camping overnights and on trips to foreign countries.

In the alternative, if the Court decides not to dismiss Plaintiff's Complaint in its entirety, then the Court should dismiss Plaintiff's claims for punitive damages.  There is no evidence of any sort of maliciousness or willful and wanton disregard here.  At best, Plaintiff is alleging negligence in the conduct of Bishop Robert Hansen's investigation and decision not to discipline Scott Hanson in 1986-87.  But negligence is not, as a matter of law, a sufficient basis for punitive damages.

## II.      THE CHURCH'S ALLEGED FAILURE TO WARN WAS NOT THE PROXIMATE CAUSE OF THE SEXUAL ABUSE BY SCOTT HANSON, BECAUSE NEGLECT BY PLAINTIFF'S PARENTS WAS A SUPERCEDING AND INTERVENING CAUSE

New Jersey law has long recognized that proximate cause "must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability."  *Caputzal v. The Lindsay Co*., 48 N.J. 69, 78 (1966) (internal quotations omitted).  As the New Jersey Supreme Court has held, proximate cause is a standard for limiting liability for the consequences of an act or omission based "upon mixed considerations of logic, common sense, justice, policy and precedent."  *Scafidi v. Seiler*, 119 N.J. 93, 101 (1990) (internal quotations omitted).

Said another way, to be fairly characterized as a proximate cause of the injury suffered by the plaintiff, the defendant's act or omission must be a "cause which in the natural and continuous sequence, *unbroken by an efficient intervening cause*, produces the result complained of and without which the result would not have occurred."  *Daniel v. State, Dep't of Trans.*, 239

18

N.J. Super. 563, 595 (App. Div. 1990), *aff'd*, 79 N.J. 547 (1979) (emphasis added, internal quotations omitted).

Ordinarily, the issue of proximate causation is reserved for the jury's determination.  *E.g., Yun v. Ford Motor Co.*, 143 N.J. 162 (1996); *but see id*., 143 N.J. at 163-68 (dissent by Justice Garibaldi).  In certain cases, however, the intervening tortious acts by third parties are so extraordinary and the chain of causation is so attenuated as the result of those superseding acts by third parties that the Court should find as a matter of policy and law that proximate causation is lacking.  *E.g., Caputzal, supra*, 48 N.J. at 78-79.  As the New Jersey Appellate Division has recognized, "legal responsibility for the consequences of an act cannot be imposed without limit."  *Jensen v. Schooley's Mountain Inn, Inc.*, 216 N.J. Super. 79, 82 (App. Div. 1987), *certif. denied*, 108 N.J. 181 (1987).  This is just such a case.

The Seventh Circuit's decision in *Peck v. Ford Motor Co.*, 603 F.2d 1240 (7th Cir. 1979), is instructive.  There, the Court drew a distinction between a tortious act which causes immediate harm and one in which the duty to prevent further harm has passed to other actors because the initial tortious act had "spent its force."  *Id*. at 1244-45 (footnote omitted).  Where the initial tort had exhausted its effect, and other parties could and should have prevented the harm, the Seventh Circuit held that the original tortfeasor cannot fairly be held responsible for the injury.

Similarly, in *Sacci v. Metaxas*, 355 N.J. Super. 499 (App. Div. 2002), the defendant's husband shot and killed the plaintiff's husband, and then killed himself, in the mistaken belief that the plaintiff's husband was having an affair with the defendant.  Plaintiff then sued, alleging that defendant should have warned plaintiff and her husband of the shooter's violent tendencies, and should not have bought him alcohol knowing he drank to excess.  The Appellate Division affirmed summary judgment in defendant's favor, holding that her purchase of alcohol was not a

proximate cause of the shooting and that the plaintiff's own knowledge of the defendant's husband's jealousy and attempts to get in touch with the decedent, was a "significant factor" mitigating against any finding of proximate cause. *Id.* at 516.

Likewise, in *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472 (Tex. 1995), the plaintiffs sued the Boys Club alleging that they were sexually abused by a Boys Club volunteer. Although the victims met the abuser through the Boys Club, the abuse occurred on non-Boys Club camping and fishing trips and in the victims' home. The Texas Supreme Court affirmed summary judgment in favor of the Boys Club, holding that "the causal connection was broken" between the Boys Club's alleged representation that it thoroughly investigated its volunteers and the abuse. *Id.* at 481. As the Texas Supreme Court explained, the personal relationship the abuser established with the victims' grandparents and their decision to allow the abuser to spend so much time with the victims were the "producing cause" of the boys' injuries. *Id.* at 479, 481.

