1        MR. BENEDICT:  Other than the continuation

2   of medication that was originally prescribed for him.

3        THE COURT:  So, you continue to receive

4   medication for those conditions?

5        THE DEFENDANT:  Yes, Your Honor.

6        THE COURT:  What you're stating, you haven't

7   seen a psychiatrist in Wisconsin?

8        THE DEFENDANT:  I did see a psychiatrist to

9   renew the medications, but not for treatment.

10       THE COURT:  What medications are you taking?

11       THE DEFENDANT:  Currently, Celexa, I think

12   there's a generic type of Celexa, I'm receiving here,

13   and also Seroquel.

14       THE COURT:  Each those medications are

15   prescribed by a physician?

16       THE DEFENDANT:  Yes, Your Honor.

17       THE COURT:  You take them as prescribed?

18       THE DEFENDANT:  Yes, Your Honor.

19       THE COURT:  Other than those medications,

20   have you had any other types of medicine, alcohol or

21   drugs within the last 24 hours?

22       THE DEFENDANT:  No, Your Honor.

23       THE COURT:  Now, do you have a copy of your

24   plea questionnaire in front of you?

25       MR. BENEDICT:  He does now.

                        20

1    THE COURT:  You now have a blank copy of it

2    in front of you, is that correct?

3    THE DEFENDANT:  Yes, Your Honor.

4    THE COURT:  Look at the center section

5    titled *Constitutional Rights*.  Did you read that

6    section very carefully before court this morning?

7    THE DEFENDANT:  Yes, Your Honor.

8    THE COURT:  And you understand that that

9    section is a listing of the Constitutional Rights that

10    you have, but give up when you plead guilty to the

11    three criminal offenses you propose to plead guilty

12    to?

13    THE DEFENDANT:  Yes, Your Honor.

14    THE COURT:  Have you had sufficient time to

15    meet with your attorney, Mr. Benedict, and review with

16    him the rights that you give up, the elements of the

17    offense that we talked about a few minutes ago, what a

18    read-in offense is and what a consecutive sentence is?

19    THE DEFENDANT:  Yes, Your Honor.

20    THE COURT:  Are you satisfied with his

21    representation?

22    THE DEFENDANT:  Yes, Your Honor, I am.

23    THE COURT:  Do you know further if you're

24    not a citizen of the United States, your plea could

25    result in deportation, exclusion of admission to this

21

WISCRIM00000129

1          country or the denial of naturalization under Federal

2          law?

3                    THE DEFENDANT:  Yes, Your Honor.

4                    THE COURT:  Mr. Benedict, are you satisfied

5          based on your contacts with Mr. Hanson that his guilty

6          plea to each of the three counts is a knowing,

7          voluntary and intelligent plea?

8                    MR. BENEDICT:  Yes.

9                    THE COURT:  In your meetings with Mr.

10         Hanson, have you had sufficient time to explain to him

11         the rights that he gives up, the elements of the

12         offense, what a read-in offense is and what a

13         consecutive sentence is?

14                   THE DEFENDANT:  Yes.

15                   THE COURT:  Mr. Hanson, I'll ask what your

16         plea is to count 2 of the amended information that

17         states that in the Spring of 1997 at Ottawa Lake State

18         Park in the Town of Eagle, Waukesha County, Wisconsin

19         that did you have sexual contact with Brian H. date of

20         birth, December 27, 1983 who has not attained the age

21         of 16, contrary to Wisconsin law?

22                   THE DEFENDANT:  Guilty, Your Honor.

23                   THE COURT:  What is your plea to the offense

24         charged in count 3 of the amended information that

25         states on a separate and distinct occasion from count

                                  22

WISCRIM00000130

1        2, in late spring, 1997 at Ottawa Lake State Park in

2        the Town of Eagle, Waukesha County, Wisconsin, you did

3        have sexual contact with Brian Hanson, date of birth

4        December 27, 1983, who has not attained the age of 16,

5        contrary to Wisconsin law?

6                    THE DEFENDANT:  Guilty, Your Honor.

7                    THE COURT:  Then, as to count 4, what is

8        your plea to that charge that states during the month

9        of October, 1998 at Ottawa Lake State Park in the Town

10       of Eagle, Waukesha County, Wisconsin that did you have

11       sexual contact with Brian Hanson, date of birth,

12       December 27, 1983 who has not attained the age of 16

13       years?

14                   THE DEFENDANT:  Guilty, Your Honor.

15                   THE COURT:  I'll accept your guilty plea on

16       each of those three counts.  On each of the counts I

17       will find you are guilty of the charges set forth

18       therein.

19                   I will further find that based upon your

20       educational background, Bachelor's Degree, Master's

21       Degree, your employment history that you talked about,

22       the answers you've given to my questions today and the

23       statements by Mr. Benedict as to his contacts with

24       you, that your guilty plea to each of these counts is

25       in fact a knowing, voluntary and intelligent plea.

                              23

1           I'll enter a judgment of conviction to each

2      of those three counts.  The court will dismiss count 1

3      and use that count as a read-in at the time of

4      sentencing.  We will then set the matter for

5      sentencing.  I will order a presentence report.  I

6      will order that that be prepared within 45 days of

7      today's date.  I'm taking into account the holidays

8      and setting a longer date for delivery of the

9      presentence report.  Then I'll order that the

10     sentencing hearing then take place within 60 days of

11     today's date.

12           THE COURT:  I will revoke Mr. Hanson's bail

13     pending that hearing.  There should be bail in this

14     case.

15           THE CLERK:  Monday, March 15th in the p.m.

16           THE COURT:  Is that the closest date we

17     have?  That's almost 90 days from today's date.  More

18     at the end of February?

19           THE CLERK:  Friday, February 27th.

20           MR. BENEDICT:  Probably not here that day.

21     I'm marked out.

22           THE CLERK:  Monday, the 23rd in the

23     afternoon.

24           MR. BENEDICT:  Sure.  1:30, perhaps.

25           THE COURT:  As I indicated, I will revoke

24

1        the defendant's bail.  I will remand him to the

2        custody of the sheriff.  Now, will he be held here

3        until that sentencing date?

4                MR. BENEDICT:  Well, he's -- he was produced

5        under the inter-state agreement under a detainer.

6        It's my understanding he's to remain here until the

7        case is disposed of so that the detainer -- well, our

8        hold on him should remain.  Then I'll, to insure that,

9        I will order that he remain in the county jail until

10       the next hearing, which is February 23, 2004.

11               MR. SZCZUPAKIEWICZ:  Thank you.

12               THE COURT:  Anything further, Mr. Benedict?

13               MR. BENEDICT:  No.  Thank you.

14               THE COURT:  Anything from the state?

15               MR. SZCZUPAKIEWICZ:  No.

16               THE COURT:  All right.  Thank you.

17               (End of proceedings.)

18

19

20

21

22

23

24

25

                              25

1      STATE OF WISCONSIN    )

2      ss.                   )

3      COUNTY OF WAUKESHA )

4

5              I, Kathryn Fus, Official Court Reporter,

6      hereby certify that I reported in Stenographic

7      shorthand the proceedings had before the Court on this

8      17th day of December 2003, and that the foregoing

9      transcript is a true and correct copy of the said

10     Stenographic notes thereof.

11             Dated this _30th_ day of _June_, 2004.

12

13

14             ___Kathryn Fus___

15             KATHRYN FUS
               Official Court Reporter

16

17

18

19

20

21

22

23

24

25

26

WISCRIM00000134

# EXHIBIT 17

```
      0001
1          UNITED STATES DISTRICT COURT
           DISTRICT OF NEW JERSEY
2          Civil Action No. 06-CV-3441(WJM)(RJH)
           --------------------------------------x
3          DAVID V. AMES,
4                       Plaintiff
5                       -against-
6          CORPORATION OF THE PRESIDENT OF
           THE CHURCH OF JESUS CHRIST OF
7          LATTER-DAY SAINTS, a Utah
           corporation sole, a/k/a the
8          "MORMON CHURCH," and SCOTT
           HANSON, individually,
9
                        Defendants.
10         --------------------------------------x
11
12             VIDEOTAPE DEPOSITION of DAVID V. AMES,
13         taken by the Defendants at the offices of Latham &
14         Watkins, LLP, One Newark Center, Newark, New
15         Jersey  07101, on Tuesday, March 4, 2008, at 10:10
16         o'clock a.m., before Catherine M. Donahue, a Certified
17         Court Reporter and Notary Public within and for
18         the State of New Jersey.
19
20                  ROSENBERG & ASSOCIATES, INC.
21             Certified Court Reporters & Videographers
22                 425 Eagle Rock Avenue - Suite 201
23                  Roseland, New Jersey  07068
24                       (973)  228-9100
25                  www.rosenbergandassociates.com
```

1

1          A.   Met at the church house a few times.

2     I do remember -- I'm sorry, I don't like to use

3     the name Scott.  I prefer William.  We met at

4     Scott's house a few times.

5          Q.   Did the whole Blazer group meet at

6     his house?

7          A.   Yes.

8          Q.   And by "Scott," you mean William

9     Scott Hanson?

10         A.   Yes.

11         Q.   When you knew him, did he call

12    himself William or Scott or something?

13         A.   Scott.

14         Q.   Scott?

15         A.   Scott.

16         Q.   How did you first meet Scott Hanson?

17         A.   He showed up on my doorstep and

18    picked me up for Scouts.

19         Q.   Do you know if he knew your parents

20    before that?

21         A.   I don't know.

22         Q.   You don't know if he had met your

23    parents before that?

24         A.   I'm not sure if they met before or

25    not.

3/4/2008  Ames, David V. - Vol. I

1          Q.   To the best of your recollection,

2     the very first time you ever met him was in

3     connection with him taking you to a Blazers

4     meeting?

5          A.   Yes.

6          Q.   When you got to that particular

7     Blazer meeting, were there multiple kids there?

8          A.   Yes.

9          Q.   Multiple adults?

10         A.   I believe so.

11         Q.   Do you recall approximately how many

12    adults?

13         A.   I don't.  I do remember there were

14    several adults, but there were several

15    activities going on in the church at the same

16    time, so --

17         Q.   Do you have an understanding as to

18    whether Scott had some kind of Scout Master role

19    in the Blazer program?

20         A.   As far as I am aware of, he did.

21         Q.   Do you know what his title was?

22         A.   Blazer leader, I believe it was

23    called.

24         Q.   Was there another Blazer leader in

25    addition to him?

1          A.   I don't know.  I don't remember.

2          Q.   Were there fathers who attended

3     these Blazer meetings, fathers of boys who were

4     participating?

5          A.   I believe they did sometimes, yes.

6          Q.   Do you know how long Scott Hanson

7     served as a Blazer leader?

8          A.   I don't know.

9          Q.   Was it for the entirety of the time

10    that you participated in the program?

11         A.   Possibly.

12         Q.   You're not sure?

13         A.   I don't know.

14         Q.   Did you go to each and every Blazer

15    meeting?

16         A.   I think so.  I might have missed one

17    or two here and there, but --

18         Q.   Did Scott Hanson drive you to each

19    and every meeting?

20         A.   Yes.

21         Q.   Was that in part because your own

22    father wasn't usually home from work in time to

23    drive you to the meetings?

24         A.   Yes.

25         Q.   Were the meetings in the evening?

1          A.   At some point, yes, there was.

2          Q.   Do you remember who they were?

3          A.   I believe at some point -- I know,

4    sorry, I believe there was two ladies at one

5    point, and then I know Scott was appointed at

6    one point.

7          Q.   Do you remember approximately when

8    Scott Hanson started as your family's home

9    teacher?

10         A.   I don't.

11         Q.   Do you remember who his partner was?

12              MR. KOSNOFF:  Objection.  Assumes

13          facts not in evidence.

14         A.   I thought -- I thought it was Cami.

15         Q.   Did Scott and Cami ever have

16   scheduled -- let me rephrase that.

17              Did Scott and Cami ever have home

18   visits at your house that were similar in format

19   to the home teaching visits that you had

20   experienced back in Utah?

21         A.   I don't remember.

22         Q.   Can you remember any visit that

23   Scott Hanson had at your house that started with

24   or concluded with a prayer?

25         A.   I do believe there were a few times

1    that there was a prayer that took place.

2              Q.   The vast majority -- let me rephrase

3    that.

