**Martin, Gunn & Martin, P.S.**
Sentry Office Plaza, Suite 420
216 Haddon Avenue
P.O. Box 358
Westmont, NJ 08108
Telephone: 856-858-0900
Facsimile: 856-858-1278

*Attorneys for Plaintiff David V. Ames*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID V. AMES,<br><br>                    Plaintiff,<br><br>v.<br><br>CORPORATION OF THE  PRESIDENT OF THE CHURCH OF JESUS CHRIST OF THE LATTER-DAY SAINTS, a Utah corporation sole, a/k/a the "MORMON CHURCH," and WILLIAM SCOTT HANSON, individually,<br><br>                    Defendants. | Civil Action No 06-CV-3441 (WJM) (MF) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Martin, Gunn & Martin, P.S.**
Sentry Office Plaza, Suite 420
216 Haddon Avenue
P.O. Box 358
Westmont, NJ 08108
Telephone: 856-858-0900
Facsimile: 856-858-1278

*Attorneys for Plaintiff David V. Ames*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID V. AMES,<br><br>     Plaintiff,<br><br>v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF THE LATTER-DAY SAINTS, a Utah corporation sole, a/k/a the "MORMON CHURCH," and WILLIAM SCOTT HANSON, individually,<br><br>     Defendants. | Civil Action No 06-CV-3441 (WJM) (MF) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ............................................................................... 1

II.  COUNTERSTATEMENT OF FACTS ................................................................... 1

    A.   1986 Scott Hanson is Charged with Two Felony Counts of Child Sexual Abuse and is Ultimately Convicted of the Crime of Lewdness Involving a Child............................... 1

    B.   Church Discipline and Record Keeping. .................................................................. 3

    C.   The Church's "Investigation" of the Sexual Abuse Charges Against Scott Hanson... 5

    D.   Scott Hanson And The Ames Family In New Jersey. .............................................. 14

III. ARGUMENT ....................................................................................................... 23

    A.   Summary Judgment Standard. ................................................................................ 23

    B.   The Issue Of Superseding And Intervening Cause Should Be Left To The Jury. ..... 24

    C.   Whether Defendant's Conduct Subjects It To Punitive Damages Should Be Left To The Jury. ......................................................................................................................... 30

IV.  CONCLUSION .................................................................................................... 34

### TABLE OF AUTHORITIES

***U.S. Supreme Court Cases:***

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................. 24

***United States Court of Appeals – Third Circuit***

*Equimark Commercial Financial Co. v. CIT Services Corp.*,
812 F.2d 141 (3d Cir. 1987)............................................................ 23

*Marzano v. Computer Science Corp.*,
91 F.3d 497 (3d Cir. 1996)............................................................. 24

***United States Court of Appeals – Seventh Circuit***

*Peck v. Ford Motor Company*,
603 F. 2d 1240 (7th Cir. 1979)....................................................... 26

***United States District Court – New Jersey***

*Perlman vs. Virtua Health, Inc.*,
2005 U.S. Dist. LEXIS 34833 (D.N.J. 2005) ................................ 33

***United States District Court – Other Districts***

*Brown vs. Youth Services, Int'l of South Dakota, Inc. d/b/a
Chamberlain Academy,*
89 F. Supp. 2d 1095 (S. D. S. D. 2000) ................................... 31, 32

***New Jersey State Cases:***

*Davis v. Brooks*, 280 N.J. Super. 406,
655 A.2d 927 (App.Div. 1993) ................................................ 24, 25

*Dong v. Alape*, 361 N.J. Super. 106,
824 A.2d 251 (App.Div. 2003) ...................................................... 31

*Nappe v. Anschelewitz, Barr, Ansell & Bonello,*
97 N.J. 37, 477 A.2d 1224 (1984)................................................. 31

*Yun v. Ford Motor Co.,*
142 N.J. 162, 669 A.2d 1378 (1996)........................................ 26, 29

*Yun v. Ford Motor Co.*, 276 N.J. Super. 142,
647 A.2d 841 (App. Div. 1994),
*rev'd on dissent*, 142 N.J. 162, 669 A.2d 1378 (1996) ..... 25, 26, 29

**Other States:**

*Sacci v. Metaxas*, 355 N.H. Super. 499,
  (App. Div. 2002) .......................................................................... 26

*Doe v. Boy's Clubs of Greater Dallas, Inc.,*
907 S.W.2d 472 (Tex. 1995) ........................................................ 26

*Doe v. Garcia*, 131 Idaho 578, 961 P.2d 1181 (1998) ............ 26, 27

*Haselhorst v. State of* Nebraska, 240 Neb. 891,
485 N.W.2d 180 (1992) ................................................................ 28

*Travis v. Bohannon*, 128 Wn. App. 231, 115 P.3d 342 (2005) ..... 28

*Walker v. Rinck*, 604 N.E.2d 591 (Ind. 1992) ................................ 28

**New Jersey Statutes:**

N.J.S.A. §2A:15-5.12(a) ................................................................ 30

N.J.S.A. §2A:15-5.12(b) ................................................................ 30

**Utah Statutes:**

Utah Stat. Ann. § 77-27-21.5 (1987) ............................................... 3

Utah Stat. Ann. § 76-9-702.5 .......................................................... 3

## I.   PRELIMINARY STATEMENT

In its motion, Defendant Church attempts to distance its actions from the harm done to David Ames.  Despite those efforts, the Church must recognize its culpability and ultimate liability for the sexual abuse of David Ames.  Indeed, had the Church met its obligation of conducting an actual investigation of the allegations of sexual abuse in 1986, Hanson would never have harmed David Ames.  Based on the Church's self-imposed practices and procedures, the investigation (and ultimate discipline) should have resulted in, at minimum, a "flag" being placed on Scott Hanson's membership record, which, in turn, should have prevented his contact with the Ames family under the imprimatur of the church's approval.  Without the ostensible blessing of the Church, Scott Hanson would never have been afforded the opportunity to gain and abuse the trust of David and the Ames family.  In these circumstances, a jury could find that the Church acted, at the least, wantonly and willfully in not properly investigating Scott Hanson's prior conduct and in not instituting and following its own procedures for ensuring that a convicted sexual predator is not thrust into the home of Mormon families.  In addition, a jury could find that, considering the major problems in the Ames household, which were known to the Church, David's parents' trust in their Church and in Scott Hanson was reasonably foreseeable, especially where Scott's prior conviction arose out of the abuse of 9-year old boy while right under the noses of his parents and family.  In sum, the Church's Motion for Summary Judgment or, in the alternative, Motion to Dismiss Plaintiff's punitive damages should be denied.

## II.   COUNTERSTATEMENT OF FACTS

### A.   1986 Scott Hanson is Charged with Two Felony Counts of Child Sexual Abuse and is Ultimately Convicted of the Crime of Lewdness Involving a Child.

In 1986, David Custer, a 14-year-old Mormon boy, alleged that he had been sexually abused by Scott Hanson, a 24-year-old life-long member of the Mormon Church ("Church").

*City of Orem Public Safety Department Incident Report ("Incident Report"): 2.[1]* A police investigation ensued. In the course of that investigation, three additional boys reported sexual abuse at the hands of Scott Hanson. *Id.* All four boys were Church members and fourteen years old or younger, three of them participated regularly in scouting with Scott; and two were the younger brothers of Scott's fiancé, JoLynne Schill. *Id.*

Scott was interviewed by police on November 14, 1986. *Incident Report:5-6.* During the interview, he confessed that he had 1) rubbed his erect penis on the back of one boy after having "thoughts and fantasies" while giving him a massage; 2) rubbed his knee on the genitals of his fiancé's nine-year old brother while the boy was sleeping over at his house; 3) on a couple of occasions, purposefully touched the genitals of his fiancé's 14-year old brother during a massage; and 4) rubbed his erect penis on the buttocks of a fourth boy while the boy was sleeping over at his house. *Id.* Scott also admitted that he felt bad and knew what he was doing was wrong." *Id.*

The interviews of the victims, along with Scott's own admissions, demonstrated Scott's particular pattern of behavior. *Incident Report:2-5.* Scott engaged in a pattern of 1) offering to give neck and back massages to the young boys he had befriended; 2) moving to leg and hip massages; 3) repeatedly touching the boys' genitals while massaging their legs; and 4) with at least two of the boys, more severe molestation - the rubbing of his own erect penis on the back or the buttocks of the child and, with one boy, repeated sodomy attempts. *Id.*

The charges against Scott were originally filed as serious felony sexual assault charges-Attempted Forcible Sodomy and Aggravated Sexual Abuse of a Child. *Information.* In October 1987, Scott entered a plea bargain in which he pled guilty to the reduced charge of Lewdness Involving a Child. *Change of Plea; Statement by Defendant in Advance of Plea of Guilty*

---

[1] The 1986 Incident Report is not inadmissible hearsay because plaintiff does not rely on the truth of the assertions in the report. Rather, Plaintiff relies on the Incident Report to show that the specifics of the allegations and Scott's statements were contained therein and that this specific information, whether or not it was true, was available to Bishop Hansen and President Howell.

