**Martin, Gunn & Martin, P.S.**
Sentry Office Plaza, Suite 420
216 Haddon Avenue
P.O. Box 358
Westmont, NJ 08108
Telephone: 856-858-0900
Facsimile: 856-858-1278

*Attorneys for Plaintiff David V. Ames*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID V. AMES,<br><br>Plaintiff,<br><br>v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF THE LATTER-DAY SAINTS, a Utah corporation sole, a/k/a the "MORMON CHURCH," and WILLIAM SCOTT HANSON, individually,<br><br>Defendants. | Civil Action No 06-CV-3441 (WJM) (MF) |

## PLAINTIFF'S STATEUMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## STATEMENT OF UNDISPUTED FACTS

Pursuant to L.R. 56.1, Plaintiff asserts that the following facts are undisputed:

1. In 1986, David Custer, a 14-year-old Mormon boy, alleged that he had been sexually abused by Scott Hanson, a 24-year-old life-long member of the Mormon Church ("Church").  *City of Orem Public Safety Department Incident Report ("Incident Report"): 2.*

2. In the course of the police investigation, three additional boys reported sexual abuse at the hands of Scott Hanson.  *Id.*

3. All four boys were Church members and fourteen years old or younger, three of them participated regularly in scouting with Scott; and two were the younger brothers of Scott's fiancé, JoLynne Schill.  *Id.*

4. Scott was interviewed by police on November 14, 1986.  *Incident Report:5-6.*

5. During the interview, he confessed that he had 1) rubbed his erect penis on the back of one boy after having "thoughts and fantasies" while giving him a massage; 2) rubbed his knee on the genitals of his fiancé's nine-year old brother while the boy was sleeping over at his house; 3) on a couple of occasions, purposefully touched the genitals of his fiancé's 14-year old brother during a massage; and 4) rubbed his erect penis on the buttocks of a fourth boy while the boy was sleeping over at his house.  *Id.*

6. Scott also admitted that he felt bad and knew what he was doing was wrong.  *Id.*

7. The interviews of the victims and Scott's admissions alleged Scott engaged in the following conduct: 1) offering to give neck and back massages to the young boys he had befriended; 2) moving to leg and hip massages; 3) repeatedly touching the boys' genitals while massaging their legs; and 4) with at least two of the boys, more severe molestation

1

8. - the rubbing of his own erect penis on the back or the buttocks of the child and, with one boy, repeated sodomy attempts. *Incident Report:2-5.*

9. The charges against Scott were originally filed as serious felony sexual assault charges-Attempted Forcible Sodomy and Aggravated Sexual Abuse of a Child. *Information.*

10. In October 1987, Scott entered a plea bargain in which he pled guilty to the reduced charge of Lewdness Involving a Child. *Change of Plea; Statement by Defendant in Advance of Plea of Guilty ("Statement").*

11. Pursuant to his conviction he was then considered a "sex offender" under Utah law and subject to sex offender registration requirements. *Utah Code Ann. §77-27-21.5 (1987).*

12. The plea agreement was reached after Scott's motion to suppress his confession based on technical Miranda violations was granted, partly because the Judge was concerned that Scott's statement was not recorded. *See May 7, 1987 Ruling.*

13. His one year jail sentence, the maximum possible sentence, was suspended for a probationary period of 18 months, during which he was required to obtain therapy and abstain from involvement in youth programs. *Judgment and Order of Probation; Statement, 2.*

Church Discipline

14. The stated purpose of the Church's formal internal discipline process is to 1) save the souls of transgressors, 2) protect the innocent; and 3) safeguard the purity, integrity and good name of the Church. *Church Handbook of Instruction ("Handbook"):91.* The Handbook states:

The **second purpose of Church discipline is to protect the innocent**. With inspiration, a priesthood leader should act to protect Church members when a transgressor poses a physical or spiritual threat to them, such as by physical harm, sexual abuse, drug misuse, fraud or apostasy.

*Id.,* 91.

15. Disciplinary counsels or "church courts" are held to deal with serious transgressions. *Id.*, 95.

16. While a Stake president has disciplinary authority over all members of a stake, Bishops normally administer Church discipline unless evidence indicates that a Melchizedek priest is likely to be excommunicated. *Id.*, 91.

17. The Handbook mandates "church courts" for members who may have committed murder, incest, child abuse, apostasy, a serious transgression while holding a prominent church position, demonstrated a pattern of serious transgressions or are predators. *Id.*, 96. Additionally, discipline *may* be used in other circumstances. *Id.*

18. The Handbook emphasizes that church courts are ecclesiastical and not civil in nature, but includes a series of procedures for serving notice, taking testimony, rendering and recording a decision, and appeal. *Handbook*, 97-101.

