EXHIBIT 1

```
RUN DATE: 11/18/86      CITY OF OREM PUBLIC SAFETY DEPART.      PAGE:      1
                              INCIDENT REPORT

 INCIDENT#    8622714              NATURE:   SEX OFFENSE

 INCIDENT DATE 11/11/86    TIMES:  RECV 11:00  DISP 11:00  ARIV 11:00  CLEAR 11:00

 LOCATION:  749   W 700 S         ST  APT:        PREMISE: PRIVATE HOME

       AREA/BEAT: 2    SUB-DIVISION:          QUAD/GRID:  44

 OFFICER: WILKINS, BRUCE          REPORTED BY TELEPHONE   REPORT DATE:  11/11/86

 DESCRIBE OFFENSE:   SEXUAL MOLESTATION
```

**************************************************************************

******** PERSONS / BUSINESS INFORMATION ********

```
PERSON #  001     REPORTING PERSON
  LAST NAME: SCHRODER              DAVE
  ADDRESS:                              TELEPHONE:  000-000-0000
  CITY:                 STATE:               DATE OF BIRTH:  0/00/00
  RACE: WHITE           SEX:  MALE      HGT    WGT    HAIR:
  FACIAL HAIR:          EYES:           COMP:         BUILD:
  EMPLOYMENT:  CHARTER CANYON HOSPITAL  ADDR:


                      BUSINESS #  000-225-2800


PERSON #  002     VICTIM/JUVENILE
  LAST NAME: CUSTER               DAVID
  ADDRESS: 431 N 900 E.                 TELEPHONE:  000-000-0000
  CITY: AMERICAN FORK       STATE: UT          DATE OF BIRTH:  2/09/72
  RACE: WHITE           SEX:  MALE      HGT    WGT    HAIR:
  FACIAL HAIR:          EYES:           COMP:         BUILD:
  EMPLOYMENT:                           ADDR:


PERSON #  003     VICTIM/JUVENILE
  LAST NAME: SCHILL               RYAN        DAVID
  ADDRESS: 151 S 1100 E                 TELEPHONE:  000-225-9541
  CITY: OREM                STATE: UT          DATE OF BIRTH:  2/21/77
  RACE: WHITE           SEX:  MALE      HGT    WGT    HAIR:
  FACIAL HAIR:          EYES:           COMP:         BUILD:
  EMPLOYMENT:                           ADDR:


PERSON #  004     VICTIM/JUVENILE
  LAST NAME: SCHILL               ROBERT
  ADDRESS: 151 S 1100 E                 TELEPHONE:  000-225-9541
  CITY: OREM                STATE: UT          DATE OF BIRTH: 12/24/71
  RACE: WHITE           SEX:  MALE      HGT    WGT    HAIR:
```

*Edward Ross 5/14/07*
L.

RUN DATE: 11/18/86          CITY OF OREM PUBLIC SAFETY DEPART.          PAGE:          2
                                    INCIDENT REPORT

FACIAL HAIR:                EYES:                COMP:                BUILD:
EMPLOYMENT:                                      ADDR:

                                                      *Edward Foss 5/14/07*

ERSON # 005        VICTIM/JUVENILE
LAST NAME: BOLEY                      RYAN
ADDRESS:                                              TELEPHONE: 000-000-0000
CITY: AMERICAN FORK          STATE: UT                DATE OF BIRTH:  0/00/00
RACE: WHITE           SEX:  MALE          HGT          WGT          HAIR:
FACIAL HAIR:          EYES:                COMP:                BUILD:
EMPLOYMENT:                                ADDR:


          ************ NARRATIVE/SUPPLEMENT ************


11-11-86   THIS OFFICER WAS CONTACTED BY DET. FINLAYSON FROM THE AMERICAN
FORK POLICE DEPTARMENT. HE ADVISED THAT HE HAD A INCIDENT THAT AFTER HE
CHECKED INTO IT, IT HAPPENED HERE IN OREM. HE ADVISED THAT A BOY BY THE
NAME OF DAVID CUSTER AGE 14 HAD BEEN SEXUALLY ABUSED BY WILLIAM SCOTT
HANSON WHO LIVES HERE IN OREM. DET. FINLAYSON ADVISED THAT HANSON WOULD
TAKE THE BOYS OVER TO HIS HOUSE AND GIVE THEM MASSAGE AND IN THE PROCESS
OF GIVING THE MASSAGE, HE WOULD HAVE THE CLOTHING OF ALL THE BOYS OFF
AND ALSO HAVE HIS CLOTHING OFF ON OCCASION AND ATTEMPTED TO HAVE SEXUAL
RELATIONS WITH CUTLER. FINLAYSON ADVISED THAT CUTLER IS NOW IS THE CHARTER
CANYON HOSPITAL AND COULD BE INTERVIEWED THERE.
DET. BRUCE WILKINS
*

11-12-86   THIS OFFICER TRIED TO GET IN TOUCH WITH CUTLERS THEROPIST AT THE
CHARGER CANYON HOSPITAL FOR THE PAST 2 DAYS. ON THIS DATE, I GOT IN TOUCH
WITH HIM. DAVE SCHRODER WAS HIS NAME. HE ADVISED THAT IF I COULD COME OVER
ON THIS DATE AT 4:30 I COULD TALK WITH DAVID. THIS OFFICER WENT OVER AND
SCHRODER GAVE ME A BACKGROUND ON CUTLER. HE THEN SHOWED ME TO A ROOM WHERE
I COULD TALK WITH CUTLER.          BWW
*

11-12-86   DAVID CUTLER 2-9-72 WAS TALKED WITH HE STARTED OFF BY ADVISING
THIS OFFICER THAT HE MET SCOTT HANSON WHILE HE WAS AT A MOUNTAIN MAN OUT
POST. SCOTT WAS RUNING A TRADING POST AND DAVID WANTED TO TRADE FOR A FOX
SKIN. AFTER THIS WAS DONE DAVID AND 2 FRIENDS WERE STAYING UP AT THE CAMP.
SCOTT ADVISED THAT THE TENT THAT DAVID WAS STAYING IN WOULD LEAK IF THE
WEATHER STARTED TO RAIN. SCOTT SUGGESTED THAT DAVID AND HIS 2 FRIENDS STAY
IN HIS TENT WITH HIM, WHICH THEY DID. SCOTT ADVISED TO DAVID THAT HE OCULD
TELL THAT DAVID WAS TENSE AND NEEDED A MASSAGE WHICH HE DID. AFTER THE
MASSAGE, SCOTT TOLD DAVID THAT HE WOULD CALL HIM AND POSSIBLY TAKE HIM
FLYING. SCOTT LATER CALLED AND THEY WENT TO THE BEAVER HIGH ADVENTURE
BASE. THEY WENT TO THE ADVENTURE BASE. AFTER THAT THEY WENT OVER TO SCOTTS
HOUSE AND SCOTT GAVE DAVID ANOTHER MASSAGE. THE MASSAGES WERE GIVEN TO
DAVID VERY OFTEN. THIS OFFICER ASKED DAVID WHAT TYPE OF MASSAGE WOULD BE
GIVEN BY SCOTT. DAVID ADVISED THAT SCOTT WOULD TELL HIM TO TAKE OFF HIS
SHIRT AND THIS WAS TO GIVE DAVID A BETTER MASSAGE. FROM THERE, IT PROGRESSED
TO ADVISING DAVID THAT HE NEEDED TO TAKE OFF HIS PANTS SO THAT HE COULDO
MASSAGE DAVIDS LEGS. THEN HE ADVISED TO DAVID THAT HE NEEDED TO TAKE OFF
HIS UNDERWEAR SO THAT HE COULD MASSAGE HIS HIP. AS THIS WAS DONE DAVID

