# EXHIBIT 8

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

-ooOoo-

| | |
|---|---|
| DAVID V. AMES, | : CIVIL NO. 06-3441 |
| Plaintiff, | : DEPOSITION OF:<br> ROBERT O. HANSEN |
| v. | : |
| | TAKEN: October 9, 2007 |
| CORPORATION OF THE | : |
| PRESIDENT OF THE CHURCH | |
| OF JESUS CHRIST OF | : |
| LATTER-DAY SAINTS, | |
| | : |
| Defendant. | |
| | : |

-ooOoo-

Deposition of ROBERT O. HANSEN, taken on
behalf of the Plaintiff, at 60 East South Temple, Suite
1800, Salt Lake City, Utah, before ROCKIE E. DUSTIN,
Certified Shorthand Reporter and Notary Public in and
for the State of Utah, pursuant to Notice.

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 7

1    going to assume that you understood them.  So please,

2    if my question is unclear or vague, or something you

3    don't understand in any way, please ask me to clarify

4    it.  Otherwise, I'll assume that my answer -- your

5    answer is to the question that you understood.          09:17

6         A.    Will do.

7         Q.    We're here about a gentleman named william

8    Scott Hanson.  Is that your understanding?

9         A.    Yes.

10        Q.    I'm going to refer to him throughout this    09:17

11   deposition, unless you object, by the name of "Scott

12   Hanson," is that okay?

13        A.    That's fine.

14        Q.    And as I understand it, his name is spelled

15   differently than yours and there's no relation; is that  09:17

16   fair?

17        A.    That's correct.

18        Q.    When did you first learn in or about -- I'm

19   going to use the 1986 timeframe, so correct me if I'm

20   wrong, but there were a series of incidents in 1986, is  09:17

21   that fair, involving Mr. Hanson?

22        A.    Yes.

23        Q.    When did you first learn about those?

24        A.    I think I first learned from Scott shortly

25   after he had been notified of those charges.            09:18

ROCKIE DUSTIN, CSR, RPR

Page 8

1    Q.    Did he contact you?

2    A.    To the best of my recollection, he did.

3    Q.    Was that telephonic or in person?

4    A.    I'm not sure I remember.  I would assume it

5    would have first been by phone.                           09:18

6    Q.    Do you have any independent recollection,

7    clear recollection, of a subsequent contact or meeting

8    with Scott about those incidents?

9    A.    Yes.

10   Q.    What is your first clear independent            09:18

11   recollection of any meeting with Scott regarding those

12   incidents?

13   A.    The timing or the substance of the meeting?

14   Q.    The timing first and then I'll ask you who

15   was there, if anyone, besides you and him, and then the   09:18

16   substance.

17   A.    I didn't record the date, but I would

18   assume it would have been in a very close timeframe,

19   within a day or two at the most, of his being informed

20   of those charges.                                          09:19

21   Q.    And this is different than the phone call

22   you believe he initiated to you?

23   A.    It would have probably been shortly after

24   the phone call.

25   Q.    Do you recall if during the phone call he      09:19

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

1    indicated to you he had been criminally charged or he

2    just said, "Hey, Bishop, I" -- "I need to see you about

3    something"?

4         A.    I'm sure he indicated he had been

5    criminally charged.                                        09:19

6         Q.    Do you recall what -- if he told you the

7    substance of what he was charged about briefly or if he

8    just said, "We've got to talk"?

9         A.    I don't know that I recall at that point.

10        Q.    Do you recall anything else from that phone   09:19

11   conversation, other than that you believe it was --

12   that first conversation was a telephone call that he

13   initiated and may have mentioned he had been charged?

14        A.    Nothing of substance.

15        Q.    Let's move on, then, to the next contact      09:19

16   that you have an independent recollection of, which I

17   understand to be a meeting within a day or two of that

18   phone call; is that correct?

19        A.    That's correct.

20        Q.    Where was that meeting held?                  09:20

21        A.    That was held in the church offices, in the

22   stake center in Orem -- the ward, I should say, the

23   ward bishop's office.

24        Q.    And that was the Orem 27th Ward?

25        A.    At that time, yes.                            09:20

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

1    of.  The four names.

2         Q.    Who did Bishop Pederson have in his ward of

3    those young men?

4         A.    I actually think Bishop Pederson contacted

5    me first.                                                    09:44

6         Q.    Do you know when that was?

7         A.    Very close to that timeframe.  I don't

8    recollect the exact date.

9         Q.    Do you know how he found out about this?

10        A.    David Custer was a member of his ward.           09:44

11        Q.    Do you know if the police contacted Bishop

12   Pederson or if he found out some other way?

13        A.    I don't recall how he found out.

14        Q.    I'm sorry?

15        A.    I just don't recall how he found out.            09:44

16        Q.    Do you know Bishop Pederson's full name?

17        A.    I do not.  I probably did then.  I don't

18   recall now.

19        Q.    I understand.  That was a long time ago.

20              Who was the bishop that was responsible for      09:44

21   the Schill boys?

22        A.    Bishop Hartshorn.

23        Q.    H-A-R-T-S-O-R-N?

24        A.    Spelled Hartshorn, H-A-R-T-S-H-O-R-N.

25   Hartshorn.                                                  09:45

Page 30

1      Q.    Do you remember his first name?

2      A.    Leon.

3      Q.    Do you know him today?

4      A.    I do not -- do I know him today?

5      Q.    Yes.                                        09:45

6      A.    No, I -- I had a class from him many years

7   ago at BYU.  He was a BYU teacher, instructor.

8      Q.    When was the last time you had any contact

9   with him?

10     A.    I don't recall now if we connected or not.   09:45

11     Q.    At the time in '86, if you connected?

12     A.    At the time.  I'd have to -- I'm having --

13  I don't recall.

14     Q.    You believe you initiated contact with him

15  by telephone, but don't know if you ever actually got   09:46

16  ahold of him; is that fair?

17     A.    I'm sorry for the long lag.

18           I don't remember.  I remember conversations

19  with Bishop Pederson regarding David Custer.  I do not

20  recall detailed conversations with Bishop Hartshorn.   09:46

21     Q.    Do you know who the bishop was of Ryan

22  Boley?

23     A.    I do not.

24     Q.    Do you believe you initiated contact with

25  that individual?                                      09:46

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 31

1       A.      I did not.

2       Q.      Just so I'm clear, when you spoke with

3    Bishop Pederson at some point in time, and it may have

4.   been initiated very early, about David Custer's

5    allegations in this case; correct?                          09:46

6       A.      Correct.  Yes.  I'm sorry.

7       Q.      That's all right.  We need an audible

8    answer.

9       A.      I'm nodding.

10      Q.      You're unclear whether you ever spoke with    09:47

11   Bishop Hartshorn about the allegations of the Schill

12   boys with respect to Scott Hanson?

13      A.      Yes.

14      Q.      And you know you never spoke to whoever the

15   bishop was that was in charge of young Brian {sic}      09:47

16   Boley at the time?

17      A.      I don't recall having spoken to Bishop --

18   to Ryan Boley's bishop.

19      Q.      Have you had the opportunity to review the

20   Church's interrogatory responses in this matter?        09:47

21      A.      The only -- I have read the deposition

22   taken from Scott Hanson by Mr. Ross.

23      Q.      Okay.

24              Let me show you a document.  I don't expect

25   you to know what an interrogatory is.  I'll provide a   09:47

ROCKIE DUSTIN, CSR, RPR

Page 36

1    all, have you ever read the police report in this case?

2         A.    I have not.

3         Q.    You've never seen that at any point in

4    time?

5         A.    I have not.                                    09:53

6         Q.    Did you ever get a firsthand -- ask this a

7    different way.

8              Aside from Scott Hanson's version of the

9    events and allegations, who else either told you about

10   what was alleged or what sources did you use to          09:53

11   determine what was alleged, aside from these interviews

12   and contact with the clergy?  Did you have any contact

13   with the state of Nevada, the detective --

14        A.    The State of Utah?

15        Q.    State of Utah, I apologize.                    09:53

16        A.    I had no contact directly with the police

17   department.  My other contacts would have been Scott's

18   parents, Joe and Betty; his legal counsel that they

19   ultimately retained, which was I think Robert Moody.

20             The majority of my information came from       09:54

21   those sources, other than my personal interviews with

22   the young men.

23        Q.    So we'll talk about all the personal

24   interviews you conducted later, your investigation

25   we'll call it later, but for now, I want to be           09:54

Page 37

1    absolutely clear that you've never read the police

2    report in the case.

3         A.    I have not.

4         Q.    That any information you have about what's

5    contained in the police report came either from Scott,    09:54

6    Scott's parents, or Scott's attorney.

7         A.    That's correct.

8         Q.    Do you have an independent recollection of

9    a conversation with Scott's attorney about the details

10   of what was alleged?                                       09:54

11        A.    We spoke -- I don't remember the number of

12   times, probably three times or so, where I asked him,

13   "What's happening?  What's your judgment in this case

14   as it proceeds," because there was an original set of

15   allegations.  And I assume after more research,           09:55

16   investigation was done by the police department, they

17   began to drop away or to be reduced.  I remember asking

18   Mr. Moody, "What's your understanding of why that's

19   happening?"

20             I was also made aware, I think originally       09:55

21   by Scott, and then I also had asked the parents and

22   Mr. Moody about the -- he was asked to undergo a

23   battery of exams by, I think, one psychologist and one

24   psychiatrist, maybe three.  There are two that I

25   remember.  In particular, I asked the results of those.   09:55

ROCKIE DUSTIN, CSR, RPR

Page 38

1           I didn't see them myself, but his counsel,

2    Mr. Moody, and Scott himself and the parents all told

3    me the same thing of those results.  I think those were

4    my main sources of information.

5           Q.    Let me focus that response a little bit.        09:56

6                 You have never read the psychological

7    report -- or in 1986, '87 or '88, had never read the

8    psychological reports prepared regarding Scott Hanson

9    at any time, any of the three?

10          A.    Not to my recollection, I did not read        09:56

11   those.  I've read subsequent documents that would

12   indicate that one of the psychologists called me and

13   spoke with me.  And to be honest, I don't remember that

14   conversation, but I assume I did.

15          Q.    But you never read those?                      09:56

16          A.    I didn't read the reports.

17          Q.    And you never relied on those reports in

18   any of your decisions from what you had seen firsthand,

19   only from what other people had told you about those

20   documents?                                                  09:57

21          A.    I'm not sure I understand that.

22                MR. KRAUS:  If you don't understand a

23   question, ask him to rephrase.

24   BY MR. BOWERS:

25          Q.    Let me ask it a different way.                 09:57

ROCKIE DUSTIN, CSR, RPR

Page 39

1          MR. BOWERS:   Thank you, Counsel.

2     BY MR. BOWERS:

3          Q.     To the extent that those reports played any

4     role in your investigation and the ultimate conclusion

5     you reached as a result of your investigation -- do you      09:57

6     understand me so far?

7          A.     Yes.

8          Q.     -- you didn't rely on firsthand information

9     contained in those reports because you had never read

10    them?                                                         09:57

11         A.     That's true.

12         Q.     You may have relied on what someone else

13    relayed to you or interpreted from those reports, but

14    you never directly read them yourself?