So, too, here, even if one assumes for the sake of argument that the Church was negligent following Scott Hanson's guilty plea in 1987 to misdemeanor lewdness in not banning him from any youth-related activities or not warning parents such as Mr. and Mrs. Ames that Scott Hanson was a risk to their sons, that alleged negligence "spent its force" by September 1998.

The most that Plaintiff can say is that the Church facilitated the introduction of Scott Hanson to his family. But, just as in the *Boys Club* case, the actual cause of Scott Hanson's abuse of David Ames (aside from Scott Hanson's wrongdoing) was the personal relationship he developed with the Ames family outside of the Church and Chris and Kathy Ames' failure to heed the alarm bells going off in their own home. Moreover, as in the *Sacci* decision, the knowledge of the Ames parents of Scott Hanson's entirely inappropriate conduct with their son forestalls, as a matter of law, any notion that a failure to warn on the Church's part caused the

abuse here.  When Chris and Kathy Ames observed Scott Hanson, a 36 year old man, sleeping in

the same bed with their 12 year old son in a "spooning" position, they had direct evidence that

something wrong was happening and that they should act to protect their son.  When David

Ames went to his father in September 1998 and told him that David was "uncomfortable" with

the way in which Scott Hanson was sleeping with him and touching him, Chris Ames had

information far more specific and compelling than anything the Church could have told him

about Scott Hanson's 1987 misdemeanor plea bargain.  And yet Chris and Kathy Ames did

nothing to protect their son from Scott Hanson.  To the contrary, they provided opportunity after

opportunity for Scott to abuse their son sexually.  Chris Ames even allowed Scott Hanson to

sleep with David *and* Chris Ames in the same bed and observed Scott Hanson maneuvering so

that he could be next to David.  Kathy Ames gave permission for Scott Hanson to sleep in the

same bed with David on scores of occasions in the Ames home, where he was sexually abused.

She also gave permission for her son to sleep at the Hanson home, where he was sexually

abused; for her son to go camping with Scott Hanson, where he was sexually abused; and for her

son to go on trips to Toronto and the Bahamas with Scott Hanson, where David was sexually

abused.  Even more remarkably, *after* Bishop Braby warned her of suspicions that Scott Hanson

was abusing her son, <u>after</u> he showed her Scot t Hanson's 1987 misdemeanor plea bargain, and

*after* DYFS had commenced an investigation of Scott Hanson's relationship with David Ames,

Kathy Ames allowed Scott Hanson to sleep with David in Scott Hanson's apartment, where Scott

Hanson sexually abused David yet again - - while Kathy Ames was sleeping in the same room.

Simply put, if Chris and Kathy Ames had not so totally failed in their duties as David's

parents to protect him from Scott Hanson, he would not have been victimized.  No jury could

reasonably find that the Church should have foreseen that parents knowing what Chris and Kathy

Ames knew would be so neglectful as to provide opportunity after opportunity for Scott Hanson to sexually abuse their son.

This is not a case where the child-victim was sexually abused in secret.  Nor is this a case where the abuse occurred in circumstances unbeknownst to the parents.  Here, the inappropriate physical relationship between Scott Hanson and David Ames was open and notorious; it occurred right in front of Chris and Kathy Ames in their own home, among other places.  There could be no satisfactory explanation as to why a 36 year old man, whose own home was only minutes away, would sleep time and again with a 12 year old boy in a "spooning" position.

In short, the inexcusable neglect of Chris and Kathy Ames was an intervening and superseding cause here that broke any possible chain of causation between the alleged negligence of the Church and the sexual abuse of David Ames by Scott Hanson.  *See, e.g., Meyer v. Bd. of Educ., Middletown Tp.*, 9 N.J. 46, 54 (1952); *Morril v. Morril*, 104 N.J.L. 557, 563 (1928); *Lynch v. Schaleninger*, 162 N.J. 209, 226 (2000).  Nothing the Church could have done or said would have convinced the Ames' parents to put a stop to Scott Hanson's glaringly inappropriate conduct with their son.  We know that because they saw that conduct, over and over again; they knew from David himself that he was "uncomfortable" with Scott touching him; and yet they encouraged Scott Hanson's obviously improper relationship with David for nearly two years.  Kathy Ames permitted and encouraged that relationship even after Bishop Braby and DYFS put her on notice that Scott Hanson might be abusing her son, David - - and that he had pled guilty to misdemeanor lewdness in Utah in 1987.  And yet she did nothing to put a stop to Scott Hanson sleeping with her son.  For Chris and Kathy to point the finger of blame at the Church rather than themselves is just wrong.  No reasonable juror could find otherwise. Accordingly, this Court should grant summary judgment and dismiss the Complaint.