4                   There were a number of times where

5    he slept over at your house, correct?

6              A.   Yes.

7              Q.   None of those visits started with a

8    prayer and included a spiritual message like

9    your home teaching visits back in Utah, did

10   they?

11             A.   No.

12             Q.   And by the time he was appointed as

13   your family's home teacher, your family was

14   already friendly with Scott and Cami; is that

15   fair to say?

16             A.   Yes.

17             Q.   I'm going to hand you a copy of the

18   transcript of your taped statement given to

19   Detective Sergeant Steven Spiers on July 19,

20   2000.  This was previously marked as Exhibit 2

21   to Chris Ames' deposition, your father's

22   deposition.

23                  Is that the transcript that you read

24   back in October?

25             A.   Yes.

1          Q.   Let's go back to the early period of

2     your relationship with Scott Hanson.

3               Is it correct that shortly after the

4     very first Blazer meeting that you went to with

5     Scott Hanson, that he asked you if you would be

6     interested in helping out at his house with

7     chores and the like?

8          A.   I believe so, yes.

9          Q.   How did that happen?  How was it

10    that he asked you?

11         A.   From what I remember, something

12    along the lines of, "Do you want to come help me

13    around the yard?"  We basically put an entire

14    lawn in.

15         Q.   Did you have your parents'

16    permission to go over to his house?

17         A.   I would assume so, yes.  I'm not

18    sure.

19         Q.   How far was your house from his

20    house?

21         A.   Maybe a mile, mile and a half or so.

22         Q.   Did you generally walk over there or

23    did you get there some other way?

24         A.   He usually came and picked me up.

25         Q.   Did you get paid for the work you

3/4/2008  Ames, David V. - Vol. I

1    did around his house?

2            A.   I don't know if I did or not.

3            Q.   It was a couple days after he first

4    asked you to come over around his house that he

5    first invited you to go camping, is that right?

6            A.   I believe so.

7            Q.   Do you want to take a look at

8    transcript pages 14 and 15 of your sworn

9    statement back in 2000.  That might help refresh

10   your recollection.

11           Do you want to take a look at that?

12       A.   Yes.

13           Q.   Does that refresh your recollection

14   of the chronology?

15       A.   Yes.

16           Q.   And that confirms that there was the

17   Blazer meeting a few days afterwards.  After the

18   first Blazer meeting, you're invited to do some

19   work at his house, and then a couple days after

20   that you're invited to go camping?

21       A.   Yes.

22           Q.   With Scott and his son?

23       A.   Yes.

24           Q.   That was not a Blazer camping trip,

25   right?

3/4/2008  Ames, David V. - Vol. I

1          Q.    Do you remember how you described

2     Scott Hanson to Detective Spiers, not

3     physically, but in what role in relation to you

4     you described him as?

5          A.    I believe I said something along

6     brother and father figure.

7          Q.    And friend?

8          A.    And friend.

9          Q.    If I told you that I couldn't find a

10    single place in this 88-page transcript where

11    you talked about him as being a home teacher,

12    would that surprise you?

13         A.    No.

14         Q.    If I also told you that the only

15    place that I can find where Blazers are

16    mentioned is in connection with the very first

17    time you met him and that discussion appears on

18    pages 12 and 13?

19         A.    Yes.

20         Q.    Would it be fair to say that back in

21    2000 and before, you thought of him as a family

22    friend?

23         A.    Yes.

24         Q.    And by 2000, he had long since

25    stopped being a Blazer leader for you, correct?

3/4/2008  Ames, David V. - Vol. I

1           A.    Correct.

2           Q.    And you never really thought of him

3    in the role of home teacher.  You thought of him

4    as a family friend, father figure and older

5    brother figure, right?

6           A.    For the most part, yes.

7                 MR. KRAUS:  Why don't we change

8           the tape.

9                 THE VIDEOGRAPHER:  We are going

10          off the record.  The time is 1:54.

11                 (Whereupon, at 1:54 o'clock

12          p.m., a recess was taken to 2:15

13          o'clock p.m.)

14                 THE VIDEOGRAPHER:  We are back on

15          the record.  The time is 2:15.

16   BY MR. KRAUS:

17          Q.    Is it correct, David, that the first

18   time that Scott Hanson started sleeping over at

19   your house was in September 1998?

20          A.    I couldn't say for sure.  I don't

21   recall.

22          Q.    Okay.

23                Let's see if we can help refresh

24   your recollection from your sworn statement.

25                Could you take a look at, starting

3/4/2008  Ames, David V. - Vol. I

1      at transcript page 19.  And do you see down on

2      the bottom third of the page, Detective Spiers

3      asked you:

4                "How long after you met him did you

5      start -- did he do, start this spooning thing

6      where you felt uncomfortable?  Was that before

7      your 12th birthday or after your 12th birthday?

8                You said, "Just before -- after my

9      12th birthday."

10               And if you go up to the next page,

11     you say, "In September of the year I turned 12."

12          A.   Okay.

13          Q.   Does that refresh your recollection

14     that it was September of 1998 that Scott first

15     started sleeping over your house?

16          A.   Yes.  That's what it says here.

17          Q.   That would be the year you turned 12

18     was 1998?

19          A.   Yes.

20          Q.   And when he first started sleeping

21     over your house, he was sleeping with you in

22     this so-called spooning position, correct?

23          A.   Yes.

24          Q.   In your bed?

25          A.   Wherever I was sleeping.  The

 1    sleeping arrangements were kind of everywhere.

 2          Q.   Did he ever tell you why at that

 3    time he was sleeping over at your house, even

 4    though his own house was only a mile or a mile

 5    and a half away?

 6          A.   I think it was something along the

 7    lines of him and Cami were having trouble,

 8    marriage problems, I believe.

 9          Q.   Your parents were aware that he was

10    sleeping over at your house at that time?

11          A.   I would assume so, yes.

12          Q.   And your parents saw him sleeping

13    with you in your bed in this spooning position,

14    right?

15          A.   I don't know for sure.  I never saw

16    them.  So it would be a guess, but --

17          Q.   It wasn't hidden?

18          A.   No.

19          Q.   Did your parents ever say to you --

20    let me start over again.

21               Did your father ever say to you in

22    words or substance that "Scott shouldn't be

23    sleeping in the same bed with you in this

24    spooning position or otherwise"?

25          A.   I don't think so.  I'm not sure.

3/4/2008  Ames, David V. - Vol. I

```
 1    BY MR. KRAUS:

 2              Q.   If you could read the whole page,

 3    whole two pages, I would appreciate it.  Let me

 4    know when you're finished.

 5              A.   Okay.

 6              Q.   Does that refresh your recollection

 7    that somewhere right around September 1998 you

 8    told your father that you were uncomfortable

 9    with Scott sleeping in the bed in a spoon

10    position with you?

11              A.   Yes.

12              Q.   And that was a couple months

13    later -- I'm sorry, that was several months

14    before Scott Hanson actually started touching

15    your genitals directly, correct?

16              A.   I don't remember when he first

17    started touching me, so --

18              Q.   Let me see if I can refresh your

19    recollection on that.

20                   Could you look at the next page of

21    your transcript, 22, and here I'm talking about

22    the middle of the page.  You're still talking

23    about telling your father and your mother,

24    right, and then you say:

25                   "And then a couple, probably a
```

1    couple months later, he would do that and then

2    he would start playing with my genitals."

3              And then two questions and answers

4    further down, Detective Spiers asks you:

5              "Do you recall and I don't, I don't

6    know if you can give me specific dates and I

7    don't expect that, but certainly if you can, you

8    know, you can tell me, do you recall the first

9    time that he actually touched your genitals?"

10             And you said, "December, probably

11   December of 1998."

12             Do you see that?

13        A.   Yes, I do.

14        Q.   So does that refresh your

15   recollection that you explained to your father

16   about the way Scott was sleeping with you and

17   touching you several months before he touched

18   your genital area?

19        A.   Yes.

20        Q.   So that's correct, what I just said?

21        A.   I'm sorry.

22             MR. KOSNOFF:  Listen to the

23        question.  He's asking whether your

24        recollection is refreshed, whether you

25        have a current memory, whether this

1          document refreshes your memory.  If it

2          does, yes.  If it doesn't, it doesn't.

3               MR. KRAUS:  That's not actually

4          the question I'm asking.

5   BY MR. KRAUS:

6          Q.   Is it correct that you told your

7   father that you were uncomfortable with Scott

8   sleeping in the same bed with you a couple

9   months before Scott actually touched your

10  genital area?

11         A.   Yes.

12         Q.   When you told your father that you

13  were uncomfortable with the way in which Scott

14  was sleeping in the same bed with you, that

15  conversation that occurred in September 1998,

16  did you expect your father to do something about

17  it?

18         A.   I didn't know what to expect.

19         Q.   Did you want your father to do

20  something about it?

21         A.   Probably.  That's why I told him.

22         Q.   Did you want your father to put a

23  stop to it?

24         A.   I guess, yes.

25         Q.   Did you want your father to tell

1       Scott not to sleep in the same bed with you and

2       touch you in a way that made you uncomfortable?

3              A.   Yes.

4              Q.   Did he do any of those things?

5              A.   Not that I was aware of.

6              Q.   Did you also tell your mother in or

7       around September 1998 that you were

8       uncomfortable with the way in which Scott was

9       sleeping in the same bed with you?

10             A.   I don't remember talking to her.

11             Q.   Did you tell any of your sisters?

12             A.   I don't remember.

13             Q.   Did you tell anyone that you can

14      recall besides your father?

15             A.   I don't know for sure.

16             Q.   Do you have any recollection of

17      telling anybody besides your father?

18             A.   No, I don't recall anyone.

19             Q.   After you told you father in or

20      around September 1998 that you were

21      uncomfortable in the way that Scott was sleeping

22      in the same bed with you, did Scott continue to

23      sleep in the same bed with you in your

24      household?

25             A.   Yes.

1    with you while you were sleeping?

2                   MR. KOSNOFF:  Objection.  Calls

3            for speculation.

4         A.   I'm not aware if they did.

5         Q.   Do you remember -- let me direct

6    your attention to page 60 of your transcript of

7    your taped statement.  And could you look in the

8    last three -- last two questions and answers at

9    the bottom of the page, and I'll read them for

10   the record.

11                  This is Sergeant Spiers:  "Now, as

12   far as you know, no one else saw it happen?"

13                  And then you said in answer, "But

14   there's been numerous times that my family

15   members and my sisters' friends have even seen

16   him in the spoon position with him and just

17   cuddling and stuff with me while I'm sleeping."

18                  Sergeant Spiers said, "Uh-hum" or

19   "uhm."

20                  And then you said, "They're like

21   something is not right here and you've got to do

22   something about this.  But, I mean, I told my

23   dad and stuff and they never did anything about

24   it."

25                  Does that refresh your recollection

1     that you knew that family members and even

2     friends of your sisters had observed Scott

3     sleeping in the spooning position with you?

4               MR. KOSNOFF:  Same objection.

5          Form of the question.

6          A.   Yes, I do recall.

7          Q.   And when you said, "They're like

8     something is not right here," do you remember

9     who "they" were in that answer?

10         A.   I would have no idea.

11         Q.   It was either family, friends or

12    your sisters' friends, correct?

13         A.   I --

14         Q.   It was either family members or your

15    sisters' friends, according to the transcript,

16    correct?

17         A.   Yes.

18         Q.   When you told your father in

19    September of 1998 that you were uncomfortable

20    with the way Scott was sleeping in your bed and

21    touching you, do you remember what your father

22    said in response?

23         A.   I have no idea.  I couldn't even

24    tell you where we were.

25         Q.   After you told your father that, as

1    we have already discussed, Scott continued to

2    sleep over your house on a regular basis,

3    correct?

4           A.    I wouldn't say a regular basis.

5           Q.    Several times a week?

6           A.    Some times.

7           Q.    Multiple times a month?

8           A.    That's fair.

9           Q.    And each time he slept over, he

10   slept in your bed with you, correct?

11          A.    It wasn't always the bed.

12          Q.    Each time that he slept over, he

13   slept with you?

14          A.    From what I recall, yes.

15          Q.    And once he started touching you in

16   your genital area in December 1998, he touched

17   you in a sexual way on virtually every occasion

18   that he slept over, correct?