*("Statement")*. Pursuant to his conviction he was then considered a "sex offender" under Utah law and subject to sex offender registration requirements. *Utah Code Ann. §77-27-21.5 (1987)*. Contrary to assertions made in the Church's motion, Scott's plea was **not** based on lack of evidence.   Instead, the plea agreement was reached after Scott's motion to suppress his confession based on technical Miranda violations was granted, partly because the Judge was concerned that Scott's statement was not recorded. *See May 7, 1987 Ruling*. His one year jail sentence, the maximum possible sentence, was suspended for a probationary period of 18 months, during which he was required to obtain therapy and abstain from involvement in youth programs. [2] *Judgment and Order of Probation; Statement, 2*.

**B.    Church Discipline and Record Keeping.**

The Church's formal internal discipline process claims to be designed to 1) save the souls of transgressors, 2) protect the innocent; and 3) safeguard the purity, integrity and good name of the Church. *Church Handbook of Instruction ("Handbook"):91*. The Handbook states:

> The **second[3] purpose of Church discipline is to protect the innocent**. With inspiration, a priesthood leader should act to protect Church members when a transgressor poses a physical or spiritual threat to them, such as by physical harm, sexual abuse, drug misuse, fraud or apostasy.

---

[2] In 1987, the State of Utah had not yet adopted a modern "Megan's Law" sex offender registration law. However, Utah's  then sex offender registration law, which limited access to registration information to court and law enforcement personnel, applied to those convicted of §76-9-702.5, Lewdness Involving a Child, and defined such convicts as "sex offenders." For that reason, the Church's entire argument regarding the fact that Scott's sentencing did not require registration is unsupported and misleading.   See Plaintiff's Statement of Undisputed Facts In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Statement of Undisputed Facts") and Plaintiff's Response to Defendant's Statement of Undisputed Facts.

[3] Interestingly, the "first purpose" of the Church discipline is to "help" the Transgressor. *Id.*, 91.

*Id.,* 91. While a Stake president has disciplinary authority over all members of a stake, Bishops normally administer Church discipline unless evidence indicates that a Melchizedek priest is likely to be excommunicated. *Id.,* 91.[4]

Disciplinary counsels or "church courts" are held to deal with serious transgressions. *Id.,* 95. The Handbook mandates "church courts" for members who may have committed murder, incest, child abuse, apostasy, a serious transgression while holding a prominent church position, demonstrated a pattern of serious transgressions or are predators. *Id.,* 96. Additionally, discipline *may* be used in other circumstances. *Id.* The Handbook emphasizes that church courts are ecclesiastical and not civil in nature, but includes a series of procedures for serving notice, taking testimony, rendering and recording a decision, and appeal. *Handbook,* 97-101.

A church court may reach one of four decisions: 1) no action, 2) formal probation, 3) disfellowshipment[4] or 4) excommunication. *Handbook,* 97. There may be a public announcement of disfellowshipment or excommunication in the case of "a transgressor whose predatory tendencies seriously threaten other persons." *Id.,* 100. Disfellowshipment or excommunication are noted in the membership records. *Id.,* 101.

The Church keeps membership records for each member in the Church. *Id.* p. 123. The Church keeps records in part to:

> Help leaders get to know members and identify their needs. For example, records can help leaders identify who may need special care in becoming more active in the Church or becoming worthy of receiving temple blessings.

*Id.* p. 123. The Handbook provides "membership records **are the only means of recording** ordinances and actions in the permanent records of the Church." *Id.* p. 127 (emphasis added). Membership records are transferred from ward to ward when members relocate and the Handbook cautions, "it is especially important to record ordinance information, promptly,

---

[4] For further explanation of the Mormon structure and priesthood see Plaintiff's Statement of Undisputed Facts.

request records of members who move into the ward, and promptly transfer the records of members who move from the ward." *Id.*, 127.

The Church has no other policies or provisions allowing for criminal background checks, reference checks or other means of tracking members as they move from ward to ward. However, a ward's ability to obtain prior information about a member has been in existence since at least 1985. The 1985 Handbook provides that a bishop may attach a "red tag request for contact" to a membership record. *1985 Handbook*, 9-3. This request for contact does not require formal church discipline, is left solely to the discretion of the bishop and does not necessarily involve Church headquarters.[5]

## C.    The Church's "Investigation" of the Sexual Abuse Charges Against Scott Hanson.

In keeping with the hierarchy and teachings of the Mormon Church, immediately after Scott was interviewed by the police, he contacted and met with his Bishop, Robert O. Hansen. *Deposition of Robert O. Hansen ("Hansen"), 7-9.*[6]   Bishop Hansen testified that he was "very troubled" about the "potential" of the charges against Scott, as he had known him for many years. *Hansen*, 9, 10, 16.   During the meeting, Scott told Bishop Hansen his version of the allegations

---

[5] In 1998, the Church instituted two formal procedures to mark a member's record. To protect church members, a record can be annotated for members "whose conduct has threatened the well being of other persons or of the Church," or for members who have been disciplined for sexual abuse of a child, incest, plural marriage, an elective transsexual operation, repeated homosexual activities (by adults), or embezzlement of church funds or property. *Id.*, 129. Membership records can also be annotated if a priesthood leader submits written notification of a criminal conviction for any of the same offenses. *Id.*, 129. More importantly, the Church provides for "Requests for Contact" on membership records. According to the Handbook:

> If a member moves and bishop feels a need to share information with the member's new bishop, he completes a Request for Contact form and sends it with the membership record. When a bishop receives a record that is accompanied by one of these forms, he should contact the previous bishop as soon as feasible. After the contact the Bishop should destroy the request for contact form.

*Handbook*, 129.

[6] Scott Hanson's immediate call to this Bishop for help is even more significant when considering the context of the role of the Bishop in the life a Mormon priest, like Scott.   See Plaintiff's Statement of Undisputed Facts.

and denied any wrongdoing. *Hansen*, 11-12. Scott claimed that the police questioning was improper and twisted the truth, but **admitted that he had made genital contact with the young boys**. *Hansen*, 12-14.

On November 14, 1986, the parents of JoLynne Schill (Scott Hanson's fiancé) called Stake President Leland Howell (Bishop Hansen's ecclesiastical supervisor) informing him of Scott's arrest and wanting to know what the Church was going to do about it. *Deposition of Leland Howell ("Howell")*, 59-60. Immediately after the phone call with the Schills, President Howell called Scott Hanson's parents. *Howell*, 61. President Howell had known Scott and his family since he was a child and Scott had often spent time at the Howell residence with Howell's son Barry. *Howell*, 51-56, 59-60. At the request of Scott's mother during the Howell/Hanson phone call, Howell met with Scott and his father to provide support to Scott. *Id.*, 62, 66-67. Howell did not recall discussing the specifics of the allegations, but recalled Scott's claims of innocence. *Id.*, 63-64. He assured Scott and his father that Church leaders would do "everything we can do to help him." *Id.*, 69.

Within days, Bishop Hansen met with President Howell to devise a plan of action. *Hansen*, 22, 48-49, 51, 76-77, *Howell*, 76. It was understood that if their investigation showed Scott had sexually abused a child, they would have no choice but to seek excommunication. *Hansen*, 258-260. Despite the severity of the situation, neither Howell nor Bishop Hansen reviewed any church materials, consulted with any church superiors, or consulted the church legal department for guidance in creating this plan. *Howell*, 77-78, 81-82. Instead, they decided that Bishop Hansen would simply monitor the criminal investigation and that he would interview boys in the ward who had interactions with Scott Hanson to determine if any of them had experienced or observed inappropriate behavior by Scott. *Hansen*, 49-50; *Howell*, 82. Bishop Hansen had limited experience with the "Church court" process and it was his first investigation

into a disciplinary issue as Bishop. *Hansen*, 67-73, 76. Because a Bishop's responsibilities include the investigation, evaluation, judgment, and discipline related to any alleged transgressions of ward members, President Howell relied on Bishop Hansen to conduct the investigation and report to Howell.[7] *Howell*, 23, 97-98, 129.

The ostensible supposed purpose of the interviews of the boys in Scott's ward was to help to determine if Scott was "guilty as accused" by the victims. *Hansen*, 103; *Howell*, 83, 88. However, Howell also testified that one of the intended purposes of the investigation was to assist Scott if he had been unjustly accused. *Howell*, 84.