19. A church court may reach one of four decisions: 1) no action, 2) formal probation, 3) disfellowshipment[4] or 4) excommunication. *Handbook*, 97. There may be a public announcement of disfellowshipment or excommunication in the case of "a transgressor whose predatory tendencies seriously threaten other persons." *Id.*, 100. Disfellowshipment or excommunication are noted in the membership records. *Id.*, 101.

20. The Church keeps membership records for each member in the Church. *Id.* p. 123.

21. The Church keeps records in part to:

Help leaders get to know members and identify their needs. For example, records can help leaders identify who may need special care in becoming more active in the Church or becoming worthy of receiving temple blessings.

*Id.* p. 123.

22. The Handbook provides "membership records **are the only means of recording** ordinances and actions in the permanent records of the Church." *Id.* p. 127 (emphasis

3

added). Membership records are transferred from ward to ward when members relocate and the Handbook cautions, "it is especially important to record ordinance information, promptly, request records of members who move into the ward, and promptly transfer records who move from the ward." *Id.*, 127.

23. In 1998, the Church instituted two formal procedures mark a member's record. To protect church members, a record can be annotated for members "whose conduct has threatened the well being of other persons or of the Church," or for members who have been disciplined for sexual abuse of a child, incest, plural marriage, an elective transsexual operation, repeated homosexual activities (by adults), or embezzlement of church funds or property. *Id.*, 129.

24. Membership records can also be annotated if a priesthood leader submits written notification of a criminal conviction for any of the same offenses. *Id.*, 129.

25. The Church provides for "Requests for Contact" on membership records. According to the Handbook:

> If a member moves and bishop feels a need to share information with the member's new bishop, he completes a Request for Contact form and sends it with the membership record. When a bishop receives a record that is accompanied by one of these forms, he should contact the previous bishop as soon as feasible. After the contact the Bishop should destroy the request for contact form.

26. The 1985 Handbook provides that a bishop may attach a "red tag request for contact" to a membership record. *1985 Handbook*, 9-3.

27. Immediately after Scott was interviewed by the police, he contacted and met with his Bishop, Robert O. Hansen. *Deposition of Robert O. Hansen ("Hansen"), 7-9.*

28. Bishop Hansen testified that he was "very troubled" about the "potential" of the charges against Scott, as he had known him for many years. *Hansen*, 9, 10, 16.

4

29. During the meeting, Scott told Bishop Hansen his version of the allegations and denied any wrongdoing. *Hansen*, 11-12.

30. Scott claimed that the police questioning was improper and twisted the truth, but admitted that he had made genital contact with the young boys. *Hansen*, 12-14.

31. On November 14, 1986, the parents of JoLynne Schill (Scott Hanson's fiancé) called Stake President Leland Howell (Bishop Hansen's ecclesiastical supervisor)informing him of Scott's arrest and wanting to know what the Church was going to do about it. *Deposition of Leland Howell ("Howell")*, 59-60.

32. Immediately after the phone call with the Schills, President Howell called Scott Hanson's parents. *Howell*, 61.

33. President Howell had known Scott and his family since he was a child and Scott had often spent time at the Howell residence with Howell's son Barry. *Howell*, 51-56, 59-60.

34. At the request of Scott's mother during the Howell/Hanson phone call, Howell met with Scott and his father to provide support to Scott. *Id.*, 62, 66-67.

35. Howell did not recall discussing the specifics of the allegations, but recalled Scott's claims of innocence. *Id.*, 63-64.

36. He assured Scott and his father that Church leaders would do "everything we can do to help him." *Id.*, 69.

37. Within days, Bishop Hansen met with President Howell to devise a plan of action. *Hansen*, 22, 48-49, 51, 76-77, *Howell*, 76.

38. It was understood that if their investigation showed Scott had sexually abused a child, they would have no choice but to seek excommunication. *Hansen*, 258-260.

39. Neither Howell nor Bishop Hansen reviewed any church materials, consulted with any church superiors, or consulted the church legal department for guidance in creating this plan. *Howell*, 77-78, 81-82.

40. Instead, they decided that Bishop Hansen would simply monitor the criminal investigation and that he would interview boys in the ward who had interactions with Scott Hanson to determine if any of them had experienced or observed inappropriate behavior by Scott. *Hansen*, 49-50; *Howell*, 82.

41. Bishop Hansen had limited experience with the "Church court" process and it was his first investigation into a disciplinary issue as Bishop. *Hansen*, 67-73, 76. Because a Bishop's responsibilities include the investigation, evaluation, judgment, and discipline related to any alleged transgressions of ward members, President Howell relied on Bishop Hansen to conduct the investigation and report to Howell. *Howell*, 23, 97-98, 129.