UCAO-RR 0069

*Edward Ross 5/14/07*

RUN DATE: 11/18/86          CITY OF OREM PUBLIC SAFETY DEPART.          PAGE:          3
                                    INCIDENT REPORT

SAID THAT HE WAS VERY UNEASY AND DID NOT KNOW WHAT TO DO SO HE WENT
ALONG WITH IT. DAVID SAID THAT AS HE WAS GETTING MASSAGES, THE FREQUENCY
THAT SCOTT WOULD BRUSH ACROSS THE GENITALS OF DAVID INCREASED. DAVID SAID
THAT HE GOT VERY UNEASY.
DAVID SAID THAT IT PROGRESSED ON THE MASSAGES UNTIL LABOR DAY WEEKEND. ON
FRIDAY (AUGUST 29TH) THEY WERE AT SCOTTS HOUSE TO SLEEP. THE NEXT DAY THEYUS
WERE GOING TO THE MOUNTAIN MAN RENDEZAUS AT FR.BRIDGER.THEY WATCHED VIDEOS
AND SCOTT ASKED DAVID IF HE WANTED A MASSAGE. DAVID SAID THAT HE DID NOT
THINK SO. SCOTT ADVISED THAT IT WOULD MAKE DAVID FEEL BETTER. THE SAME
SET OF CIRCUMSTANCES HAPPEND. ON THIS OCCASION, DAVID WAS UNCLOTHED AND
SO WAS SCOTT. DAVID SAID THAT AS HE WAS BEING MASSAGED SCOTT KEPT TOUCHING
HIS GENITAL AREA AND THE TOUCHING WAS ON THE HEAD OF HIS PENIS AND ALSO
ON HIS TESTICLES. DAVID ADVISED THAT HE HAD AN ERECTION AND WAS SCARED
AS TO WHAT WAS HAPPENING.AS SCOTT WAS MASSAGING DAVIDS LEGS, HE WOULD
TOUCH THE PENIS AND TESTICLES OF DAVID ALOT. DAVID SAID THAT HE KNEW THAT
IT WAS NO ACCIDENT THAT HE KEPT TOUCHING HIM, AND FINALLY DAVID HAD A
CLIMAX. DAVID SAID THAT IT HURT AND FELT LIKE FIRE WAS GOING THROUGH HIM.
DAVID SAID THAT SCOTT AT THIS TIME WAS LAYING WITH HIS FRONT TOWARDS
DAVIDS BACK. SCOTT THEM STARTED TO RUB HIS PENIS AGAINST DAVIDS HIP. DAVID
ADVISED THAT HE DID NOT LIKE THAT AT ALL AND WAS SCARED ABOUT WHAT WAS
HAPPENING. DAVID THEN SAID THAT SCOTT THEN TRIED TO PUT PENIS BETWEEN
HIS BUTTOCKS AND TRIED TO PUT HIS PENIS IN HIS ANAL CAVITY. DAVID ADVISED
THAT HE TUGHTENED UP HIS ANAS AND AFTER A WHILE SCOTT STOPPED TRYING.
DAVID ADVISED THAT HE THEN WENT TO SLEEP. DAVID SAID THAT HE AND SCOTT
DID NOT HAVE ANY CLOTHING ON AT THIS POINT. DAVID SAID THAT AFTER A PERIOD
OF TIME HE WAS AWOKE BY SCOTT AGAIN ON TOP OF HIM AND TRYING TO PUT HIS
PENIS IN DAVIDS ANAL AREA. DAVID ADVISED THAT HE KEPT TIGHTENING UP HIS
MUSCLES SO THAT SCOTT COULD NOT MAKE PENITRATION. DAVID SAID THAT SCOTT
THEN PLAYED LIKE HE WAS MASSAGING HIS LEG AND AGAIN KEPT TOUCHING HIS
PENIS AND TESTICLES. DAVID ADVISED THAT HE AGAIN HAD A CLIMAX AND AGAIN IT
HURT LIKE FIRE. DAVID SAID THAT HE KEPT ROLLING OVER AND FINALLY SCOTT
STOPPED TRYING TO FORCE HIS WAY INTO HIM. DAVID ADVISED THAT SCOTT HAD
A ERECTION. DAVID ADVISED THAT HE WAS SCARED TO SAY ANYTHING TO SCOTT
ABOUT THE INCIDENT AND IN THE MORNING, SCOTT NEVER SAID ONE WORD ABOUT
WHAT HAD HAPPENED. THEY WENT TO FORT BRIDGER TO THE RENIUZAUS THE NEXT DAY
ON SATURDAY AND WHILE THERE THEY SLEPT IN THE SCOTTS VEHICLE. WHILE IN THE
VEHICLE SCOTT AGAIN ASKED DAVID IF HE WANTED TO HAVE A MASSAGE. DAVID SAID
THAT HE KNEW WHAT SCOTT WAS GOING TO DO. DAVID DID NOT KNOW WHAT TO DO.
SCOTT AT THIS TIME DID THE SAME THING. SCOTT HAD DISROBED HIMSELF AND
ALSO TOOK THE UNDERWEAR OF DAVID AND PULLED THEM DOWN TO HIS KNEES. DAVID
SAID THAT AS HE WAS MASSAGING HE DID THE SAME THING AND AS HE CROSSED FROM
RUBBING ONE LEG TO THE OTHER, HE WOULD TOUCH DAVIDS PENIS AND TESTICLES.
DAVID ADVISED THAT AGAIN SCOTT ATTEMPTED TO HAVE ANAL INTERCOURSE WITH HIM
BY TRYIN GTO PUT HIS PENIS INSIDE OF DAVID. DAVID SAID THAT HE KEPT TIGHT-
ING HIS MUSCLES SO THAT SCOTT COULD NOT GET IT INSIDE OF DAVID. DAVID SAID
THAT HE KNOWS THAT SCOTT HAS A PROBLEM AND THAT WHAT HE DID WAS NOT RIGHT
AND SCOTT NEEDS HELP.
DAVID SAID THAT HE WOULD TESTIFY AGAINS HIM IF NESSESSARY. THIS OFFICER
ASKED DAVID WHO OF THE OTHER KIDS THAT HE IS AROUND WOULD HE BELIEVE SCOTT
WOULD DO THIS SAME THING WITH. HE ADVISED THAT A RYAN BULLY FROM A.F.
WOULD ALSO POSSIBLY BE A VICTIM, SINCE RYAN SPENT ALOT OF TIME WITH SCOTT.
DAVID ALSO ADVISED THAT A ROB SCHILL AND A RYAN SCHILL BOTH ARE HIS GIRL-
FRIENDS BROTHERS HAVE SPENT TIME WITH SCOTT AT SCOUT CAMPS AND HE MIGHT