15         A.     That's accurate.                                  09:57

16         Q.     You indicated that one of the psychologists

17    or psychiatrists involved in that process had a

18    conversation with you, but you don't recall it; is that

19    fair?

20         A.     I do not recall it.                               09:57

21         Q.     Is your recollection that that conversation

22    was regarding his conclusions?  In other words, that

23    conversation came before the report was prepared?

24         A.     Are you asking me about a conversation he

25    had with me --                                                09:58

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 40

1          Q.     Let me ask this --

2          A.     -- regarding that report?

3          Q.     -- maybe a better way.

4          A.     Because I don't remember a conversation

5    with him.                                              09:58

6          Q.     You never had a conversation with any of

7    these mental health professionals, who prepared reports

8    about Scott, about their report and conclusions after

9    those were issued?

10         A.     Not to my recollection, I did not.        09:58

11         Q.     Okay.

12                Who gave you -- let me ask you this:  Did

13   anybody, at any point in time, ever say to you, "David

14   Custer has alleged this on this occasion, that on

15   another occasion.  Ryan Boley has made these specific   09:58

16   allegations under these circumstances.  The Schills

17   have made these allegations under these circumstances"?

18                Did anybody ever summarize in that level of

19   detail what was alleged in the report prepared by the

20   police department there in Orem?                        09:59

21         A.     Yes.  Scott certainly did.

22         Q.     Okay.

23         A.     But also his counsel, Mr. Moody.

24         Q.     Do you know how --

25         A.     And I --                                   09:59

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 41

1          MR. KRAUS:  He's not finished.

2          MR. BOWERS:  I apologize.

3          MR. KRAUS:  Slow down a little bit, Chad,

4     if you could, please.

5          MR. BOWERS:  I apologize.                    09:59

6          THE WITNESS:  I'm not offended at all.  I'm

7     responding slowly because I'm racking my tired old hard

8     drive memory here to try and recall.

9          MR. BOWERS:  And I should slow down and be

10    more patient for you.                              09:59

11         THE WITNESS:  I remember a conversation

12    with Bishop Pederson.  There were probably only a

13    couple of those conversations.  In one of those, I

14    think he expressed to me that David Custer had recanted

15    or changed his testimony completely.              09:59

16         So probably -- and certainly, Joe and

17    Betty, that I kept in contact with.  So I think my

18    sources for how that unfolded were Bishop Pederson, the

19    family, meaning Scott, his parents and Mr. Moody.

20    BY MR. BOWERS:                                    10:00

21         Q.   Who of those people outlined for you both

22    the specific allegation made by each of the boys and

23    the circumstances of each of those allegations?  Which

24    of those people that you listed did that?

25         A.   Probably just Scott and Mr. Moody.  I don't  10:00

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 42

1    think Joe and Betty went into any details.

2          Q.    Do you have an independent recollection of

3    your conversation with Mr. Moody regarding that

4    specific issue, where he outlined what each boy alleged

5    and what the circumstances of that were?              10:01

6          A.    In broad terms, he did.

7          Q.    Broad terms?

8          A.    Of the original -- what's the proper word?

9    Charges?

10         Q.    Police report?  Allegations?              10:01

11         A.    Police report, charges.

12         Q.    Okay.  And I'm sorry to correct you.

13         A.    My discussions with him were not frequent.

14   There may have been a number of weeks between the first

15   discussion update, you know, two to three weeks later,  10:01

16   and then an update at conclusion.  I think I spoke with

17   him two or three times, maybe four times.  I really

18   don't recall.  It was not a regular meeting I held with

19   Mr. Moody, just an update, either as I solicited or I

20   think he called me once or twice.                      10:01

21         Q.    Let's be clear.  I hate to nitpick with

22   you, but for this time, let me say that the police

23   report contains allegations only, because charges

24   carries a legal connotation.  And I want to talk about

25   just what the boys alleged, is that okay?              10:02

ROCKIE DUSTIN, CSR, RPR

1    ward.

2    BY MR. BOWERS:

3        Q.    Let me be clear where we're at so I

4    understand.

5            We're shortly after Scott's formally        10:27

6    charged; right?

7        A.    Yes.

8        Q.    Okay.

9            And is it fair to say that the monitoring

10   portion of your plan is to keep an eye on the criminal   10:28

11   charges, and Mr. Moody is now involved; right?

12       A.    Right.

13       Q.    So you got Scott's permission to be

14   involved as needed with Mr. Moody so you could be kept

15   updated and aware of the criminal proceedings?          10:28

16       A.    I think they volunteered that.  I don't

17   know that I requested it.

18       Q.    Either way, you were going to keep an eye

19   on these things, but Mr. Moody was a competent

20   attorney, or at least an attorney, and you were going    10:28

21   to stay out of his way; right?

22       A.    Right.

23       Q.    But you wanted to be aware of what he was

24   up to?

25       A.    That's true.                                  10:28

1    their parents, you've got to meet with the bishop about

2    Scott Hanson molesting other kids?

3         A.    They may or may not have been told that

4    prior to coming.

5         Q.    All right.                                    11:21

6               I'm sorry.

7         A.    And so as they would come in.  Of course, I

8    knew all of these young men very well, very early on,

9    and I would say, "Do you know why you're here?"  And if

10   they didn't, I would explain to them why we're there.   11:21

11              I would try to make them very comfortable

12   that anything we talked about in that setting would be

13   confidential, but I needed to know if there is

14   anything, and that I would proceed in the questions,

15   anything in their experience with Scott that had ever   11:21

16   made them uncomfortable in any way with his behavior.

17              And I think the sensitivity of that

18   probably changed a little bit with age group to age

19   group, but I tried to hold a pretty steady course on

20   that.  And I would ask them a variety of questions      11:22

21   about Scott's behavior.  "Was there ever nudity?  Did

22   he ever show you anything that we would" -- I don't

23   know if I used the word pornography or not, "but that

24   would show you anything that was not appropriate?  Did

25   he ever show you" -- I probably did use the word        11:22

Page 96

1    pattern -- did you ever get enough -- let me start

2    over.

3              Did you ever get enough specific

4    information about what these boys had alleged in terms

5    of time, place and circumstance about Scott Hanson,          11:24

6    that you saw similarities or patterns in Scott's

7    behavior?

8              MR. KRAUS:  Objection to the form of the

9    question.  I think the problem is "these boys."  That's

10   an indefinite phrase.                                         11:24

11             MR. BOWERS:  Ryan Schill, those four.

12             MR. KRAUS:  You can answer with that

13   clarification.

14             THE WITNESS:  I don't know the timing of

15   when my understanding was more complete, but at some         11:24

16   point in time, I knew there had been discussion about

17   behavior possibly at one of the scout camps, the high

18   adventure camp.  That might have been with David

19   Custer.  I don't recall exactly.  And other times, it

20   was in the home of his fiancTe, the Schill family.  He       11:25

21   was engaged to their daughter.  I think her name was Jo

22   Lynn, Jolene, Jo Lynn Schill.

23             I don't think I knew anything about Rob

24   Schill or -- I just drew a blank -- Ryan Boley.

25   BY MR. BOWERS:                                               11:25

1    Q.    So you didn't -- at the time you had this

2  interview in 1986, you didn't have an understanding of

3  a pattern of behavior that Scott had engaged in with

4  any of these boys, being the four?

5    A.    I think my concern would have been any time    11:25

6  in a private setting, whether that was in the hills or

7  rock climbing or mountain biking or camping or alone in

8  a home or otherwise.  Did I answer that?

9    Q.    You did.

10    A.    Okay.

11    Q.    I believe you did.

12         At the time, were you familiar with -- had

13  you ever heard the word "grooming"?

14    A.    Grooming?

15    Q.    Grooming.                                       11:26

16         MR. KRAUS:  I assume you mean in the

17  context of child sex abuse?  This time you have to say

18  yes.

19         MR. BOWERS:  Yes.

20         THE WITNESS:  He has to say yes.  I'm         11:26

21  sorry.

22  BY MR. BOWERS:

23    Q.    I've said my yes.  Now we're waiting for

24  yours.

25    A.    I remember seeing the term grooming, like    11:26

Page 102

1    questions about that harmless contact with these boys,

2    your boys that you were interviewing?

3         A.    In my interviewing process with them?   It

4    was probably in broader terms.   I don't know that I

5    specifically asked, "Has Scott ever given you a back          11:32

6    rub?" I did ask if he had ever touched them

7    inappropriately.

8         Q.    Going back to --

9         A.    I was probably even more -- I'm sorry for

10   interrupting.

11        Q.    That's all right.   No, finish.

12        A.    Probably even more specific than that.

13   With some of them I said, "Did he ever touch your

14   buttocks?  Did he ever touch your genitals?  Do you

15   know what I mean by genitals," because some of them      11:32

16   didn't.  I remember that, too.

17        Q.    Going back to that time, knowing that

18   hindsight is 20/20, did you ask any questions in your

19   mind that were designed to determine if there was an

20   escalation of Scott's behavior, or did we go straight      11:32

21   to inappropriate touching and its various forms?

22        A.    There were so many interviews with young

23   men, I don't know that I can say with certainty that I

24   asked was there an escalation.   I could say with

25   certainty that I asked each of them if there was any      11:33

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 103

1    touching that made them uncomfortable, that was of an

2    inappropriate nature.

3        Q.    Were you looking for anything in particular

4    in their responses, other than, yeah, he grabbed me, or

5    no, he didn't?                                           11:33

6        A.    I think I was looking for anything that

7    would give me some indication that he was guilty as

8    accused.

9        Q.    What did you think those things would be?

10       A.    If the young men said, "Yes, he used to      11:33

11   walk around naked or he seemed to go out of his way to

12   expose himself to me or to urinate in front of me," or

13   yes, you know, because -- they would frequently sleep

14   in the same tents, sometime large numbers and sometimes

15   two or three.                                           11:34

16            You know, "Yes, he would, you know, snuggle

17   up next to me or cuddle up next to me." Anything that

18   would have indicated to me that this is not right.

19       Q.    I understand.

20       A.    There's something that doesn't feel right    11:34

21   about this.

22       Q.    And the things that would have indicated to

23   you that something didn't feel right about this were

24   affirmative answers to the questions that you tried to

25   ask each boy about pornography, nudity, inappropriate   11:34

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

1    a few exceptions when I was early married, all of my

2    assignments up to the time I was called in the

3    bishopric were working with young men --

4         Q.    Okay.  So you grew up --

5         A.    -- in various capacities.                    11:38

6         Q.    So these kids grew up with you in the ward?

7         A.    We moved to that ward in 1979.  And so at

8    that point, I had known youth in that ward for about

9    seven years, seven or eight years.

10        Q.    Okay.                                          11:38

11        A.    So you'd have to spill that -- overlay that

12   over the top of the age groups.

13        Q.    Okay.  I've gotcha.

14              So you conduct an interview of these 15 to

15   25 young men and find nothing; right?                   11:38

16        A.    That's correct.

17        Q.    In your opinion, none of their responses

18   indicated any possibility that Scott Hanson had done

19   anything inappropriate with them?