III.   **IN THE ALTERNATIVE, PLAINTIFF'S DEMAND FOR PUNITIVE DAMAGES SHOULD BE STRICKEN**

A.   **The Legal Standard for Punitive Damages Under New Jersey Law**

New Jersey's Punitive Damages Act, N.J.S.A. §2A:15-5.12, provides that, to justify an award of punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant was guilty of actual malice or a wanton and willful disregard of the foreseeable harm that likely would be caused by the defendant's wrongful acts or omissions.  In pertinent part, the Act states:

> Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.  This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

N.J.S.A. §2A:15-5.12(a).  In determining whether punitive damages are to be awarded, the Act instructs that the trier of fact should consider the following factors:  "(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct; (2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct; (3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and (4) The duration of the conduct or any concealment of it by the defendant."  *Id.* at (b).

N.J.S.A. §2A:15-5.10 defines "actual malice" as "an intentional wrongdoing in the sense of an evil-minded act."  That same statutory sub-section further defines "wanton and willful disregard" as "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission."  *Id.*

As the Third Circuit has explained, to prove "wanton and willful misconduct",

23

> [i]t must appear that the defendant with knowledge of existing
> conditions, and conscious from such knowledge that injury will
> likely or probably result from his conduct, and with reckless
> indifference to the consequences, consciously and intentionally
> does some wrongful act or omits to discharge some duty which
> produces the injurious result.

*Kane v. U-Haul Int'l, Inc.*, 218 Fed. Appx. 163, 167 (3d Cir. 2007) (citing *McLaughlin v. Rova Farms, Inc.*, 56 N.J. 288, 305 (1970)).

The Punitive Damages Act itself specifies that "proof of any degree of negligence including gross negligence" is not enough to justify an award of punitive damages.  N.J.S.A. §2A:15-5.12(a).

Even before the passage of The Punitive Damages Act, the New Jersey Supreme Court had made clear that mere negligence, or even gross negligence, is not enough under New Jersey law to warrant punitive damages.  As the Supreme Court held in *Nappe v. Anschelewitz, Barr, Ansell & Bonello*:

> Something more than the mere commission of a tort is always
> required for punitive damages.  There must be circumstances of
> aggravation or outrage, such as spite or 'malice,' or a fraudulent or
> evil motive on the part of the defendant, or such a conscious and
> deliberate disregard of the interests of others that his conduct may
> be called wilful or wanton.  Lacking this element, mere negligence,
> however 'gross', is generally held not to be enough.

97 N.J. 37, 50 (1984) (citing *DiGiovanni v. Pessel*, 55 N.J. 188, 190 (1970) (quoting *W. Prosser, Handbook on the Law of Torts* §2, at 9-10 (2d ed. 1955)); *Pavlova v. Mint Mgmt. Corp.*, 375 N.J. Super. 397, 407-08 (App. Div. 2005) (reversing lower court and granting partial summary judgment to defendants on punitive damages claim because "absent here is the blatantly egregious, deliberate conduct that was practically certain to cause both imminent and serious harm" despite the fact that defendants' conduct "may arguably amount to negligence, or even gross negligence").

**B.** **The Undisputed Facts Here Preclude, As a Matter of Law, Any Award of Punitive Damages**

This is not a case where the pedophile abused children in secret during the course of his employment, the employer learned of the abuse and the employer transferred the pedophile to a new position where he abused other children. *Contrast Doe v. Holy See*, 434 F. Supp. 2d 925 (D. Or. 2006) (priest admitted to sexually molesting a minor while assigned to an Archdiocese in Ireland; he was then transferred to the private counseling office of an all boys high school in Chicago, where he abused three more boys).

Here, Scott Hanson was never an employee of the Church.  He never was a Church clergy member.  There is no allegation, much less evidence, that he sexually abused anyone on Church property or in connection with a Church function.  Although he may have initially met David Ames in connection with David's participation in the Blazers as an 11 year old, he never sexually abused David at a Blazer activity.  Likewise, although Scott Hanson may have been assigned for a time as the Ames' home teacher, David and Chris Ames have both conceded that they knew Scott Hanson was not acting in his home teacher role when he slept with David Ames at the Ames home and elsewhere.  (Ex. 17, D. Ames Dep., Tr. 103-04; Ex. 18, C. Ames Dep., Tr. 131-32.)  Indeed, when David Ames was interviewed by the police in July 2000, he repeatedly described Scott Hanson as a "family friend" and never as a home teacher.  (Ex. 17, D. Ames Dep., Tr. 103-04.)