19          A.    Something along those lines, yes.

20          Q.    Could you take a look at page 26 of

21   your taped statement.  Do you see in the middle

22   of the page, Sergeant Spiers asks you:

23               "Okay.  That was the very first

24   time.  Okay.  Referring back to December 1998,

25   how many times do you think he's done that?"

115

1            And you said:  "Almost, almost every

2    time he slept over."

3            And then Sergeant Spiers says:

4    "Almost every time he slept over?"

5            And you said, "Almost."

6            Does that refresh your recollection

7    that it was almost every time that he slept

8    over, he sexually molested you?

9        A.   Yes, that's what it says.

10       Q.   Does that refresh your recollection

11   that that statement is true?

12       A.   Yes.

13       Q.   Was it your understanding at the

14   time that when Scott slept over at your house,

15   that he did so with your parents' knowledge and

16   permission?

17       A.   I don't know for sure, because I

18   know there was a few times where I just figured

19   he was going to put me to bed and I would wake

20   up and he would be next to me.  As far as them

21   knowing, I couldn't say yes or no.

22       Q.   Is it your understanding that on

23   many occasions they knew he was sleeping over?

24       A.   Yes.

25       Q.   You also slept over from time to

1    time at Scott Hanson's house?

2            A.    Yes.

3            Q.    Following December 1998, were --

4    when you slept over at the Hanson house, did he

5    sleep in the same bed with you?

6            A.    Yes.

7            Q.    And did he sexually molest you in

8    their house?

9            A.    Yes.

10           Q.    On virtually every occasion that you

11   slept over there?

12           A.    For the most part, yes.

13           Q.    When you slept over there, did you

14   have your parents' permission to do so?

15           A.    Yes, I believe so.

16           Q.    Did your parents, either of your

17   parents ever ask you what the sleeping

18   arrangements were when you were in the Hanson

19   household?

20           A.    I don't know.  I don't know if they

21   ever asked me that.

22           Q.    Were there instances after

23   December 1998, where you, Scott and your father

24   were watching TV in the same bed in your

25   father's room?

3/4/2008  Ames, David V. - Vol. I

1        A.    No.

2                MR. KRAUS:  Why don't we go off

3         the record.

4                THE VIDEOGRAPHER:  We are going

5         off the record.  The time is 2:37.

6                (Whereupon, at 2:37 o'clock

7                p.m., a recess was taken to

8                conference with the court to 3:00

9                o'clock p.m.)

10               THE VIDEOGRAPHER:  We are back on

11        the record.  The time is 3:00 o'clock.

12  BY MR. KRAUS:

13        Q.    Shortly before the break, David, we

14  were talking about occasions where you, Scott

15  and your father slept in the same bed.

16               Do you remember that?

17        A.    Yes.

18        Q.    Could you take a look at pages 29,

19  30 and 31 of your taped statement.  Let me just

20  ask you a preliminary question.

21               Do you recall that after -- let me

22  start over.

23               Do you recall that there were

24  occasions that you got sufficiently upset at the

25  way in which Scott was sleeping with you and

3/4/2008  Ames, David V. - Vol. I

1    touching you, that you would get up and go into

2    your father's bedroom to sleep and Scott would

3    follow you into that bedroom and sleep in the

4    same bed with you and your father?

5          A.   I believe, I believe that happened,

6    yes, I believe so.

7          Q.   And on those occasions, although you

8    started out with your father in the middle and

9    Scott on one side of him and you on the other,

10   during the night, Scott would rearrange things

11   so that he was sleeping next to you and cuddling

12   with you, correct?

13         A.   Yes.

14         Q.   And your father would wake up and

15   see that, right?

16              MR. KOSNOFF:  Objection.  Calls

17        for speculation.

18         A.   I assume so.

19         Q.   Let me direct your attention to page

20   30 of the transcript of the taped statement.  If

21   you look about a third of the way up from the

22   bottom of the page, Sergeant Spiers asks you:

23   "Scott would follow you into your dad's room?"

24              And your answer was, "Yes."

25              Sergeant Spiers then asked:  "What

                                                    121

3/4/2008  Ames, David V. - Vol. I

1          A.   Yes.

2          Q.   Now, I want to go back to that

3   camping trip that you and Christian Birch and

4   Scott Hanson were on.  And you said that Scott

5   touched you inappropriately during that camping

6   trip, right?

7          A.   Yes.

8          Q.   And we have already established that

9   your recollection is that the first time that

10  Scott actually touched you in the genital area

11  inappropriately was in December of '98?

12         A.   Yes.

13         Q.   By December of 1998, you were almost

14  12-1/2?

15         A.   Yes.

16         Q.   Since Blazers are an 11-year-old

17  activity, does that refresh your recollection

18  that that camping trip with Christian Birch and

19  Scott Hanson could not have been a Blazer

20  camping trip?

21         A.   Yes, I am aware.  I do remember that

22  now.

23         Q.   So we have established that

24  beginning in December 1998, Scott slept in the

25  same bed with you and in your house and molested

1    you, Scott and Issac?

2              A.   Yes.

3              Q.   On the ones where it was just you,

4    Scott and Issac, what were the sleeping

5    arrangements?

6              A.   All three of us would either be in

7    the tent or in his truck.

8              Q.   Did Scott sexually molest you on any

9    of those trips?

10             A.   Yes, he did.

11             Q.   On the majority of them?

12             A.   Yes.

13             Q.   For these 20 to 30 camping trips

14   that you took with Scott and sometimes with

15   others, were your parents aware of each and

16   every trip before you went on it?

17                  MR. KOSNOFF:  Objection.  Calls

18            for speculation.  To the extent you

19            know.

20   BY MR. KRAUS:

21             Q.   Let me ask the question a little bit

22   differently, David, since you seem to be

23   struggling with that question.

24                  Was it your regular practice before

25   you went on a camping trip with Scott to ask

1    your parents' permission?

2            A.    It was usually my mom.

3            Q.    Okay.  My fault.  The question was

4    imprecise.

5                  Was it usually your practice before

6    you went on a camping trip to ask the permission

7    of at least one of your parents before you went?

8            A.    Yes.

9            Q.    Was it, in fact, always your

10   practice to ask at least one of your parents for

11   permission before you went on a camping trip

12   with Scott Hanson?

13           A.    It wasn't always me asking.  There

14   was a few times where Scott asked my mom, kind

15   of like a prearranged kind of thing, kind of

16   make it like a surprise for me.

17           Q.    Would it be fair to say that you

18   would not have gone on a camping trip with Scott

19   Hanson without one way or another your parents,

20   one of your parents giving you permission?

21           A.    I'm sorry, can you repeat the

22   question?

23           Q.    I'll rephrase it.

24                 Would it be fair to say that during

25   this period of time when you were 12 to 13 years

1          A.   Yes.

2          Q.   There were also 20 or 30 camping

3     trips that you took with him and on multiple

4     occasions on those camping trips he sexually

5     molested you, correct?

6          A.   Yes.

7          Q.   Was there a time when Scott took you

8     on a business trip to Toronto, Canada?

9          A.   Yes.

10          Q.   Do you recall approximately when

11     that was?

12          A.   Time, I don't remember.  I do

13     remember it was winter; so, it would have either

14     been the beginning of '99 or end of '99.

15          Q.   Did anyone else go on that trip with

16     the two of you?

17          A.   No.

18          Q.   Did one of your parents know that

19     you were going on that trip with Scott?

20          A.   I believe so.

21          Q.   Do you know which one of your

22     parents knew that?

23          A.   I believe it was my mom.

24          Q.   Do you know if your father knew it?

25          A.   I didn't.  I don't know.

```
1     while you were in Canada did you spend with

2     Scott Hanson on that trip?

3            A.   The majority of the time, I believe.

4            Q.   Was there any portion of the time

5     when you were left alone?

6            A.   I don't remember.

7            Q.   Did he sexually molest you while you

8     were in Canada?

9            A.   Yes, he did.

10           Q.   In addition, did Scott Hanson take

11    you on a cruise to the Bahamas at some point in

12    time?

13           A.   Yes, he did.

14           Q.   Do you know when that was?

15           A.   I almost want to say February, but

16    of what year, I don't remember.  I don't know

17    for sure.

18           Q.   Was there anyone else on that cruise

19    with the two of you, together with you?

20    Obviously, there were lots more people on the

21    boat, but did anyone go together with the two of

22    you on that cruise?

23           A.   No.

24           Q.   Before that -- before you went on

25    that cruise, did you get the permission of one
```

1    of your parents?

2            A.   I didn't ask.  I think it was Scott

3    had arranged everything, so --

4            Q.   Do you know if your mother knew that

5    you were going on that cruise?

6            A.   Yes, she did.

7            Q.   Do you know if your father knew that

8    you were going on that cruise?

9            A.   At that point in time -- sorry, at

10   that point in time, no, he didn't.

11           Q.   That was something he learned later?

12           A.   Yes.

13           Q.   Did your sisters know that you were

14   going on that cruise?

15           A.   I don't know.

16           Q.   Do you know if Cami Hanson knew

17   whether you were going on that cruise?

18           A.   I don't.

19           Q.   Did you ever ask your mother if she

20   knew why it was that Scott was taking you on a

21   cruise and not his wife or son?

22           A.   I'm sorry, what was the question?

23           Q.   Sure.

24                Did you ever discuss with your

25   mother before that cruise took place why Scott

1        UNITED STATES DISTRICT COURT

1        DISTRICT OF NEW JERSEY

2        Civil Action No. 06-CV-3441(WJM)(RJH)

    2    ---------------------------------------x

3        DAVID V. AMES,

4                        Plaintiff

5                        -against-

6        CORPORATION OF THE PRESIDENT OF

    6    THE CHURCH OF JESUS CHRIST OF

7        LATTER-DAY SAINTS, a Utah

    7    corporation sole, a/k/a the

8        "MORMON CHURCH," and SCOTT

    8    HANSON, individually,

9

    9                    Defendants.

10       ---------------------------------------x

    10                       VOLUME II

11

12              CONTINUED VIDEOTAPE DEPOSITION of DAVID V.

13       AMES, taken by the Defendants at the offices of

14       Latham & Watkins, LLP, One Newark Center, Newark,

15       New Jersey  07101, on March 5 2008, at 9:15

16       o'clock a.m., before Catherine M. Donahue, a

17       Certified Court Reporter and Notary Public within

18       and for the State of New Jersey.

19

20                    ROSENBERG & ASSOCIATES, INC.

21             Certified Court Reporters & Videographers

22                  425 Eagle Rock Avenue - Suite 201

23                   Roseland, New Jersey  07068

24                       (973)  228-9100

25                   www.rosenbergandassociates.com

**3/5/2008  Ames, David V. - Vol. II (Exhibits)**

1          A.   During my interview, no, I don't

2     believe he was.

3          Q.   Did you tell that investigator that

4     Scott Hanson was sexually molesting you?

5          A.   No, I didn't.

6          Q.   Why not?

7          A.   I didn't know the reason why they

8     were there.  They never asked any questions that

9     I remember of that sort.  It was more just what

10    your relationship is like with him.  I mean, is

11    he a good person.  What do you guys do together.

12    Is he a role model to you.  That sort of thing.

13         Q.   Did you understand at the time, that

14    is, back in the spring of 2000, that the fact

15    that Scott was engaged in sexually molesting you

16    meant that he was not a good person?

17         A.   No, I was not aware.  I thought what

18    was happening was normal and I was embarrassed

19    about it.

20         Q.   When did your parents separate?

21         A.   I don't remember when they

22    actually -- when my father moved out.  I do know

23    that their divorce was final in September.

24         Q.   If I told you that your father

25    testified that he moved out in around May of

1    Scott move to the apartment in New Brunswick,

2    was your sister, Christine, there also?

3         A.    She was.

4         Q.    Anybody else besides you and Scott?

5         A.    I believe it was just the four of

6    us.

7         Q.    And do you recall how much or how

8    long before you ended up speaking to the police

9    this move was?

10        A.    I think it was a week or about a

11   week before.

12        Q.    In connection with that move, did

13   you, your mother and your sister stay overnight

14   at Scott's new apartment?

15        A.    Yes, we did.

16        Q.    What were the sleeping arrangements?

17        A.    It was the four of us sleeping on

18   the floor in his living room because his

19   furniture wasn't ready until the next day.