Despite Bishop Hansen's intention to conduct interviews of over a dozen young boys regarding extremely sensitive information -- essentially asking them if Scott Hanson had ever molested them -- Bishop Hanson did almost no preparation or research on how to conduct such interviews. *Hansen*, 80. Prior to the interviews, 1) he did not bother to learn the details of the allegations; 2) he did not seek advice of mental health professionals or law enforcement officials; and 3) he does not recall referencing the church and secular materials to which he had access regarding child sexual abuse and how to conduct interviews. *Hansen*, 79-80, 89-90. Although the Incident Report clearly outlines Scott's escalating pattern of behavior, because Bishop Hansen never read that report and instead only received Scott and his attorney's self-serving version of the facts, while conducting his interviews, Bishop Hansen never understood Scott's escalating pattern of behavior. *Hansen*, 96-97. Thus, Hansen does not even know whether he asked any of the boys whether Scott had given them backrubs. *Hansen*, 100. Nor does he recall asking questions to determine if there was any escalating behavior by Scott. *Hansen*, 102-103. In light of Hansen's "interview" techniques, not surprisingly, none of the boys in Scott's ward reported any inappropriate behavior. *Hansen*, 107-108.

---

[7] Howell's term ended in June of 1987 and Bruce Olsen took over as President, which included the responsibilities of monitoring and supervising the "investigation". *Howell*, 29, 108-109.

Oddly, the vast majority of the information gathered by Bishop Hansen in his "investigation" came from Scott, Scott's parents, and Scott's criminal defense attorney. *Hansen,* 36. The only information about the specifics of the allegations came from Scott and his defense attorney. *Hansen,* 36, 40, 41-42. Bishop Hansen never read the police report, and never bothered to get direct information from the police department, the prosecutor, or the victims and their parents. *Hansen,* 36-37, 100, 186-187. Bishop Hanson recalls being contacted by David Custer's Bishop, but he does not recall talking to the Schill's Bishop or the other victim's Bishop, or whether he even tried to contact them. *Hansen,* 29, 30-31.[8]

President Howell also did not bother to ask Bishop Hansen to interview the victims, nor did he himself bother to contact the victims or their families. *Howell,* 94. Howell also never read the Incident Report, as he did not think it would have been helpful. *Howell,* 117-118. Howell did interview Scott, who claimed he had just been "horsing around" with three or four other boys and had done nothing wrong, but did admit wrestling under the covers with boys, "getting carried away," inadvertently touching the boys' private parts and "getting caught." *Howell,* 105-106, 109-111.[9]

Throughout the criminal process, Scott and his attorney met with Bishop Hansen on several occasions and discussed the case. *Hansen,* 37, 63. In fact, prior to the entry of the plea agreement, Bishop Hansen met with Scott and his attorney and counseled Scott that if he pled

---

[8] On page 7 of its Memorandum, the defendant states that "Bishop Hansen also called the Bishop for the Schill's ward but never received a return call," citing pp. 29-30 of Bishop Hansen's deposition transcript. The record contains no such testimony. See Plaintiff's Response to Defendant's Statement of Undisputed Facts.

[9] At the time of the interview, because Howell had not read the Incident Report and had very edited information regarding the allegations, he failed to grasp Scott was talking about 9-14 year old boys and not men of his own age. *Howell,* 83, 109.

"no contest" to the reduced charges, Bishop Hansen believed he would not need to initiate any church disciplinary proceedings. *Hansen*, 144-145, 159-161. [10]

Scott Hanson pled guilty shortly thereafter and was convicted of Lewdness Involving a Child.[11] Astoundingly, around that same time, despite Scott's conviction, Bishop Hansen recklessly came to the conclusion that the allegations against Scott were unfounded. *Hansen*, 135-137, 143. Bishop Hansen believed that Scott's conviction was simply the result of his "bad judgment" in allowing his fiancé's nine-year old brother to climb into bed with him during the night while sleeping at the Schill home. *Hansen*, 158-159. Even assuming that Hansen was truthful regarding his conclusion of innocence, the reasons given for that conclusion were as absurd as the "investigation" was recklessly conducted. **Bishop Hansen essentially admitted that he looked only for exculpating evidence and did not consider incriminating evidence, stating that if he had a chance to do his "investigation" over again he would have looked at the negative information he did not review: "In hindsight, ...I would have probably called for the reports. All of it. The positives and the negatives."** *Hansen*, 129-130.

Bishop Hansen claims that he started to doubt the allegations after learning from Bishop Pederson that David Custer had recanted his allegations and that the charges based on the abuse of David Custer were withdrawn. *Hansen*, 112-115. Based on that information, Bishop Hansen then decided that David Custer's allegations were not true and he no longer needed to consider them in his "investigation" and he also began to doubt the veracity of other allegations and wonder whether they were improperly solicited by the police. *Hansen*, 115-118.

---

[10] On page 8 of its Memorandum, the Church states that Bishop Hansen understood that Scott ultimately pled "no contest" to the criminal charges "in order to put the episode behind him and to put an end to the expensive legal fees being paid by his parents," citing to page 143 of Hansen's deposition transcript. This testimony also does not appear in the record. See Plaintiff's Response to Defendant's Statement of Undisputed Facts.

[11] Bishop Hansen claims that he did not know at the time that Scott Hanson pled guilty instead of "no contest" to the charges of lewdness involving a child, but testified that it would not have made any difference to him in deciding that Scott was innocent. *Hansen*, 149-151

Bishop Hansen continued his "investigation" with those doubts, even though he was aware of published Church advice that he should 1) give a child reporting sexual abuse the "benefit of the doubt" and "help and support," because "children rarely make up such things;" and 2) assume the allegations are true unless he found "irrefutable evidence to the contrary." *Hansen*, 255, 262; *I Have a Question, The Ensign/July 1984* ("*1984 Ensign*"), 30; *Child Abuse: Helps for Ecclesiastical Leaders* ("*Child Abuse: Helps*"), *1985*, 4. Bishop Hansen later questioned the credibility of the accusations, and determined Scott was innocent, in large part because the original charges were reduced, although he was not aware that Scott's confession was inadmissible because of a technical Miranda violation and that there was a technical violation in conducting the interview of one of the victims. *Hansen*, 117-120, 127. Tellingly, although he testified that he relied on the reduction of the charges in deciding Scott was innocent of a crime –although convicted, **he also testified that the information regarding the reasons for the reduced charges would not have made any difference to him**:

> I don't know that it would have had any influence, because everything else, my interviews, the removal of the testimony by two of the young men, Scott, his attorney, the psychiatrist, **I just didn't think he was guilty**.

*Hansen*, 119 (emphasis added). Because Bishop Hansen "just didn't think" a convicted sex offender was guilty, he provided his support to Scott even though he was aware of the published church advice that instructed him of the dangers of such actions:

- Trying to protect a molester almost always worsens the situation and validates the molester's behavior. *1984 Ensign*, 30;

- When child abuse is disclosed, one offender might deny the problem and another feel remorse and deep penitence. Much like an alcoholic, an offender usually continues the abusive behavior until he acknowledges it and accepts help."[12] *Child Abuse: Helps*, 4.

---

[12] Hansen did not recall that Scott expressed remorse or concern, but would have read such expressions if he had reviewed the Incident Report. *Hansen*, 264-265; *Incident Report, 5*.

- A person guilty of serious child abuse rarely changes his pattern of behavior without facing up to all consequences- criminal proceedings, Church discipline, social ostracism and others. *Child Abuse: Helps*, 5.

In additional bizarre reasoning, Bishop Hansen relied on the conclusions of two mental health professional reports that Scott was "clean" and not a pedophile, even though 1) the reports were created at the request of Scott's criminal defense attorney in an effort to beat the charges; 2) Bishop Hansen never actually read the reports or talked to either of the mental health professional about their conclusions, but instead relied upon the summary of the findings as relayed to him by Scott, Scott's parents, and Scott's attorney;[13] and 3) one of the mental health professionals actually relied on exculpating information received from Bishop Hansen's dangerously inept investigation in conducting his evaluation of Scott: "Bishop Hansen told me he had interviewed about a dozen boys in his ward and all of them have said that there was never any inappropriate behavior between the boys and your client." *Hansen*, 37-39, 117, 124-125; *May 5, 1987 Report of Robert J. Howell, Ph.D.* ("*Howell Report*"), 4; *Psychiatric Evaluation of William Scott Hanson by Peter Heinbecker, MD (undated) ("Heinbecker Report")*.

At the conclusion of his "investigation", despite the fact that Bishop Hansen was aware of his ability to do so, he decided, in consultation with then stake president Olsen that he should not conduct any church disciplinary court, nor make a request for contact, nor make a notation in Scott's church records regarding Scott's conviction of a child sex abuse crime because he believed Scott was innocent and falsely accused. *Hansen*, 189-191, 196, 225-226, 227-231; *Deposition of Bruce Olsen ("Olsen"),* 40-41. This decision was made even though, based on his awareness of church advice, **he understood that 1) he should only not notate Scott's records if he had irrefutable proof of his innocence; and 2) if he was wrong about Scott's innocence,**

---

[13] Had Bishop Hanson actually read the reports he would have learned that the reports did not state unequivocally that Scott was "clean." Dr. Heinbecker wrote: "I don't think it is possible to know with certainty what the truth of the matter is," noting Scott was potentially suppressing homosexual tendencies and his history showed of a lack of sexual interest in females. *Heinbecker Report*, 5.