42. Howell's term ended in June of 1987 and Bruce Olsen took over as President, which included the responsibilities of monitoring and supervising the "investigation". *Howell*, 29, 108-109.

43. The ostensible supposed purpose of the interviews of the boys in Scott's ward was to help to determine if Scott was "guilty as accused" by the victims. *Hansen*, 103; *Howell*, 83, 88. However, Howell also testified that one of the intended purposes of the investigation was to assist Scott if he had been unjustly accused. *Howell*, 84.

44. Prior to the interviews, Bishop Hanson 1) did not learn the details of the allegations; 2) he did not seek advice of mental health professionals or law enforcement officials; and 3) he does not recall referencing the church and secular materials to which he had access regarding child sexual abuse and how to conduct interviews. *Hansen*, 79-80, 89-90.

45. Bishop Hansen never read the Incident report and instead only received Scott and his attorney's version of the facts, while conducting his interviews, Bishop Hansen never understood Scott's escalating pattern of behavior. *Hansen*, 96-97.

46. Hansen did not know whether he asked any of the boys whether Scott had given them backrubs. *Hansen*, 100.

47. Hansen did not recall asking questions to determine if there was any escalating behavior by Scott. *Hansen*, 102-103.

48. None of the boys in Scott's ward reported any inappropriate behavior to Bishop Hansen. *Hansen*, 107-108.

49. The vast majority of the information gathered by Bishop Hansen in his "investigation" came from Scott, Scott's parents, and Scott's criminal defense attorney. *Hansen*, 36.

50. The only information about the specifics of the allegations came from Scott and his defense attorney. *Hansen*, 36, 40, 41-42.

51. Bishop Hansen never read the police report, and never got direct information from the police department, the prosecutor, or the victims and their parents. *Hansen*, 36-37, 100, 186-187.

52. Bishop Hanson recalls being contacted by David Custer's Bishop, but he does not recall talking to the Schill's Bishop or the other victim's Bishop, or whether he even tried to contact them. *Hansen*, 29, 30-31.

53. President Howell also did not ask Bishop Hansen to interview the victims, nor did he himself contact the victims or their families. *Howell,* 94.

54. Howell also never read the Incident Report, as he did not think it would have been helpful. *Howell,* 117-118.

55. Howell did interview Scott, who claimed he had just been "horsing around" with three or four other boys and had done nothing wrong, but did admit wrestling under the covers with boys, "getting carried away," inadvertently touching the boys' private parts and "getting caught." *Howell*, 105-106, 109-111.

56. At the time of the interview, because Howell had not read the Incident Report and had very edited information regarding the allegations, he failed to grasp Scott was talking about 9-14 year old boys and not men of his own age. *Howell*, 83, 109.

57. Throughout the criminal process, Scott and his attorney met with Bishop Hansen on several occasions and discussed the case. *Hansen*, 37, 63.

58. Prior to the entry of the plea agreement, Bishop Hansen met with Scott and his attorney and counseled Scott that if he pled "no contest" to the reduced charges, Bishop Hansen believed he would not need to initiate any church disciplinary proceedings. *Hansen*, 144-145, 159-161.

59. Bishop Hansen claims that he did not know at the time that Scott Hanson pled guilty instead of "no contest" to the charges of lewdness Involving a child, but testified that it would not have made any difference to him in deciding that Scott was innocent. *Hansen*, 149-151

60. Around that same as Scott's conviction, Bishop Hansen came to the conclusion that the allegations against Scott were unfounded. *Hansen*, 135-137, 143.

61. Bishop Hansen believed that Scott's conviction was simply the result of his "bad judgment" in allowing his fiancé's nine-year old brother to climb into bed with him during the night while sleeping at the Schill home. *Hansen*, 158-159.

62. Bishop Hansen stated that if he had a chance to do his "investigation" over again he would have looked at the negative information he did not review: "In hindsight, …I

8

would have probably called for the reports. All of it. The positives and the negatives." *Hansen*, 129-130.

63. Bishop Hansen stated that he started to doubt the allegations after learning from Bishop Pederson that David Custer had recanted his allegations and that the charges based on the abuse of David Custer were withdrawn. *Hansen*, 112-115.

64. Based on that information, Bishop Hansen then decided that David Custer's allegations were not true and he no longer needed to consider them in his "investigation" and he also began to doubt the veracity of other allegations and wonder whether they were improperly solicited by the police. *Hansen*, 115-118.