RUN DATE: 11/18/86        CITY OF OREM PUBLIC SAFETY DEPART *Edward Ross* 5/14/07    PAGE:
                                    INCIDENT REPORT                                              4

OF DONE THE SAME THING TO THEM.
*

11-13-86  THIS OFFICER FOUND THAT RYAN SCHILL AND ROB SCHILL WERE BOTH
LIVING IN OREM. AT 151 S 1100 E, OREM. 225-9541. THIS OFFICER CALLED AND
TALKED WITH MRS. SCHILL. I EXPLAINED THE CIRCUMSTANCES AND ADVISED THAT +
I NEEDED TO TALK WITH RYAN AND ROB. SHE ADVISED THAT SHE WOULD BRING THEM
IN TOMORROW AT 11:00 AM SINCE RYAN WOULD BE OUT OF SCHOOL.
*

11-14-86  THIS OFFICER TALKED WITH RYAN SCHILL. HE ADVISED THAT HE WAS 9
YEARS OLD ( 2-21-77 ) HE WAS ASKED BY THIS OFFICER IF HE KNEW SCOTT HANSON
AND HE ADVISED THAT HE DID. THIS OFFICER ASKED IF SCOTT HAD EVER GIVEN HIM
A MASSAGE. HE ADVISED THAT HE HAD. THIS OFFICER ASKED HIM IF THERE HAD
EVER BEEN ANY THING DURING THAT MASSAGE THAT SCARED HIM. HE ADVISED THAT
THERE WAS A FEW THINGS. RYAN SAID THAT HE HAD SLEPT OVER TO SCOTTS HOUSE
ABOUT THE MIDDLE OR END  OF JUNE. AT THAT TIME IT WAS SATURDAY NIGHT. SCOTT
ASKED IF HE WANTED TO HAVE A MASSAGE. HE THEN STARTED TO GIVE HIM A MASSAGE
TO RYAN. RYAN SAID THAT HE HAD TAKEN OFF HIS UNDERWEAR AND THAT AS HE WAS
GIVING HIM A MASSAGE, HE WOULD RUB HIS LEGS AND IN DOING SO, WOULD MOVE
AROUND AND WOULD TOUCH HIM. I ASKED IF IT APPEARED TO BE ACCIDENTAL, OR IT
RYAN FELT THAT IT WAS ON PURPOSE. RYAN SAID THAT HE FELT THAT IT WAS ON
PURPOSE. HE ADVISED THAT SCOTT DID NOT HAVE ON HIS UNDERWEAR. RYAN ADVISED
THAT SCOTT WOULD PUT HIS KNEE UP SO AS TO REST IT AGAINST RYANS PRIVATE
AREA. RYAN SAID THAT AS HE WAS MASSAGING HIM, SCOTTS KNEE WOULD RUB BACK A
AND FORTH AGAINST HIS PRIVATE AREA WITH HIS KNEE. RYAN SAID THAT HE
FELT THAT THIS WAS NOT AN ACCIDENTAL THING, BUT THAT IT WAS ON PURPOSE. +
RYAN ALSO SAID THAT AT RYANS HOUSE HE WAS BEING MASSAGED BY SCOTT AND
AT THSI TIME THEY HAD THEIR CLOTHING ON AND THAT AS HE WAS MASSAGING
RYAN, SCOTT WOULD RUB HIS HAND ACROSS HIS PRIVATE AREA AND SCOTT TOUCHED
RYAN SEVERAL TIMES IN HIS PRIVATE AREA WITH HIS HAND. HE ALSO FELT THAT
THIS WAS ON PURPOSE AND NOT AN ACCIDENT. RYAN ALSO SAID THAT THIS ALSO
HAPPENED 2 MORE TIMES WHILE THEY WERE AT THE BEAVER HIGH ADVENTURE BASE.
RYAN SAID THAT THE TIME AT RYANS HOUSE WAS AROUND THE FIRST PART OF
SEPTEMBER. THIS OFFICER ASKED IF SCOTT EVER TALKED WITH HIM ABOUT IT.
RYAN SAID THAT HE NEVER SAID A THING. I ASKED IF WHAT SCOTT HAD DONE EVER
SCARED HIM. HE ADVISED THAT IT DID. I ASKED WHY DID NHE NOT TELL ANYONE
ABOUT THIS AND HE ADVISED THAT HE WAS SCARED AND DID NOT KNOW WHAT TO SAY.
DET. BRUCE WILKINS.
*

11-14-86  THIS OFFICER TALKED WITH ROBBY SCHILL AGE 14 ( 12-24-71 ) HE
ADVISED THAT HE KNEW SCOTT AND THAT HE HAD BEEN HIS ASSISTANT AT THE SCOUT
CAMP. ROBBY SAID THAT HE GOT MASSAGES ALL THE TIME FROM SCOTT. ROBBY SAID
THAT THEY HAPPENED ON A FREQUENT TIME FROM LATE JUNE TO MIDE AUG WHEN HE
WENT BACK TO GET READY FOR SCHOOL. ROBBY ADVISED THAT ON THE MASSAGES,    +
SCOTT WOULD MASSAGE HIM AND THAT HE ALWAYS HAD ON HIS UNDERWEAR. THIS
OFFICER ASKED IF SCOTT EVER TOUCHED HIM IN HIS PRIVATE AREA WHEN HE WAS
GIVING ROBBY A MASSAGE. HE ADVISED THAT HE DID. ROBBY ADVISED THAT SCOTT
AT FIRST WOULD MASSAGE HIM AND THAT HE NEVER BRUSHED BY HIS GENITAL AREA
AND THAT AS TIME WENT BY SCOTT WOULD BRUSH BY HIS GENITAL AREA MORE AND
MORE AND TOUCH HIM. THIS OFFICER ASKED HIM IF IT WAS A KIND OF THING THAT
HE FELT WAS AN ACCIDENT OR A THING THAT WAS ON PURPOSE. ROBBY SAID THAT HE
FELT THAT IT WAS ON PURPOSE. I ASKED WHY WOULD HE THINK THAT IT WAS ON
PURPOSE. ROBBY SAID THAT THE MORE TIMES I GOT MASSAGES, THE MORE TIMES
HE WOULD TOUCH ME. HE ADVISED THAT AS HE WOULD MASSAGE HIS LEGS, HE WOULD

RUN DATE: 11/18/86          CITY OF OREM PUBLIC SAFETY *Edward Coy* 5/14/07          PAGE:     5
                                INCIDENT REPORT

RUN HIS HANDS ACROSS FROM ONE LEG TO ANOTHER AND AS HE DID THIS, HE WOULD
KEEP BRUSHING HIS HANDS ON HIS GENITAL AREA. ROBBY SAID THAT HE DID NOT
KNOW WHAT TO SAY TO SCOTT BECAUSE HE WAS AFFRAID TO SAY ANYTHING ABOUT IT.
I ASKED IF SCOTT EVER SAID ANYTHING TO HIM. ROBBY SAID THAT HE NEVER DID
SAY ANYTHING TO HIM ABOUT IT.
THIS OFFICER ASKED HIM WHERE THIS HAPPENED. HA ADVISED THAT IT HAPPENED
WHEN HE WAS STAYING UP AT THE BEAVER HIGH ADVENTURE BASE.
DET. BRUCE WILKINS
*