20        A.    I know it sounds like a stretch, Chad -- or  11:39

21   Mr. Bowers.

22        Q.    Whatever you'd like to call me.

23        A.    It -- I didn't find a single incidence

24   where young men -- in fact, I don't know how far to go

25   with this, but in fact, almost to the contrary.  With  11:39

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 108

1    some of the older boys, that had spent many hours and

2    days and nights, there was almost a sense of shock.

3    "Scott?  Come on, Bishop.  You know, he's a prude."

4    That was the word from my son, "Dad, if anything, he's

5    a prude.  You know, he never does" --                    11:39

6              You know, most of the guys are rougher than

7    Scott is with their language -- or not most of them,

8    but some of the guys have a tendency to do that.  But

9    that was not an uncommon reaction about Scott.  And

10   that was kind of the experience I had had with Scott up   11:39

11   until this unfolded, that, wow, of all the people,

12   Scott?

13        Q.    So the other guys were maybe a little freer

14   in their sexual talk and conduct?  I mean, without --

15        A.    Typical teenage stuff.                          11:40

16        Q.    Yeah.

17        A.    I don't think we had anyone that was --

18   well, maybe a couple, but I don't think we had anyone

19   that was extremely out of line.

20        Q.    So, if anything, your investigation            11:40

21   revealed that Scott might be a little, you know, the

22   other way on the extreme?

23              MR. KRAUS:  What do you mean by "the other

24   way"?

25              MR. BOWERS:  Well, I think we were talking      11:40

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

1      Q.      Did those --

2      A.      I actually went back through my limited

3  personal journals and stuff for my own interest, when

4  counsel called me a few weeks ago and said, "Have you

5  got any?"                                              11:44

6              I said, "I don't have anything," and I

7  really don't.

8              So to answer your question, no.

9      Q.      And anything you would have created at that

10  time would have been destroyed?                        11:44

11     A.      (Witness nods.)

12     Q.      Is that a yes?

13     A.      That's yes.  I'm sorry.

14     Q.      Let's talk about the next part of your

15  investigation, which was to speak to Bishop Peterson,  11:44

16  as I understand it; correct?

17     A.      I don't know the sequence.

18     Q.      Right.

19     A.      It was probably either -- yes, I spoke to

20  Bishop Pederson, I think it is.                        11:44

21     Q.      Pederson, I'm sorry.

22             And Bishop Pederson --

23     A.      Peterson, Pederson.

24     Q.      He was David Custer's bishop at the time?

25     A.      Yes.                                         11:44

1        Q.    And what did Bishop Pederson relay to you

2    about David Custer?

3        A.    I think we had a couple of conversations,

4    and the first one -- and I don't remember -- I think

5    that he initiated those.  I may have called him.  But          11:44

6    the first one was, "We have got these serious

7    allegations," or maybe they were charges at that point.

8    I think just allegations.  "It involves a member of

9    your ward, Scott Hanson."

10            And we reviewed what he knew about that and          11:45

11    that he would just stay in touch with me, you know,

12    keep informed.  And I said, "And likewise, I will" -- I

13    don't know if that was -- I think that was after my

14    initial discussion with Scott, when the police -- I'm

15    pretty sure it would have been after that discussion.          11:45

16        Q.    Was that the end of your communications

17    with Bishop Pederson?

18        A.    No.  He -- we talked at least a couple of

19    times.  And I do recall as this unfolded, and I'm

20    sorry, I don't recall the timeframe, if it was a week          11:45

21    later or three weeks or a month later, in a subsequent

22    conversation, and he was a very forthright gentleman on

23    the phone.  I never met him face-to-face.

24            He left me with the impression that based

25    on his findings, what had been communicated to him,          11:46

Page 114

1    that David Custer had completely recanted his testimony

2    in the matter and withdrawn all charges.

3            He also said as he interviewed with David

4    Custer, I remember him saying words to the effect that

5    he kept shifting back and forth.  And so for Bishop        11:46

6    Pederson, he wasn't sure where all of it was going to

7    end up until he got to the end.

8        Q.    How long was that conversation?

9        A.    I don't recall.

10        Q.    Do you recall if you went into details or       11:46

11    was the gist of the conversation that he had recanted

12    and so you didn't need to include him in --

13        A.    No, detail that I knew generally, that the

14    charges were of a sexual nature.  He may have even said

15    to me at that point that -- something about used the     11:46

16    word "sodomy" or something.  I just remember it was

17    very serious.  And I think that was after I had

18    initiated that with Scott.

19        Q.    I'm getting the two calls confused.  He

20    described the charges to you on the one call and then    11:47

21    you had another call later on where he informed you

22    about recanting; is that fair?

23        A.    Yes.

24        Q.    Okay.

25        A.    And I don't know the time between.            11:47

ROCKIE DUSTIN, CSR, RPR

Page 115

1        Q.      And I don't care.

2        A.      I'm not sure.

3        Q.      Yeah, what I want to know is from the

4   recanting phone conversation, is what you took away

5   basically this kid had recanted and I don't need to be        11:47

6   concerned about his allegations in my investigation, or

7   did you take something different from that call?

8        A.      I probably took a couple of things away.

9   That would have been one, that.

10       Q.      All right.

11       A.      Well, it's good to know that that whole

12  thing is not true.  And to the best of my

13  understanding, it was not true.

14              Second, it probably made me wonder at that

15  point to some degree about the truthfulness of the        11:47

16  other testimonies, who had solicited them, where did

17  they come from?

18       Q.      Well, were they --

19       A.      Were they volunteered by the boys, were

20  they brought out in a setting similar to what Scott had        11:48

21  experienced?

22       Q.      What about the conversation with Bishop

23  Pederson led you to believe that David Custer's

24  testimony had originally been solicited by somebody, or

25  his allegation had been solicited by somebody?        11:48

Page 117

1        When this happened, I think my thought

2   process started to turn, that if that one is not true,

3   I wonder if these boys gave testimony themselves, face

4   up on this, or if it was through an interview process

5   that we're later going to find out might be recanted,        11:50

6   which turned out -- I guess two more of those were

7   dropped.

8        This is kind of that timeframe within a few

9   weeks.  I'm sorry, I don't recall the actual dates, but

10  as this started to unfold, kept reducing and reducing        11:50

11  and reducing.  And I'm interviewing young men with some

12  trepidation, actually, that I'm going to uncover some

13  serious problems and never got there.

14       And so I'm naturally starting to think, I

15  wonder how much of this is true?  And then when I found     11:50

16  out the professional investigators, the police, the

17  attorneys, were reducing, reducing and what appeared to

18  me to be shifting positions with the severity of the

19  crime or something else.  And about this time, I found

20  out he was undergoing psychological -- I knew             11:50

21  previously he was going to be undergoing some

22  psychological evaluation, but I got information back on

23  that that said that he has no pedophile -- pedophiliac

24  tendencies, etcetera.

25       All of that, I think -- if I could bring it        11:51

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 118

1    back to that point in the testimony of the young men, I

2    think all of that started to create in my mind a

3    question about who recorded the testimony?  How did it

4    take place?  How much of it is truth and how much of it

5    is not?                                               11:51

6        Q.    What's your understanding of why the

7    charges were reduced?

8        A.    I don't have a -- it sounds sort of silly,

9    but I don't have a strong legal background.  I know it

10   was a plea bargain, but how much that plea bargain is   11:51

11   based on lack of strong evidence, I guess, in my mind,

12   I assume a while lot.  That if the prosecuting attorney

13   and police department really had the goods in fact, why

14   would they have let go of that?  Why would they have

15   reduced when you have young lives at stake?  That's      11:52

16   that was my thought process.

17       Q.    Back then --

18       A.    I don't know that it has any basis --

19       Q.    No, I think it does.

20       A.    -- in reality, but why would they have done   11:52

21   that?

22       Q.    I think that's a pretty good call.

23       A.    If he's guilty, why not go get him?

24       Q.    Did anybody ever communicate to you, at any

25   time or place, that the reason the plea agreement was   11:52

ROCKIE DUSTIN, CSR, RPR

Page 119

1    offered was because there was a technical violation of

2    the Sixth Amendment that precluded Scott's statement?

3        A.    Which one is the Sixth?  Is that the

4    Miranda?

5        Q.    Right to counsel and Miranda.                 11:52

6        A.    Right to counsel, sure.  No.

7        Q.    You never heard that?

8        A.    I heard it yesterday.

9        Q.    You heard it yesterday.  Would that have

10   been nice information to have back in '86?              11:52

11       A.    Yeah.  At the expense of sounding -- and I

12   don't want to sound calloused, because if you jump to

13   the end of this, I have heartfelt feelings about what

14   happened to David Ames and any others.  I have agonized

15   over this.  I mean that sincerely.  But as I have       11:53

16   looked back at what I had in front of me at that period

17   of time, I don't know that it would have had any

18   influence, because everything else, my interviews, the

19   removal of testimony by two of the young men, Scott,

20   his attorney, the psychiatrist, I just didn't think he  11:53

21   was guilty.

22       Q.    And I appreciate your answer.

23       A.    So I guess to answer your question, did

24   it -- and, you know, would it have been nice to know

25   that?  Yeah, it would have been nice to know it.        11:53

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 120

1      Q.    I mean the bottom line --

2      A.    Is it a question that would have affected

3  my final judgment a few weeks later?  I'm not sure it

4  would have, because I thought he pled no contest.  It

5  turns out he pled guilty.  But I'm not sure as I have          11:54

6  -- I'm covering a lot of categories.  I'll quit talking

7  and let you ask the questions.

8      Q.    Let me formalize this one before we move

9  on.

10          The bottom line is you never had the piece          11:54

11  of information communicated to you in one way or

12  another, or you never discovered that the reason the

13  plea agreement came about was there was a technical

14  violation of the evidence he had provided against

15  himself?                                                      11:54

16      A.    I honestly --

17          MR. KRAUS:  Objection to the form of the

18  question.  Assumes a fact not in evidence.

19          MR. BOWERS:  That's fine.

20          MR. KRAUS:  You can answer the question.             11:54

21          THE WITNESS:  I honestly don't recall being

22  aware of that.

23  BY MR. BOWERS:

24      Q.    Just real quickly, what else besides the

25  things we've talked about, which I understand to be          11:54

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 124

1    conversation with Bishop Pederson.  Any other steps in

2    your investigation?

3         A.    They weren't steps that I followed up on.

4    I would have, had they not come from both Scott and

5    Mr. Moody, but the results of the psychiatric exams.        11:58

6         Q.    And just so I'm clear, you're not -- you

7    never saw those?

8         A.    I didn't see them.  I heard from Scott and

9    Mr. Moody the results.

10        Q.    And what you heard was Scott's not a           11:58

11   pedophile?

12        A.    There was more detail in that, in

13   particular from Scott.  And, yes, the end result was

14   that they didn't feel he was a risk.  They didn't feel

15   like he had those tendencies.                             11:58

16        Q.    Tell me what you heard, tell me what you

17   relied on from those reports secondhand.