Nor is there any evidence that any Church leader knew that Scott Hanson was sexually abusing David Ames prior to July 2000 or that any Church leader even suspected such wrongdoing until Kami Hanson reported her suspicions to Bishop James Braby.  Once he learned of those suspicions, Bishop Braby always acted, in Kami Hanson's words, "in the best interests of David [Ames]."  (Ex. 14, K. Hanson Dep., Tr. 286.)

25

Moreover, Scott Hanson's arrest in 1986 and the felony sex abuse charges that were brought against him in Utah County were public events that were reported in the media.  (Ex. 7, J. Britsch Dep., Tr. 34; Ex. 9, R. Hansen Dep., Tr. 77-78.)  Bishop Robert Hansen did not make any attempt to cover up those charges: he could not have done so because the police and prosecutor's office were involved before he even learned of the charges.  (Ex. 9, R. Hansen Dep., Tr. 8-9.)

Indeed, the evidence is undisputed that Bishop Hansen took those charges very seriously, immediately disqualifying Scott Hanson from any youth-related calling and commencing his own investigation, without any prejudgment of the merits of those charges.  (Ex. 9, R. Hansen Dep., Tr. 24, 26-27.)  He interviewed 15-25 boys in his ward who had interacted with Scott Hanson in scouting or otherwise.  None of them reported any inappropriate conduct by Scott Hanson.  (*Id.* at 107-08.)  He spoke to the bishop for the ward in which the principal accuser lived, who told him that that boy had suspect credibility.  (*Id.* at 29, 41, 113-114.)  He interviewed Scott Hanson on multiple occasions and Scott Hanson consistently denied any wrong doing.  (*Id.* at 12-13.)

In addition, he monitored the developments in the criminal proceedings.  He spoke on multiple occasions to Scott Hanson's criminal lawyer, Robert Moody.  (*Id.* at 63.)  He learned that Scott Hanson had been examined by two mental health professionals who had administered, among other tests, a plethysmograph exam and concluded that Scott Hanson did not evidence any tendencies towards pedophilia.  (*Id.* at 123-25.)

Bishop Hanson also learned that the Utah County Prosecutor ultimately agreed to a plea bargain pursuant to which the two felony sex abuse charges were dropped and Scott Hanson pled guilty only to a misdemeanor lewdness charge.  (*Id.* at 136.)  And he further learned that Scott

Hanson was sentenced to only 18 months probation.  (*Id.* at 163.)  Based on those facts, Bishop Hansen concluded that, in his judgment, Scott Hanson was not guilty of child sex abuse and no Church discipline was necessary or appropriate.  (*Id.* at 196.)

There is not a shred of evidence that Bishop Hansen acted with "actual malice", defined as "intentional wrongdoing in the sense of an evil-minded act".  To the contrary, no matter what criticisms Plaintiff's counsel may make now of his investigation, there can be no dispute that Bishop Hansen tried to come to a reasoned judgment about Scott Hanson's guilt or innocence.

Likewise, it cannot credibly be argued that Bishop Hansen acted with willful and wanton disregard of a "likelihood" that Scott Hanson would sexually abuse one or more boys in the future.  *See Kane v. U-Haul Int'l, Inc.*, 218 Fed. Appx. at 167.  Notably, the Utah Judgment and Order of Probation did not require Scott Hanson to register as a sex offender.  (Ex. 13, Judgment and Order of Probation, UTAHUC00000138-140.)  If the Utah criminal authorities believed that Scott Hanson was a likely or probable risk to sexually abuse children in the future, they most certainly would have required him to register.[8]  That they did not is powerful corroboration for Bishop Hansen's decision not to notify any subsequent bishops that Scott Hanson was a risk to children.  At a minimum, the criminal authorities' decision not to require Scott Hanson to register precludes any finding that Bishop Hansen acted with willful and wanton disregard.

Indeed, it is only with 20/20 hindsight, knowing that Scott Hanson sexually abused David Ames 11 years later, that Plaintiff's counsel can even accuse Bishop Hansen of negligence in his 1986-87 investigation.  In truth, there is no admissible evidence that Scott Hanson sexually abused anyone in 1986-87.  Plaintiff's counsel did not depose either of the two boys who were the subjects of the two Utah felony charges.  At his deposition, Scott Hanson categorically

---

[8]     Though the information was available only for official law enforcement purposes, Utah did have a sex offender registry in 1987.  (Ex. 24, Utah Code Ann. § 77-27-21.5 (1987)).

denied abusing anyone in 1986-87; accordingly, there is no direct evidence as to whether those two boys were in fact sexually abused by Scott Hanson.  (Ex. 4, S. Hanson Dep., Tr. 101.)