20        Q.    Who slept next to whom?

21        A.    Scott and I slept next to each other

22   and Christine and my mother slept next to each

23   other.

24        Q.    Did Scott sleep next to you in that

25   spooning position?

1          A.   Yes, he did.

2          Q.   And your mother was within feet?

3          A.   Yes, she was.

4          Q.   Did Scott touch you in a sexually

5     inappropriate way that night?

6          A.   Yes, he did.

7          Q.   I apologize for having to ask this

8     question:  But exactly how did he touch you that

9     night?

10         A.   I don't recall exactly what

11    happened, but I do remember that was the last

12    time that anything of that sort happened.

13         Q.   Was it limited to him touching you

14    in your genital area with his hand?

15         A.   I can't say for certain.

16         Q.   Over the whole period between

17    December 1998 and July of 2000 when Scott was

18    arrested -- let me rephrase that.

19              What I'm trying to do, David, in the

20    least intrusive way I can do it, is determine

21    what sorts of things Scott did to you.  So I

22    just want to ask hopefully only three questions.

23         A.   Okay.

24         Q.   During the period of time between

25    December 1998 and July of 2000, did Scott

# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

-ooOoo-

DAVID V. AMES,                  : CIVIL NO. 06-3441

        Plaintiff,          : DEPOSITION OF:

                             CHRIS G. AMES

v.                              :

                             TAKEN: October 11, 2007

CORPORATION OF THE              :

PRESIDENT OF THE CHURCH

OF JESUS CHRIST OF              :

LATTER-DAY SAINTS,

                         :

        Defendant.

                         :

_____

-ooOoo-

        Videotaped Deposition of CHRIS G. AMES, taken
on behalf of the Plaintiff, at 60 East South Temple,
Suite 1800, Salt Lake City, Utah, before ROCKIE E.
DUSTIN, Certified Shorthand Reporter and Notary Public
in and for the State of Utah, pursuant to Notice.

```
1          A.    My time -- my recollection of time is kind

2     of sketchy back then, but I -- I'm going to say it was

3     pretty close after -- I would say '98.

4          Q.    Did you understand -- I'm sorry, did you

5     finish your answer?                                    10:30

6          A.    Beginning of '98.

7          Q.    Did you understand at the time that any

8     hiking or camping or biking events with the Blazers

9     would involve multiple adults?

10         A.    I had assumed it would, because usually     10:30

11    during my scout activities there were always more than

12    one adult.

13         Q.    And there were always multiple kids

14    involved; correct?

15         A.    Usually, correct.                           10:30

16         Q.    And that was your understanding as to what

17    would happen with Scott as a Blazer?

18         A.    Exactly.

19         Q.    Did you ever participate in any of the

20    Blazer activities?                                     10:30

21         A.    Never did.

22         Q.    Do you know if Scott and David ever went

23    camping as a Blazer activity?

24         A.    I know they went camping.  Under what

25    umbrella, I don't know.                                10:31
```

1    date.

2          Q.    I didn't actually ask for a date first.

3    All I want to know is did you learn that it happened?

4          A.    I learned that it happened, yes.

5          Q.    And that was after you had already met him?    10:32

6          A.    Absolutely, uh-huh.

7          Q.    Do you know if he had any interaction at

8    all with Scott in -- I'm sorry, let me rephrase that.

9                Do you know if Scott had any interaction at

10   all with David in Scott's capacity as young men's        10:33

11   president?

12         A.    I don't know.  I wasn't active and I don't

13   know.

14         Q.    Did you participate in any Blazer

15   activities?                                              10:33

16         A.    Never.

17         Q.    Did there come a point in time when Scott

18   Hanson was appointed as the home teacher for your

19   family?

20         A.    Yes.                                         10:33

21         Q.    Do you know when that was?

22         A.    It wasn't too long after he actually

23   introduced us to himself.  I want to say mid-'98,

24   maybe.

25         Q.    So it was after you already knew him?        10:33

1    out in May.

2         Q.    No, not moved out of the house.  Moved into

3    your own bedroom by yourself.

4         A.    Oh, I'm sorry.  Yes.  That's true.

5         Q.    So it would be about December of '98?        11:00

6         A.    That would be about December of '98.

7         Q.    And in fact, it was around December of '98

8    that you observed Scott and David sleeping together in

9    the same bed in the spooning position; correct?

10        A.    Correct.                                       11:01

11        Q.    And there, at that time, they were sleeping

12   alone in Kathy's room; correct?

13        A.    (Witness reviews document.)

14        Q.    Why don't you look at page 11 and see if

15   that helps refresh your recollection.                    11:01

16        A.    (Witness reviews document.)  Okay, you know

17   I -- I don't see a timeframe on this, though.  That's

18   what I'm having trouble with.

19        Q.    Well, on page 10 you say that you're

20   talking about a year and a half ago, which we just       11:02

21   established would have been December 1998.  And then

22   you go on to talk about instances, or at least one

23   instance, where you observe Scott sleeping with David

24   in their underwear.

25        A.    Uh-huh.                                        11:02

1    Exhibit 1, on page 12, your testimony under oath was

2    that David said to you, "Scott's getting on my nerves."

3    And I'm here near the top of the page in the first long

4    answer.

5              Do you see that?                              11:15

6        A.   Uh-huh.

7        Q.   "He's touching me, you know, he's just

8    kinda making me uncomfortable.  You know, and I, and I

9    did ask him a couple of times, has Scott ever touched

10   you where he shouldn't and, you know, he said well, no,  11:16

11   this was at that time."

12             So you knew that there was something to be

13   concerned about here; correct?

14       A.   And that's why I asked the question.

15       Q.   All right.                                     11:16

16             If you had that concern why not just tell

17   Scott, "Don't sleep in the same bed with my son

18   anymore"?

19       A.   Well, number one, I can't be sure of the

20   timeframe on this and neither can any of us, because he  11:16

21   said probably September.  We're too close to the time

22   that I had my breakdown.

23             The other issue is why, when you have faith

24   in the Church and you believe they would never send

25   anybody into your home that could do such a thing to     11:16

1              MR. ROSS:  You have the wrong book.

2    BY MR. KRAUS:

3         Q.    We're talking about your statement under

4    oath, Exhibit 1, page 12.

5              Let's start at the top of page 12 and let's    11:24

6    walk through to make sure that we both understand what

7    was going on.

8         A.    Okay.

9         Q.    At the top of page 12 -- let's actually

10   start at the bottom of page 11.                          11:24

11        A.    (Witness reviews document.)

12        Q.    Bottom of page 11, three paragraphs up, you

13   tell the detective that Scott and David would fall

14   asleep and they would be cuddled up in the spoon

15   position.                                                11:24

16             Do you see that?

17        A.    Uh-huh.

18        Q.    And then the detective asks you to describe

19   that and you describe that Scott was right up against

20   David so that his penis, his whole frontal part, was     11:24

21   pressed up against David's back.

22             Do you see that?

23        A.    Uh-huh.

24        Q.    Then we go to the next page, page 12, and

25   the detective asks you, "Okay, and you observed this."   11:24

1           And you said, "I observed this on several

2    occasions"; right?  That's what you said under oath in

3    July of 2000.

4         A.    Okay.

5         Q.    And then the detective asks you a question     11:25

6    designed to figure out when this happened and says,

7    "This was about a year and a half, you started to say,"

8    and you say, "I started to see this, yes."

9           And a year and a half before July we've

10   already established would have been at least December    11:25

11   of 1998; correct?

12        A.    Uh-huh.

13        Q.    You have to say "yes."

14        A.    Yes.

15        Q.    And then you give a long answer that           11:25

16   describes multiple instances where David would come in

17   and say to you that Scott was getting on his nerves,

18   he's touching you, "He's just kind of making me

19   uncomfortable."

20           Do you see that?                                  11:25

21        A.    Right.  Yes.

22        Q.    And then as we go down the page, you're

23   asked what was happening with you at the time, and you

24   say you'd had a nervous breakdown, that you claimed

25   that you were incapable of helping David at the point    11:25

67

1                    (Discussion off the record.)

2                    (Recess taken.)

3       BY MR. KRAUS:

4            Q.    Before we took a short break, Mr. Ames, I

5       was asking you about whether or not you had ever spoken    11:43

6       to Scott.  I think you told me that you didn't think

7       you had, and then I directed you to read pages 16 and

8       17 of your sworn statement from July of 2000, to see if

9       that refreshed your recollection.

10                   Have you read those two pages?             11:44

11           A.    I have read them, yes.

12           Q.    Does that refresh your recollection that

13      you did speak to Scott Hanson?

14           A.    Honestly, I don't remember speaking to

15      Scott Hanson.  However, if I stated here that I did,      11:44

16      then I did.

17           Q.    So whatever mental incapacity you had, you

18      had enough ability to function that you spoke to Scott

19      Hanson about David's discomfort; correct?

20           A.    Correct.                                     11:44

21           Q.    Did you -- to the best of your

22      recollection, did you ever say to Scott, "Don't sleep

23      in the same bed with David anymore"?

24           A.    I probably did, yes.

25           Q.    And did you do anything to make sure that    11:44

1     that -- that he followed those instructions?

2              A.    I do recall asking Kathy to make sure that

3     that -- I didn't want him in the house anymore.

4              Q.    But he did continue to sleep in your house,

5     didn't he?                                           11:45

6              A.    I believe so, yes.

7              Q.    Did you pick up the phone and call the ward

8     bishop to tell him that David was uncomfortable with

9     the way Scott was sleeping in the same bed with him?

10             A.    No.                                    11:45

11             Q.    Did you pick up the phone and call the New

12    Jersey Division of Youth and Family Services about

13    Scott at that time?

14             A.    I didn't know the degree, no, of what was

15    going on.                                            11:45

16             Q.    The answer to my question, did you call

17    DYFS at that time?

18             A.    No.

19             Q.    Did you call the police?

20             A.    No.                                    11:45

21             Q.    Did you call Kami Hanson?

22             A.    No.

23             Q.    Notwithstanding the fact that you say that

24    you told Kathy not to allow Scott to sleep over at your

25    house anymore, Scott continued to sleep over at your   11:46

1    There were times when" -- well, let's stop there.

2              Times is multiple occasions; correct?

3         A.    Yes.  My understanding, yes.

4         Q.    So does that refresh your recollection that

5    there were multiple occasions when Scott slept in the      11:48

6    same bed with you and David?

7         A.    Honestly, I can't -- I do not recollect

8    that, no.

9         Q.    But if you said it under oath in July of

10   2000, it would have been truthful at that time to the      11:48

11   best of your recollection; correct?

12        A.    Absolutely.  Yes.

13        Q.    So you don't doubt that there were multiple

14   occasions on which that happened, do you?

15        A.    From what I'm reading here, then that is a      11:48

16   correct statement.  But if you ask me, do I remember

17   that, no.

18        Q.    But if you said it under oath then, it must

19   be true?

20        A.    Correct.                                        11:48

21        Q.    Yes?

22        A.    Yes.

23        Q.    And then the detective goes on to say,

24   "With you?"

25              And you go on to explain, you know, in a        11:48

1    relatively long answer that they would -- that the

2    three of you would fall asleep like having a little

3    campout.  Do you see that answer?  I could read it into

4    the record, but have you read it?

5          A.    Yes.  I see it.  Yes.                      11:49

6          Q.    The detective then asked you, "Do you

7    remember there being contact and having to say anything

8    to Scott?"

9                And you answered under oath, "I did.  There

10   were times when I, you know, they, they would start     11:49

11   out, you know, apart from each other, but Scott would

12   somehow manipulate himself during the evening, um, and

13   would end up rolled against David or up against the

14   wall with David."

15               Was that your answer under oath in July of   11:49

16   2000?

17         A.    Yes, it is.

18         Q.    Was it a truthful answer at the time, to

19   the best of your recollection?

20         A.    Yes.                                        11:49

21         Q.    The detective then asked you, "Well, what's

22   the sleeping arrangement when they're in the bed with

23   you?"

24               And you answered, "That became an issue,

25   because David kept saying I don't want Scott next to     11:49

1    me, you know, so David and I would make a point to

2    make David to make sure that he was lying next to me."