**he would make things worse**. *Hansen*, 256-257. Bishop Hansen did not bother to make any informal notation to future Bishops in Scott's church records to contact him for more information. *Hansen*, 190. Nor did he bother to contact any of Scott's subsequent Bishops after Scott moved to Texas and beyond to warn them about Scott. *Hansen*, 215-217. He did not even take any steps to ensure that Scott complied with the terms of his probation. *Hansen*, 188.

Hansen also testified that he decided not to take any action to ensure that Scott had no involvement with youth because he assumed that Scott would abide by that requirement of his probation. *Hansen*, 188-189, 191, 220. Amazingly, however, Scott had received the suspension of his one-year jail sentence with probation based in part on Bishop Hansen's testimony as a character witness on Scott's behalf at the sentencing hearing. *Judgment and Order of Probation*, 2. Bishop Hansen had offered his testimony at the sentencing hearing with knowledge that it would help Scott. *Hansen*, 177, 186. At the hearing, Bishop Hansen testified that he was Scott's ecclesiastical leader, that he conducted interviews of boys in the ward and discovered no sexual misconduct, and that he was convinced that Scott was innocent of the charges. *Hansen*, 140, 142, 178-180.

Despite the fact that Bishop Hansen claims that he and the President had "great concern for children within the ward and outside of the ward," Bishop Hansen testified that he never even considered whether he may have been wrong in his conclusion that Scott - a convicted sex offender- was innocent and, if he was wrong, whether a temporary notation in Scott's church record would protect other children. *Hansen*, 231-235. Instead, Bishop Hansen was concerned about negative effects upon Scott. *Hansen*, 234-235. Consistent with that concern, Kami Hanson, Scott's former wife, testified that **Bishop Hansen later told her that he did not flag Scott's records because he did not want to ruin Scott's life**. *Deposition of Kami Hanson ("K. Hanson")*, 146-147. Bishop Hansen did not deny that he made such a statement. *Hansen*, 206.

Page 12

Plaintiff's expert, Harvard professor and pediatrician, Dr. Eli Newberger, opines the following regarding Bishop Hansen's actions:

> Bishop Robert Hansen's strategizing with W. Scott Hanson and his attorney, his credulous acceptance of their reports of the police investigation, psychological examinations, and the prosecutor's conclusions, his conducting his own "investigation" without attention to the victim's disclosures and their and their families' responses to W. Scott Hanson's abuse, his participating as a supportive witness in W. Scott Hanson's criminal sentencing, his enabling W. Scott Hanson's victimizing behavior by minimizing both Hanson's offenses and the significance of his guilty plea, his neither conducting a Church trial nor tagging W. Scott Hanson's membership records, increased the likelihood of W. Scott Hanson's subsequent offending and contributed directly to the sexual abuse of David Ames...by intruding into the ministry of the Bishop (Pederson) whose congregants were victimized by W. Scott Hanson, rather than to engage the clarifying and helpful participation of knowledgeable clinicians, Bishop Robert Hansen added confusion and erroneous interpretations of the victims' disclosures and reified the Church's mistaken conclusion of W. Scott Hanson's innocence, notwithstanding his guilty plea.

*Ames v. Mormon Church: Violations of Canons of Congregate Care for Children, Eli H. Newberger, M.D., March 7, 2008,* ("*Newberger Report*"), 21. Furthermore, Plaintiff's punitive damages pattern and practice expert, Dr. Martha Beck, Ph.D.[14] a Harvard educated sociologist, and the daughter of prominent Mormon theologian and Brigham Young professor Hugh Nibley, opines that the response patterns of Church officials in this case reflect a broad and persistent pattern of child sexual abuse concealment by the defendant. Dr. Beck notes the salient reasons supporting her conclusion that there exists a substantial probability that the kinds of failures that occurred here will be repeated unless sufficiently deterred:

---

[14] Dr. Beck's opinions are based in part on her published peer-reviewed sociological research on the response patterns of Church leaders to child sexual abuse victims. One study interviewed 71 female Mormon sexual abuse victims from different congregations that had disclosed abuse by LDS priesthood holders to church leaders. The interviews contain very similar narratives, which support the existence of patterns that characterize behavior in the Church as a whole, not isolated or unusual congregations. *Adult Survivors of Childhood Sexual Abuse: The Case of Mormon Women*, Gerdes, Beck, Cowan-Hancock and Wilkinson-Sparks, Affilia, Journal of Social Work, Vol. 11, No. 1 Spring 1996, 39-60; *Betrayal of Sacred Trust, "Sanctuary Trauma" in Sexual Abuse Survivors*, Gerdes and Beck, Social Work Today, April 1, 2002.

- The social history, formal structure, and informal social dynamics of the LDS church are overwhelmingly biased in favor of protecting the reputation and confidentiality of pedophiles who are members of the church, and denying, minimizing, or suppressing the openness and impartiality necessary to help survivors of sexual abuse.

- When victims of abuse report their victimization to their Mormon church leaders, the reaction of those leaders is often to discount, minimize, or deny the abuse, while offering support for the reputation and secrecy of Mormon perpetrators.[15]

- The bias toward support of Mormon perpetrators and suppression of assistance to victims is a systemic characteristic of the church's leadership structure.

- The social history of the LDS church is one in which hiding sexually aberrant relationships[16] and behaviors, especially those of male church members, is extraordinarily prominent.

- The structural, social and psychological patterns within Mormonism support and conceal sexually aberrant behavior on the part of male church members.

*Report on Sexual Abuse in Mormonism, Martha Beck*, March 27, 2008 ("*Beck Report*"), 1-2.

**D.    Scott Hanson And The Ames Family In New Jersey.**

In November of 1997, after Chris Ames accepted a job as network manager with Donna Karin, Chris and Kathy Ames moved to Hackettstown, New Jersey with David and three of his siblings. *Deposition of Chris Ames ("C. Ames"), 18-19, 21-22.* Chris had been raised in the church and had held callings in the Church, including in the Elder's Quorum leadership. *C. Ames*, 20-23. Kathy had been raised in the Church and was active and a regularly attending member in 1998. *C. Ames*, 22.

---

[15] Four types of negative reactions were reported: 1) The leaders did not want to talk about the abuse or refused to believe that the alleged perpetrators "would ever do anything like that;" 2) The leaders offered simple "solutions," such as telling the survivors, "Stop thinking about it," or "Read your scriptures and pray more;" 3) The survivors were told to simply "forgive and forget;" and 4) Some leaders accused the survivors of somehow having caused their own abuse.

[16] Dr. Beck notes that "it has only been a few generations since polygamists were actively hidden from secular authorities by believing Latter-day Saints (my own great-grandfather was a polygamist). This means that psychologically, as well as structurally, Mormons are exposed to behavior and belief patterns that hide and protect aberrant sexual behavior when perpetrated by Mormon men in good standing." *Beck Report*, 14

In early 1998 Scott Hanson was called[17] by then Bishop Wallin to serve as the "11-yeard-old Scout leader," also known as the Blazer leader, in the Ledgewood Ward. *Deposition of Erik Wallin* ("*Wallin")*,19; *Deposition of W. Scott Hanson* ("*S. Hanson")*, 201. Bishop Wallin testified the Blazer program was affiliated with the Boy Scouts of America in 1998 but that the church limited "full" scout participation to boys of at least twelve. *Wallin,* 24. As the Blazer leader Scott's duties included weekly Blazer meeting and the organization of an overnight camp-out with the Blazer scouts. *Wallin,* 24.

In 1998 the Boy Scouts of America required any adult involved with the Boy Scouts of America to complete an adult registration form. In addition, in 1997 the New Jersey Area Presidency's position on adult registration stated:

> Never allow a scout leader to function at any position in a unit sponsored by the Church in the United States until he has been registered with the Boy Scouts of America.

*Wallin,* 59, COP 599. Despite this explicit requirement, Bishop Wallin's interpretation was that he would be in compliance with the church policy on registration if he allowed a leader to function until such time as he registers, but there would be a problem if he did not ultimately register. *Wallin,* 66-67. As no one from the Church ever asked Scott to register, as a Blazer leader he was violating the Church's stated policy of registering generally and also registering prior to functioning as a leader. *S. Hanson*, 203.

Bishop Wallin does not recall interviewing Scott for the position of Blazer leader prior to "calling" Scott into that position. *Wallin,* 19. Bishop Wallin never asked Scott for references or whether he had been convicted of any crimes, nor did he conduct a background check or question any of Scott's prior Bishops or church leaders about the appropriateness of Scott acting as a youth leader. *Wallin,* 19, 37-8, 45-6. Bishop Wallin testified that because Scott's

---

[17] See Plaintiff's Undisputed Statement of Facts for information regarding "callings" in the Mormon church.

membership records contained no mention of prior problems he had no reason to inquire of Scott or any prior church authorities about his suitability as a Blazer leader. *Wallin,* 11-13, 16, 37-8.