65. During his investigation, Bishop Hansen was aware of published Church advice that he should 1) give a child reporting sexual abuse the "benefit of the doubt" and "help and support," because "children rarely make up such things;" and 2) assume the allegations are true unless he found "irrefutable evidence to the contrary." *Hansen*, 255, 262; *I Have a Question, The Ensign/July 1984* ("*1984 Ensign*"), 30; *Child Abuse: Helps for Ecclesiastical Leaders* ("*Child Abuse: Helps*"), *1985*, 4.

66. Bishop Hansen later questioned the credibility of the accusations, and determined Scott was innocent, in large part because the original charges were reduced, although he was not aware that Scott's confession was inadmissible because of a technical Miranda violation and that there was a technical violation in conducting the interview of one of the victims. *Hansen*, 117-120, 127.

67. Bishop Hansen testified that the information regarding the reasons for the reduced charges would not have made any difference to him:

I don't know that it would have had any influence, because everything else, my interviews, the removal of the testimony by two of the young men, Scott, his attorney, the psychiatrist, **I just didn't think he was guilty**.

*Hansen*, 119 (emphasis added).

68. Bishop Hansen was aware of the following published church advice::

Trying to protect a molester almost always worsens the situation and validates the molester's behavior. *1984 Ensign*, 30;

When child abuse is disclosed, one offender might deny the problem and another feel remorse and deep penitence. Much like an alcoholic, an offender usually continues the abusive behavior until he acknowledges it and accepts help." ***Child Abuse: Helps***, 4.

A person guilty of serious child abuse rarely changes his pattern of behavior without facing up to all consequences- criminal proceedings, Church discipline, social ostracism and others. *Child Abuse: Helps*, 5.

69. Hansen did not recall that Scott expressed remorse or concern, but would have read such expressions if he had reviewed the Incident Report. *Hansen*, 264-265; *Incident Report, 5*

70. Bishop Hansen relied on the conclusions of two mental health professional reports that Scott was "clean" and not a pedophile, even though 1) the reports were created at the request of Scott's criminal defense attorney in an effort to beat the charges; 2) Bishop Hansen never actually read the reports or talked to either of the mental health

71. professional about their conclusions, but instead relied upon the summary of the findings as relayed to him by Scott, Scott's parents, and Scott's attorney; and 3) one of the mental health professionals actually relied on exculpating information received from Bishop Hansen's dangerously inept investigation in conducting his evaluation of Scott: "Bishop Hansen told me he had interviewed about a dozen boys in his ward and all of them have said that there was never any inappropriate behavior between the boys and your client." *Hansen*, 37-39, 117, 124-125; *May 5, 1987 Report of Robert J. Howell, Ph.D.* ("*Howell Report*"), 4; *Psychiatric Evaluation of William Scott Hanson by Peter Heinbecker, MD (undated) ("Heinbecker Report").*

72. Dr. Heinbecker wrote in his report: "I don't think it is possible to know with certainty what the truth of the matter is," noting Scott was potentially suppressing homosexual

10

tendencies and his history showed of a lack of sexual interest in females.   *Heinbecker Report*, 5.

73. Despite the fact that Bishop Hansen was aware of his ability to do so, he decided, in consultation with then stake president Olsen that he should not conduct any church disciplinary court, nor make a request for contact, nor make a notation in Scott's church records regarding Scott's conviction of a child sex abuse crime because he believed Scott was innocent and falsely accused. *Hansen*, 189-191, 196, 225-226, 227-231; *Deposition of Leland Olsen ("Olsen")*, 40-41.

74. Bishop Hansen made this decision with the understanding that 1) he should only not notate Scott's records if he had **irrefutable** proof of his innocence; and 2) if he was wrong about Scott's innocence, he would make things worse. *Hansen*, 256-257.

75. Bishop Hansen did not make any informal notation to future Bishops in Scott's church records to contact him for more information. *Hansen*, 190. Nor did he contact any of Scott's subsequent Bishops after Scott moved to Texas and beyond to warn them about Scott. *Hansen*, 215-217. Nor did he take any steps to ensure that Scott complied with the terms of his probation. *Hansen*, 188.

76. Hansen also testified that he decided not to take any action to ensure that Scott had no involvement with youth because he assumed that Scott would abide by that requirement of his probation. *Hansen*, 188-189, 191, 220.

77. Scott had received the suspension of his one-year jail sentence with probation based in part on Bishop Hansen's testimony as a character witness on Scott's behalf at the sentencing hearing. *Judgment and Order of Probation*, 2.

78. Bishop Hansen had offered his testimony at the sentencing hearing with knowledge that it would help Scott. *Hansen*, 177, 186.

79. At the hearing, Bishop Hansen testified that he was Scott's ecclesiastical leader, that he conducted interviews of boys in the ward and discovered no sexual misconduct, and that he was convinced that Scott was innocent of the charges. *Hansen*, 140, 142, 178-180.