11-14-86  THIS OFFICER WENT TO THE HOME OF WILLIAM SCOTT HANSON AND HE
WAS THERE. HE WAS ADVISED THAT I WAS FROM THE OREM POLICE DEPT.AND ADVISED
HIM THAT WE NEEDED TO HAVE HIM COME DOWN TO THE POLICE DEPARTMENT BECAUSE
WE NEEDED TO TALK WITH HIM CONCERNING SOME OF THE BOYS THAT HE HAS BEEN
HANGING AROUND. AS WE DROVE TO THE STATION HE ASKED IF ANY OF THE BOYS
WERE IN TROUBLE. I EXPLAINED THAT I WOULD GIVE HIM ALL OF THE DETAILS AS
TO WHAT THIS WAS ABOUT WHEN WE GOT TO THE STATION. WHEN WE ARRIVED HE WAS
TAKEN TO MY OFFICE. HE AT THIS TIME WAS ADVISED THAT THIS WAS CONCERNING
SOME IMPROPER TOUCHING BY HIM TO SOME OF THE BOYS THAT HE HAS HAD OVER TO
HIS HOUSE AND ON CAMPING TRIPS. AFTER ADVISING HIM OF THIS, THIS OFFICER
ADVISED SCOTT HANSON OF HIS MIRANDA RIGHTS. HE ADVISED THAT HE UNDERSTOOD
THEM AND WANTED TO TALK.AS WE TALKED SCOTT HANSON WENT FROM NEVER TOUCHING
THE BOYS AT ALL. TO AS HE WAS MASSAGING THEM HE WOULD ACCIDENTALLY TOUCH
THEM IN THE GENITAL AREA, TO THERE WERE SPECIFIC TIMES WHEN HE TOUCHED THE
BOYS PURPOSEFULLY. AS WE TALKED, THIS OFFICER AT FIRST ASKED HIM IF HE
EVER HAD HIS CLOTHING OFF. HE DENIED EVER HAVING HIS CLOTHING OFF, BUT
THEN HE ADVISED THAT HE ONLY HAD THE TOP OF HIS GARMENTS OFF, BUT THE BOT-
TOMS ON. THEN HE ADVISED THAT HE DID HAVE HIS CLOTHING OFF ON OCCASION.
THIS OFFICER THEN ASKED HIM ABOUT EACH OF THE INDIVIDUAL BOYS AND WHAT
HE HAD DONE WITH THEM. SCOTT ADVISED THAT WITH RYAN SCHILL. HE HAD RYAN
SLEEP OVER TO HIS HOUSE AND THAT WHILE SLEEPIGN THERE, HE WENT AND GOT
INTO THE SHOWER AND WHEN HE GOT OUT HE WENT OVER AND HAD A ROBE ON AND
LAYED NEXT TO RYAN. HE ASKED RYAN IF HE WANTED A MASSAGE. HE THEN WAS
FACING RYAN AND HE RUBBED HIS SHOULDERS AND NECK. HE DENIED EVER HAVING
TOUCHED RYAN OR EVER PUTTING HIS KNEE ON RYANS GENITALS. THEN HE CHANGED
HIS STORY TO ADVISE THAT HE DID PUT HIS KNEE UP AGAINST RYANS GENITALS
AND ADVISED THAT HE MIGHT OF RUBBED BACK AND FORTH WITH HIS KNEE AS HE
WAS MASSAGING RYANS BACK HE ADVISED THAT THIS WAS IN LATER SEPTEMBER OR
EARLY OCTOBER. THIS OFFICER THEN ASKED HIM ABOUT RYAN BULLY FROM AMERICAN
FORK UTAH. SCOTT ADVISED THAT HE NEVER DID ANYTHING WITH HIM WHILE THEY
WERE AT HIS HOUSE, BUT WHEN THEY WENT TO THE BEAVER HIGH ADVENTURE BASE
HE AND RYAN WERE SLEEPING NEXT TO EACH OTHER AND RYAN WAS FACING AWAY FROM
SCOTT AND SCOTT DECIDED TO GIVE HIM A MESSAGE. AS SCOTT WAS GIVING RYAN
A MASSAGE, SCOTT ADVISED THAT HE GOT AN ERECTION AND STARTED TO HAVE
" THOUGHTS AND FANTASIES " SCOTT ADVISED THAT HE HAD HIS CLOTHING ON AND
THEN AS HE WAS LAYING NEXT TO RYAN BULLY, HE STARTED TO RUB HIS ERECTED
PENIS AGAINST THE HIP OF RYAN BULLY. HE ADVISED THAT HE DID THIS FOR
ABOUT 5 SECONDS ON THE HIP AREA OF BULLY. AS HE WAS RUBBING AGAINST
BULLY SCOTT ADVISED THAT HE FELT BAD AND KNEW THAT HE SHOULD NOT BE DOING
THIS. SCOTT THEN WENT TO THE BATHROOM.
SCOTT ADVISED THAT WITH RYAN BULLY THIS ONLY HAPPENED AT THE BEAVER HIGH
ADVENTURE BASE. SCOTT ADVISED THAT THIS HAPPENED IN LATE JULY OR THE
FIRST PART OF AUGUST.
THIS OFFICER THEN ASKED SCOTT ABOUT ROB SCHILL. SCOTT ADVISED THAT HE HAD

Case 2:06-cv-03441-WJM-MF   Document 42-4   Filed 04/21/08   Page 7 of 31 PageID: 836