18        A.    Let me start with Mr. Moody first.  It was

19   probably the more brief of the two.

20             I remember him using the word "extensive"      11:59

21   or something to that effect, tests that Scott had gone

22   through.  That was in their home, as I recall.  And

23   those were tests, broad tests as well as tests

24   specifically designed to determine if he had problems

25   of a sexual nature in terms of pedophilia.  I don't      11:59

ROCKIE DUSTIN, CSR, RPR

Page 125

1  know if the word "deviancy" was used, but, you know,

2  abnormal behavior, whatever.

3         And his summary to that was -- in my

4  recollection, that he has none.  He's clean.  The

5  professionals have found he does not have these          12:00

6  tendencies.  They claim nothing here.

7     Q.   Anything else that you relied on in coming

8  to your conclusion?

9     A.   Parallel that with Scott on that psych --

10  I'm talking about the psychology part again?          12:00

11    Q.   I'm talking anything.  Scott's conclusions

12  differed from what you were just told?

13    A.   Scott was greatly revolted by that part of

14  the test.  I didn't even know the name of it until I

15  read it from Mr. Ross's deposition, and I'm not sure I   12:00

16  can pronounce it.

17    Q.   The plethysmograph?

18    A.   That thing.

19    Q.   Is that what you're referring to?

20    A.   Plethysmograph.  Plethysmograph.          12:00

21         Scott had come in and distressed after that

22  particular test.  I know he either came to my door or

23  called me that night and was very upset.  And I don't

24  think he knew the results of it.

25         He just said, "It's one of the more          12:00

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

1    department.

2        Q.    Okay.

3        A.    That had an impact in my mind.

4        Q.    Okay.

5              And were you aware -- we've established        12:02

6    that you weren't aware necessarily why those charges

7    were reduced; correct?

8        A.    True.

9        Q.    Were you aware of the circumstances

10   surrounding Mr. Boley's charges, either not being        12:02

11   charged or his accusations not being included in the

12   charge?

13       A.    I'm not aware.  To the best of my

14   knowledge, I don't recall why they were dropped.

15       Q.    At any point in time, did you learn that as   12:02

16   a technical matter, his interview wasn't properly

17   conducted or followed up on and that's why the charges

18   were dismissed or not brought?

19       A.    No, I'm not aware of that.

20       Q.    Would that have been information, if true,    12:02

21   that you would have liked to have had at the time you

22   made your decision regarding your investigation?

23             MR. KRAUS:  Objection to the form of the

24   question.  Asks him a hypothetical and assumes facts

25   not in evidence.                                          12:02

ROCKIE DUSTIN, CSR, RPR

Page 129

```
 1       Q.    The prosecutor's file firsthand?

 2       A.    I have not.

 3       Q.    The statements Scott made to the police

 4  firsthand?

 5       A.    I have not.                              12:04

 6       Q.    You nor any agent of you ever spoke with

 7  the detective that investigated this?

 8       A.    No.

 9       Q.    Did you speak with Prosecutor Reagan?

10       A.    No.  Well, not -- not to my recollection, I   12:04

11  didn't.

12       Q.    Okay.  All right.

13             Were you present in court -- you were

14  present in court at some time with Scott; right?

15       A.    Yes.                                     12:04

16       Q.    Did you overhear any conversations she had

17  with Mr. Moody and Scott where you might have been

18  close enough to --

19       A.    I did not.

20       Q.    What would you have done differently if you   12:04

21  had a chance to do that investigation again today?

22             MR. KRAUS:  Objection to the form of the

23  question.  Hypothetical, but you can answer.

24             THE WITNESS:  In the context of today and

25  looking backwards?                                 12:05
```

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

1    BY MR. BOWERS:

2        Q.    Knowing what you know now.

3        A.    Let me answer it two ways.

4             One, I felt like I had a very trustworthy

5    source that had reviewed those documents you've just        12:05

6    listed, and Mr. Moody in particular, who had -- and he

7    enjoyed a good reputations as an attorney in the

8    valley.  I knew him by reputation long before I met

9    him.

10            In hindsight, had they been available to            12:06

11   me, and I honestly didn't know if they were or were

12   not, simply as an ecclesiastical person, I would have

13   probably called for the reports.  All of it.  The

14   positives and potentially negatives.

15       Q.    Anything else?                                     12:06

16       A.    No.

17       Q.    Do you know now that -- have you ever seen

18   a psych report prepared for something like this?

19       A.    I saw one yesterday.

20       Q.    Okay.                                              12:06

21            Is it -- do you recall that within that

22   report there are a number of things that are reported

23   by the person being interviewed, or in this case Scott?

24       A.    I'm not sure I understand.

25       Q.    Scott Hanson tells the mental health              12:07

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

1              MR. KRAUS:  You can answer the question,

2     but don't speculate.

3     BY MR. BOWERS:

4         Q.    Go ahead, please, sir.

5         A.    Can you ask me again?  I just want to make        12:11

6     sure I'm answering correctly, or we can read it back.

7         Q.    I'll ask it again.

8              Knowing what you know now, would you think

9     that there was another side of the story of the

10    information that you would have gotten from Robert        12:12

11    Moody as a defense attorney for Scott in 1986?

12             MR. KRAUS:  Same objection.

13             THE WITNESS:  I really don't think so.

14    BY MR. BOWERS:

15        Q.    At what point in this investigation did you        12:12

16    come to the conclusion that the allegations were

17    untrue?

18        A.    I know that I spent a significant amount of

19    time -- are we short on time?

20        Q.    Go ahead and answer this question then        12:12

21    we'll...

22        A.    -- trying to look at the entire path this

23    had taken, from the early interviews with Scott to the

24    charges and my communications with the other bishop and

25    the subsequent reduction in the psychology reports.  I        12:13

ROCKIE DUSTIN, CSR, RPR

1    don't think I would have changed my opinion.

2         Q.    When did you form it?

3         A.    When did I form it?  Toward the end of the

4    process.  I think after I had completed all of my

5    interviews with young men, after my understanding of          12:13

6    the psychological reports, of the reduction of

7    charges -- I don't know --

8         Q.    Was --

9         A.    I don't know an exact date.  It was toward

10   the end of that process.                                      12:14

11        Q.    Was the criminal case resolved?

12        .A.    Was the criminal case resolved?

13        Q.    Yes.  Had he been sentenced or had he pled?

14   Do you recall?

15        A.    When I made my decision?                           12:14

16        Q.    Yes, sir.

17        A.    They were very close in proximity, I would

18   assume.  I know that I became aware that there had been

19   a reduction of the original charges from what I

20   understood to be very, very severe to a misdemeanor           12:14

21   that involved no touching or contact.  I remember that

22   was part of the understanding I had from Mr. Moody and

23   from Scott and his parents.  But that I think where

24   I -- my discussions with Scott was probably very poor

25   judgment --                                                   12:15

Page 137

1     Q.    Did you --

2     A.    -- on his part.

3     Q.    Oh, I'm sorry.

4     A.    I'm sorry, I delayed long enough, you

5  thought I was done.                                    12:15

6     Q.    Is that the conclusion of that answer?

7     A.    I'm not sure I've answered you because I

8  don't know exactly when I made that.  It was a

9  culmination of things as they drifted in.

10    Q.    I hear you saying --

11    A.    Not drifted in, as they were given to me in

12  summary.

13    Q.    I hear you saying you came to that

14  conclusion after the resolution of the criminal case in

15  relation to all of these other things happening as      12:15

16  well.

17    A.    I think it was just prior.  It was about

18  the time -- I think probably one of the last things I

19  heard is when there was going to be a reduction in the

20  charge to a misdemeanor.  And to -- a reduction to a    12:15

21  misdemeanor.  And I think that's about the time that I

22  was becoming convinced in my mind that the severity of

23  this was nowhere close to where it had started out, and

24  that Scott was innocent of these things.

25    Q.    Have you ever heard of a polygraph?           12:15

ROCKIE DUSTIN, CSR, RPR

Page 140

1            MR. BOWERS:   Okay.   We're out of tape so

2   maybe take a couple of minutes here.

3            (Discussion off the record.)

4            (Lunch recess taken.)

5   BY MR. BOWERS:                                          13:09

6       Q.    Ready to resume, Mr. Hansen?

7       A.    Ready.

8       Q.    All right.

9            You had some role in the criminal

10  proceedings regarding Mr. Hanson, didn't you?          13:09

11      A.    I testified, what I thought was at his

12  presentencing.  It may have been at the sentencing.  I

13  testified as a character witness.

14      Q.    Were you there at the time he changed his

15  plea, that is Mr. Hanson, from a plea of not guilty to   13:09

16  something else?

17      A.    I don't know when that took place, until I

18  read it in the deposition record with Mr. Ross.   I

19  still thought it was a plea of no contest.   If it took

20  place while I was there, I was either --                13:10

21      Q.    Well, let me ask you this --

22      A.    -- not attentive or something.

23      Q.    -- were you there twice?

24      A.    Just once.

25            MR. KRAUS:   Just so the record is clear,      13:10

ROCKIE DUSTIN, CSR, RPR

Page 142

1        A.     On the very top, yes.

2        Q.     Yes, okay.

3               And let's turn to page 2 of that document.

4    And if you look up from the bottom of that page, do you

5    see that paragraph there that says, "The court called        13:11

6    for those in the Courtroom who desired to be heard in

7    this matter.  Robert Hanson {sic}, ecclesiastical

8    leader of the defendant, addressed the Court in behalf

9    of the defendant."

10              Do you see that there?                             13:11

11              MR. KRAUS:  Page 2.  Oh, I don't think he

12   has page 2 in his version.  There you go, I'll hand you

13   mine.

14              MR. BOWERS:  Sorry about that.

15              (Discussion held off the record.)

16              THE WITNESS:  (Witness reviews document.)

17   Right here.  Okay.  Your question is what?  I've found

18   it.

19   BY MR. BOWERS:

20       Q.     You've seen that, yes?                             13:12

21       A.     Spelled incorrectly, but...

22       Q.     Do you believe that's you?

23       A.     That's me.

24       Q.     Do you believe this is the hearing you were

25   present at?                                                   13:12

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 143

1      A.    I'm sure it was.

2      Q.    And if you look on the first page it's

3   dated November 20th, 1997.  Is that date consistent

4   with your recollection of events?

5      A.    I didn't track the dates.  I couldn't          13:12

6   comment accurately.

7      Q.    Any reason to dispute that date?

8      A.    No.

9      Q.    And you were present and you did make a

10   statement to the court; right?                          13:13

11     A.    Yes.

12     Q.    It says, "On the 8th of October, 1997, the

13   defendant entered a plea of guilty to the crime charged

14   in the Amended Information."

15           This is on the bottom paragraph of page 1.     13:13

16     A.    Uh-huh.

17     Q.    And is it your testimony that that is a new

18   piece of information for you, that you did not know

19   Mr. Hanson had pled guilty to being charged until

20   recently, that you did not know that in '86?           13:13

21     A.    It is my understanding he had pled no

22   contest to the charge, until very recently.