Plaintiff's counsel did depose two other youths (now adults) named in the 1986 Utah police Incident Report as alleged sex abuse victims of Scott Hanson.  As an initial matter, those alleged victims were not the subjects of any criminal charges against Scott Hanson in 1986-87.  More to the point, when those two alleged victims were deposed in this case, they both denied that Scott Hanson sexually molested them.

Thus, the first alleged victim testified that Scott Hanson gave him back massages approximately 5 times but never touched his genital area or did anything that he regarded as being sexual in any way:

> Q   Just to clarify something, in the approximately five times
>     that Scott Hanson gave you a massage, was he fully clothed
>     at each of those times?
>
> A   Yes.
>
> Q   And were you clothed at least to the point of having your
>     shorts on -- I'm sorry – your underwear on?
>
> A   Yes.
>
> Q   And I believe you testified earlier that on none of those
>     occasions did he touch you at all in your genital area; is that
>     correct?
>
> A   That's correct.
>
> Q   Did he do anything to you that, at the time of the massages,
>     you reacted to as being sexual in any way?
>
> A   No.

(Ex. 25, Martin R. Davis ("M. Davis") Dep., Tr. 49-50.)

Similarly, the second alleged victim testified that he received two back massages from Scott Hanson.  The first time, there was no touching of the genital area; the second time, Scott

Hanson momentarily touched the genital area with the inside of his wrist (not his fingers).  At the time, the alleged victim regarded that as "inadvertent and not sexual in nature."  (Ex. 26, Ryan Boley ("R. Boley") Dep., Tr. 71-76.)[9]

In sum, the most that Plaintiff can argue here is that Bishop Hansen's 1986-87 investigation should have been, in Plaintiff's counsel's hindsight view, done differently or better and he should have asked Scott Hanson's subsequent bishop to contact him so that he could warn that bishop not to call Scott Hanson to any youth-related position.  Those arguments are meritless but, for present purposes, the key is that they amount at most to a claim of negligence.  There is no evidence of actual malice or willful and wanton disregard here.  And negligence, even gross negligence, is not, as a matter of law, enough to warrant an award of punitive damages.  *See, e.g., Parks v. Pep Boys*, 282 N.J. Super. 1, 25-26 (App. Div. 1995) (holding that, in an action alleging that defendants negligently sold Freon to a minor which was then inhaled by the minor's friend who died as a result, defendant's conduct could only "rise to the level of negligence or even 'gross' negligence," which is not a "*prima facie* basis for [an] award of punitive damages.").

---

[9]      Presumably, Plaintiff's counsel are relying on the 1986 Police Incident Report as evidence that Scott Hanson sexually abused as many as five boys in 1986 and purportedly confessed to that abuse.  Plaintiff's counsel may also be relying on retired Detective Wilkins' deposition in this case, where he reiterated the contents of his 1986 Report.  That reliance is misplaced.  *First*, the purported statements by alleged victims and by Scott Hanson in that Report or repeated by Wilkins at his deposition are "classic hearsay within hearsay."  *United States v. DePeri*, 778 F.2d 963, 976-77 (3d Cir. 1985), *cert. denied*, 475 U.S. 1110 (1986).  Even if the Report itself was admissible under the public records exception, Fed. R. Evid. 803(8)(B), the included hearsay statements by the alleged victims and/or Scott Hanson would need to fall within another recognized exception to the hearsay rule - - and they do not.  *Id.*; *see also United States v. Sallins*, 993 F.2d 344, 347-49 (3d Cir. 1993).

And *second*, the Report and Wilkins testimony lack sufficient indicia of trustworthiness.  The two alleged victims who were deposed in this case both contradicted key elements of the Report.  (Ex. 25, M. Davis Dep., Tr. 54-55, 59; Ex. 26, R. Boley Dep., Tr. 69, 75.)  Moreover, the Utah court in 1987 excluded any evidence of Scott Hanson's alleged confession on *Miranda* grounds.  (Ex. 27, Ruling, UTAHUC00000061-68.)

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant summary judgment dismissing Plaintiff's Complaint in its entirety with prejudice.  In the alternative, the Court should grant summary judgment striking Plaintiff's claim for punitive damages.


Dated:  March 24, 2008                    Respectfully submitted,

                                          LATHAM & WATKINS LLP


                                          By:  ___/s/ Alan E. Kraus_____
                                               Alan E. Kraus
                                               Attorneys for Defendant Corporation of the
                                               President of The Church of Jesus Christ of
                                               Latter-day Saints