3              And your next answer was, "And then Scott

4    either on my side or something to keep him away from

5    David."                                              11:50

6              Do you see that?

7         A.    Uh-huh.   Yes.

8         Q.    The reason that you wanted to have yourself

9    in between Scott and David was because of David's

10   discomfort with the way in which Scott was touching him   11:50

11   in his sleep?

12        A.    That's correct.

13        Q.    And notwithstanding your best laid plans,

14   sometime during the night, Scott would rearrange things

15   so that he was sleeping next to David; correct?         11:50

16        A.    Correct.

17        Q.    And that happened on multiple occasions?

18        A.    I can't tell you that.  I don't recall

19   that.  I really don't.

20        Q.    But that's what you said under oath in July   11:50

21   of 2000?

22        A.    That's correct.

23        Q.    Well, here's what I don't understand,

24   Mr. Ames:  If you know that David doesn't want to be

25   sleeping next to Scott, and if you've told Kathy that    11:50

1     you don't want Scott sleeping at your house, and if

2     you've gone to the trouble of arranging things when

3     he's sleeping in your house, notwithstanding that, to

4     separate Scott and David, and he then manipulates it so

5     he's right next to David, didn't that set off like          11:51

6     major warning bells in your mind?

7            A.   It concerned me.  But when -- again, like I

8     say, when you're living in this darkness, you have a

9     tendency to not want to believe it.

10           Q.   So you didn't order Scott not to sleep at        11:51

11    your house, did you?

12           A.   I don't recall.

13           Q.   Well, whether you did order it or not, he

14    kept sleeping at your house, didn't he?

15           A.   I guess so.  Yes.  I mean, I -- all I know        11:51

16    is from the time when I told Kathy, and I moved out,

17    that's all I can tell you, is it was a short period,

18    fairly short period of time.

19           Q.   Well, let me see if I can refresh your

20    recollection.                                                 11:52

21                I've already shown you David's sworn

22    testimony that it was around September 1998 when he

23    told you about his discomfort.  Do you remember that?

24           A.   I remember reading it, yes.

25           Q.   And you told Scott that David was                11:52

77

1    reason to keep him out of your house?

2           A.   I trusted him.

3           Q.   Not only did he sleep with your son in your

4    house, he also slept with your son in other places,

5    too; correct?                                      12:00

6           A.   Correct.

7           Q.   And he slept with your son at the Hanson

8    house; correct?

9           A.   I believe so.

10          Q.   He took your son on camping trips where    12:00

11   they slept in the same tent together; correct?

12          A.   I wasn't there, but I would -- yes.  I know

13   he took him on camping trips.  I don't know what the

14   sleeping arrangements were.

15          Q.   Given what your son had told you about his  12:00

16   discomfort, did you ever ask either David or Scott what

17   the sleeping arrangements were?

18          A.   I trusted them both.

19          Q.   Scott was 12 years old at the time?

20          A.   Scott or David?                           12:01

21          Q.   I'm sorry, David was 12 years old at the

22   time?

23          A.   Correct.

24          Q.   You trusted him to be able to put a stop to

25   anything that was inappropriate?                     12:01

1          Q.    Did you see your wife on a daily basis?

2          A.    No.

3          Q.    How did you get food?

4          A.    I either would go down to the kitchen or I

5     would have one of the kids bring them in, so I might      12:05

6     see one of them for a brief moment.  That was it.

7          Q.    At some point after your son had told you

8     that he had a feeling of discomfort with the way in

9     which Scott was sleeping with him, Scott took David on

10    a business trip to Toronto, Canada; correct?           12:05

11         A.    Correct.

12         Q.    Did you know that at the time?

13         A.    No.

14         Q.    If you had known it, would you have

15    forbidden it?                                          12:06

16         A.    I can't answer that.

17         Q.    At the time that your son was doing these

18    campouts, in these various places, is it your

19    understanding that your wife knew that the campouts

20    were taking place?                                     12:06

21         A.    That's my understanding.

22         Q.    And they occurred with your wife's

23    permission?

24         A.    I assume.

25         Q.    And your wife was aware of David's feeling   12:06

1    of discomfort with the way in which Scott was touching

2    him?

3         A.    I can't say whether she was or not.  You'd

4    have to ask her that.

5         Q.    Well, actually, you can say because you        12:06

6    told her; correct?

7         A.    I didn't say -- I might have told her.  I

8    didn't say she was uncomfortable with it.

9         Q.    No, that isn't the question I asked you.

10             Your wife was aware that David had             12:07

11   expressed discomfort with the way in which Scott was

12   touching him and sleeping with him; correct?

13        A.    Correct.

14        Q.    And notwithstanding that, she gave

15   permission for Scott and David to do these campouts and  12:07

16   this trip to Toronto.  Is that your understanding?

17        A.    I would say that that would have to be,

18   because I didn't give the permission, yes.

19        Q.    After you -- well, let me back up.

20             How long would you say that you were          12:07

21   confined to your room because of your depression?

22        A.    A year and a half.

23        Q.    From late November 1998 until when?

24        A.    May.  When I moved out, in 2000.

25        Q.    Was there a period of time before you moved   12:08

1          A.    Well, not right at first, but towards the

2     end, yes.

3          Q.    Is it your testimony that David had

4     absolutely no further contact with Scott?

5          A.    No.  I know he had.  No, he wasn't with        12:34

6     me -- I just had him at my place more often.  He was

7     still -- and had plenty of access with Scott, up until

8     probably a couple of days prior to the arrest or

9     disclosure.

10         Q.    Did you tell your wife not to allow Scott       12:34

11    to spend any time with David?

12         A.    No.

13         Q.    I know that there -- well, strike that.

14               There did come a point in time when you

15    called the police; correct?                                12:35

16         A.    That is correct.

17         Q.    At any point in time between when you

18    learned of the DYFS investigation in June and when you

19    ultimately called the police in -- on or about July 19,

20    2000, did you speak to anybody at the police about your    12:35

21    suspicions?

22         A.    No.

23         Q.    Did you speak to anybody at the police at

24    all?

25         A.    Not until -- no.  Not until --                  12:35

1         Q.    July 19th?

2         A.    19th.

3         Q.    Did you talk to Bishop Braby at any point

4    between June and July 19th?

5         A.    Now, July 19th was when?  Was that the date    12:35

6    after the arrest or was that the day of the disclosure?

7         Q.    Well, I think your counsel and I can agree

8    that the arrest is the 20th and the interviews with the

9    police are the 19th.  That's the date on the

10   transcripts.                                              12:36

11        A.    So, yes, then I did --

12              MR. ROSS:  I always thought it was on or

13   about.  I wasn't exactly sure.

14              MR. KRAUS:  I'm not -- I wasn't there, so I

15   can't say that.                                           12:36

16              MR. ROSS:  If you're representing that

17   those are the dates, then that's fine.

18   BY MR. KRAUS:

19        Q.    I'll tell you -- just so everybody is clear

20   on the record, my recollection from having read the       12:36

21   statements is that you said that you spoke to David on

22   July 18th and that's when he told you of the abuse.

23   And then the statements were given on the 19th, and we

24   know that the arrest was on the 20th.

25        A.    Right.                                          12:36

10/11/2007  Ames, Christopher G. - Vol. I (Timestamp/Exhibits)

1           Q.    And so I draw the inference that you went

2      to the police on either the 18th or the 19th.

3           A.    Right.  I mean, I can give you the full

4      chronology on that if you want it.

5           Q.    We're going to get there.                 12:36

6           A.    Okay.  I figured so.

7           Q.    If there's one thing I am, it's thorough.

8                 Between -- when you learned of the DYFS

9      investigation in June, and had the conversation with

10     your wife, and when you made the report to the police    12:37

11     on or about July 19th, did you have any conversations

12     with anyone --

13          A.    Yes.

14          Q.    -- about any concerns that you had?

15          A.    Yes.                                       12:37

16          Q.    With whom?

17          A.    Kami.

18          Q.    When did you speak to Kami?

19          A.    It would have been -- please forgive me,

20     but I'm going to go by days much more than dates.    12:37

21                I believe it was Saturday before I actually

22     went to -- no.  Yes, Saturday.  Because then I

23     contacted the Hackettstown police Saturday afternoon

24     and then the prosecutor's office called me Sunday.  So

25     it would have been Saturday.                          12:37

1          Q.    You were never excommunicated?

2          A.    No.

3          Q.    Were you ever the subject of a disciplinary

4     council?

5          A.    No.                                          13:58

6          Q.    I think you told us before that you were a

7     home teacher at one time?

8          A.    Correct.

9          Q.    When you were a home teacher, did you ever

10    sleep overnight in any of the family's homes for whom     13:58

11    you were the home teacher?

12         A.    No.

13         Q.    I would take it that you never slept in the

14    same bed with any of their younger male children?

15         A.    No.                                          13:59

16         Q.    And you knew that that was not part of a

17    home teacher's assignment or role; correct?

18         A.    Of course.  That was something Scott had

19    assigned.  He went to Bishop Braby and asked that he be

20    assigned as the home teacher.                           13:59

21         Q.    How do you know that?

22         A.    He told me.

23         Q.    Scott told you?

24         A.    (Witness nods.)

25               MR. ROSS:  Is that a yes?                    13:59

131

```
 1                    THE WITNESS:  Yes.

 2      BY MR. KRAUS:

 3           Q.    Scott lied to you any number of times,

 4      didn't he?

 5           A.    Obviously, yes.                        13:59

 6           Q.    Scott's a liar?

 7           A.    Yes.

 8           Q.    Scott doesn't have a lot of credibility

 9      with you, does he?

10           A.    Zero.                                  13:59

11           Q.    Based on your experience as a home teacher,

12      one of the responsibilities of a home teacher is to

13      bring a spiritual message during their visits with

14      their families; is that correct?

15           A.    That's correct.                        14:00

16           Q.    When Scott was sleeping over in your house,

17      did he bring any spiritual messages?

18           A.    No.

19           Q.    He wasn't there in his home teacher role,

20      he was there in his predator role; right?          14:00

21           A.    Obviously, yes.

22           Q.    Were you ever a High Priest in the Church?

23           A.    No.

24           Q.    Do you feel any responsibility for what

25      Scott did to David?                               14:00
```

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

-ooOoo-

DAVID V. AMES,                    : CIVIL NO. 06-3441

        Plaintiff,          : DEPOSITION OF:

                                  KATHLEEN AMES

v.                                :

                                    TAKEN: October 30, 2007

CORPORATION OF THE                :

PRESIDENT OF THE CHURCH

OF JESUS CHRIST OF                 :

LATTER-DAY SAINTS,

                              :

        Defendant.

                              :

_____

-ooOoo-

Deposition of KATHLEEN AMES, taken on behalf of the Defendant, at 60 East South Temple, Suite 1800, Salt Lake City, Utah, before ROCKIE E. DUSTIN, Certified Shorthand Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

1

1          A.    I still don't remember, but --

2          Q.    Do you have any reason to dispute it?

3          A.    I don't even -- no.  I don't even know this

4     place.

5          Q.    Do you recall knowing that your son was        10:46

6     going on camping trips with Scott Hanson and only Isaac

7     Hanson?

8          A.    I know they did at times, yes.

9          Q.    Did you know that they were doing it as

10    early as the summer of 1998?                              10:46

11         A.    It's very possible.  I don't remember

12    timelines back when that actually started happening.

13         Q.    Do you remember the first time that David

14    slept over at the Hanson home?

15         A.    I'm thinking it was towards the end of '98    10:47

16    or as early as '99.

17         Q.    When David was sleeping over at the Hanson

18    home did you ever ask anyone what the sleeping

19    arrangements were?

20         A.    It was my understanding at first that he      10:47

21    slept with Isaac.

22         Q.    And what was that understanding based on?

23         A.    I asked David.

24         Q.    Did there come a time when you learned that

25    that changed?                                             10:47

1          Q.    You had a downstairs room in the basement

2     where Scott could have slept; correct?

3          A.    No.  I had daughters down there.

4          Q.    You had a couch in the living room where he

5     could have slept?                                  11:16

6          A.    If it was after I moved out I usually was

7     on the couch.  So I don't know.  Yes, he could have.

8          Q.    He could have slept on the floor in David's

9     room.

10         A.    Yes, he could have.                      11:16

11         Q.    He could have slept on the floor in Chris's

12    room.