Scott's first contact with David Ames and the Ames family was squarely in his capacity as Blazer leader. *Deposition of Kathleen Ames ("K. Ames")*, 48. Someone contacted the Ames house and stated that Scott was the scout leader for the boys of David's age in their ward, and asked if Scott could take David to Church and Wednesday night Blazer activities. *Id.*, 48-9. David had been attending Church but did not become involved in any Church activities until Scott showed up on his doorstep to take him Blazer scouts. *Deposition of David Ames ("D. Ames")*, 77, 79. At around the time David met Scott and began regularly attending Blazer scouts, David's father was working long days with lengthy daily commutes. *Id.*, 82. As a result, Scott regularly drove David to Blazer meetings. *Id.*, 82.

Almost immediately after meeting Scott through the Blazer program, at Scott's request, David began helping Scott with yardwork and other jobs at Scott's home. *D. Ames*, 100. Scott began taking David on other activities including camping, rafting and biking. *C. Ames*, 36-39. Chris was glad that Scott was taking an interest in David, since, due to Chris's work schedule and declining physical condition, David was having experiences that Chris could not provide. *C. Ames,* 38. Chris also learned that Scott had been called to Young Men's President for the Ledgewood Ward. *C. Ames*, 28. While Chris would have had concerns about the appropriateness of David's relationship with Scott had Scott been a stranger, because of Scott's involvement with the Ames family under the "bailiwick" of the Church, Chris was grateful for the opportunities he believed Scott was giving David. *C. Ames*, 26, 39-40.

In addition to acting as Blazer leader, Scott was also called as the Ames Family's Home Teacher. *C. Ames*, 29; *K. Ames,* 51. Scott's calling as Home Teacher was another step in Scott's process of using the imprimatur of the Church to interject himself into the Ames family. *K.*

*Ames*, 51. During Scott's initial contact as Home Teacher, he followed the Church's procedure for Home Teaching. *K. Ames*, 53. Scott also used his position as Home Teacher to gain Kathy's permission to include David on biking, camping and other trips with Scott. *K. Ames*, 54.

By the summer of 1998, Scott had used his various positions in the Church to develop a friendship between his family and the Ames family. *K. Ames*, 56-58; *C. Ames*, 31. Scott's involvement with David and the Ames family continued through the summer and sometime in the fall of 1998 when he began sleeping at the Ames' residence. Scott first spent the night at the Ames home with his son Isaac. *K. Ames*, 72. Scott led Kathy, David and Chris Ames to believe that Scott needed to stay at the Ames home because was having marital problems with his wife Kami. *K. Ames*, 72, *C. Ames*, 45; *D. Ames*, 106.

In late November of 1998, Chris Ames suffered a mental breakdown and was hospitalized through much of December. *C. Ames*, 52, 53, 55. After his breakdown, he moved into a bedroom in the Ames residence by himself, ceased functioning as a father and was incapable of taking any active role in the household. *C. Ames*, 52, 53, 55. By the beginning of 2000, because of Chris' mental problems, the Ames family was receiving financial assistance from the Church. *K. Ames*, 113-14. Chris' depression lasted through May of 2000 and to date he receives disability insurance benefits and has been unable to maintain even the most rudimentary employment for more than a few months. *D. Ames*, 98-99.

There is significant dispute over when Scott first began sleeping at the Ames home. In David's statement to police, he estimates that in September of 1998 Scott began sleeping at the Ames residence in bed with David. *David Ames July 2000 Statement to police ("D. Ames Statement"), 20: 1.* David also stated that Scott started sleeping over with him "a couple of months" prior to when the abuse started in December of 1998. *D. Ames Statement*, 22. During Chris' and David's depositions, Defendant COP used this estimate to establish that Scott began

sleeping with David in the "spooning" position in September of 1998 and that David spoke with his father about Scott making him uncomfortable before Chris suffered his breakdown. *D. Ames*, 108-112, *C. Ames*, 55-58.

However, in the same statement on the same pages David explicitly establishes that Chris Ames had already suffered his breakdown when Scott began sleeping with him and making him uncomfortable. *D. Ames Statement*, 21-22. David's statement to New Jersey detective Stephen Speirs provides the basis for the ambiguity:

| | |
|---|---|
| David Ames: | And then I mean I went and told my dad, dad, I'm, I'm uncomfortable with Scott sleeping over. |
| Stephen Speirs: | M-hm |
| David Ames: | Sleeping in the same bed as me, cuddling me and stuff. But that was kind of a time where my, um, parents were split, starting to really have problems. |
| Stephen Speirs: | Okay so your parents had some.... |
| David Ames: | So.... |
| Stephen Speirs: | mar |
| David Ames: | Yeah |
| Stephen Speirs: | Marital problems? |
| David Ames: | Yeah, uh, yeah, my dad was (inaudible)...mentally ill. |
| Stephen Speirs: | M-hm. |
| David Ames: | Down, didn't, just wasn't with it and then my mom, she had gall bladder problems, so .... |
| Stephen Speirs: | Okay |
| David Ames: | They really couldn't do anything about him, I mean they weren't really with it. |

Kathy's best estimate of when Scott began sleeping over was late 1998 or even early 1999. *K. Ames*, 67, 70. Despite Defendant's best efforts to use David's statement to get Kathy to

Page 18

accept that Scott began sleeping at the Ames in September of 1998, Kathy does not recall that Scott began sleeping over at the Ames home until after Chris's breakdown. *K. Ames*, 71-77.

There is agreement, however, that after gaining the Ames' family's trust through his Church callings, beginning in December of 1998 and continuing through May of 2000, Scott frequently and severely sexually abused David. *D. Ames*, 131-33. The abuse included fondling David's penis and genitals, oral sex and attempted sodomy. *D. Ames*, 131-33, *D. Ames Statement*, 56-68. Scott abused David in various locations, including Scott's home, David's home and on camping trips, anywhere from two to five times a week. *D. Ames*, 115, 131-33.

Between December 1998 and May 2000, Chris and Kathy Ames were aware that Scott was sleeping over in their house and in bed with David. *K. Ames*, 82; *C. Ames*, 54. However, Chris was mentally incapable of recognizing any problems with the situation. *C. Ames*, 54. Additionally, Chris had been an active member of the Church through his childhood and was "taught and raised by the Church to believe and trust [his] leaders." *C. Ames*, 62. David denied that Scott had ever touched him and Chris was conditioned from an early age to the fact that "when you have faith in the Church ... you believe they would never send anybody into your home that could do such a thing" as abuse your children. *C. Ames*, 60-61. Likewise, Kathy was not alarmed by the situation. *K. Ames*, 83. Kathy testified that Scott sleeping over did not occur to her to be unusual. *K. Ames*, 83. As a lifelong active member of the Church, Kathy viewed Scott as having the approval of the Church. *K. Ames*, 9-10. During this same time period, Kathy also suffered from medical problems, but Kathy had opened her house to people in need before and because of the cramped quarters did not find the sleeping arrangements as a cause for alarm. *K. Ames*, 83-85, 99. It is unclear how much Chris was capable of understanding about how often David was staying at Scott's home, but Kathy found no cause for concern as David was usually with his sister when they stayed at Scott's house. *K. Ames*, 101. Although Kathy was aware of

the sometimes one on one camping trips with Scott, Kathy did not believe she had any reason to be alarmed. Scott had so involved himself with her family that she believed the relationship with Kami and Scott Hanson was beneficial to all her children. *K. Ames*, 107. In Kathy's words:

> It didn't strike me as odd. I looked at --like I said before, it was a kind of -- a conjoined thing, you know, and so I thought these were opportunities. Our life is falling apart. I was trying to make decisions, I was having surgery. I had a daughter out here [in Utah] sick. I mean, there was a lot going on in '99. And I looked to Scott and Kami as being helpmates. They were giving my kids opportunities that we couldn't. Their dad was in bed. Their mother was trying to do whatever to survive and help all of my kids, including my sick daughter here in Utah. And so I was thinking -- the only thing I was thinking is my kids were having a little bit of joy and fun in their life that their parents couldn't provide. And because I trusted both of these people -- if Kami would have said, "Can I just take Christine and go somewhere," I would have let her.