80. Bishop Hansen testified that he never considered whether he may have been wrong in his conclusion that Scott - a convicted sex offender- was innocent and, if he was wrong, whether a temporary notation in Scott's church record would protect other children. *Hansen*, 231-235.

81. In his "investigation" Bishop Hansen was concerned about negative effects upon Scott. *Hansen*, 234-235.

82. Kami Hanson, Scott's former wife, testified that Bishop Hansen later told her that he did not flag Scott's records because he did not want to ruin Scott's life. *Deposition of Kami Hanson ("K. Hanson"),* 146-147.

83. Bishop Hansen did not deny that he made such a statement. *Hansen*, 206.

84. In November of 1997, after Chris Ames accepted a job as network manager with Donna Karin, Chris and Kathy Ames moved to Hackettstown, New Jersey with David and three of his siblings. *Deposition of Chris Ames ("C. Ames"), 18-19, 21-22.*

85. Chris had been raised in the church and had held callings in the Church, including in the Elder's Quorum leadership. *C. Ames*, 20-23.

86. Kathy had been raised in the Church and was active and a regularly attending member in 1998. *C. Ames*, 22.

87. In early 1998 Scott Hanson was called by then Bishop Wallin to serve as the "11-yeard-old Scout leader," also known as the Blazer leader, in the Ledgewood Ward. *Deposition of Erik Wallin ("Wallin"),*19; *Deposition of W. Scott Hanson ("S. Hanson"),* 201.

88. Bishop Wallin testified the Blazer program was affiliated with the Boy Scouts of America in 1998 but that the church limited "full" scout participation to boys of at least twelve. *Wallin,* 24.

89. As the Blazer leader Scott's duties included weekly Blazer meeting and the organization of an overnight camp-out with the Blazer scouts. *Wallin,* 24.

90. In 1998 the Boy Scouts of America required any adult involved with the Boy Scouts of America to complete an adult registration form.

91. In addition, in 1997 the New Jersey Area Presidency's position on adult registration stated:

    Never allow a scout leader to function at any position in a unit sponsored by the Church in the United States until he has been registered with the Boy Scouts of America.

    *Wallin,* 59, COP 599.

92. Bishop Wallin's interpretation was that he would be in compliance with the church policy on registration if he allowed a leader to function until such time as he registers, but there would be a problem if he did not ultimately register. *Wallin,* 66-67.

93. No one from the Church ever asked Scott to register. *S. Hanson,* 203.

94. Bishop Wallin does not recall interviewing Scott for the position of Blazer leader prior to "calling" Scott into that position. *Wallin,* 19.

95. Bishop Wallin never asked Scott for references or whether he had been convicted of any crimes, nor did he conduct a background check or question any of Scott's prior Bishops or church leaders about the appropriateness of Scott acting as a youth leader. *Wallin,* 19, 37-8, 45-6.

96. Bishop Wallin testified that because Scott's membership records contained no mention of prior problems he had no reason to inquire of Scott or any prior church authorities about his suitability as a Blazer leader. *Wallin,* 11-13, 16, 37-8.

97. Scott's first contact with David Ames occurred when someone contacted the Ames house and stated that Scott was the scout leader for the boys of David's age in their ward, and asked if Scott could take David to Church and Wednesday night Blazer activities. *Id.,* 48-9.

98. David had been attending Church but did not become involved in any Church activities until Scott showed up on his doorstep to take him Blazer scouts. *Deposition of David Ames ("D. Ames"),* 77, 79.

99. At around the time David met Scott and began regularly attending Blazer scouts, David's father was working long days with lengthy daily commutes. *Id.,* 82. As a result, Scott regularly drove David to Blazer meetings. *Id.,* 82.

100. Almost immediately after meeting Scott through the Blazer program, at Scott's request, David began helping Scott with yardwork and other jobs at Scott's home. *D. Ames,* 100. Scott began taking David on other activities including camping, rafting and biking. *C. Ames,* 36-39.

101. Chris was glad that Scott was taking an interest in David, since, due to Chris's work schedule and declining physical condition, David was having experiences that Chris could not provide. *C. Ames,* 38.

102. Chris also learned that Scott had been called to Young Men's President for the Ledgewood Ward. *C. Ames,* 28. While Chris would have had concerns about the appropriateness of David's relationship with Scott had Scott been a stranger, because of Scott's involvement with the Ames family under the "bailiwick" of the Church, Chris

14

was grateful for the opportunities he believed Scott was giving David. *C. Ames*, 26, 39-40.