TOUCHED ROB IN THE GENITAL AREA A COUPLE OF TIMES. SCOTT ADVISED THAT THIS
HAPPENED AT THE BEAVER HIGH ADVENTURE BASE ALSO. SCOTT ADVISED THAT HE
WOULD GIVE HIM MASSAGES ALSO AND THAT ON THIS OCCASION AT THE BEAVER BASE
ROB WAS LAYING SO THAT HE WAS BEHIND HIM AND FACEING HIS BACK. SCOTT
ADVISED THAT AS HE WAS MASSAGING HIM ON A COUPLE OF TIMES HE WOULD TOUCH
ROB ON HIS PENIS. THIS OFFICER ASKED HIM IF THIS WAS ON PURPOSE OR A
ACCIDENT AS HE WAS MASSAGING HIM. SCOTT ADVISED THAT IT WAS ON PURPOSE
AND THAT HE DID IT FOR THE PURPOSE IN " SEEING WHAT ROB HAD ".SCOTT SAID
THAT AS HE WAS MASSAGING ROB, HE GOT SEXUAL AROUSED ON A COUPLE OF OCCAS-
IONS AND AS HE DID SO HE WOULD USE THE SIDE OF HIS HAND AND AS HE WOULD
GO FROM ONE LEG TO ANOTHER IN MASSAGING ROB AND AS HE WOULD GO FROM ONE
LEG TO ANOTHER, HE WOULD USE THE SIDE OF HIS HAND AND TOUCHED ROB IN
A SEXUAL WAY. SCOTT ADVISED THAT AS HE WAS TOUCHING ROB, HE FELT BAD
ABOUT WHAT HE WAS DOING AND KNEW THAT IT WAS WRONG. AFTER HE DID THAT HE
ADVISED THAT HE TURNED OVER AND WENT TO SLEEP.
SCOTT ADVISED THAT THIS HAPPENED AROUND THE MIDDLE TO LATE PART OF THE
SUMMER, AROUND JULY.
THIS OFFICER THEN ASKED SCOTT ABOUT DAVID CUSTER. SCOTT ADVISED THAT HE
HAD HIM OVER TO THE HOUSE ON SEVERAL OCCASIONS TO SLEEP OVER WITH HIM.
SCOTT ADVISED THAT HE DID GIVE DAVID ALOT OF MASSAGES AND THAT ON ONE
OCCASION DAVID WAS SLEEPING AT HIS HOUSE AND HE GAVE HIM A MASSAGE AND
HE DID RUB HIS PENIS AGAINST THE HIP AREA OF DAVID AND THAT IT WAS NEAR
ONE OF DAVIDS CHEEKS NEAR THE CRACK. SCOTT ADVISED THAT HE HAD AN ERECTION
AND THAT AS HE WAS SEXUALLY AROUSED,HE THEN STARTED TO RUB HIS PENIS AGAIN
DAVID ON HIS CHEEK FOR ABOUT 10 SECONDS. SCOTT ADVISED THAT AFTER HE DID
THIS HE ROLLED OVER AND THEN DAVID WENT TO THE BATHROOM.HE COULD TELL THAT
SOMETHING WAS WRONG AND HE ASKED DAVID IF ANYTHING WAS WRONG, BUT DAVID
JUST SAID THAT HE WAS FINE. DAVID THEN WENT BACK TO SLEEP. HE ADVISED THAT
THIS HAPPENED ON THE NIGHT JUST BEFORE THEY WENT TO THE MOUNTAIN MAN
RENDAZAUS AT FT.BRIDGER. THE NEXT DAY THEY GOT UP AND WENT TO THE MOUNATIN
MAN RENDAZAUS. THAT NIGHT THEY SLEPT IN SCOTTS CAR AND HE ADVISED THAT
NOTHING HAPPENED THERE, BUT A MASSAGE TO DAVID.   DET. BRUCE WILKINS
SCOTT TOLD THIS OFFICER ON THE WAY HOME THAT HE WAS GLAD THAT I WAS
HELPING HIM AND THAT HE DID NOT KNOW IF WHAT HE DID WAS WRONG, BECAUSE HE
NEVER DID WANT TO DO ANYTHING THAT WOULD HURT THE KIDS BECAUSE HE REALLY
CARED FOR THEM.FROM THIS OFFICERS OPINION, IT APPEARED TO ME THAT HE WAS
NOT SORRY ABOUT TOUCHING THE BOYS, BUT THAT HE WANTED TO DO THE BEST
THING FOR HIM TO KEEP HIM OUT OF TROUBLE.I ALSO ADVISED SCOTT NOT TO HAVE
ANY CONTACT WITH ANY OF THE VICTIMS. HE ADVISED THAT HE WOULDN'T.  BWW.

11-17-86  THIS OFFICER TALKED WITH SHARLENE BARLOW AND SHE ADVISED THAT
SHE FELT THAT THERE WAS ENOUGH FOR A SEXUAL ABUSE OF A CHILD CHARGE AND
ALSO A ATTEMPTED SODOMY CHARGE. DET. BRUCE WILKINS

PROVING SUPERVISOR _____        PREP: _Edward Ross_ 5/14/07

# EXHIBIT 2

SUMMONS

NOALL T. WOOTTON
Utah County Attorney
Utah County Building
Provo, UT 84601

OREM                         DEPARTMENT, EIGHTH CIRCUIT COURT,
UTAH COUNTY, FOURTH JUDICIAL DISTRICT, STATE OF UTAH

| | |
|---|---|
| **STATE OF UTAH,** | : *Amended* |
| Plaintiff, | : **INFORMATION** |
| vs. | : |
| WILLIAM SCOTT HANSON | : Criminal No. *86000548 1* |
| DOB:  3/9/62 | |
| Defendant(s). | : |
| 749 West 700 South | |
| Orem, Utah | |

NOALL T. WOOTTON, Utah County Attorney, State of Utah, accuses the defendant(s) of the following crime(s):

## COUNT I

ATTEMPTED FORCIBLE SODOMY, a Second Degree Felony, in violation of 76-4-101, 102 and 76-5-403, Utah Criminal Code, as amended, in that he, on or about August 29, 1986, in Utah County, Utah, did attempt to intentionally engage in a sexual act involving the genitals of the defendant and the mouth or anus of a person 14 years of age or older.

## COUNT II

~~AGGRAVATED~~ SEXUAL ABUSE OF A CHILD, a Second Degree Felony, in violation of 76-5-404.1, Utah Criminal Code, as amended, in that he, on or about June 28, 1986, in Utah County, Utah, did knowingly or intentionally touch the anus, buttocks, or genitals of a child under 14 years of age, with the intent to arouse or gratify the sexual desire of any person, or with the intent to cause substantial emotional or bodily pain to any person, ~~and at the time of such acts, the said William Scott Hanson occupied a position of special trust in relation to the child, to-wit:  adult scout leader.~~

*JWS*
*1-5-87*

For Official Purpose Only
Released by the County Attorney to

*Edward Ross 5/4/07*

This Information is based on evidence sworn to by:   Bruce Wilkins, Orem PD

Authorized for prosecution by:

_____
UTAH COUNTY ATTORNEY

_____
DEPUTY

Estimated time for preliminary hearing:

_____
COMPLAINANT

Subscribed and sworn to before me
this 19th day of Nov 19 86

_____
JUDGE

For Official Purpose Only
Released by the County Attorney to
Edward Ross 5/4/07

# EXHIBIT 3

FILED
FOURTH JUDICIAL DISTRICT COURT
OF UTAH COUNTY, STATE OF UTAH
*Oct 8, 1987*
WILLIAM F. HUISH, CLERK
—————— DEPUTY

Robert L. Moody, #2302
TAYLOR, MOODY & THORNE
Attorneys for Defendant
2525 North Canyon Road
P.O. Box 1466
Provo, Utah 84603
Telephone 801-373-2721

IN THE FOURTH JUDICIAL DISTRICT COURT OF UTAH COUNTY

STATE OF UTAH

| | | |
|---|---|---|
| THE STATE OF UTAH, | : | |
| Plaintiff, | : | STATEMENT BY DEFENDANT IN ~~A~~ |
| vs. | : | ADVANCE OF PLEA ~~OF NO CONTEST~~ GUILTY |
| WILLIAM SCOTT HANSEN, | : | Case No. CR 87 72 |
| Defendant. | : | Judge Boyd L. Park |

COMES NOW William Scott Hansen, the Defendant in the above entitled matter and hereby acknowledges and certifies the following:

1. I have had the assistance of counsel in reviewing and completing this form.

2. The nature of the charges against me have been explained. I have had an opportunity to discuss the nature of the charges with my attorney, and I understand the charges and the elements which the State is required to prove.

3. I understand that I am charged with the offense of Lewdness involving a child, a Class A misdemeanor. I have

- 1 -

reviewed the charge and the statute and what I am told the amended Information will be.