23     Q.    You said you had an opportunity to read

24   Mr. Hanson's deposition as taken by Mr. Ross; is that

25   fair?                                                   13:13

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 144

1      A.    Yes.

2      Q.    Do you recall in that deposition where

3  Scott Hanson indicated he consulted with you about the

4  plea agreement?

5      A.    Yes.                                          13:14

6      Q.    Do you have an independent recollection of

7  consulting with Mr. Hanson about the plea agreement?

8      A.    When you say consulting about it, I sat in

9  his home with Mr. Moody and himself, when they talked

10  about it, and he had questions about his plea of no     13:14

11  contest.

12     Q.    What were his questions aimed at?  What was

13  the point of those questions he'd asked you?

14           Let me ask the question a different way.

15           Wasn't that discussion focused on what you    13:14

16  would you do as an ecclesiastical leader if he entered

17  a plea to this charge?

18     A.    In part, that was part of the discussion.

19  He was still adamant in his innocence and he felt it

20  was a compromise to plead guilty, not guilty but no     13:14

21  contest is what I heard in the home.  Plead no contest.

22  Would that be construed as an admission of guilt?  My

23  understanding at the time would be that that would be

24  construed as an admission of guilt to these charges if

25  he pled no contest.                                     13:15

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 145

1      Q.    That discussion was an ecclesiastical

2   conversation about whether you would construe those as

3   an admission of guilt, not a discussion of how the

4   court would view those; is that correct?

5      A.    I think that would be the context.          13:15

6      Q.    And was he concerned about what you would

7   do to him if he admitted guilt surrounding these

8   charges in an ecclesiastical context?  Is that why you

9   were there with Mr. Moody and Mr. Hanson?

10          MR. KRAUS:  I object to the form of the      13:15

11   question.  You're asking him about Mr. Hanson's

12   understanding?

13          MR. BOWERS:  To the extent he knows.

14   That's the question.

15          THE WITNESS:  This Mr. Hansen or Scott        13:15

16   Hanson?

17   BY MR. BOWERS:

18      Q.    No, Scott Hanson.

19      A.    I think that was part of his intent for

20   inviting me there.                                    13:16

21      Q.    I'm going to hand you what I'm going to

22   have marked as Exhibit No. 3 to this deposition and

23   I'll provide a copy to your counsel.

24          (Exhibit 3 marked.)

25   BY MR. BOWERS:                                        13:16

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 155

1   deception?

2           MR. KRAUS:   Why don't we read the question

3   back.

4           MR. BOWERS:   That's a good idea.

5           (Whereupon the record was read by the          13:27

6   reporter as follows:

7           QUESTION:   My question is:   When he sends

8   you down to his sentencing, when you were still

9   thinking he's pled no contest and fails to inform you

10  that in fact the deal had changed, and he had

11  acknowledged the facts we're going to talk about in the

12  complaint, where he was guilty, was that failure to

13  fill you in on that deceptive?)

14          THE WITNESS:   I don't think it was

15  intentionally deceptive.   I'm struggling with is it    13:28

16  deceptive or is it intentionally deceptive?   What was

17  the intent?   Is it -- given the conversations with

18  everybody involved, was it deceptive?   Was it an

19  oversight or an admission?   I didn't feel deceived.

20  BY MR. BOWERS:                                          13:28

21      Q.   Did you know on November 20th that he --

22      A.   I'm not trying to be contentious.   I just

23  -- it's just such a strong word, deceptive.   To me, you

24  know, if I want to deceive you, I do it intentionally.

25  I'm not sure there was an intentional omission on his   13:28

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 156

1    part of the attorney or the family to come back and

2    say, "By the way, this is" -- through whatever sequence

3    of negotiations subsequent, it has now changed from no

4    contest to guilty.

5         Q.    So no one told you of that, but you don't        13:29

6    know whether that was intentional or not?

7         A.    Correct.

8         Q.    On November 20th, when you went to court,

9    is it your testimony that nobody ever said he had pled

10   guilty or you just didn't understand that proceeding?        13:29

11        A.    I wasn't aware of it.  I still thought it

12   was a no contest plea.

13        Q.    Do you know what the charge was that he

14   pled to?

15        A.    Lewdness with a minor.                            13:29

16        Q.    Do you know what that entails?

17        A.    I had a very brief explanation in the home

18   by Mr. Moody.  I think I may have referred to it in an

19   earlier testimony that it didn't necessarily even mean

20   nudity, and it -- there was no admission of contact or       13:29

21   touching.

22        Q.    Can I --

23        A.    So I was --

24        Q.    Oh, sorry.

25        A.    -- a bit confused as to what -- you know,         13:29

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 157

1   and I think he talked to me a bit more about intent, if

2   there was exposure and some state of undress with the

3   intent to do harm or something to that effect.  But do

4   I have a detailed knowledge of it?  Not really.

5       Q.    Okay.                                          13:30

6             Let me hand you what's been -- we're going

7   to mark as -- I believe it's Exhibit 5.

8             (Exhibit 5 marked.)

9   BY MR. BOWERS:

10      Q.    Which is the "Amended Information" to which   13:30

11  Mr. Moody -- I mean Mr. Hanson pleaded guilty.  Can you

12  take a moment to review that.

13      A.    (Witness reviews document.)

14      Q.    Have you had a chance to review that?

15      A.    I have.                                        13:31

16      Q.    Is it consistent with your understanding

17  that whatever the deal was, it involved the crime of

18  knowing or intentionally exposing his genitals or

19  private parts or performing any other act of gross

20  lewdness, which Scott Hanson knew or should have known  13:31

21  would likely cause affront or alarm to a person under

22  14 years of age?

23            Is that something more or less consistent

24  with your understanding in 1986 or is that new

25  information?                                             13:31

ROCKIE DUSTIN, CSR, RPR

Page 158

1     A.     The broad scope of that, I think I

2  understood it could be on a scale of from nudeness and

3  exposure of genitalia, etcetera, to any other act of

4  gross lewdness, and that he should have known better.

5           The definition that I understood, in the        13:31

6  home from the attorney, is that there was not

7  nudeness --

8     Q.     Well, what was it --

9     A.     -- nudity.

10    Q.     What did he do?  What should he have known    13:31

11 better not to do?

12    A.     That they were in their underwear.  The --

13 described both by Scott and by the attorney, at some

14 point in time in his fiancTe's house, the young man had

15 come in and crawled into bed with him.  Scott's         13:32

16 testimony to me was that he wasn't aware of that until

17 he woke up in the morning.

18    Q.     So you said he exercised bad judgment just

19 now.  Did I misunderstand that?

20    A.     I'm sorry.  He apparently woke up during      13:32

21 the night and saw he was there.  And my point to him

22 is, "At that point, you should have picked him up,

23 carried him back to his bedroom, called mom and dad.

24 You don't let an 11-year-old crawl in bed with you at a

25 guesthouse somewhere."                                  13:32

ROCKIE DUSTIN, CSR, RPR

Page 159

1    Q.    So your understanding --

2    A.    I thought that was bad judgment.

3    Q.    So your understanding of what Scott Hanson

4    did wrong, that your opinion is bad judgment that led

5    to this criminal conviction, was that at his fiancTe's      13:32

6    house, he was sleeping in his underwear.  His fiancTe's

7    brother crawled into bed, also in his underwear, and

8    Scott should have put him back into his bed, but he

9    just went back to sleep?

10   A.    That's a pretty accurate description.                  13:33

11   Q.    Okay.

12   A.    And I thought that was -- I just would add

13   to that, I thought that was bad judgment.  Even though

14   he knew the young man, had had a lot of interaction,

15   they were friends and close and that, his explanation    13:33

16   was -- I said, "Scott, that has nothing to do with it.

17   It's still inappropriate."

18   Q.    Did you advise him to plead no contest?

19         (Discussion held off the contest.)

20         THE WITNESS:  No, I didn't render any              13:34

21   counsel, except the one evening when they asked me

22   specifically about the no contest portion of that.

23   BY MR. BOWERS:

24   Q.    Did you indicate to him that if he went

25   through with that, there would be no formal or informal   13:34

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 160

1    or any other kind of ecclesiastical caution or

2    discipline to him?

3         A.    My recollection of that differs a bit from

4    the deposition he gave Mr. Ross.  It's close.  I would

5    have given my opinion at that point in time, but also        13:34

6    with the explanation or caveat that my opinion wouldn't

7    necessarily be final.  The end results of that would be

8    reviewed between myself and the stake president and

9    that there might be subsequent interviews required with

10   Scott there.  But that at that point in time, after all      13:34

11   I've iterated prior to this, I didn't see a cause of --

12        Q.    So you determined --

13        A.    -- concern.

14        Q.    Had you determined, then, by that point in

15   time that Scott wasn't guilty of the other allegations       13:35

16   that had been made against him?

17        A.    I think at that point in time, I had pretty

18   well arrived at that conclusion, based on everything I

19   explained before.  I'm not absolutely positive of the

20   timeframe, but I think it was about the time of that         13:35

21   meeting in the home that I was pretty well convinced he

22   was guilty of very immature judgment.

23        Q.    Before he had entered a plea into this?

24        A.    That's what time again?

25        Q.    Well, if the meeting in the home is about         13:35

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 161

1    entering the plea --

2         A.    Probably.  Probably.

3         Q.    Okay.

4         A.    I knew that the charges through the plea

5    agreement, probably from a meeting either with          13:35

6    Mr. Moody prior to the one in the home and Scott,

7    either were going to be or had been reduced.  And that

8    certainly had influence on my decision and judgment.

9               And then I think the meeting in the home

10   took place a short time, it might have been a day or     13:36

11   few days after that.

12        Q.    Were you aware of whether a conviction

13   under this statute required a registration as a sex

14   offender?

15        A.    I was not aware.                              13:36

16        Q.    You weren't aware of that?

17        A.    No.

18        Q.    Would that -- if --

19        A.    The State of Utah, did it have a law to

20   require them to register?  Are you asking me was I       13:36

21   aware --

22        Q.    Were you aware of that then?

23        A.    No.

24        Q.    If that crime had required registration as

25   a sex offender, would that have affected your opinion?   13:36

ROCKIE DUSTIN, CSR, RPR

Page 177

1    So, no, I had heard nothing about that until I read it

2    in the deposition.

3        Q.    So we're not saying it happened, and we're

4    not saying it happened with Bishop Wudel, but if it did

5    happen, it could have happened with Wudel and you'd          13:52

6    never have known about it?

7        A.    That's possible; true.

8        Q.    Why did you -- why did you go down and

9    speak at this guy's sentencing?

10       A.    They asked me to.                                   13:53

11       Q.    Who did?

12       A.    Mom and dad and Scott and --

13       Q.    Did you have some reservations about that?

14       A.    Probably mixed feelings as to the

15   appropriateness of it, but I felt like I could simply       13:53

16   describe my personal findings in it.  And bear in mind,

17   too, at that point in time, in '80 -- I guess that was

18   '87, I really felt like he was innocent of these

19   things.

20       Q.    So are we agreeing, then, that when you go         13:53

21   down there, you're going down with the intention of not

22   only saying, "Hey, I've known Scott since he was a kid

23   and this isn't like him," you're going to give

24   additional information to the court about things that

25   you've gone and done, your investigation and its            13:54

ROCKIE DUSTIN, CSR, RPR

Page 178

1    conclusions; correct?