13         A.    Yes, he could have.

14         Q.    You could have told him to go home to his

15    wife.                                               11:16

16         A.    I sure could have.

17         Q.    You could have told him to get a motel

18    room.

19         A.    I sure could have.

20         Q.    But it didn't strike you that you ought to   11:16

21    do any of those things, is that your best recollection?

22         A.    That's right.

23         Q.    So let's now fast forward to the period '99

24    and early 2000.  Would it be fair to say that beginning

25    in 1999, that David started spending a substantial      11:17

1    amount of time with Scott Hanson?

2           A.    More and more, yes.

3           Q.    And that included camping trips?

4           A.    I don't think in January or February.

5           Q.    No, in 1999 and early 2000, they went on        11:17

6    multiple camping trips together; correct?

7           A.    I don't know multiple just by themselves,

8    but they did go on some, yes.

9           Q.    Did you know each time they went on a

10   camping trip who else was going?                            11:17

11          A.    If it would have concerned my kids and had

12   my other kids with them, yes.

13          Q.    Well, let me rephrase it.

14                If David was going on an overnight camping

15   trip with Scott, did you always ask who else, if           11:18

16   anyone, was going to be there?

17          A.    Yes.

18          Q.    And were you told that there were going to

19   be people in addition to David there on every occasion?

20          A.    I know they went on some alone, but I --       11:18

21   not very many.  Somebody -- one of the girls or -- they

22   always took somebody with them.

23          Q.    So it's your best recollection that --

24          A.    I know they did go a few by themselves, but

25   I wouldn't say multiple, multiple nights.                  11:18

1        Q.    Did you ever ask Scott not to sleep in the

2   same bed with David any more?

3        A.    I don't think I ever did.

4        Q.    Did you ever say to Kami, "There's

5   something odd about the way in which your husband is     11:37

6   sleeping over at our house three to four times a week

7   in the same bed with my 12- or 13-year-old son?

8        A.    No.

9        Q.    And I take it you never talked to anybody

10  at the Ledgewood Ward about it?                          11:37

11       A.    No.

12       Q.    You never spoke to Bishop Wahlen or Bishop

13  Braby about this, did you?

14       A.    No.

15       Q.    You never expressed any concern to anybody   11:37

16  who was in any kind of leadership position at the ward;

17  is that correct?

18       A.    That's correct.

19       Q.    In addition to Scott sleeping -- do you

20  want to take a break, Mrs. Ames?                         11:37

21       A.    No, I'm fine.  I just have to breathe.

22       Q.    Well, breathing is good.  It's fundamental,

23  I think.

24              (Laughter.)

25  BY MR. KRAUS:                                            11:38

```
 1      thought that they had a -- I assumed things.

 2             Q.    And that trust was based on the

 3      relationship that you had built up with the Hansons?

 4             A.    Exactly.  And I knew Kami was there.

 5             Q.    Now, David also went on a business trip    11:39

 6      with Scott to Toronto --

 7             A.    Correct.

 8             Q.    -- during 1999; correct?

 9             A.    Correct.

10             Q.    And that was a multiple-day trip; correct?   11:39

11             A.    That's right.

12             Q.    It was just the two of them; right?

13             A.    That's right.

14             Q.    Was it your understanding that they were

15      sleeping in the same hotel room?                        11:39

16             A.    Yes.

17             Q.    Did you ever ask Scott whether he and David

18      were sleeping in a single bed?

19             A.    No.

20             Q.    Did you ever ask David?                    11:39

21             A.    No.

22             Q.    Did you ever ask anybody?

23             A.    No.

24             Q.    Whose idea was it that David go on this

25      business trip to Toronto?                               11:40
```

**10/30/2007  Ames, Kathleen - Vol. I**

1          A.     Scott had -- if I remember correctly, Scott

2      had asked us, and I knew there was a great friendship

3      there.  I had total trust.  There was no way I would

4      let my child go with somebody if I didn't have total

5      trust.  There were no concerns.  Chris knew about it.          11:40

6      And we agreed to let him go.

7          Q.     So if Chris were to testify today that he

8      didn't know that his son was going to Toronto at the

9      time of the trip, that would be inconsistent with your

10     recollection?                                                  11:40

11         A.     I assumed -- I can almost guarantee he knew

12     of it.  At that point in our lives, I don't know.  We

13     hardly even spoke to each other.  We lived in the same

14     house.  He was so sick, he was so out of it, I don't

15     know.                                                          11:41

16         Q.     Well, you say that Chris was out of it in

17     '99 and early 2000.

18         A.     Uh-huh.

19         Q.     You took a family trip to Oregon in the

20     summer of '99; is that right?                                  11:41

21         A.     We brought my daughter out to school and

22     then we did go up to Washington to see my sister.

23         Q.     Did Chris go on that trip?

24         A.     Yes, he did.

25         Q.     Did you drive across country or fly?               11:41

```
1     about -- you know, he made it sound like it was going

2     to be an educational -- they were going to do, you

3     know, sightseeing, they were going to do some

4     educational things.

5          Q.   Did it strike you as perhaps unusual that      11:43

6     this unrelated man would show so much interest in your

7     son to spend the money to take him to Toronto, Canada,

8     when he had his own son and his own wife?  Do you

9     remember that striking you at the time?

10         A.   Kami didn't like to go with Scott places.      11:44

11    They were two completely different individuals.  They

12    had different interests.  And I had complete trust in

13    Scott.

14         Q.   In addition to the business trip to

15    Toronto, Scott also took your son on a cruise to the    11:44

16    Bahamas; correct?

17         A.   Yes, he did.

18         Q.   When was that?

19         A.   I guess it was in '99, when everything else

20    was so bad.                                             11:44

21         Q.   Neither Kami nor Isaac went on that cruise,

22    did they?

23         A.   No.

24         Q.   And you knew that at the time?

25         A.   Yes.  If I remember right, Kami took some     11:44
```

1    of my girls.  That's how it usually was, because their

2    interests were so different.  I had complete trust in

3    both of these people, that I would let Kami take my

4    girls and do things, I would let Scott take my son and

5    do things, because his father couldn't do things with      11:45

6    him.  And I felt like these were things that little

7    boys are supposed to do.  And I had the trust.

8            Q.    Did you think that little boys are supposed

9    to go on cruises to the Bahamas alone with a man that

10   they're not related to?                                      11:45

11           A.    At that time in my life, I don't know what

12   was good and what was bad.

13           Q.    Did you know when they went on the cruise

14   that they were sharing a single state room?

15           A.    I assume they were in the same room.          11:45

16           Q.    Did you ask what the sleeping arrangements

17   would be?

18           A.    No, I did not.

19           Q.    After they came back, did you ask either

20   David or Scott what the sleeping arrangements had been?     11:45

21           A.    No, I didn't.

22           Q.    Scott paid for all of that?

23           A.    Yes, he did.

24           Q.    Did it strike you as odd at the time that

25   Scott would be volunteering to take your son one-on-one     11:46

```
 1           Q.    And you didn't ask at the time?

 2           A.    No.

 3           Q.    There was also a trip to Washington, D.C.?

 4           A.    Yes.

 5           Q.    Who went on that trip?                    11:50

 6           A.    David, Scott, Christine and myself.

 7           Q.    Did the four of you sleep in one hotel room

 8     or multiple rooms?

 9           A.    Yes, we did.

10           Q.    Who slept next to whom?                   11:51

11           A.    Christy and I slept in one bed and David

12     and Scott slept in the other.

13           Q.    And you were, to the best of your

14     recollection, the first one to fall asleep that night?

15           A.    Probably.                                 11:51

16           Q.    So you don't know whether anything happened

17     between Scott and David that night?

18           A.    No, I do not.

19           Q.    Would it be fair to say that Scott Hanson,

20     by the end of 1999, first quarter of 2000, had become a  11:51

21     very close friend?

22           A.    Yes.

23           Q.    He provided financial support to your

24     family?

25           A.    Okay, hold on just a minute.              11:51
```

1        Q.    There came a time in early February 2000

2   when Bishop Braby asked to speak to you about the

3   relationship between David and Scott.  Do you remember

4   that?

5        A.    I don't remember the exact month.  I was        12:14

6   thinking it was more March or April, when David was

7   playing ball, but it could have been.

8        Q.    Do you remember that there were two

9   separate occasions when Bishop Braby wanted to talk to

10  you, once when he wanted to tell you that he thought     12:14

11  that the relationship was unhealthy because of the

12  Hanson marital situation, and once when he wanted to

13  tell you that there were reports or concerns that David

14  was being sexually abused by Scott?  Do you remember

15  that there were those two separate --                    12:14

16       A.    Yes, I do.

17       Q.    -- discussions?

18       A.    Uh-huh.

19       Q.    Now, the first one was the discussion that

20  Bishop Braby thought it was unhealthy that Scott and     12:14

21  David were spending so much time together; correct?

22       A.    Yes.

23       Q.    And that was in the winter of 19 -- of

24  2000?

25       A.    It was in 2000.  Like I said, I thought it     12:14

```
1    was more March-April, but whatever.

2          Q.    That's okay.

3                At that time, Bishop Braby suggested to you

4    that it would be much better if Scott and David spent

5    much less time together; correct?                      12:15

6          A.    Correct.

7          Q.    Did you do anything to reduce the amount of

8    time that Scott and David were spending together after

9    that warning from Bishop Braby?

10         A.    I did, but not a massive cutoff.           12:15

11         Q.    What did you do?

12         A.    I was with him all the time.  I made sure

13   they were not alone.  I opened my eyes more.  I was at

14   a point where I didn't trust or believe a lot of things

15   at that point in my life, because that's when Chris and 12:15

16   I were breaking up, too.  And I was questioning what I

17   was going to do.  So I didn't want to cut that string

18   yet, unless I knew for a fact that I knew something for

19   sure was going on.  I didn't know how to handle it

20   myself.                                                12:16

21         Q.    At the time of the first warning, the one

22   about the relationship just being unhealthy because of

23   the marital problems, do you recall that Scott was

24   either in Utah or on his way to Utah?

25         A.    I don't know where Scott was.              12:16
```

**10/30/2007  Ames, Kathleen - Vol. I**

1          A.    Okay.  Good.

2          Q.    If you take a look at Exhibit 1 to your

3    deposition, and page 15.

4          A.    (Witness reviews document.)

5          Q.    Would you read page 15 to yourself?          12:21

6          A.    (Witness reviews document.)  Okay.

7          Q.    And you see in the middle of the page you

8    state, "I would say March or April of this past year.

9    I got a call from my bishop of the church and he

10   brought me in and said that he had received information   12:22

11   that Scott was abusing David."

12         A.    Okay.  Yes.

13         Q.    Does that refresh your recollection that

14   the first time you had that kind of a conversation with

15   Bishop Braby was in March or April?          12:22

16         A.    Well, I told you March or April, because I

17   remembered the ball field.

18         Q.    And then DYFS did an investigation?

19         A.    Right.

20         Q.    And at the time of Bishop Braby telling you   12:22

21   of these -- this information about abuse and of DYFS

22   doing an investigation, you didn't really believe that

23   Scott was abusing David, did you?

24         A.    No, I didn't.

25         Q.    In fact, Scott had been -- become a very       12:22

1    good friend and you spent hours and hours talking with

2    him through things when you were down and having a bad

3    day.  Obviously, paraphrasing what you had to say on

4    page 16.  Do you see that, bottom of page 16?

5         A.    (Witness reviews document.)  That's          12:23

6    correct.  At that time, he was probably spending more

7    time with me than he was anybody else.

8         Q.    Except for David?

9         A.    No.  He was spending more time with me.  I

10   mean, David was probably around, but...                 12:23

11        Q.    Even after Bishop Braby brought those

12   concerns about abuse to your attention, and even after

13   DYFS did its investigation, you went on a trip to

14   Washington, D.C., with Christine, David and Scott;

15   correct?                                                 12:24

16        A.    Correct.

17        Q.    And that was the trip where there were two

18   double beds and Scott slept in the same bed with David;

19   correct?

20        A.    Right, but I also remember seeing David on   12:24

21   top of the covers and Scott under the covers.