In early 2000, Kami left Scott in New Jersey and returned to Utah with her son Isaac. *K. Hanson*, 13. Bishop James Braby had replaced Hans Wallin as the Bishop in the Ledgewood ward and Scott told Bishop Braby that Kami had had an affair. *Deposition of James Braby ("Braby")*, 8. In March, when Bishop Braby called Kami to speak with her about the affair, Kami informed Bishop Braby of her suspicions that Scott may have been abusing David and that Scott had a previous conviction for a sexual offense involving a minor child. *Braby*, 10-11. Bishop Braby was shocked when he learned of Scott's Utah conviction from Kami and that he had not learned it from a notification in Scott's membership records. *Braby*, 51, 52. Nevertheless, Bishop Braby contacted the LDS Church help line and did not report the suspected abuse to the New Jersey Department of Youth and Family Services (hereinafter DFYS). The Church help line had advised Bishop Braby to not report the abuse but rather to have Kami or Kathy Ames report the abuse. *Braby*, 16. Bishop Braby contacted Kathy about Kami's suspicions because, in his opinion, Chris was incapable of doing anything about the situation and Kathy was coherent. *Braby*, 17.

In April 2000, Kami reported the suspected abuse to DFYS. DFYS conducted an investigation into the relationship between Scott and David but David denied any inappropriate contact and, in June, DFYS closed the investigation. *K. Ames*, 142. Bishop Braby told DFYS he had encouraged Kami to report the abuse but that he was under no obligation to report the abuse himself. *Braby*, 88-89.

In May of 2000, Chris moved out of the family residence and began to recover from his depression. *C. Ames*, 88 On July 18, 2000, Kami called Chris directly and informed Chris of her suspicions about Scott and David, Scott's prior Utah conviction, and her concerns about other abuse victim in the past. *C. Ames*, 110. Able to function again as a parent, Chris questioned David, who this time admitted to abuse. Chris then reported the information to the police and Scott Hanson was arrested within 48 hours of Kami providing Chris the same information she provided to Bishop Braby over three months prior. *C. Ames*, 112. Scott was never released from custody. He was sentenced to substantial prison terms in New Jersey and Wisconsin and is likely to die in custody before he will be eligible for parole.[18]

---

[18] Subsequent to criminal proceedings in New Jersey Scott Hanson was also convicted of multiple counts of 2nd degree sexual assault of a child in Waukesha County, Wisconsin. *Judgment of Conviction, Wukesha County, Wisconsin.* The similarity between Scott Hanson's pattern of conduct in Wisconsin and Hanson's conduct in New Jersey is striking and demonstrates that Scott's conduct in New Jersey was simply a repetition of the plan he executed in Wisconsin. Court pleadings, transcripts and police reports from Wisconsin demonstrate that in Wisconsin, 1) Scott's initial contact with the victim's family stemmed directly from Scott's calling as a Scouting leader then Young Men's presidency member, 2) that Church officials failed to follow their own policy of requiring Scott to register with the Boy Scouts of America, 3) that within days of his introduction to the survivor Scott began having the survivor work at his home as a babysitter, 4) that Scott ingratiated himself into the survivor's family under the guise of his callings in the Church and then began to groom the victim through participation in outdoor activities including camping, biking and rock climbing, 5) that these outdoor activities and camping trips were where much of the abuse occurred and were integral to Scott's modus operandi, 6) that the father of the Wisconsin victim, although a former Wisconsin County prosecutor and licensed attorney was rendered unable to work by debilitating depression, 7) that like Chris Ames the Wisconsin victim's father welcomed Scott's involvement in his son's life for the apparent opportunities afforded to his son. *Police report, sentencing transcript, indictment and amended indictment Waukesha County, Wisconsin.* Plaintiff maintains that in light of identical pattern of behavior in Wisconsin and New Jersey, Scott's Wisconsin conviction is admissible generally, but is specifically admissible in light of the COP's defense that Chris and Kathy Ames are the proximate cause of David's abuse by Scott.

Regarding the actions of Bishop Braby, Dr. Newberger opines that deeply-embedded institutional factors reinforced the policy and leadership failures that caused the harm to plaintiff:

> Bishop James Braby, who first learned of W. Scott Hanson's sexual offending from Hanson's wife Kami, both failed to report the abuse and mistakenly concluded that David was "secure" from further abuse by W. Scott Hanson because David was in counseling. He thereby contributed to the Mormon Church's delay of David Ames's protection from abuse. Furthermore, the Mormon Church Abuse Hotline, rather than to facilitate the protection of children, served to prolong both David Ames's abuse by W. Scott Hanson, as well as risk to other children, by telling Bishop Braby that it was not his responsibility not to make a report to the New Jersey Department of Family and Children's Services (DYFS) but rather to press Kami Hanson or David Ames's mother to do so… This subversion of the legally mandated process to report suspected abuse was in keeping with contemporary Mormon Church guidelines and policies, quoted above (III C.) These policies were and remained, over the period of their development and through the tenure of W. Scott Hanson's victimization of Mormon children, contradictory, confusing, and misleading to clergy and members alike. They are replete with double messages[19] about the need to protect children but not to abide by the public statutes and procedures established to protect them in child protection agencies and civil and criminal courts; to support victims and prevent subsequent abuse by perpetrators, but to leave to the perpetrators and their lawyers the obligations to make mandated case reports; and

---

[19] Dr. Newberger highlights one particularly striking example of the Mormon Church's doublespeak on the issue child abuse prevention:

"The 1997 document, "Abusive Behavior: Areas of Emphasis," sent by the Mormon Church to all Bishops and Mission Presidents is remarkable for the absence of any guidance regarding the obligation to assure the welfare of victimized children, including assuring that they have appropriate medical and psychological diagnostic and therapeutic care, that their families are supported, and that church officials neither intrude nor obstruct the process of investigative and professional interviewing. Rather, the document contradicts its proclamation that its first responsibility is to help those who have been abused and to take appropriate steps to protect persons vulnerable to abuse by: urging the bishops themselves to conduct interviews with abused children; by engaging professionals sympathetic to Church standards and procedures, rather than professionals who are experienced in the diagnosis and treatment of child abuse to support and guide the bishop's work (even as the Church reminds him that he "should remember that he [not the professional] is the common judge with the right to revelation for the handling of each case"); to deter mandated reporting of suspected abuse by calling a toll-free help line rather than the mandated police or social services department; and, when counseling a perpetrator to report his abusive activities to "urge the perpetrator to secure qualified legal advice to guide him as he does so," guidance that clearly discourages the perpetrator from making such a report. The policy appears to diminish rather than to enhance the care and protection of children and falls beneath the standards direct first priority to the best interests of children and to the control and deterrence of sexual offenses against children." *Newberger Report*, 27.

to deter Mormon clergy from cooperating with civil and criminal authorities in their investigations, including refusing to disclose past criminal convictions of fellow Mormons in the service of supporting congregants and the Church...[t]here was an apparent failure to make appropriate warnings both within the Mormon Church and to potential victims that extended through W. Scott Hansen's participation in church activities. It is my opinion that this failure to warn jeopardized children.

> **In my opinion, the evidence in the record signifies both a failure to warn and an institutional policy to discourage [reporting of][20] sexual abuse of children, as required by the doctrines of ethical care of children. This failure, associated with maintaining W. Scott Hanson's status as a Melchidezek priest in the Mormon Church, served to enable rather than to deter his offending. Had appropriate action been taken, the abuse of David Ames would have been prevented.**

*Newberger Report*, 21; 27-28 (emphasis added).

As a result of the abuse, David has suffered great damage. He has suffered in school, suffered substance abuse problems, and been diagnosed with bipolar disorder, major depressive order, and post traumatic stress disorder. *D. Ames*, 178, 185, 243, 256, 258. David has been hospitalized multiple times in inpatient psychiatric facilities, has had multiple suicide attempts and requires ongoing medication for his significant problems. *D. Ames*, 79, 278, 290, 296.

## III.    ARGUMENT

### A. Summary Judgment Standard.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Equimark Commercial Financial Co. v. CIT Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987). In opposing summary judgment, the nonmoving party

---

[20] Dr. Newberger has confirmed that his report contains this typographical error; Dr. Newberger will be submitting a revised report.

must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; rather, only disputes over facts that might affect the outcome of the lawsuit, under the governing substantive law, will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. Of course, at the summary judgment stage, the Court must view all evidence and consider all reasonable inferences in a light most favorable to the non-moving party. *Marzano v. Computer Science Corp.*, 91 F.3d 497, 501 (3d Cir. 1996)." Here, as discussed in more detail below, defendant's summary judgment should be denied because there are materials facts in dispute as to whether the Church knew, or reasonably should have known, that Scott Hanson was a dangerous pedophile and whether the Church, therefore, failed in its duty to warn and protect his potential victims. Second, summary judgment should be denied as to the punitive damages claim because a jury could determine that the defendant's conduct in failing to warn potential victims was a result of defendant's desire to protect itself from scandal and was, therefore, a willful and wanton disregard of its obligations to warn.

## B. The Issue Of Superseding And Intervening Cause Should Be Left To The Jury.

In its motion, the Church is attempting to shirk its clear liability for David's significant damages because of David's parents' inability to protect him from a man who was negligently thrust into their lives under the veil of trust of their church even though he was a convicted sex offender. Considering all facts in the light most favorable to David, whether the actions of his parents were intervening or superseding causes must be resolved by the jury.