103. In addition to acting as Blazer leader, Scott was also called as the Ames Family's Home Teacher. *C. Ames*, 29; *K. Ames*, 51. During Scott's initial contact as Home Teacher, he followed the Church's procedure for Home Teaching. *K. Ames*, 53. Scott also used his position as Home Teacher to gain Kathy's permission to include David on biking, camping and other trips with Scott. *K. Ames*, 54.

104. By the summer of 1998, Scott had used his various positions in the Church to develop a friendship between his family and the Ames family. *K. Ames*, 56-58; *C. Ames*, 31.

105. Scott's involvement with David and the Ames family continued through the summer and sometime in the fall of 1998 when he began sleeping at the Ames' residence.

106. Scott first spent the night at the Ames home with his son Isaac. *K. Ames*, 72. Scott led Kathy, David and Chris Ames to believe that Scott needed to stay at the Ames home because was having marital problems with his wife Kami. *K. Ames*, 72, *C. Ames*, 45; *D. Ames*, 106.

107. In late November of 1998 Chris Ames suffered a mental breakdown and was hospitalized through much of December. *C. Ames*, 52, 53, 55.

108. After his breakdown, he moved into a bedroom in the Ames residence by himself, ceased functioning as a father and was incapable of taking any active role in the household. *C. Ames*, 52, 53, 55.

109. By the beginning of 2000, because of Chris' mental problems, the Ames family was receiving financial assistance from the Church. *K. Ames*, 113-14.

110. Chris' depression lasted through May of 2000 and to date he receives disability insurance benefits and has been unable to maintain even the most rudimentary employment for more than a few months. *D. Ames*, 98-99.

111. In David's statement to police, he estimates that in September of 1998 Scott began sleeping at the Ames residence in bed with David. *David Ames July 2000 Statement to police ("D. Ames Statement"), 20: 1*. David also stated that Scott started sleeping over with him "a couple of months" prior to when the abuse started in December of 1998. *D. Ames Statement*, 22.

112. In the same statement on the same pages David states that Chris Ames had already suffered his breakdown when Scott began sleeping with him and making him uncomfortable. *D. Ames Statement*, 21-22. David's statement to New Jersey detective Stephen Speirs provides:

David Ames:      And then I mean I went and told my dad, dad, I'm, I'm uncomfortable with Scott sleeping over.

Stephen Speirs:   M-hm

David Ames:      Sleeping in the same bed as me, cuddling me and stuff. But that was kind of a time where my, um, parents were split, starting to really have problems.

Stephen Speirs:   Okay so your parents had some....

David Ames:      So....

Stephen Speirs:   mar

David Ames:      Yeah

Stephen Speirs:   Marital problems?

David Ames:      Yeah, uh, yeah, my dad was (inaudible)...mentally ill.

Stephen Speirs:   M-hm.

David Ames:      Down, didn't, just wasn't with it and then my mom, she had gall bladder problems, so ....

Stephen Speirs:    Okay

David Ames: `They really couldn't do anything about him, I mean they weren't really with it.

113. Kathy's best estimate of when Scott began sleeping over was late 1998 or even early 1999. *K. Ames*, 67, 70. Kathy does not recall that Scott began sleeping over at the Ames home until after Chris's breakdown. *K. Ames*, 71-77.

114. Beginning in December of 1998 and continuing through May of 2000, Scott frequently and severely sexually abused David. *D. Ames*, 131-33.

115. The abuse included fondling David's penis and genitals, oral sex and attempted sodomy. *D. Ames*, 131-33, *D. Ames Statement*, 56-68.

116. Scott abused David in various locations, including Scott's home, David's home and on camping trips, anywhere from two to five times a week. *D. Ames*, 115, 131-33.

117. Between December 1998 and May 2000, Chris and Kathy Ames were aware that Scott was sleeping over in their house and in bed with David. *K. Ames*, 82; *C. Ames*, 54.

118. However, Chris was mentally incapable of recognizing any problems with the situation. *C. Ames*, 54.

119. Additionally, Chris had been an active member of the Church through his childhood and was "taught and raised by the Church to believe and trust [his] leaders." *C. Ames*, 62.

120. David denied that Scott had ever touched him and Chris was conditioned from an early age to the fact that "when you have faith in the Church ... you believe they would never send anybody into your home that could do such a thing" as abuse your children. *C. Ames*, 60-61. Likewise, Kathy was not alarmed by the situation. *K. Ames*, 83.

121. Kathy testified that Scott sleeping over did not occur to her to be unusual. *K. Ames*, 83. As a lifelong active member of the Church, Kathy viewed Scott as having the approval of the Church. *K. Ames*, 9-10.

122. During this same time period, Kathy also suffered from medical problems, but Kathy had opened her house to people in need before and because of the cramped quarters did not find the sleeping arrangements as a cause for alarm. *K. Ames*, 83-85, 99.