4. I understand that the maximum penalty that can be imposed for this offense for which I am accused is one (1) year in the Utah County jail or TWENTY FIVE HUNDRED ($2,500.00) DOLLARS. I understand the Court may impose either or both of such penalties.

5. I understand that I have the right to be represented by an attorney at every stage of the proceeding, and I know that if I cannot afford an attorney one will be appointed to represent me. I know that I have the right to plead "Not Guilty" and I know that if I do plead "Not Guilty" I can persist in that plea.

6. I know that I have the right to a jury trial. I understand that this right to a jury trial includes the following rights.

      a. I have the right to the assistance of counsel;

      b. I have the right to see and observe the witnesses who testify against me;

      c. My attorney can cross-examine all witnesses who testify against me.

      d. I can call such witnesses as I desire, and I can obtain subpoenas to require the attendance and testimony of those witnesses;

      e. I cannot be forced to incriminate myself, and I do not have to testify at my trial;

- 2 -

f.  If I do not want to testify, the jury will be instructed that no inference adverse to me may be drawn from my failure to testify.

g.  The State must prove each and every element of the offenses charged against me beyond a reasonable doubt.

h.  I understand that I am presumed innocent of the charges against me and the presumption continues until and unless each member of the jury is convinced of my guilt beyond reasonable doubt;

i.  If I were to be convicted I would have the right to appeal that conviction, and if I cannot afford to appeal, the State will pay the costs of the appeal including the services of appointed counsel.

7.  I understand that the State has the burden of proving each and every element of the charge against me to the satisfaction of each juror.  I understand that the elements of the charges against me are as follows:

a.  That I, William Scott Hansen;

b.  In Utah County, State of Utah;

c.  Performed an act of gross lewdness under circumstances I should know will likely cause affront or alarm;

d.  That such act was in the presence of another who was under the age of fourteen (14) years of age;

8.  I understand that should I plead No Contest to the charges contained in the Information that such plea constitutes a

- 3 -

waiver of my rights as follows:

a. That by pleading ~~No Contest~~ Guilty that it is the same as entering a conviction against me and that I am giving up the following rights:

1. That by pleading ~~No Contest~~ Guilty I am giving up my right to a jury trial, my right to the presumption of innocence, my right to confront and cross-examine the witnesses against me, and my right to remain silent.

b. That by pleading ~~No Contest~~ Guilty I am consenting to the entry of a conviction against me by the Court;

c. That by pleading ~~No Contest~~ Guilty I am waiving my right to appeal the verdict and judgment of the Court;

d. That by pleading ~~No Contest~~ Guilty I am relieving the State of its burden of proving me guilty beyond a reasonable doubt;

e. That by pleading ~~No Contest~~ Guilty I am consenting to the entry of judgment against me by the Court;

9. No agreements have been reached and no representations have been made to me as to what the sentence will be should I plead No Contest and I thereby consent to the entry of judgment against me by the Court.

10. I know that if I enter a plea of ~~No Contest~~ Guilty, the Judge may ask me questions under oath about the offense to which the plea is entered. These questions, if asked on the record and in the presence of counsel, must be answered by me; and if I give

- 4 -

07/16/00  08:21 FAX 8                    T                           ☒007

false answers, I can be prosecuted for perjury.

11. The only plea agreement which I have entered into with the State is that the charges pending in Utah County and also in Beaver County will be dismissed.

12. No threats or promises of any sort have been made to induce me or to persuade me to enter into a plea agreement.

13. No one has told me that I would receive probation nor any other form of leniency because of my plea;

14. I have discussed this case and this plea with my attorney as much as I wish to. I am satisfied with the advise of my attorney.

15. My decision to enter this plea was made after full and careful thought, with the advise of counsel, and with a full understanding of my rights, the facts and circumstances of the case and the consequences of the plea.

16. I was not under the influence of any drugs, medication or intoxicants when the plea was made, and I am not now under the influence of any drugs, medication, or intoxicants.

By affixing my initials to the blank spaces above, I acknowledge that I understand the content thereof and that the statements made are correct. By signing in the place designated below, I do hereby affirm that I am doing this of my own free will and choice.

WILLIAM SCOTT ~~HANSON~~

- 5 -

# EXHIBIT 4

For Official Purpose Only
Released by the County Attorney to
*Edward Poss* 5/14/07

IN THE FOURTH JUDICIAL DISTRICT COURT

UTAH COUNTY, STATE OF UTAH

\* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| THE STATE OF UTAH, | ) | MINUTE ENTRY |
| Plaintiff, | ) | CASE NUMBER:  CR 87 72 |
| vs. | ) | DATED:  November 20, 1987 |
| WILLIAM SCOTT HANSON, | ) | BOYD L. PARK, JUDGE |
| Defendant. | ) | Rept.: Richard C. Tatton, CSR |

JUDGMENT AND ORDER OF PROBATION

This matter came before the Court for pronouncement of judgment on the above-named defendant on a charge of Lewdness Involving a Child, a Class A Misdemeanor.  Deputy County Attorney John Allan appearing for and on behalf of the State of Utah.  The defendant appearing in person and through attorney Robert L. Moody.

On the 8th day of October, 1987, the defendant entered a plea of guilty to the crime charged in the Amended Information and the matter was referred to the Adult Probation and Parole Department for a presentence investigation and report.  Their report has now been received and considered by the Court and defendant's counsel has been made privy to the report.

Dr. Philip Washburn, Psychiatrist, conducted an independant evaluation of the defendant pursuant to stipulation of counsel and upon approval by the Court.  The Court has also received and considered Dr. Washburn's report.

The Court requested that Dr. Philip Washburn appear and testify.  Dr. Philip Washburn, psychiatrist, was sworn and testified on direct by Mr. Moody.  The Court questioned Dr. Washburn.  Mr. Moody continued direct examination.  Cross by Mr. Allan.

Mr. Moody addressed the Court in behalf of the defendant regarding the recommendation of Adult Probation and Parole Department.  Mr. Moody moved that sentencing be continued one year, that the defendant be placed on probation, and at the end of the one year period, this matter be dismissed.  Mr. Moody advised the Court of the defendant's plan to move to Texas to enter graduate school.  Mr. Moody requested that the Court order that the defendant is not to be involved in programs with young people and that the defendant receive further therapy.  Mr. Allan responded and will waive the ISAT evaluation, however, desires the defendant to have long term therapy.

The Court called for those in the Courtroom who desired to be heard in this matter.  Robert Hanson, ecclesiastical leader of the defendant, addressed the Court in behalf of the defendant. The Court again called for those who desired to be heard in this matter.

There being no legal reason having been shown why sentence should not be pronounced, it is the judgment of the Court that the defendant be sentenced to the Utah County Jail for

For Official Purpose Only
Released by the County Attorney to

one year.   Execution of the sentence is suspended and defendant
is placed on probation for a period of eighteen months upon the
following terms and conditions:

    1.  Defendant enter into an agreement with the Adult
        Probation and Parole Dept. and comply strictly with
        the terms of probation.

    2.  Defendant make himself available to the Dept. and
        the Court when requested to do so.

    3.  Defendant is not to violate the laws of the United
        States, State of Utah, or any municipality wherein
        he/she may reside.