2         A.    I went down at their request to be a

3    character witness, and that was probably their intent.

4    I don't know that I thought through that as a cognitive

5    process, but I'm sure that's -- and I guess there's not      13:54

6    a transcript of what I said.  It would have been words

7    to that effect, that I've interviewed a number of young

8    men, I've tried to track this as closely as I can, and

9    I find him guilty of very poor judgment.

10        Q.    I mean, there's --                                 13:54

11        A.    And nothing else.

12        Q.    -- two parts to this.

13        A.    I honestly don't think I spoke much longer

14   than that.  I think I was in front of them for less

15   than a minute.                                                13:54

16        Q.    But there's -- let's stop for a second,

17   because there's two parts to this statement you agreed

18   to make.  And I'm going to say what they are and you

19   tell me whether you agree or not, okay?

20             The first part is, "I've known Scott.  He's        13:55

21   a good kid.  This really surprised me.  His reputation

22   in the community is such that this wouldn't happen,"

23   character stuff; right?

24        A.    I don't think I said all that.

25        Q.    Those sorts of things is one part of what         13:55

ROCKIE DUSTIN,  CSR,  RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 179

1    you intended to offer; right?

2        A.    Those sorts of things.

3        Q.    Okay.

4              The second part of what you intended to

5    offer is, "I've spoken to the other bishop.  I've          13:55

6    interviewed these boys.  I've done these things to come

7    to my own conclusion that Scott didn't do what was

8    alleged"?

9        A.    Except I don't think I detailed it that

10   much.                                                       13:55

11       Q.    But that was --

12       A.    I think I lumped it into a summary

13   statement, that I have tried to track this.  I've done

14   interviews.  I've come to my personal conclusion that

15   he's innocent of these charges, except for very bad        13:55

16   judgment.

17       Q.    Okay.

18       A.    Immature judgment.  I don't know the exact

19   words I used.

20       Q.    I probably went about that backwards,            13:56

21   because I was trying to establish there were two

22   different things, but now tell me exactly, to the best

23   of your recollection, what you believe you told that

24   judge on that day with respect to what should happen to

25   Scott Hanson.                                               13:56

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 180

1      A.    What should happen to him?

2      Q.    What did you tell him?

3      A.    I didn't make any recommendations to them

4  about what I thought should happen.

5      Q.    Okay.  That's fair.                          13:56

6      A.    Is that what you're asking me?

7      Q.    No, it was a bad question on my part.

8  We'll make it easy.

9            Tell me exactly, to the best of your

10  recollection, what you told to that judge.            13:56

11     A.    Well, a long time ago, Mr. Bowers.  I'm

12  sure I would have simply stated that from my position

13  in the interview process and the communications I had

14  had, that I had become convinced he was innocent of

15  those charges, but that he had exercised bad judgment  13:57

16  and shown real immaturity.

17     Q.    Did you -- so you told the court he's

18  innocent, right, in your opinion?

19     A.    I don't know that I said that, but I

20  probably did.                                          13:57

21     Q.    Okay.

22            Did you tell the court what you thought it

23  was that Scott did that was bad judgment or did you

24  just say, hey, something along the line it was bad

25  judgment?                                              13:57

Page 186

1    influence on his future therapy and tracking and that.

2    I don't really recall.

3         Q.    Whatever the court was going to do, you

4    went down there offering what you could, knowing that

5    it very well might help Scott out?                        14:03

6         A.    That's probably a fair statement.

7         Q.    Thanks.  Okay.

8               I'm just going to verify real quickly.  I'm

9    going to hand you and counsel -- we can go ahead and

10   mark it as exhibit next in order, whatever that is.      14:03

11              (Exhibit 6 marked.)

12   BY MR. BOWERS:

13        Q.    I'll represent to you that that's some sort

14   of a report compiled by the City of Orem in relation to

15   the '86 incidents.                                        14:04

16              Have you ever seen that document before?

17        A.    I have not.

18        Q.    So even as we sit here today, you've never

19   had an opportunity to read firsthand what was contained

20   in that document; right?                                  14:04

21        A.    That's correct.

22        Q.    Before I move on, I just want to be totally

23   clear, you never spoke to Ryan Boley or his family;

24   correct?

25        A.    Not to my knowledge.                           14:04

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 187

1    Q.    You never spoke to either of the Schill

2  boys directly?

3    A.    No.

4    Q.    You never spoke to any other member of the

5  Schill family with the exception of Jo Ellen?          14:05

6    A.    Jo Lynn.

7    Q.    Jo Lynn, I'm sorry.

8    A.    No.

9    Q.    And you never spoke to any member directly

10  of the Custer family?                                   14:05

11    A.    No.

12    Q.    Did I ask you whether your ecclesiastical

13  opinion would have changed if Mr. Hanson had pled -- if

14  you knew he was pleading guilty?

15    A.    You did ask that.                               14:05

16         MR. KRAUS:  You did.

17  BY MR. BOWERS:

18    Q.    I did?  And that's where you said it's too

19  hard to go back and all the rest.  I'm sorry.

20         Do you know a guy named DeLoach?                 14:05

21    A.    I've read his name in the record.

22    Q.    Did you talk to a bishop in Dallas at any

23  point when Scott moved down there?

24    A.    I don't think I ever did.

25    Q.    Really?  Never -- Scott -- let's go back.       14:06

ROCKIE DUSTIN, CSR, RPR

Page 188

1          Scott leaves Orem; right?  Are you still

2    bishop?

3          A.    Yes.

4          Q.    And moves to Dallas.  You're still bishop?

5          A.    Uh-huh.                                    14:06

6          Q.    And you never contacted any Church leader

7    of any kind about Scott once he moved to Dallas?

8          A.    Not to my knowledge.  I don't think I did.

9          Q.    I think wherever this has come up, it's

10   been represented that this bishop in Dallas was hearing   14:06

11   impaired.  Do you recall that?

12         A.    I read it in the deposition.  That's the

13   first I knew.

14         Q.    Do you think that's something that would

15   have made that more memorable to you had you been         14:06

16   involved with contacting them there?

17         A.    I don't know if it would have done or not.

18         Q.    Bad question.

19         A.    I have hearing impaired friends and I know

20   sometimes their voice is very distinctive, if that's     14:06

21   what you mean.

22         Q.    Well, yes, or that you had to use a TTDY

23   device or whatever the case was, okay.

24               Was Scott on probation when he left?

25         A.    It's my understanding he was on probation    14:07

Page 189

1    with some very closely defined guidelines, what he

2    could or could not do, and that it would be monitored

3    even though he went out of state.

4         Q.    What, if anything, did you do to make sure

5    that Scott wasn't put in charge of the Blazer program        14:07

6    there in Dallas while he was on probation?  And I mean

7    Blazer program as a generic term, for responsible for

8    youth in any way.

9         A.    Yes.  Yes, young men.  I left that up to

10   the follow-up probation officer and the requirements of      14:07

11   the probation, of which Scott knew the penalties if he

12   violated them.

13        Q.    So from an ecclesiastical perspective, you

14   did absolutely nothing with Scott regarding this

15   incident after he left Salt Lake?                            14:07

16        A.    Contrary to the testimony I saw in his

17   deposition, I'm quite sure that I told Scott to discuss

18   this with his new bishop.  And if they felt they needed

19   to call me, they could do so.

20        Q.    You independently took no steps to see that       14:08

21   that happened, that Scott reported this?

22        A.    I did not.

23        Q.    We'll talk more about records in a minute,

24   but just so I'm clear, you made no permanent notation

25   in his Church membership records about this incident?        14:08

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 190

1      A.     I did not.

2      Q.     And did you make any informal, put a

3  Post-It note in the file, say, "Please call me, Bishop.

4  I know he's moving and you're going to get this, give

5  me a ring," real friendly, casually?                    14:08

6      A.     No.

7      Q.     Was that an option that was available to

8  you?

9      A.     I think there was a method to tag

10  membership files up through the next priesthood leader.   14:08

11      Q.     Well, if you had --

12      A.     A process to do that.

13      Q.     Well, if you had been released as bishop,

14  and the next guy came in, and Scott didn't move, you

15  could say, "Hey, this happened.  You may or may not      14:09

16  know about it, you maybe did because it was in the

17  paper, but this is what I came up with.  We're not

18  making any notations in his permanent file, but I have

19  some concerns."  Right?  That option was available to

20  you?                                                     14:09

21      A.     Yeah.  I don't think that would fall in

22  confidentiality.  I could have done that with the

23  bishop that followed me.

24      Q.     Sure.  Sure.  And you at any time could

25  have gone to Scott, who had been very, I think in your   14:09

1    own words, quick to volunteer waiver of that privilege

2    as it related to him in this incident; right?   He

3    waived it with the attorney, he seemed willing to waive

4    it whenever you asked or he volunteered; right?

5         A.    Yes.                                          14:09

6         Q.    So you certainly could have -- well,

7    without that waiver, without talking to Scott, could

8    you have called whoever his bishop was in Dallas and

9    said, "Hey, you know, I made the call as bishop, no

10   discipline should be enforced here, but I have some     14:10

11   concerns, I want you to keep an eye out on this"?

12        A.    Given the requirements of his probation and

13   the end results of all my tracking and evaluation, I

14   don't think I had great concerns at that point.

15        Q.    Okay.                                         14:10

16            You chose not to do that, I understand.

17   You came to some opinions, but could you have done it?

18        A.    Sure.  I could have called him.

19        Q.    Without even requesting that Scott waive

20   the privilege, you could have called him and said,      14:10

21   "Hey, keep an eye out.  Here's what happened.  No big

22   deal, but we want you to know"?

23        A.    I think that option was available to me.

24        Q.    All right.

25            Kami Hanson, do you know Kami Hanson?           14:10

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 196

1      A.    I don't know that I would have said I

2  dismissed it because they weren't credible.  I don't

3  think I would have put it in that context.  Had she

4  asked me did I believe that Scott was innocent of those

5  charges, I would have said yes.                          14:15

6      Q.    Let me ask you this:  Did you believe that

7  he was innocent or did you believe there was not enough

8  evidence to substantiate the charges?  Is there a

9  difference in your mind?

10     A.    I believe that he was innocent.              14:15

11     Q.    Falsely accused?  Yes?

12     A.    Yes.

13     Q.    Who did you blame for that?

14     A.    I don't know that I tried to affix blame.

15  As I've gone back and read the record and all these     14:16

16  many years since then, you know, I understand the

17  police department following up, as I understood what

18  began with David Custer's statements or accusations and

19  went from there.  I don't know that I affixed blame on

20  anyone for it, but based on all we've talked about       14:16

21  previously, I felt he was innocent.

22     Q.    Did you have any opinions regarding whether

23  allegations of sexual abuse, back in 1986, were likely

24  to be false or likely to be true?

25     A.    Could you repeat that for me?  I'm not sure   14:16

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 205

1      Q.     So apparently allegations or -- oh, go

2  ahead.