22        Q.    That was right before you fell asleep?

23        A.    Whatever.  Yes.  If that's what I said.

24        Q.    And, in fact, even after you had received

25   that warning from Bishop Braby and you knew of the DYFS  12:24

1       investigation, you helped Scott move to an apartment in

2       New Brunswick.  Do you remember that?

3               A.    Yes, I do.

4               Q.    And that was in July, about a week or so

5       before you and Chris went to the police; correct?        12:24

6               A.    Correct.  Uh-huh.

7               Q.    And when you helped Scott move to that

8       apartment, you and Christine and Scott and David all

9       stayed overnight on the floor in that apartment;

10      correct?                                                 12:25

11              A.    Right.

12              Q.    And David and Scott slept together under a

13      blanket on the floor that night in New Brunswick;

14      correct?

15              A.    I don't -- I know we were all on the floor.  12:25

16      He could have been.

17              Q.    Do you recall your son David saying in his

18      taped statement to the police that Scott fondled his

19      genital area all that night in New Brunswick in July?

20              A.    No, I do not remember that.  (Witness       12:25

21      reviews document.)

22              Q.    Could you take a look at pages 47 and 48 of

23      David's sworn statement.

24              A.    (Witness reviews document.)

25              Q.    In fact, read all the way over to 49, if    12:27

# EXHIBIT 20

```
 1                          UNITED STATES DISTRICT COURT

                            DISTRICT OF NEW JERSEY

 2                          CIVIL ACTION 06-CV-

    _____        (WJM)  (MF)

 3                                        :

    DAVID V.  AMES,                       :

 4                                        :

                    Plaintiffs,           :      DEPOSITION UPON

 5                                        :   ORAL EXAMINATION OF:

           vs.                            :      JAMES BRABY

 6   CORPORATION OF THE PRESIDENT         :

     OF THE CHURCH OF JESUS CHRIST        :

 7   OF LATTER-DAY SAINTS, a Utah         :

     Corporation, et als.                 :

 8                    Defendants.         :

    _____

 9

10

11           TRANSCRIPT of the deposition notes of JAMES

12   BRABY, witness called for oral Examination in the

13   above-entitled action, said deposition being

14   conducted pursuant to the Rules Governing Civil

15   Practice in the Superior Court of New Jersey, by

16   and before LYNDA A. COPLON, a Notary Public and

17   Certified Shorthand Reporter of the State of New

18   Jersey, License No. 170849, at the offices of

19   LATHAM and WATKINS, One Newark Center, Newark, New

20   Jersey, on October 24, 2007, commencing at 11:10

21   a.m.

22

23                   ROBERT CIRILLO, INC.

                  Certified Shorthand Reporters

24                  182 Columbia Turnpike

                Florham Park, New Jersey  07932

25                     (973) 740-1331
```

1

1    A.        I had a conversation with Scott in February

2     2000.

3              Q.       Okay.  When did you have -- did

4     you have another conversation with Scott Hanson

5     next or did you talk to Kami next?

6    A.        I did not talk with Kami until March.

7     During this period of time I could had some other

8     conversations with Scott.

9              Q.       Okay.

10   A.        I would have to -- at some time I would

11    have had to have Scott tell me of an allegation

12    against Kami that would precipitate my involvement

13    with the marital affairs of the -- Scott and Kami

14    Hanson family.

15             Q.       Scott had to say to you my wife

16    been unfaithful?

17   A.        Scott called me on the phone and said

18    Bishop I need to talk to you.  When I was putting

19    my wife on a plane out to Salt Lake she had

20    confessed that she had had an extra marital affair.

21             Q.       So that I'm clear, the first

22    conversation you recall having with Scott Hanson

23    about the marriage between Scott and Kami Hanson

24    occurred after Kami Hanson had left New Jersey?

25   A.        Yes.

10/24/2007  Braby, James - Vol. I

1          Q.        And you may have had other

2    conversations with Scott subsequent to that, but at

3    some point in time you spoke to Kami about that?

4    A.        Yes.

5          Q.        During that time, that first

6    conversation you had with Kami was that on the

7    telephone?

8    A.        Yes.

9          Q.        And was she in Utah to the best of

10   your knowledge?

11   A.        She was in Utah, yes.

12         Q.        And what was the substance of that

13   conversation?

14   A.        The substance of the conversation was her

15   transgression.

16         Q.        And during that conversation was

17   there any discussion with Kami Hanson about any

18   allegation of inappropriate contact between Scott

19   Hanson and any child or did that not come up until

20   a later conversation?

21   A.        I listened to -- as I reached out for Kami,

22   I told her why I was calling and it was to -- only

23   for the sexual transgression because I was not

24   aware of anything else at that time, and at that

25   time she had told me after we had talked about her

10/24/2007  Braby, James - Vol. I

1     situation she had said, Bishop, there are some

2     other things that you need to know.

3          Q.       Okay.

4     A.       And so I listened.

5          Q.       And so the first conversation you

6     had with Kami in March of 2000 was also the first

7     conversation you had had with Kami involving any

8     issues regarding her marriage and it's your

9     recollection that that's the first time Kami Hanson

10    or anyone else had relayed to you that Scott had

11    some kind of prior incident in Utah involving minor

12    children?

13    A.       Yes.

14         Q.       What did she tell you about that?

15    A.       She told me that she had felt that her

16    husband had intimacies with David Ames.

17         Q.       Did she mention -- and for

18    simplicity sake, are you comfortable with the term

19    abuse or allegation of abuse?

20    A.       Yes.

21         Q.       Okay.  Did she mention anything

22    about the possible abuse of other boys?

23    A.       I think, yes, it was a long time ago, and

24    I'm trying to be as clear as I can.  Did I learn of

25    abuse of other boys?  Particularly she had

```
 1              Q.      Okay.  Is he with us?

 2    A.        He's in Texas.

 3              Q.      Okay.

 4    A.        He moved away.

 5              Q.      Do you know what part?

 6    A.        Richard G.  Myers.

 7              Q.      How long after your conversation

 8    with Kami Hanson, the first one in March of 2000,

 9    did you contact your Stake President, Richard

10    Myers, about that phone call and the information

11    you learned?

12    A.        That night.

13              Q.      What did you and Stake President

14    Myers discuss at that time?

15    A.        He wasn't there.  I didn't make contact

16    with him that night.

17              Q.      After you called him and left a

18    message I presume?

19    A.        Yeah, I left a message.

20              Q.      What did you then do next with

21    respect to either of the -- either the Hansons

22    divorce or the allegation of abuse against Scott

23    Hanson?

24    A.        I called the Salt Lake Church hotline set

25    up for these type of situations.
```

13

1            Q.        Was that that same evening?

2    A.        The next day because it was at night and I

3      called the next day.

4            Q.        Is that the -- I forget what they

5      call it but it's in the file but that's the number

6      that you're encouraged to contact with situations

7      involving legal matters?

8    A.        No.  That hotline was not I don't think set

9      up for that.  That hotline was set up for abuse

10     situations.

11           Q.        Okay.

12   A.        Alleged abusive situations or whatever, to

13     report number one to the Church and number two, to

14     start getting guidance.

15                     MR. KRAUS:  If I can be of

16                 assistance I think it's commonly called the

17                 help line.

18                     MR. BOWERS:  Okay.  Good,

19                 got everybody helping me with what I should

20                 know.

21           Q.        You called the hotline the next

22     day?

23   A.        Yes.

24           Q.        And did you have an understanding

25     one way or the other whether that was for legal

14

1    A.        Out in the Salt Lake area.

2          Q.        I believe we had just in terms of

3    chronology discussed the phone call you made with

4    Kami Hanson encouraging her to report to DYFS any

5    knowledge she had about Scott's abuse the first

6    time that she mentioned it to you in March of 2000.

7    Is that correct?

8    A.    Yes.

9          Q.        Did you then next call Kathy Ames?

10   A.        I called Kathy Ames shortly after.  I don't

11   know the hour or anything but there wasn't too much

12   grass left underneath my feet.

13         Q.        But with respect to this issue of

14   what you're learning in March of 2000 about Scott

15   Hanson and Kami Hanson has and David Ames, the next

16   thing that you did was call Kathy Ames?

17   A.        Yeah, had her come over after I talked with

18   Kami Hanson.

19         Q.        You made appointments with --

20   A.        Yes, I asked her to come over.

21         Q.        Did she come over that day?

22   A.        Yes, she did.

23         Q.        What did you guys talk about?

24   A.        We talked about the allegations that Kami

25   had made about David and things.  I don't believe I

1      told her anything else.  I was talking about David

2      because I was concerned about David and she needed

3      to know that the allegations had been made.  She

4      denied that Scott would do anything like that.  She

5      thought Kami was making this up as part of the

6      divorce.  I told her I did not think so.  I

7      counseled her to go home and after we talked, we

8      talked for hours between tears and denials.  I

9      counseled her to go home and talk with her husband

10     Chris Ames and to talk with David and that if they

11     did believe the story or the allegations or

12     whatever it was, that they should contact DYFS.

13     They should do whatever is necessary to protect

14     David.

15           Q.        Did you inform Kathy at that time

16     that Scott had been convicted of a sex offense

17     involving a minor child in 1986?

18                         MR. KRAUS:  Objection to

19           the form.  You can answer.

20     A.        I can't remember.

21           Q.        Did you inform her because when

22     you were just giving me that answer you stated you

23     talked about David's allegations.  What history

24     with other children besides David Ames did you

25     relate if any in your conversation with Kathy Ames?

1      Kathy and I had several telephone conversations

2      about this situation with Scott and the sexual --

3      alleged sexual abuse and I say alleged because at

4      that time it was her stating what it was, but I

5      knew that it was in a proper frame.  In April I got

6      a call from DYFS --

7              Q.      Can I stop you?

8      A.      Sure.

9              Q.      The last thing we had for sure was

10     some time in March you had gone to Kathy and then

11     Kami had said it would have been reported and you

12     said great.  Now we're to April with some real

13     dates.  I want to be clear what happened in the

14     interim.  As I understand it you spoke with Kami

15     Hanson on a couple of other occasions, just

16     generally about these allegations?

17     A.      Allegations and about when she was going to

18     come back.

19             Q.      Okay.

20     A.      So that we could have -- convene a

21     disciplinary council on her part of the sexual

22     transgression.

23             Q.      Did you discuss anything else with

24     Kami Hanson during that period of time between that

25     last phone conversation and when you heard from

# EXHIBIT 21

THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

The Presiding Bishopric
50 East North Temple Street, Salt Lake City, Utah 84150

May 10, 1995

To: General Authorities; Regional Representatives; Stake, Mission, and District Presidents;
Bishops and Branch Presidents in the United States and Canada

Dear Brethren:

<u>A Telephone Help Line</u>

Abuse in any form is tragic and is in opposition to the teachings of the Savior. Our hearts go out to all those who carry burdens resulting from such sins. Bishops and counselors in stake presidencies should consult with their stake president about incidents of abuse that come to their attention.

To help priesthood leaders respond more effectively to situations involving abuse, especially child abuse, a telephone Help Line has been established. Ecclesiastical leaders in the United States and Canada who become aware of any abuse involving Church members, are to call the Help Line (1-800-453-3860, extension 1911). This will enable the caller to consult with social services, legal, and other specialists who can assist in answering questions and in formulating steps that should be taken. Information about local reporting requirements will also be provided. Calls made to the Help Line are confidential.

May the Lord bless your continued efforts to ensure the well-being of all the members within your charge.

Sincerely,

THE PRESIDING BISHOPRIC

Merrill J. Bateman

H. David Burton

Richard C. Edgley

# RESPONDING TO CHILD ABUSE
## Guidelines for the Instructor

## BACKGROUND

### Problem

Abusive behavior is contrary to the laws of God and the policy of the Church. It can have a devastating effect on individuals and families and may expose the Church to significant costs and embarrassment.

### Incidents with Serious Consequences

- Extending callings to members who are known to have abused others.
- Not notifying priesthood leaders when a known perpetrator of abuse will move into their unit.
- Not registering Scout leaders.
- Not reporting abuse to civil authorities as required.
- Not responding appropriately and in a timely manner when potential problems involving abuse first come to the attention of leaders.
- Calling members to positions without first obtaining their membership records or without clearing the calling with former priesthood leaders.