"The existence of proximate causes and intervening causes are factual issues which must be resolved by the jury." *Davis v. Brooks*, 280 N.J. Super. 406, 410, 655 A.2d 927 (App.Div. 1993) Whether or not subsequent actions are intervening or superseding causes that break the

Page 24

chain of causation turns on whether or not such actions are reasonably foreseeable. *Id.* at 412. New Jersey Courts have ruled that an action is reasonably foreseeable if it "is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable." *Davis v. Brooks*, 280 N.J. Super. 406, 412, 655 A.2d 927 (1993). Furthermore, the defendant "need not foresee the precise injury; it is enough that the type of injury be within an objective "'realm of foreseeability'"." *Yun v. Ford Motor Co*., 276 N.J. Super. 142, 159, 647 A.2d 841 (App.Div.1994) (Baime, J., concurring and dissenting), *rev'd on the dissent,* 142 N.J. 162, 669 A.2d 1378 (1996) (citations omitted).

In *Yun*, the plaintiff-decedent was traveling at night on the Garden State Parkway in his daughter's van when the spare tire assembly failed and the spare tire fell from the rear of the van and rolled across two lanes of highway. *Yun v. Ford Motor Co*., 276 N.J. Super. at 147-148. The tire came to a stop against the median and was not a threat to the plaintiff or any other motorist. *Yun v. Ford Motor Co*., 142 N.J. at 164 (dissent). The plaintiff-decedent had been aware of the defective assembly for about a month and previously decided with his daughter to leave it unrepaired. *Yun v. Ford Motor Co*., 276 N.J. Super. at 148-149. The 65-year old man then ran across the rainslicked highway, at night, to retrieve the tire and while returning was struck by a vehicle causing injuries that resulted in his death seven months later. *Id.* at 148. The trial court granted summary judgment of dismissal holding that the plaintiff's highly extraordinary actions broke the chain of causation. Over a strongly-worded dissent, the Appellate Division affirmed, stating that plaintiff's decision to not repair the assembly and his "extraordinarily dangerous, if not suicidal" actions in retrieving the tire, which were both illegal and "with complete disregard for his own personal safety," constituted superseding and intervening causes. *Id.* at 152-155. The dissent strongly disagreed, stating that the issue of

foreseeability of the plaintiff's actions were reasonably debatable and should have been left to the jury:

> What may appear strange to judges might seem rather ordinary to others. It thus generally makes sense to have lay people, not judges, make decisions on the question of proximate cause, grounded as that concept is in considerations of foreseeability and fairness.

*Id.,* at 162. In reversing, the Supreme Court explicating stated that it was adopting the reasoning expressed by the appellate court's dissenting justices. *Yun,* 142 N.J. at 163 (reversed for "substantially for the reasons expressed" in the dissent)[21]

Decisions in other jurisdictions regarding a parent's actions or inactions in protecting a child from sexual abuse support sending the issue of intervening and superseding cause to the jury.[22] For example, in *Doe v. Garcia,* 131 Idaho 578, 961 P.2d 1181 (1998), the Supreme Court

---

[21] In reversing the Appellate Division and adopting the decision of the dissent, the New Jersey Supreme Court implicitly rejected the Appellate Division's reliance on the holding of *Peck v. Ford Motor Company*, 603 F. 2d 1240 (7ᵗʰ Cir. 1979). Thus, the Church's reliance *Peck* in its memorandum is misplaced.

[22] Defendant's reliance on *Sacci v. Metaxas,* 355 N.H. Super. 499 (App. Div. 2002) is misplaced. *Sacci* stands for the proposition that there is no generalized duty to control the actions of another person, "absent a special relationship or special circumstances among the parties." *Id.* at 508. However, despite rejecting the duty in that case, in rendering its decision the *Sacci* court specifically contrasted the situation before it to those situations in which sexual abuse may have occurred. Indeed, the *Sacci* court specifically distinguished the non-existent duty of spouse to report the violent tendencies of a spouse, from the legislatively-mandated duty of "all citizens to report child abuse immediately to the Division of Youth and Family Services." *Id.* at 515. As discussed herein, the Church, both through Bishop Hanson, and later through Bishop Braby, had knowledge that Scott Hansen was a convicted sex offender. Bishop Hanson's failure to notate Scott Hansen's membership record, at least, facilitated his later abuse of David Ames. Furthermore, a jury should be allowed to determine whether Bishop Braby's failure to comply with his duty to report was not a proximate cause of David Ames' continuing harm.

The defendant's reliance on *Doe v. Boy's Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472 (Tex. 1995) is also misplaced. The Texas court determined that the Boy's Club failure to investigate the background of a volunteer (Mullen) was not a proximate cause of his later abuse of children who attended the Boy's Club. However, the underlying rationale for the Texas court's determination was, simply, that had the Boy's Club investigated it would have learned only that Mullen had two misdemeanor DWI convictions – convictions that had nothing whatsoever to do with molestation of children. Here, in contrast, Scott Hanson was a convicted of a sex offense involving children. It is for the jury to determine whether, with such knowledge, it would have been foreseeable that Scott Hanson would have molested additional children.

of Idaho reversed summary judgment dismissal in a suit based on the sexual abuse of a former patient by a former hospital employee. *Id.* at 579. The reversal was based in part on the Supreme Court's determination that there was a question of fact as to whether the hospital's negligent hiring and retention was a proximate cause of the perpetrator's ultimate victimization of a young boy. *Id.* at 581-582.

In *Doe,* a young boy was hospitalized and while in the hospital met and was befriended by the perpetrator, who had been employed at the hospital for almost a year. *Id.* at 578. However, when he was hired the hospital did not conduct a complete reference or background check. *Id.* Had the hospital done so, it would have likely discovered that the employee/perpetrator was terminated from his previous employment for sexually abusing a patient. *Id.* at 580. The Hospital continued to ignore information about the perpetrator when it was disclosed during the perpetrator's counseling session within the hospital's Employee Assistance Program. *Id.*

The abuse of Doe began after the boy left the hospital and never occurred on hospital premises; however, there was no question that the perpetrator would not have met the victim but for his employment at the Hospital. *Id.* at 579-580. Additionally, as in the instant case, the victim's parents were aware of the friendship and supported it, indeed, the parents drove their son to the perpetrator's home on several occasions, even after learning that the perpetrator was no longer working at the hospital and was instead driving a taxi. *Id.* at 583. Despite the lack of abusive events occurring on hospital property and despite the parents possible negligence in allowing the "friendship" to continue, the Supreme Court determined that there was a question of fact as to the whether the hospital's negligence was a proximate cause of the plaintiff's harm. *Id.* at 583.

Similarly, in *Haselhorst v. State of Nebraska*, 240 Neb. 891, 485 N.W.2d 180 (1992), the Supreme Court of Nebraska upheld the trial court's decision that the parents of four children who were sexually molested by a foster child were not contributory negligent and that their lack of supervision was not an intervening cause that negated proximate cause. The Nebraska court rendered this decision even though 1) the parents had learned, a few months after placement in their home, that the foster child had likely exposed himself to one of their children; 2) upon learning of that exposure, they demanded that the foster child be removed from their home; but 3) were convinced by the caseworker to keep the foster child and thereafter allowed him to baby-sit their children; and 4) it was ultimately discovered the foster child had been molesting all four children since shortly after his placement. *Id.* at 893-894. Although he foster child placement agreement with the family required that they be informed of all information from all medical and psychological reports, but they were never informed that his previous hospitalization was related to his multiple attacks on his mother, which included his threats to kill her unborn child with a knife. *Id.* The parents testified that they never would have accepted the boy in their home if they had known of his violent tendencies. *Id.* In addition, the plaintiffs' expert opined that the parents were loving, caring people who had no experience with sexual abuse, did not understand the risk involved, and were susceptible to the reassurances given to them. *Id.* at 897. Based on all these facts, the trial court's determinations on contributory negligence of the parents and superseding and intervening cause were upheld. See also, *Walker v. Rinck*, 604 N.E.2d 591, 596, (1992) (parents action in conceiving additional children was not superseding or intervening cause of children's injuries where it was reasonably foreseeable that they would conceive additional children, even though aware of the risk of harm); *Travis v. Bohannon*, 128 Wn. App. 231, 115 P.3d 342 (2005) (jury should decide whether mother's consent to daughter's activity with knowledge of risk of harm was intervening and superseding cause.)