123. Kathy found no cause for concern when David slept at Scott's house as David was usually with his sister when they stayed at Scott's house. *K. Ames*, 101.

124. Although Kathy was aware of the sometimes one on one camping trips with Scott, Kathy did not believe she had any reason to be alarmed. Scott had so involved himself with her family that she believed the relationship with Kami and Scott Hanson was beneficial to all her children. *K. Ames*, 107. In Kathy's words:

> It didn't strike me as odd. I looked at --like I said before, it was a kind of -- a njoined thing, you know, and so I thought these were opportunities. Our life is falling apart. I was trying to make decisions, I was having surgery. I had a daughter out here [in Utah] sick. I mean, there was a lot going on in '99. And I looked to Scott and Kami as being helpmates. They were giving my kids opportunities that we couldn't. Their dad was in bed. Their mother was trying to do whatever to survive and help all of my kids, including my sick daughter here in Utah. And so I was thinking -- the only thing I was thinking is my kids were having a little bit of joy and fun in their life that their parents couldn't provide. And because I trusted both of these people -- if Kami would have said, "Can I just take Christine and go somewhere," I would have let her.

125. In early 2000, Kami left Scott in New Jersey and returned to Utah with her son Isaac. *K. Hanson*, 13.

126. Bishop James Braby had replaced Hans Wallin as the Bishop in the Ledgewood ward and Scott told Bishop Braby that Kami had had an affair. *Deposition of James Braby ("Braby")*, 8.

127. In March, when Bishop Braby called Kami to speak with her about the affair, Kami informed Bishop Braby of her suspicions that Scott may have been abusing David and that Scott had a previous conviction for a sexual offense involving a minor child. *Braby*, 10-11.

128. Bishop Braby was shocked when he learned of Scott's Utah conviction from Kami and that he had not learned it from a notification in Scott's membership records. *Braby*, 51, 52.

129. Nevertheless, Bishop Braby contacted the LDS Church help line and did not report the suspected abuse to the New Jersey Department of Youth and Family Services (hereinafter DFYS). The Church help line had advised Bishop Braby to not report the abuse but rather to have Kami or Kathy Ames report the abuse. *Braby*, 16.

130. Bishop Braby contacted Kathy about Kami's suspicions because, in his opinion, Chris was incapable of doing anything about the situation and Kathy was coherent. *Braby*, 17.

131. In April 2000, Kami reported the suspected abuse to DFYS. DFYS conducted an investigation into the relationship between Scott and David but David denied any inappropriate contact and, in June, DFYS closed the investigation. *K. Ames*, 142.

132. Bishop Braby told DFYS he had encouraged Kami to report the abuse but that he was under no obligation to report the abuse himself. *Braby*, 88-89.

133. In May of 2000, Chris moved out of the family residence and began to recover from his depression. *C. Ames*, 88.

134. On July 18, 2000, Kami called Chris directly and informed Chris of her suspicions about Scott and David, Scott's prior Utah conviction, and her concerns about other abuse victim in the past. *C. Ames*, 110.

135. Able to function again as a parent, Chris then questioned David, who this time admitted to abuse. Chris then reported the information to the police and Scott Hanson was arrested within 48 hours of Kami providing Chris the same information she provided to Bishop Braby over three months prior. *C. Ames*, 112.

136. Scott was never released from custody. He was sentenced to substantial prison terms in New Jersey and Wisconsin and is likely to die in custody before he will be eligible for parole.

137. Subsequent to criminal proceedings in New Jersey Scott Hanson was also convicted of multiple counts of 2nd degree sexual assault of a child in Waukesha County, Wisconsin. *Judgment of Conviction, Wukesha County, Wisconsin.* Court pleadings, transcripts and police reports from Wisconsin demonstrate that in Wisconsin, 1) Scott's initial contact with the victim's family stemmed directly from Scott's calling as a Scouting leader then Young Men's presidency member, 2) that Church officials failed to follow their own policy of requiring Scott to register with the Boy Scouts of America, 3) that within days of his introduction to the survivor Scott began having the survivor work at his home as a babysitter, 4) that Scott ingratiated himself into the survivor's family under the guise of his callings in the Church and then began to groom the victim through participation in outdoor activities including camping, biking and rock climbing, 5) that these outdoor activities and camping trips were where much of the abuse occurred and were integral to Scott's modus operandi, 6) that the father of the Wisconsin victim, although a former Wisconsin County prosecutor and licensed attorney was rendered unable to work by debilitating depression, 7) that like Chris Ames the Wisconsin victim's father welcomed Scott's involvement in his son's life for

the apparent opportunities afforded to his son. *Police report, sentencing transcript, indictment and amended indictment Waukesha County, Wisconsin.*

138. As a result of the abuse, David has suffered great damage.

139. He has suffered in school, suffered substance abuse problems, and been diagnosed with bipolar disorder, major depressive order, and post traumatic stress disorder. *D. Ames*, 178, 185, 243, 256, 258.