    4.  Defendant is to contact Dr. Philip Washburn or
        another qualified psychiatrist to continue
        psychiatric treatment and psyco-therapy with the
        cooperation and approval of Adult Probation and
        Parole Dept.  The defendant is to also seek therapy
        in Texas if requested to do so by the designated
        doctor and must arrange same through Adult
        Probation and Parole Department.  The defendant is
        to pay for the expenses of all therapy.

    5.  Defendant is not to be involved in any youth
        programs that involve children in their minority
        during the term of his probation.

    The Court will allow the defendant to go to the State
of Texas.  The Court will not require the defendant to serve jail
time and will not require a fine or victim reparation fee.

    Court retains jurisdiction to make further orders as
necessary.

    Dated this 20th day of November, 1987.

                    BY THE COURT:

                    BOYD L. PARK, JUDGE

For Official Purpose Only
Released by the County Attorney to

IN THE FOURTH JUDICIAL DISTRICT COURT

OF THE STATE OF UTAH, IN AND FOR UTAH COUNTY

\* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| THE STATE OF UTAH, | ) | MINUTE ENTRY |
| Plaintiff, | ) | CASE NUMBER:  CR 87 72 |
| vs. | ) | DATE:  October 8, 1987 |
| WILLIAM SCOTT HANSON, | ) | BOYD L. PARK, JUDGE |
| Defendant. | ) | Rept.: Richard C. Tatton, CSR |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### CHANGE OF PLEA

This being the time fixed for trial of the above-named defendant.  The State of Utah appearing by and through Deputy County Attorney Sherry Ragan.  Defendant appearing in person and through attorney Robert L. Moody.  A jury was not called pursuant to the representation of defendant's counsel that the defendant wished to withdraw his not guilty plea and enter a guilty plea.

Ms. Ragan advised the Court that the State desires to amend Count II and that the State will move to dismiss Count I upon the defendant entering a Guilty plea to the Amended Information.  Ms. Ragan was sworn and executed an Amended Information in open court with the Court affixing it's signature to same.  A copy was given to the defendant.  The defendant waived the reading of the Amended Information.

The Court advised the defendant fully of his constitutional rights and of the consequences of entering a guilty plea. Counsel submitted Statement of Plea Agreement to the Court wherein counsel, defendant and the Court executed same.  Ms.

For Official Purpose Only
Released by the County Attorney to

_Edward Foss_  5/14/07

Ragan stated the factual basis for the charge in the Amended
Information.  The Court allowed defendant to withdraw his not
guilty plea.  The defendant was sworn, advised by the Court of
his rights, and executed the Statement by Defendant in open
court, with Court and counsel affixing their signatures to same.
Defendant entered a plea of **GUILTY** to the crime of **Lewdness
Involving a Child, a Class A Misdemeanor** as charged in the
Amended Information.  Affidavit of Counsel was submitted to the
Court.  Ms. Ragan moved to dismiss Count I in the original
Information.  The defendant did not object and Court granted
same.  The Court accepts said plea finding it has been entered
knowingly, with full understanding of his rights, that it was
entered freely and voluntarily, without force, threat, or
promise of reward and finding there is a factual basis for the
plea.

The defendant waived the statutory time in which to be
sentenced.  Upon motion of defendant this matter is referred to
the Adult Probation and Parole Department for a presentence
investigation and report.  Defendant is to cooperate fully with
the department.  Dr. Philip Washburn will also submit an
independant evaluation.

This matter is continued to **November 20, 1987 at 8:00
a.m.** for pronouncement of sentence.  Defendant is ordered to be
present at that time.

Defendant is released on his own recognizance until
time fixed for sentencing or as otherwise ordered by the Court.

For Official Purpose Only
Released by the County Attorney to
Edward Foss 5/14/07

# EXHIBIT 5

For Official Purpose Only
Released by the County Attorney to

W. Peterson          MAR 1 4 2007

IN THE FOURTH JUDICIAL DISTRICT COURT

UTAH COUNTY, STATE OF UTAH

*******

| | | |
|---|---|---|
| STATE OF UTAH, | ) | Case Number  CR 87 72 |
| Plaintiff, | ) | |
| vs. | ) | RULING |
| WILLIAM SCOTT HANSON, | ) | |
| Defendant. | ) | |

********

This matter is before the court on defendant William Scott Hanson's Motion to Suppress and is considered pursuant to Rule 3.5, Rules of Practice of the District Court.

### OBSERVATION

Rendering a decision on this motion is extremely difficult in light of the testimony of the defendant and Detective Bruce Wilkins. The testimony of both at the suppression hearing was in conflict on most material points. This difficulty could have been avoided if the interrogation of the defendant had been recorded. The court notes that the Orem City Police have the capability of recording any such interrogations and that Detective Wilkins admitted at the hearing that such equipment was available at the time.

### FACTS

On November 14, 1986, Detective Wilkins went to the home of the Hanson and requested that he accompany him to the

UTAHPROS00000030

For Official Purpose Only
Released by the County Attorney to

W. Peterson

MAR 1 4 2007.

police station. The officer's express purpose was to question and book the defendant. (Transcript, p. 33). After arriving at the police station Hanson was advised of his rights and he stated that he understood them. During the course of the interrogation Hanson claimed to have requested an attorney on more than one occasion. Officer Wilkins admits that the defendant requested an attorney on one occasion and denies defendant made any other requests.

### Direct Examination of William Scott Hanson by Mr. Moody

Q: Okay, then what did you ask, if anything?

A: At that time he had said when he read those rights to me that I could contact an attorney and my dad is pretty smart with stuff like that and knows what rights I had but if and he didn't say that I had a right to talk to my dad but he did say that I had a right to talk to an attorney and so then I asked him if I could talk to an attorney to find out what rights I really had.

Q: What did he say?

A: At that time he told me that I could contact an attorney but that if I did he could tell me just what would happen. The attorney would tell me to say absolutely nothing and at that point our conversation would be over and he had no way to help me.

Q: And what, if anything else, did he do after he made that statement?

A: Well, after that I realized that I was in trouble because I didn't know what rights I really had or if he had the power to do what he said he was going to do.

Q: What did he do?

A: Well, he said that if you cooperate with us we can keep you out of jail.

. . .

For Official Purpose Only
Released by the County Attorney to
W Peterson

MAR 1 4 2007

Q:  Okay, after an hours worth of questions, what if any concerns did you have?

A:  . . . so I said listen I don't want you to put me in jail I don't want to be belligerent and I just in a daze, I would like to find out what my rights or would it be all right if I just asked a lawyer. At that time he cursed and then he shoved the phone towards me and he said that you can call a lawyer if you would like but the minute you touch that phone our conversation is over.  I will fingerprint you, take your picture and put you in jail.

Q:  Okay, what if any questions did he ask you after that confrontation?

A:  Well at that point I figured the only chance I had was just answer his questions to the best I could, of course that was difficult because when I told the truth about stuff he seemed to be angry and wouldn't accept it unless I phrased things a certain way.  That went on for about an hour he kept asking me different questions of these boys.

Q:  Another hour?

A:  Yes, it was around 2:00 or 3:00 when he picked me up, and it was dark after I left his office. We were there for several hours.