3      A.     Either that phone call or a subsequent

4  phone call, I think she started to indicate to me that

5  she wasn't aware of this -- the happenings in '86 or        14:25

6  '87, because there was a comment like, "Why didn't you

7  tell me, or why wasn't" -- you know, I don't remember

8  the detail.

9           And my response to her was, "You knew

10  everything, did you not?"  And she was just silent,        14:26

11  which I took to mean that yes, I did, but if Scott

12  fooled me in '86 or '87 and others, he fooled you, too.

13      Q.     Well, let me break that down a second.

14           How many phone calls did we have -- did you

15  have with Kami Hanson after 2000?                          14:26

16      A.     I think just one, but there may have been

17  two.

18      Q.     Okay.

19           So as I ask you questions, I'd like you to

20  differentiate them, if you have a differentiation, as      14:26

21  you just voluntarily did.  Because I think I understood

22  your testimony to say this didn't happen during the

23  first phone call, but it may have been happened in the

24  second one; is that fair?

25      A.     I'd have to retract that, then.  It could       14:26

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 206

1   have been all in the same phone call.

2        Q.    You don't know whether --

3             MR. BOWERS:  Thank you, Counsel.

4   BY MR. BOWERS:

5        Q.    You don't know whether there were one or        14:26

6   two phone calls?

7        A.    I don't know if she did one or two.  I

8   really don't.

9        Q.    Did she ask you not why you didn't tell

10  her?  Is it possible that instead she asked me why      14:27

11  didn't you notate Scott's record, his membership record

12  in the Church about this incident?

13       A.    I don't think that was the question.

14       Q.    So you don't believe she ever asked that

15  question?                                                14:27

16       A.    I honestly don't know.  She talked for

17  awhile and she may have asked that.  I don't recall.  I

18  honestly don't recall.

19       Q.    Do you recall whether you may have

20  responded that the reason you didn't do that is you     14:27

21  didn't want to ruin Scott's life?

22       A.    I'm not sure I would have said that.  I

23  would have probably responded that I didn't feel there

24  was a reason to do so.  I felt like he was innocent of

25  the charges.                                             14:27

Page 215

1       Q.      Leland Howell or Olsen.  I apologize.

2       A.      Yes, President Howell, President Olsen.

3               In written form, no.

4       Q.      Orally was -- so then the only reports that

5   were given about Scott Hanson's 1986 incident to anyone      14:47

6   in the Church, besides yourself, were to President

7   Leland Howell or to President Olsen?

8       A.      To the best of my knowledge.

9       Q.      Okay.  That's all I can ask you for.

10              And I think we've covered this, but I just        14:47

11  want to make absolutely certain.  You never, in writing

12  or orally, communicated with any Church leader about

13  Scott Hanson in Dallas, Texas?

14      A.      I did not.

15      Q.      Any Church member?                                14:47

16      A.      Not -- no.

17      Q.      Any Church member or leader, did you

18  communicate to them orally or in writing about Scott

19  Hanson in the 1986 incident in Indiana?

20      A.      '86 incident in Indiana?                          14:48

21      Q.      Yes, sir.

22              MR. KRAUS:  I think it's the form of the

23  question.

24              THE WITNESS:  If I could be --

25  BY MR. BOWERS:                                                14:48

ROCKIE DUSTIN, CSR, RPR

Page 216

1     Q.    Let me ask it again.  Throughout -- I'm

2  going to ask you about four or five questions about

3  your communications with Church officials in places

4  subsequent to Dallas, okay?

5     A.    Okay.                                    14:48

6     Q.    And I'm going to -- in each instance, I

7  want to know if you communicated anything about what

8  had happened here in 1986.

9     A.    In '86?

10    Q.    Correct.                                 14:48

11    A.    I think I communicated that in phone calls

12 to Bishop Braby.

13    Q.    In New Jersey in 2000?

14    A.    I'm sorry.  Yes.

15    Q.    I'm going to go through some places and    14:48

16 just to confirm that there was -- well, let me ask you

17 this way:  There was no one other than Bishop Braby

18 that you communicated with in the Church, prior to

19 2000, about what you knew about Scott here in 1986?

20    A.    Other than Presidents Howell and Olsen;   14:49

21 that's correct.

22    Q.    Correct.  So no one in Virginia; right?

23    A.    Correct.

24    Q.    No one in Beaumont, Texas?

25    A.    Correct.                                  14:49

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

1     Q.     No one in Wisconsin?

2     A.     Correct.

3     Q.     Now, you did speak with Braby?

4     A.     Yes.

5     Q.     Tell me about that.                            14:49

6     A.     He called me at about the time -- I think

7  he called me.  I have his number, I think, from another

8  call.  He called me to tell me the charges against

9  Scott when we spoke.

10     Q.     Did he call you before or after Kami        14:49

11  Hanson?

12     A.     Gosh, I don't know.

13     Q.     Before or after Betty Hanson?

14     A.     The Betty Hanson phone call and the Bishop

15  Braby phone call were very close.  I would think        14:50

16  certainly within a week or less, and maybe a day or

17  two.

18     Q.     Was the last -- I think you answered it so

19  I'm sorry to go over old ground, but was the last Scott

20  Hanson phone call, as I understood it, like '88 or '89?  14:50

21     A.     The last one I recall was when he went to

22  school.

23     Q.     At Purdue?

24     A.     To Purdue.  And out of the clear blue, I

25  got a call one time, just kind of a catch-up, "How are   14:50

ROCKIE DUSTIN, CSR, RPR

Page 220

```
 1                  MR. KRAUS:  Well, I object to the preamble.

 2             You can answer the question.

 3                  MR. BOWERS:  Sorry.  I'm trying to help,

 4    not confuse him.

 5                  THE WITNESS:  I don't know his phone call    14:52

 6    in relationship to whether Scott was already arrested,

 7    incarcerated or if it was during that investigation.  I

 8    don't know.

 9    BY MR. BOWERS:

10        Q.    Okay.                                            14:52

11              Any other thing that might establish a

12    phone call timing of this Braby issue that you can

13    think of?

14        A.    No.

15        Q.    Okay.                                            14:53

16              So you told Braby what happened in Utah;

17    right?

18        A.    Yes.

19        Q.    And which was, correct me if I'm wrong,

20    amongst other things that you conducted an              14:53

21    investigation here, you determined he had been wrongly

22    accused.  He was sentenced by the court to probation.

23    As far as you know, he completed it, and that was

24    basically the last contact you'd had with the issue and

25    Scott?                                                   14:53
```

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 225

1          MR. KRAUS:  Can we get a timeframe on that?

2          MR. BOWERS:  Back in '86.

3          THE WITNESS:  I would have directed the

4    ward clerk to make such an amendment, is my knowledge.

5    BY MR. BOWERS:                                        14:58

6        Q.    And then you would have reviewed the record

7    and said, "Hey, it's there, good.  We're covered."

8    Right?

9        A.    Correct.

10       Q.    This record, does it appear to be, as you     14:58

11   understand it, Church records to work the entirety of

12   Scott Hanson's membership record?

13       A.    I think it would hit the highlights of

14   different Church recorded events and activities in his

15   life, yes.                                             14:58

16       Q.    Had you decided that one of the things that

17   needed to happen to Scott Hanson as a result of these

18   1986 incidents was to make a notation that there's some

19   concerns about Scott and homosexuality or Scott and

20   young men, this record should contain that; right?     14:58

21       A.    Yes.

22       Q.    And you elected --

23       A.    Well, yes, I'm sure it would.  From '86.

24   Sure.

25       Q.    And you elected not to do that; correct?     14:59

ROCKIE DUSTIN, CSR, RPR

Page 226

1      A.     That's correct.

2      Q.     Why did you decide that that was something

3  that you would not do?

4      A.     I thought he was innocent of the charges.

5      Q.     What would be the effect -- well, first of        14:59

6  all, what would that look like in this record?

7      A.     Some kind of an amendment or tagging.

8      Q.     Let's go back a step further.

9             What were your options as you understood

10 them in 1986 to notate Scott's membership record about     14:59

11 this incident in any form, which I assume on one end

12 would be excommunication at the far end of the

13 spectrum, and I don't know what the lesser options are

14 if any?

15            MR. KRAUS:   Objection to the form.              14:59

16            THE WITNESS:   I'm not sure I understand.

17 What you just named would have been part of a Church

18 court process.

19 BY MR. BOWERS:

20     Q.     Uh-huh.                                           15:00

21     A.     There are certain findings that can take

22 place.

23     Q.     Correct.

24     A.     Are you asking me outside of a Church court

25 setting, what are my options?  I'm not sure what you're    15:00

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 227

1   asking me, I'm sorry.

2        Q.   You're bishop.  You and the stake president

3   together come up with a decision of how to handle

4   whatever did or did not occur with Scott Hanson in

5   1986.  Okay?                                          15:00

6             I absolutely understand you feel he was

7   innocent and so you did nothing to this record.  Okay?

8             Assuming that you didn't feel he was

9   innocent, I'm not saying you felt he was guilty of

10  everything that was charged, but just assuming that you  15:00

11  didn't feel he was completely innocent, what options

12  did you have available to you?

13            And I'm not talking about taking away his

14  recommend or having him forego sacrament or whatever

15  those options were with respect to your authority over  15:00

16  him at the time.  I'm asking what options did you have

17  available to make note of this problem or this incident

18  in the Church records?

19       A.   My best recollection of that would have

20  been that we could -- when he left the boundaries of    15:01

21  our ward, or my, quote-unquote, jurisdiction as his

22  bishop, I could have tagged those.

23       Q.   Okay.

24       A.   And said, "Do nothing with him" --

25       Q.   Tagged this --                               15:01

ROCKIE DUSTIN, CSR, RPR

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 228

1      A.    -- "without contacting me."  I could have

2  tagged them with some note of reference at some level.

3      Q.    Okay.

4            And what would that -- what would that tag

5  have actually looked like on this document?  Would it        15:01

6  have been a line entry that said something?

7      A.    I don't know.

8      Q.    Okay.

9      A.    I never received one that had that and I

10  didn't take tag one during my time as bishop.              15:01

11     Q.    Okay.

12           Do you know, could have you tagged it,

13  "please call"?

14     A.    I don't know.  It would be -- my assumption

15  is you could list certain recommendations for contact.      15:02

16     Q.    Do you know what your choices were?

17     A.    I don't.

18     Q.    So tagging is an option; correct?

19     A.    (Witness nods.)

20     Q.    And is that available to all bishops, as        15:02

21  far as you're aware?

22     A.    I'm sure it is.

23     Q.    What -- is there a disciplinary proceeding,

24  is there a Church court that needs to be held in order

25  to tag a file?                                              15:02

1      A.     Good question.  I don't know.  I don't

2  know -- to be honest, I don't know if I could tag it as

3  a bishop alone or if I need to do it in conjunction

4  with the stake president.

5      Q.     What if the stake president and you          15:02

6  together decided this file should be tagged with a

7  message to a subsequent bishop to give you a call, is

8  that something you could have done?

9      A.     Yes.

10     Q.     Okay.                                         15:03

11            And to your knowledge, could it have said,

12  "Please call regarding morality issue when you receive

13  this file"?