## INSTRUCTION

### Objectives of the Special Meeting

- Help leaders recognize and prevent abuse.
- Present one simple instruction: priesthood leaders are to call the HELP LINE for direction when they become aware of abuse. Call *1-800-453-3860, ext. 1911.*

### Preparing for the Meeting

- Duplicate and distribute copies of Study A and Study B to all who will attend.
- Distribute to the stake president and his counselors, and to bishops and their counselors copies of the booklet *Responding to Abuse: Helps for Ecclesiastical Leaders* (32248) so that they may carefully study the booklet before the meeting. Additional copies of the booklet may be obtained from the Church distribution center.

### How to Teach

- Hold a special meeting in conjunction with stake conference beginning with the second half of 1995. Stake presidents and their counselors, bishops and their counselors, and stake and ward Relief Society presidents are to attend this special meeting.
- Briefly review with participants the instruction found in the booklet and the related scriptures. Then discuss the attached studies, answering the questions presented with each study.
- Because of the delicate nature of this topic, seek the guidance of the Spirit in teaching these principles; avoid discussion of any supposed details of the abuse or personal experiences or illustrations.

### Points to Teach

- Bishops must take seriously any reports of child abuse and call the HELP LINE. They must also call the HELP LINE for instruction regarding child abuse reporting laws in their area. Bishops and other leaders must encourage members to comply with child abuse reporting laws.
- Members must not be called to positions until their membership records have arrived in the ward or until contact is made with the previous bishop.
- A membership record that is annotated or flagged with the comment "Bishop—Contact Headquarters" means there is very important information the bishop needs to know about this member.
- All Scout leaders must register with Boy Scouts of America or Scouts Canada immediately after they are called.
- Church-sponsored activities, whether in Church facilities or other locations, must be properly supervised to ensure the well-being of children and youth.
- Experience indicates that no matter how remorseful the offender appears to be, repeated abusive behavior will not change until the offender admits his behavior and takes responsibility for it. Ecclesiastical actions may involve Church discipline as prompted by the Spirit, appropriate legal intervention, or professional counseling.
- When the unit to which a member is moving is known and when the bishop needs to pass on important information, a Request for Contact form (32387) can be stapled to a membership record. This indicates that the new bishop must contact the previous bishop.

## Study A

Bishop McBride has just been informed by a Young Women adviser that a fifteen-year-old young woman was touched inappropriately by a male member while attending an activity in the ward meetinghouse. The girl, whose name is Andrea, was so distraught that she told her adviser about the incident immediately after it happened. Young Women advisers had earlier expressed concerns about the way this man related to the young women.

The man's name is Jim. He and his family moved into the ward about three months ago. Jim was so eager to serve that callings were extended to him and his wife before membership records were received in the ward. Jim is quick to make friends and seems to be reliable in his calling. The couple have three children. Bishop McBride has been impressed with Jim, and it is difficult for him to accept the possibility that Jim would inappropriately touch one of the young women.

The bishop invites Andrea to an interview. Andrea is shy and has difficulty talking. Andrea reaffirms what she said previously. She has not told her parents. They are not active members of the Church, and she fears that they will consider the Church to be at fault.

When privately confronted by the bishop, Jim admits that he may have inadvertently touched Andrea, but he was only "joking around." He claims that it is the only time he has done so and expresses remorse for his action. He denies having any previous involvement in such behavior. He is tearful and assures the bishop that this kind of thing will never happen again. He appears to be sincerely repentant.

When Bishop McBride checks with Jim's former bishop, he learns that a similar incident occurred in the previous ward. No disciplinary action was taken because the family moved shortly after the incident became known. However, the bishop had attached to the membership record a Request for Contact form (32387).

Discussion Questions

1. What is the first action a bishop should take when he becomes aware of abuse? (Call the HELP LINE; see *Responding to Abuse*, "Using the HELP LINE," p. 3.)
2. How would the bishop respond if he learned of the abuse through a confession from Jim rather than the report of others? (Call the HELP LINE; see *Responding to Abuse*, "USING THE HELP LINE," p. 3.)
3. What responsibility does the bishop have to investigate the allegations? (See *Responding to Abuse*, "Helping the Child," p. 2.)
4. Based on the laws in your area, what responsibility does the Young Women adviser have to report the abuse?
5. What actions should the bishop take regarding Jim?

Caution

Center the discussion on the appropriate way to resolve the issues that the study demonstrates, not on any supposed details of the abuse or on personal experiences or illustrations. In the discussion, avoid references to delicate matters.

COP00000551

## Study B

John has recently moved into the ward from out of state.  He is eager to be active in the new ward.  He explains that most of his Church experience is working in the Young Men program.  Staffing Scouting positions in the ward is a current challenge, and John is called to serve as a Cub Scout leader.  No immediate action is taken to register John with the Boy Scouts of America since the unit will be rechartered in three months and all leaders will be registered at that time.

John is diligent in his calling and spends considerable time with the boys both as a group and individually.  After John has served in this calling for several months, the mother of one of the Cub Scouts reports to the bishop that her son does not want to participate anymore.  The boy is not specific about the problem, saying only that he does not like John.  The son is starting to have behavioral problems at home and school, and the parents are concerned.  When John is interviewed, he expresses regret but feels he is effective with the other boys.  Within six months additional complaints have come to the bishop.  The most recent complaint alleges that John, following den activities at the meetinghouse and in his home, has repeated touched one of the boys inappropriately.

When confronted by the bishop, John denies the allegations.  The parents report the incident to the police, and an official investigation reveals that John was previously convicted of child molestation.  A short time later, as part of the rechartering process, an official from the Boy Scout council informs the bishop that John was previously barred from registration because of a similar situation.  Closer examination of John's membership record reveals the annotation "Bishop—Contact Headquarters."  Neither the bishop nor the ward clerk had noticed the annotation.  A call to Church headquarters reveals that John was disfellowshipped for child abuse.

Discussion Questions

1.  What is the first action a bishop should take when he becomes aware of abuse?  (Call the HELP LINE; see *Responding to Abuse*, "Using the Help Line," p. 3.)
2.  What safeguards could have been followed to help prevent a recurrence of child abuse?
3.  If the previous bishop had used a Request for Contact form, how might the situation have been different?
4.  What is the significance of the comment "Bishop—Contact Headquarters" when printed on the membership record?
5.  Why is it so important to register Scout leaders through the Boy Scouts of America or Scouts Canada immediately following their call?
6.  What action should the bishop take regarding John?

Caution

Center the discussion on the appropriate way to resolve the issues that the study demonstrates, not on any supposed details of the abuse or on personal experiences or illustrations.  In the discussion, avoid references to delicate matters.

COP00000552

# EXHIBIT 22

```
 1            IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF NEW JERSEY

 2               CIVIL ACTION NO. 06-3441

 3     DAVID V. AMES,                  :

 4                    Plaintiff,       :

 5               -vs-                 : DEPOSITION OF:

 6     CORPORATION OF THE PRESIDENT OF  :   JEFF KLINE

       THE CHURCH OF JESUS CHRIST OF

 7     LATTER-DAY SAINTS,              :

 8                    Defendant.       :

 9     ----------------------------------

10

11     B E F O R E:

12          SHARON B. STOPPIELLO, a Certified Court

13     Reporter and Notary Public of the State of New

14     Jersey, at the offices of LATHAM & WATKINS, L.L.P.,

15     One Newark Center, Newark, New Jersey, on Friday,

16     February 8, 2008, commencing at 11:25 a.m., pursuant

17     to Notice.

18

19

20

21

22

23

                           DepoLink

24     Court Reporting & Litigation Support Services

            Phone (973) 353-9880    Fax (973) 353-9445

25                www.depolinklegal.com
```

1

**2/8/2008  Kline, Jeff - Vol. I (Exhibits)**

1    guess that's how I know it.

2         Q      And there's indications that that

3    information came from Kami, but not from Mrs. Ames,

4    correct?

5    A      Yeah, I think so, by what I'm looking at.

6         Q      Is there any indication that Kathy

7    Ames told Mr. Deemer that family members observed

8    Scott and David cuddling in the Ames' living room?

9    I would define "cuddling" as embracing or arms

10   wrapped around each other.

11   A      In this document or ever?

12        Q      Well, would this document reflect the

13   more thorough explanation of Mr. Deemer's

14   conversation with Mrs. Ames?

15   A      This reflects his investigation.

16        Q      And in that investigation he met with

17   Mrs. Ames, correct?

18   A      Correct.

19        Q      And in that explanation he discusses

20   the conversation that they had and the information

21   she provided to him?

22   A      Yes.

23        Q      Is there any information provided

24   from Mrs. Ames that Scott and David were seen

25   cuddling in the Ames' living room?

**2/8/2008  Kline, Jeff - Vol. I (Exhibits)**

1    A    I don't think so.

2         Q    How about that Ames family members,

3    including Mrs. Ames, may have observed Scott and

4    David in a spooning position in a bed in their

5    house?

6    A    No.

7         Q    And would you understand a spooning

8    position to be one person lying behind the other

9    with their arm wrapped around?

10   A    Yes.

11        Q    Is there any indication that Mrs.

12   Ames told DYFS that Scott took David with him on a

13   business trip to Toronto, where they shared a hotel

14   room?

15   A    In this investigation?

16        Q    In the course of this investigation.

17   A    This first one?

18             MS. D'ALEO:  Are we talking about the

19   document, the first contact that was made, or within

20   the course of DYFS's history with this case?

21             MR. ROSENTHAL:  We would refer only

22   to the April investigation.

23             MS. D'ALEO:  So the document that

24   he's looking at right now, Kline-3.

25             MR. ROSENTHAL:  Correct.

1    A      From Mrs. Ames saying he went to Toronto?

2           Q       Correct.

3    A      No, I don't see anything about that here.

4           Q       How about is there any information

5    that Mrs. Ames told Mr. Deemer that Scott took David

6    on a cruise to the Bahamas?

7    A      Not during this contact.

8           Q       Is there any indication that Mrs.

9    Ames told DYFS that Scott and David wore matching

10   jewelry that Scott had bought for them?

11   A      No.

12          Q       Is there any indication that Mrs.

13   Ames told DYFS that David had complained to his

14   father that he was uncomfortable with Scott sleeping

15   in his bed with him?

16   A      No.

17          Q       Would you consider the information we

18   just discussed relevant to a DYFS investigation?

19   A      If it had been reported to DYFS during this

20   investigation, it would have been important.

21          Q       And would you think that this is

22   information that you would want to know when

23   investigating allegations regarding a relationship

24   between a minor child and an adult?

25   A      Could you repeat your question?  I'm sorry.

1    Scott's medication and counseling?

2    A      I don't recall any.

3           Do you want me to keep talking about the

4    first question?

5           Q      Absolutely.

6    A      They talked about previous allegations

7    involving other boys.

8           Q      Did Mr. Hanson confirm those?

9    A      He said it was a "witch hunt," never

10   criminally charged, but it continued for a year.  He

11   was cleared of misconduct.  He was aware that Kami

12   made allegations.  The bishop had confronted him

13   about it -- I'm sorry, confronted Mrs. Ames about

14   the allegations of a possible sexual nature between

15   he and David.  Scott confronted the bishop.  The

16   bishop didn't deny it.  Then he talks about the

17   previous bishop being more sympathetic towards him

18   and was by his side during the previous

19   investigation.

20          Q      Did Scott, in fact, confess to an

21   inappropriate relationship with David Ames?

22   A      No.

23          Q      In fact, he outright denied that

24   anything inappropriate was happening?

25   A      He did deny it.

1    verify and confirm that.  It's a nice thing to do.

2    It's good casework, it's not policy.  Some workers

3    will tell the family at the last visit that they go

4    to that they believe that the case will probably be

5    submitted for closure, and then we close the case.

6    And there's a technical procedure, you know, with

7    the computer system and all that that we have to go

8    through.

9         Q     Once a case is closed, is there a

10   lower threshold for reopening an investigation?

11             MS. D'ALEO:  I think --

12             MR. ROSENTHAL:  How about I'll

13   rephrase it.

14        Q     Does having a prior closed case

15   influence a later investigation?

16   A     No.  It doesn't influence the screening

17   decision to accept a referral.  It could influence

18   our thinking during a subsequent referral.

19        Q     When was the effective date that the

20   Ames case was closed?

21   A     Terminated 6/13/2000, according to the front

22   of the case record.

23        Q     You've previously said that DYFS

24   couldn't prove abuse in this case; is that correct?

25   A     Right.  Not that any was alleged, but we