The reasoning in *Yun* along with the reasoning of other courts dealing with the specific issue of a parent's ability to protect a child from sexual abuse compels the denial of the Church's motion for summary judgment on proximate cause. Here, viewing the facts in the light most favorable to David, a jury could determine that it was reasonably foreseeable that if the church failed to take any disciplinary action or annotate Scott's records, or failed to at least informally warn future church leaders regarding the allegations against Scott and his conviction, future Bishops, without conducting any background checks and ensuring that he complied with scouting registration requirements, would "call" him to positions of great trust within another church family, where he would abuse a child whose parents were blindly trusting of their Church and incapable of recognizing the risk that was actually known to the church. A jury could determine that the actions of Chris and Kathy Ames, in their extremely comprised state, were reasonably foreseeable, even though they may also find that their actions were "highly extraordinary" and "extraordinarily dangerous". That David's parents would have full faith in their church leaders and not be alarmed by actions such as Scott and David's sleeping together are even more reasonably foreseeable in light of the fact that the 1986 allegations involved Scott's abuse of Mormon boys from his own fiancé's family and Bishop Hansen understood, at the very least, that Scott was convicted of a sex offense based on Scott's sleeping in the same bed with his fiancé's nine-year old brother in the boy's own home. Thus, even assuming that Bishop Hansen really believed Scott was innocent of the sex offense charges of which he was convicted, based on the information available to Bishop Hansen, it was within the "objective realm of foreseeeability" and "not entirely improbable" that Scott would again use his positions of trust in the church to infiltrate a troubled Mormon family and gain access to and eventually molest a boy within that family -- right under the trusting noses of his parents. Thus, even if the Church is

Page 29

able to establish that David's parents were negligent, whether or not that negligence was so unforeseeable to break the chain of causation should be decided by the jury.

## C. Whether Defendant's Conduct Subjects It To Punitive Damages Should Be Left To The Jury.

The New Jersey punitive damages statute evidences an intent to punish conduct that is either intentional or in which a defendant demonstrates a wanton and willful disregard of persons who foreseeably might be harmed by such act or omission. N.J.S.A. §2A:15-5.12(a). The nonexclusive factors to be considered **by the jury** are (1) the likelihood, at the relevant time, that serious harm would arise from the defendant's conduct; (2) the defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct; (3) the conduct of the defendant upon learning that its initial conduct would likely cause harm; and (4) the duration of the conduct or any concealment of it by the defendant. N.J.S.A. §2A:15-5.12(b). Each of these factors is present in this case.

The Church's own publications establish the first and second factors: In its publications, the Church acknowledges that (1) serious harm flows from being a victim of childhood sexual abuse and (2) the harm flowing to abuse victim is increased if the abuser is "protected" or not adequately dealt with. The third factor is also met – Bishop Hanson acknowledged that he knew childhood sexual abuse would cause harm – and he was aware of the Church's publications. Despite this knowledge he nevertheless undertook steps to protect Scott Hansen. With regard to the fourth factor, the Church's protection of Scott Hansen endured for over 10 years – and allowed him to later molest other children in other wards in other states. Instead of arguing against these "factors," defendant focuses on the standard of liability and asserts that church's conduct is not sufficiently egregious to allow the jury to determine whether punitive damages should be imposed. Plaintiff respectfully disagrees.

A defendant's conduct is sufficient egregious to impose punitive damages if the defendant's conduct is "wantonly reckless or malicious." *Dong v. Alape,* 361 N.J. Super. 106, 116, 824 A.2d 251 (App.Div. 2003). This standard is met by demonstrating either that the defendant acted intentionally **or** that the defendant acted with a "wanton and willful disregard of the rights of another." *Id.* quoting *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 49, 477 A.2d 1224 (1984). Stated otherwise, a claim for punitive damages should be submitted to the jury if the plaintiff demonstrates that the defendant acted with a "conscious and deliberate disregard of the interests of others" or with "knowledge of a high degree of probability of harm and reckless indifference to consequences." *Id.* It is not a defense to a claim that the defendant did not recognize that his or her actions would expose another person to a dangerous condition; instead punitive damages may be imposed if the defendant "knew or had reason to know of circumstances which would bring home to the ordinary reasonable person the highly dangerous character of his or her conduct." *Id.* at 116-17.

In 1986, at a time when the sexual abuse of children was a well-publicized problem – and where the Mormon Church itself recognized that protection of children from sexual abuse was of extreme importance, the Church demonstrated a callous disregard for the safety of children by failing to properly investigate and respond to allegations that one of its members was sexually assaulting children. Such facts are sufficient to allow a jury to determine whether punitive damages should be imposed.

Courts in other jurisdictions have held that the failure to protect children from known or suspected child molesters is sufficient to impose punitive damages. For example, the South Dakota District Court held that evidence of the failure to conduct an investigation into allegations of child sex abuse is sufficient to submit the question of punitive damages to the jury. *Brown vs. Youth Services, Int'l of South Dakota, Inc. d/b/a Chamberlain Academy,* 89 F. Supp.

2d 1095 (S. D. S. D. 2000). In *Brown,* children residing at Chamberlain Academy (a residential home for "troubled juveniles and young adults") were molested by one of the counselors. The plaintiffs (victims of the abuse) alleged that the Academy knew of the perpetrator's conduct long before he was discharged and failed to take any action in response to that information. The evidence was two-fold: (1) one victim testified that he reported abuse some time before the perpetrator was discharged; and (2) another victim testified that despite reporting a "fondling" event, the perpetrator "continued to molest him and to escalate the level of the sexual assault." From this evidence, the plaintiffs contended the Academy engaged in conduct sufficient to submit a claim for punitive damages to the jury. The South Dakota District Court agreed:

> . . . the evidence of the Academy's failure to investigate the claimed earlier complaints . . . does form a reasonable basis to believe the Academy's [sic] is guilty of willful and wanton misconduct. Such a failure, if proven, could amount to intentional infliction of emotional distress or show recklessness on the part of the Academy. That type of conduct can form the basis for an award of punitive damages.

89 F. Supp. 2d at 1107.

Here, by their own admission, the Mormon Church did not fulfill its obligation to investigate allegations of childhood sex abuse. Instead, Bishop Hanson freely admits that in his "investigation" he specifically sought information that would exculpate Hanson stating, among other things:

- One of his intended purposes was to assist Scott if he had been unjustly accused. *Howell,* 83;

- He essentially refused to consider any incriminating evidence, stating that if he had a chance to do his "investigation" over again he would have asked to see all the reports, including the negative information he did not review: "In hindsight, …I would have probably called for the reports. All of it. The positives and the negatives." *Hansen.* 129-130;

- He counseled Scott to plead "no contest" to the criminal charges for the specific purpose of avoiding having to initiate any church disciplinary proceedings. *Hansen*, 144-145, 159-161;

- Despite his ability (and obligation), Bishop Hansen, in consultation with Stake President, made the unilateral decision not to conduct a church disciplinary court or to even make a notation in Scott's records. He did so despite knowing that the Church's published stand on this issue was that a membership record should not be flagged if, and only if, there was **irrefutable** proof of innocence; *Hansen*, 256-257; Furthermore, Hansen did not deny that he purposefully did not flag Scott Hansen's file because he did not want to ruin Scott's life. *Hansen*, 205-06.

Despite these undisputed unrealities, defendant seeks to obtain summary judgment by imposing its determination that Bishop Hanson's "investigation" of allegations against Scott was "reasonable" or, at worst, negligent. The Church's assertions are misplaced. It is for the jury – not the Church –to determine whether or to what extent Bishop Hansen's conduct rose to the level of wanton and willful misconduct.[23] Indeed, New Jersey courts have already held that a defendant's knowledge that even potential harm can result from a failure to act is sufficient misconduct to allow a jury to determine whether punitive damages should be imposed. *See, Perlman vs. Virtua Health, Inc.,* 2005 U.S. Dist. LEXIS 34833 (D.N.J. 2005). In *Perlman,* the plaintiff was injured when a cord on a surgical device malfunctioned. Plaintiff presented evidence demonstrating that defendant was aware of the potential for the cord failure and failed to modify its warnings relating to the product, despite having received information demonstrating that the warning should be modified. *Id.* at *30-*31. In determining that the punitive damage claim should be submitted to the jury, the court specifically noted that the jury might – or might not – come back with an award for punitive damages; and therefore, should be submitted to the jury.

The Church's own publications demonstrate that the Church was well-aware of the harm that could flow from its failure to properly act to protect potential victims of Scott Hanson. A jury could conclude that the Church engaged in wanton and willful conduct in essentially

---

[23] The Church goes so far as to assert that there "can be no dispute that Bishop Hansen tried to come to a reasoned judgment. . . ." This statement, in and of itself, is an outright falsehood. As the Church is well-aware, plaintiff contends, and continues to contend, that Bishop Hansen did anything **but** a "reasonable" investigation.

strategizing with Scott Hansen in his efforts to beat the criminal charges and failing to conduct an adequate investigation and follow its own policies and procedures enacted to protect children from sexual abuse. Therefore, the punitive damage claim should be submitted to the jury.

## IV.    CONCLUSION

For the above-stated reasons, plaintiffs respectfully requests that this Court deny defendant's Motion for Summary Judgment, in its entirety.

MARTIN, GUNN & MARTIN, P.A.
Attorneys for Plaintiff David Ames

BY:  /s/ William J. Martin
WILLIAM J. MARTIN