140. David has been hospitalized multiple times in inpatient psychiatric facilities, has had multiple suicide attempts and requires ongoing medication for his significant problems. *D. Ames*, 79, 278, 290, 296.

The Role of the Bishop and the Stake President

141. Within the Church there are two groups of priesthood, the Melchizedek and the Aaronic. *Howell*, 16.

142. The Aaronic, or lesser priesthood, is comprised of the offices of priest, teacher and deacon. *Howell*, 16.

143. The Melchizedek priesthood is comprised of High Priests, Elders and Patriarchs. *Howell*, 16.

144. All leadership positions in the Church from Bishop through President of the Church are held by males exclusively. The Bishop in each ward is the supervising ecclesiastical authority for the members of the Elders Quorum and High Priests in his ward. *Wallin*, 27-8).

145. Amongst other duties, the Bishop and Stake President, are "Judges in Israel" and in that capacity they are expected to conduct regular worthiness and priesthood interviews of church members. *Handbook*, 19.

146. Stake presidents, Bishops and their counselors are directed to regularly interview the

priesthood leaders who report to them. *Id.*

147. Bishops are directed to conduct numerous interviews including interviews for worthiness to enter the temple as well as annual interviews of all youth (ages 12-15) and semi-annual interviews of 16-17 year old males and females. *Id.*, 20.

148. Members are also directed to seek counseling from their priesthood leaders and Bishops. *Handbook*, 21. As Judges in Israel, stake presidents and bishops counsel stake and ward members who seek spiritual guidance, who have weighty personal problems, or who have committed serious transgressions. *Id.*

149. Members are taught that "the stake president and bishop are entitled to the discernment and inspiration necessary to be spiritual advisers and temporal counselors to ward members who need such help. *Id.*

Church Callings

150. The Church has no paid employees at the ward and stake level. As such "the work of the Church is carried out through volunteer service by the members, who are called by priesthood leaders to contribute in various capacities." *Encyclopedia of Mormonism* ("Encyclopedia"), 249.

151. Members can hold multiple callings, often for indefinite periods of time. *Id.*, 249.

152. The most typical callings involve positions in local congregations in either the priesthood or auxiliary programs of the Church. *Id.*.

153. Members are directed that a calling as an officer or teacher is a stewardship, where they are to bless those they have been called to serve. *Id.*

154. While members are able to refuse callings, Church members are instructed that the

prime consideration for a calling is confirmation by the Holy Ghost of the correctness of the final selection, thus refusal of a calling is viewed with regret by those issuing the call. *Id.*, 248-250.

155. Prior to accepting certain callings, members are interviewed by their priesthood leaders to determine if they are worthy to accept the calling. *Id., 250.*

156. If the member is worthy and accepts a calling, a laying on of hands by authorized priesthood holders may be required. *Id.,* 250.

157. This ordination confers the authority of the office or position and testifies that the powers are vested in the in the recipient. *Id.*

158. Former Church President Ezra Taft Benson wrote that an essential priesthood calling, equal in importance to any other in the church, is to assist Church families through Home Teaching. *Id.,* 248-249.

159. Home Teachers are priesthood holders assigned to visit three to five families within the ward each month. *Id.,* 654.

160. According to then Bishop Hans Wallin, home teachers act as the "eyes and ears" of the Bishop within a ward. *Wallin,* 30.

161. Because of the more informal, intimate nature of a home teacher's visit, members understand that home teachers are often in a better position to help family members than other Church officers or teachers and are directed that home teaching is one of the most effective ways to manifest their commitment to "bear one another's burden." *Encyclopedia,* 655.

162. Bishop Wallin expected quarterly interviews by priesthood leaders of home teachers so the Bishop "could identify the needs of individual families" *Wallin,* 29.

163. In order to "act on needs" of families within the ward as they arose, Bishop Wallin met

weekly in a "Priestly Executive Committee meeting." *Wallin,* 30-31.

164. Although this reporting system was designed to inform the Bishop of family's needs within the ward, Bishop Wallin has no recollection of ever receiving any report regarding the Ames family. *Wallin,* 101.

165. Bishop Wallin acknowledged that neither he nor a priesthood holder's immediate priesthood leader would interview individuals for the position of home teacher. *Wallin,* 34.

MARTIN, GUNN & MARTIN, P.A.
Attorneys for Plaintiff David Ames

BY:   /s/ William J. Martin
      WILLIAM J. MARTIN