Q:  Okay, this was the second time that you requested for a lawyer?

A:  That was the second time, yes.

Q:  And after you had requested that the questioning continued each time for an hour or more is that correct?

A:  I had no way of telling exactly it was about evenly paced, and I knew that I was in there for at least three hours or so.

Q:  All right, after the second request and after the questioning of an hour or whatever it was, did you  have another request to make of Officer Wilkins with regard to a lawyer?

A:  Yes I did, that was when that was I was getting a little bit scared because I wasn't answering the questions the way that he wanted me to, and he said that if I didn't cooperate with him he would see to it that I went to prison. . .

UTAHPROS00000032



For Official Purpose Only
Released by the County Attorney to    MAR 1 4 2007
W Peterson

Q:  Okay.

A:  And at that time I made the final request that
well it wasn't the final one, but it was another
request to.   I said that listen I am really
confused about this and I don't know what the law
is, isn't it all right if I just find out from an
attorney what the law is and that time he said
that if I just cooperate with him for a little bit
longer and he would let me go home.

Transcript, pp. 7-11.

Cross Examination of Bruce Wilkens by Mr. Moody

Q:   And do you recall another conversation with
regard to his understanding of his rights?

A:  No, that never happened.

Q:  Are you sure?

A:  Yes.

Q:   You didn't put any of these things in your
notes did you?

A:  No, I did not.   I remembered how many times he
asked for an attorney and that was only once.

Transcript, p.30.

Defendant  also  asked  to  talk  to  his  parents  at  one
point  during  the  interrogation.    He  claims  the  request  was
denied.    This officer states that Hanson was told he could call
his family after the interrogation, and that they agreed that any
communications with his family would be after the interrogation.

Direct Examination of William Scott Hanson by
Moody

Q:   Now after ten minutes of not being able to
determine whether or not from Officer Wilkins
whether or not you were under arrest, what if any
request did you make?

A:   Well, after I could see that I was getting
nowhere trying to find out anything from him.   I
phrased the question as many ways as I could think

For Official Purpose Only
Released by the County Attorney to    MAR 1 4 2007
_W Peterson_

of when I ran out of ways I asked him I don't
understand what is happening to me or what rights
I really have, could I talk to my mom or dad.

Q:   And what was his response?

A:   His response was "no mom, no dad, just you and
me.  You have your chance here to impress me so I
can help you."

Q:   Okay, what if anything else did you request?

A:   He, when I told him I wanted to talk with my
mom or dad to find out what was going on he said
after he said "no mom and no dad just you and me:
he said, and I told him I didn't understand my
rights, he said that well I read them to you what
else to do you want. . .

Transcript, pp. 6, 7.

Direct Examination of Bruce Wilkins by Ragan

Q:   . . . Did he request to use your phone at all
while he was there?

A:   Yes, he did.

Q:   Okay, and that was in the intial part of your
conversation that you have already described?

A:   He did request that he wanted to call his
family.

Q:   Okay, and when was that?

A:   That was about halfway through.

Q:   Okay and what happened at that time?

A:   Advised him at that time that when we got
through if he wanted to contact his family that
would be fine.

Q:   Okay, did you tell him that he couldn't
contact them?

A:   After discussing it with him we decided
between ourselves that we would wait until
afterward and that we decided not to just go home.

Transcript, pp. 25, 26.

UTAHPROS00000034

For Official Purpose Only
Released by the County Attorney to
W Peterson                    MAR 1 4 2007

Finally, although the officer claims that Hanson never asked to leave. Hanson claims that he did ask to leave and was told he could not.

### Direct Examination of William Scott Hanson by Moody

Q: Okay, what if anything else did you request?

A: . . . and so I just simply said that I would like to leave.

Q: What was his response to your request to leave?

A: He said just one word, he said, "Sorry."

Transcript, p, 7.

### Direct Examination of Bruce Wilkins by Ragan

Q: He didn't, did he ask if he could leave at any time?

A: No, he did not.

Q: Okay, did you respond to him "Sorry"?

A: No, I did not.

Transcript, p. 26.

### DISCUSSION

The defendant correctly cites the law with regards to custodial interrogations.  In Miranda v. Arizona, 384 U.S. 436 (1966) the U.S. Supreme Court stated:

> Our holding . . . briefly stated . . . is this: The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  The defendant may waive effectuation of these rights, provided the

MAR 1 4 2002

For Official Purpose Only
Released by the County Attorney to
*W Peterson*

waiver is ~~made voluntarily~~, knowingly, and
intelligently. If, however, he indicates in <u>any</u>
<u>manner</u> and <u>at any stage</u> of the process that he
wishes to consult with an attorney before speaking
there can be no questioning. The mere fact that
he may have answered some questions or volunteered
some statements on his own does not deprive him of
the right to refrain from answering any further
inquiries until he has consulted with an attorney
and <u>thereafter</u> consents to be questioned. <u>Id.</u> at
444, 445 (emphasis added).

In <u>Fare v. Michael C.</u>, 442 U.S. 707 (1979) the U.S. Supreme Court

after citing with obvious approval from <u>Miranda</u> stated:

The rule in <u>Miranda</u>, . . . was based on this
court's perception that the lawyer occupies a
critical position in our legal system because of
his unique ability to protect the Fifth Amendment
rights of a client undergoing custodial
interrogation. Because of this special ability of
the lawyer to help the client preserve his Fifth
Amendment rights once the client becomes enmeshed
in the adversary process, the Court found that
"the right to have counsel present at the
interrogation is indispensable to the protection
of the Fifth Amendment privilege under the system"
established by the Court. <u>Id.</u> at 469, 86 S.Ct. at
1625. Moreover, the lawyer's presence helps guard
against overreaching by the police and ensures
that any statements actually obtained are
accurately transcribed for presentation into
evidence. <u>Id.</u> at 470, 86 S.Ct., at 1625.

The <u>per se</u> aspect of <u>Miranda</u> was thus based on the
unique role the lawyer plays in the adversary
system of criminal justice in this country. . .
the lawyer is the one person to whom society as a
whole looks as the protector of the legal rights
of that person in his dealings with the police and
the courts. For this reason, <u>the Court fashioned</u>
<u>in Miranda the rigid rule that an accused's</u>
<u>request for an attorney is per se an invocation of</u>
<u>is Fifth Amendment rights, requiring that all</u>
<u>interrogation cease.</u> <u>Id.</u> at 719 (emphasis added).
<u>Edwards v. Arizona</u>, 451 U.S. 477, 485 (1981).

It is apparent from the testimony the interrogation of

Hanson was custodial in nature. Hanson either did not feel free

to leave, or had his request to do so denied. Hanson requested

*Or the request for leave.*

an attorney at least at one point in time, and the interrogation
continued on beyond that point.

For the above stated reasons the court rules:

RULING

Defendant William Scott Hanson's Motion to Suppress is
granted.

DATED at Provo, Utah, this 7th day of May, 1987.

BY THE COURT:

BOYD L. PARK, JUDGE

cc:  Utah County Attorney
     Robert L. Moody

For Official Purpose Only
Released by the County Attorney to
W. Peterson                     MAR 1 4 2007

UTAHPROS00000037