14     A.     I would assume you could have pointed the

15  reasons out for tagging the file.                      15:03

16     Q.     Could you have pointed the reasons out

17  without saying, you know, accused of molesting children

18  and these are the allegations?  Could you have pointed

19  it out in a way that might maintain some semblance of

20  his privacy?                                           15:03

21     A.     That probably could have been achieved.

22     Q.     So tagging is one level of warning and you

23  don't understand exactly what you could or couldn't

24  have put, but you believe it could have been something

25  fairly innocuous, sort of a red flag, here's an alert,  15:03

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 230

1    give me a call?  Do you think that would have worked?

2         A.    Would have worked?

3         Q.    Was an option that was available to you as

4    bishop with the stake president's approval.

5         A.    I think we could have tagged his records.    15:04

6         Q.    And do you know whether that tag would have

7    been a permanent notation to his record or whether that

8    could have been removed by a subsequent bishop?

9         A.    I don't think in '86 I knew if it would be

10   a permanent record or if it would go just to the next   15:04

11   priesthood leader.  I've found out since then what the

12   process would have been.

13        Q.    What's your understanding now?

14        A.    That it would have gone to the next

15   priesthood leader.                                      15:04

16        Q.    And then he would have had the discretion

17   to take it off?

18        A.    He would have determined whether to take it

19   off or pass it on.

20        Q.    Did you ever say to yourself, I think       15:04

21   Scott's innocent, but since this is sex abuse in

22   children, it might be a good idea to make some kind of

23   informal note and I'm going to go check out if there's

24   a way to do that?

25        A.    I think I discussed that at length with the  15:05

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 231

1    stake president.

2         Q.    Which one?

3         A.    It would have been, at that point in time,

4    President Olsen.

5         Q.    What did you guys decide?                    15:05

6         A.    That he was innocent and we wouldn't do

7    that.

8         Q.    Is there a reason why you wouldn't err on

9    the side of caution there?

10        A.    We just felt he was innocent.               15:05

11        Q.    Do you remember that discussion or series

12   of discussions that led to that decision not to

13   annotate or tag his record?

14        A.    I just remember both President Howell and

15   President Olsen discussing the progression of events in  15:06

16   detail.

17        Q.    You don't remember --

18        A.    And what action --

19        Q.    -- the conclusion?

20        A.    Sure.  And what action would be appropriate  15:06

21   for us to take.

22        Q.    And did you and President Howell come to a

23   decision not to annotate the record or was that you and

24   President Olsen?

25        A.    I would assume, because of the timing, that  15:06

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 232

1   the decision would have been myself and President

2   Olsen.

3        Q.   And no one -- do you remember either of you

4   engaging in the following line of thought:  We believe

5   he's innocent.  We think that's the case.  Maybe in a        15:06

6   million years we could possibly be wrong, but either

7   way, a temporary notation doesn't harm him in any way,

8   but goes a good deal in the future to protect youth

9   that he might be exposed to through his involvement in

10  the Church?  Did anything like that ever come up?            15:07

11       A.   At the conclusion of this process, I don't

12  think it did, because I think we both felt like he was

13  innocent.

14       Q.   And there was no cost/benefit analysis that

15  you recall about the potential consequences if you are       15:07

16  wrong versus the harm to him if you are right?

17       A.   Again, looking at it from 20 years back,

18  that sounds like a terrible --

19       Q.   I'm sorry, I didn't hear you.

20       A.   I said looking at it from 20 years back,           15:07

21  that sounds really bad, but we didn't think he was

22  guilty of the charges.

23       Q.   So that just never even came up?

24       A.   So it didn't come up.  We felt like he was

25  innocent of the charges.                                     15:08

Page 233

1      Q.    So you don't recall either of you ever

2   saying, "Good guy, I think he's not innocent, but what

3   if?"  You were so sure about the conclusion of this

4   that it just wasn't even worth making a temporary note

5   in the file?                                      15:08

6      A.    I honestly don't know if we would have gone

7   through that thought process.  My mind tells me we

8   probably would have done and come to the conclusion

9   that he was still innocent of the charges.  I mean,

10  it's hard for me to say we did or did not entertain  15:08

11  that line of thought.  We -- you know, we obviously had

12  great concern for children, for youth, both in the

13  Church and out of the Church.

14     Q.    Well, I guess that's my problem, is I

15  believe that statement and I just am having a hard time  15:08

16  figuring out how a little temporary entry in this

17  record that could have prevented, you know, this

18  horrific string of events we're now facing, and it

19  never even occurred to anybody who was making this call

20  to enter that.                                    15:09

21           MR. KRAUS:  Objection to the form.  Now

22  you're just arguing with him.

23           MR. BOWERS:  Well, I just want to make sure

24  that that was what happened.

25           MR. KRAUS:  Then frame a different      15:09

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 234

1     question, because that's argument to the jury, that's

2     not a question.  I'm not going to let him answer that

3     argumentative question.  Frame a different one.

4          MR. BOWERS:  You're instructing the witness

5     not to answer that question?                        15:09

6          MR. KRAUS:  Yes, I am.

7          MR. BOWERS:  Okay.

8     BY MR. BOWERS:

9          Q.   All right.  So you knew you could put a

10    permanent tag in there, and did you, at the time, ever   15:09

11    ask anyone what are my options here regarding whether a

12    tag is permanent or not and what it has to say, how

13    that works?

14         A.   I'm confident that was part of the

15    discussion with the stake president.               15:09

16         Q.   But you don't have a recollection as we sit

17    here today of what your options were with respect to a

18    tag?

19         A.   I just knew we could tag the records.  I

20    guess my question is about they have been throughout   15:09

21    the remainder of his life or for a given period of

22    time, and I don't know if that affected my decision or

23    judgment then, but I don't recall that I knew that as a

24    point in fact.

25         Q.   So you don't ever recall thinking I'm not   15:10

ROCKIE DUSTIN, CSR, RPR

Page 235

1    going to tag this record, or telling anyone I'm not

2    going to tag or mark this record in any way because I

3    don't want it to haunt him forever?

4         A.   You know, I may have had concern about

5    that, but it wouldn't have been of the same priority as   15:10

6    if there were any doubt in my mind as to his guilt,

7    would I have done it.  I just didn't think he was

8    guilty.

9         Q.   As I understand your answer, you may have

10   thought that, are we in agreement?                         15:10

11        A.   About would the tagging harm Scott for

12   life?

13        Q.   Uh-huh.  Was that a thought that crossed

14   your mind?

15        A.   A thought that crossed my mind?  Probably.       15:11

16        Q.   Okay.

17             Did you ever express that to anyone?

18        A.   I don't believe so.

19        Q.   Was there anyone else besides yourself and

20   the stake president who had discretion as to how this      15:11

21   matter -- you know, this matter is these whole series

22   of allegations, investigation, all the rest, how that

23   should be handled with respect to Scott's membership

24   records?

25        A.   I would assume not.  I would assume that me      15:11

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 255

1      Q.    And the very first thing it says is, "Give

2  the child the benefit of the doubt if he tells you he

3  has been molested.  Children rarely make up such

4  things.  Assume the child is right unless you find

5  irrefutable evidence to the contrary."                    15:44

6          Now, I guess this was written by the Church

7  Public Communications Special Affairs gentleman.  So

8  that carries some weight to it, does it not?

9      A.    Yes.

10     Q.    That's a serious piece of advice you've got    15:45

11 to consider in administering your obligations over the

12 members of your ward; right?

13     A.    True.

14     Q.    And would you have been aware of this

15 thought, this piece of advice in 1986?                     15:45

16     A.    Yes.

17     Q.    As we sit here today, do you feel you had

18 irrefutable evidence to counter the allegations made by

19 those boys with respect to Scott Hanson?

20     A.    Yes, I do.                                       15:45

21     Q.    Because if you didn't have irrefutable

22 evidence, you would have gone contrary to the position

23 of the Church, at least expressed in this writing; is

24 that right?

25     A.    That's correct.                                 15:45

Page 256

1          MR. KRAUS:  Objection to the form of the

2     question.

3          THE WITNESS:  I'm sorry.  I answered too

4     quickly.  Yes.

5     BY MR. BOWERS:                                    15:46

6          Q.    Okay.

7          "Sexual molestation is seldom a one-time

8     offense."

9          I'm sorry, I'm reading now just below where

10    the fourth bullet point ends.                     15:46

11         A.    Almost to the bottom, I've gotcha.

12         Q.    Okay.

13         "Trying to protect a molester almost always

14    worsens the situation and validates the molester's

15    behavior."                                        15:46

16         Is that something you were aware of in

17    1986?

18         A.    I assume I would have been.  It rings true

19    now.  I'm sure it would have rang true then had I read

20    it.                                               15:46

21         Q.    So in considering what to do about the

22    Scott Hanson situation, you would have said to yourself

23    I can -- "I should only not notate the records if I

24    have irrefutable proof that he didn't do this, and if I

25    don't notate the records and end up inadvertently       15:46

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a

Page 257

1    protecting a sexual predator or molester, that's even

2    worse"; right?  These are things that would have been

3    part of that decision-making process?

4              MR. KRAUS:  Objection to the form.

5              You can answer.                              15:47

6              THE WITNESS:  (Witness reviews document.)

7    Yes.

8    BY MR. BOWERS:

9         Q.   I think we're finished with that document.

10   I'm going to move on to another one which I'll put as a   15:47

11   10 here.

12             MR. BOWERS:  Counsel, you don't mind if the

13   court reporter marks these later, do you?

14             MR. KRAUS:  No, I don't.

15             MR. BOWERS:  Okay.                           15:48

16   BY MR. BOWERS:

17        Q.   I'll give a copy to yourself and your

18   counsel.  And this document appears to be another

19   Ensign article.  Would you agree with that?

20        A.   Yes.                                         15:48

21             (Exhibit 10 marked.)

22   BY MR. BOWERS:

23        Q.   And this document is authored by President

24   Hinckley; right?

25        A.   It is.                                       15:48

ROCKIE DUSTIN, CSR, RPR

Page 262

1     Q.     And we're going to talk bishops, stake

2  presidents, priesthoodholders, maybe, young men's

3  leaders for sure, is that the target audience?

4     A.     Ecclesiastical leaders I would assume would

5  include all of those, yes.                          15:53

6     Q.     And you notice the copyright was 1985?

7     A.     Yes.

8     Q.     The time you were a bishop?

9     A.     Yes.

10    Q.     Is this something that you had back then?   15:53

11    A.     I'm sure I did.

12    Q.     Okay.

13           Do you recall having read it?

14    A.     I'm sure I did.

15    Q.     As we go through here, we get another       15:53

16 definition of sexual abuse on page 560.  Can you see

17 that there in the first column?

18    A.     Yes.

19    Q.     And just for the record, this document --

20 now, let me ask you, does this document, as a bishop,  15:54

21 carry any greater emphasis or sway than the Ensign

22 article from the communications office, or are they all

23 important?

24    A.     They're all important, but I think this

25 would receive a higher priority and more study.    .   15:54

1f9942f1-01fd-4dd3-8823-f47caf1e7a7a