**LATHAM & WATKINS LLP**
One Newark Center, 16th floor
Newark, New Jersey 07101-3174
Telephone: 973-639-1234
Facsimile: 973-639-7298

*Attorneys for Defendant Corporation of the President of The Church of Jesus Christ of Latter-day Saints*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DAVID V. AMES,<br><br>                    Plaintiff,<br><br>v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, a/k/a the "MORMON CHURCH," and WILLIAM SCOTT HANSON, individually,<br><br>                    Defendants. | Civil Action No. 06-CV-3441 (WJM) (MF) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT, CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS' MOTION FOR SUMMARY JUDGMENT DISMISSING PLAINTIFF'S COMPLAINT IN ITS ENTIRETY OR, IN THE ALTERNATIVE, STRIKING PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT..........................................................................................................................2

    I.      NEGLECT BY PLAINTIFF'S PARENTS WAS THE PROXIMATE
            CAUSE OF THE SEXUAL ABUSE BY SCOTT HANSON................................2
            A.      The Chronology Issue ..............................................................................3
            B.      The So-Called "Trust" Issue ...................................................................5
            C.      Plaintiff's Key Cases Are Inapposite, At Best..........................................6

    II.     PLAINTIFF'S PUNITIVE DAMAGES CLAIMS FAIL AS A MATTER
            OF LAW ..................................................................................................................8
            A.      Claims of Clergy Malpractice Are Not Justiciable ...................................8
            B.      Plaintiff's Claim that Bishop Hansen Conducted a Sham
                   Investigation is Made Up Out of Whole Cloth .........................................9
            C.      The Opinions of Plaintiff's Experts Are Irrelevant..................................11

CONCLUSION......................................................................................................................11

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Daubert v. Merrell Dow Pharmaceuticals*,
  509 U.S. 579 (1993) ................................................................................................ 11

*Klagsbrun v. Va'ad Harabonim*,
  53 F. Supp. 2d 732 (D.N.J. 1999) ............................................................................ 8

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ................................................................................................ 11

*Serbian E. Orthodox Diocese v. Milivojevich*,
  426 U.S. 696 (1976) ................................................................................................ 8

*St. Matthew's Slovak Roman Catholic Congregation v. Wuerl*,
  106 Fed. Appx. 761 (3d Cir. 2004) .......................................................................... 8

### **STATE CASES**

*Caputzal v. The Lyndsay Co.*,
  48 N.J. 69 (1966) .................................................................................................... 2

*Doe v. Garcia*,
  131 Idaho 578, 961 P.2d 1181 (1998) ..................................................................... 7

*Franco v. The Church of Jesus Christ of Latter-day Saints*,
  21 P.3d 198 (Utah 2001) ......................................................................................... 9

*Haselhorst v. Nebraska*,
  240 Neb. 891 (1992) ............................................................................................... 6

*Hunter v. Department of Corrections*,
  138 Idaho 44, 57 P.3d 755 (2002) .......................................................................... 7

*Watkins v. Myers*,
  12 N.J. 71 (1953) .................................................................................................... 5

## STATUTES

N.J.S.A. § 2A:15-5.12 (1995) ...............................................................................................................11

N.J.S.A. § 2A:84A-23 (1994) .................................................................................................................5

N.J.S.A. § 9:6-8.10 (1987) ......................................................................................................................5

**PRELIMINARY STATEMENT**

Plaintiff's Memorandum of Law in Opposition to Defendant Corporation of the President of The Church of Jesus Christ of Latter-day Saints' ("Church") Motion for Summary Judgment ("Pl. Mem.") is replete with mischaracterizations of the record, factual assertions without record support and reliance on unqualified "experts." We will not, however, waste the Court's time with a point-by-point rebuttal; rather, we address below only those points that have potential relevance to the outcome of this motion.

Notably, Plaintiff does not dispute -- because he cannot -- that the abuser, Scott Hanson, was never clergy and never abused Plaintiff at a Church function or on Church property. Nor does Plaintiff contend that any Church leader was aware that Scott Hanson was abusing Plaintiff, or even that he might be abusing Plaintiff, until Scott Hanson's estranged wife, Kami Hanson told Bishop Braby in March 2000 of her suspicions. Nor does Plaintiff dispute that, immediately upon learning of those suspicions, Bishop Braby urged Kami Hanson to report her concerns to the New Jersey Division of Youth and Family Services ("DYFS").

In tacit recognition of the fact that, unlike the Church, Plaintiff's parents knew that Scott Hanson was a danger to their son before and during the over 18 months that he was sexually abusing David Ames, Plaintiff argues that (1) his father, Chris Ames, did not learn of Plaintiff's discomfort with Scott Hanson until sometime in December 1998; (2) Chris Ames was then mentally incapable of appreciating that Scott Hanson was a danger to his son; and (3) Chris and Kathy Ames ignored the bizarre fact that Scott Hanson, a 36 year-old man, was routinely sleeping in a bed with their 12 year-old son because they blindly trusted him as a Blazer leader and home teacher called by the Church. The sworn testimony -- and simple common sense -- flatly contradict each of those assertions.

Plaintiff's legal argument that proximate cause is always an issue for the jury fares no better. As New Jersey law has long recognized, in extraordinary cases, the original negligence, if any, exhausts itself when intervening actors, such as the Ames parents, had more than sufficient knowledge and both an obligation and an opportunity to protect the victim from harm -- but they do nothing.

Plaintiff's attempt to save his punitive damages claims is equally flawed. Those claims rest on the assertions that Bishop Hansen in 1986-87 failed to follow Church doctrine when he elected not to impose Church discipline on Scott Hanson, or to issue a Request for Contact to Scott Hanson's next bishop. Those arguments are, at bottom, claims of clergy malpractice that would require the Court and the jury to consider and resolve issues of Church doctrine that the First Amendment provides are not justiciable in civil courts.

Moreover, Plaintiff's tortured argument that Bishop Hansen conducted a sham investigation rests on a blatant mischaracterization of a single answer he gave in his deposition. Indeed, Plaintiff's contention that Bishop Hansen, and later Bishop Braby, had as their primary motive a "desire to protect [the Church] from scandal" (Pl. Mem. at 24) fails the test of basic logic: when Bishop Hansen learned of the 1986-87 allegations against Scott Hanson, they were already the subject of a public criminal proceeding; and Bishop Braby continuously urged Kami Hanson to report her concerns to DYFS and, subsequently, to the police. On the undisputed facts, protecting the Church from scandal was never part of the equation here.

## ARGUMENT

### I. NEGLECT BY PLAINTIFF'S PARENTS WAS THE PROXIMATE CAUSE OF THE SEXUAL ABUSE BY SCOTT HANSON

Proximate cause "must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability." *Caputzal v. The*

2

*Lyndsay Co.*, 48 N.J. 69 (1966) (internal quotations omitted).  Here, even assuming *arguendo* that the Church was negligent in not warning the Ames family, Plaintiff's parents, unlike the Church, knew that Scott Hanson was a danger specifically to their son <u>before</u> David Ames was first abused and did nothing effective to protect him.  To the contrary, time and again, they provided opportunities for Scott Hanson to abuse their son.  Their intervening neglect was the proximate cause of Scott Hanson's sexual abuse of David Ames.

    A.    **<u>The Chronology Issue</u>**

Plaintiff contends that there is a disputed issue of fact as to when Chris Ames was told by his son that David was "uncomfortable" with Scott Hanson sleeping in David's bed and touching him.  Plaintiff then suggests that perhaps Chris Ames was too mentally ill to appreciate the significance of what David said.  (Pl. Mem. at 17-19).  The sworn testimony of Chris and David Ames in this case and in their July 2000 statements to the police categorically belie those arguments.

In his July 2000 sworn statement to the police, David Ames stated no less than 7 times that the first occasion on which Scott Hanson sexually molested him was in December 1998. (*See* Affidavit of Paul A. Rosenthal, Esq. sworn to April 28, 2008, Ex. A, D. Ames Sworn Statement, Tr. 21-22, 26-28, 33, 59.)[1]  David Ames also reported that Scott Hanson first started sleeping at the Ames' home "[p]robably September of the year I turned 12", *i.e.*, 1998. (*Id.*, Tr. 19-20.)  David Ames further stated that it was a "couple months" before Scott Hanson abused him when David told his father that he was "uncomfortable" with the way Scott Hanson slept in his bed and touched him. (*Id.*, Tr. 20-21.)

In his deposition in this case, David Ames confirmed that chronology:

3

> Q. Is it correct that you told your father that you were uncomfortable with Scott sleeping in the same bed with you a couple months before Scott actually touched your genital area?
> A. Yes.
> Q. When you told you father that you were uncomfortable with the way in which Scott was sleeping in the same bed with you, that conversation that occurred in September 1998, did you expect your father to do something about it?
> A. I didn't know what to expect.
> Q. Did you want your father to do something about it?
> A. Probably. That's why I told him.
> Q. Did you want your father to put a stop to it?
> A. I guess, yes.
> Q. Did you want your father to tell Scott not to sleep in the same bed with you and touch you in a way that made you uncomfortable?
> A. Yes.
> Q. Did he do any of those things?
> A. Not that I was aware of
>
> (Ex. B, David Ames ("D. Ames") Dep., Tr. 110-11.)

Chris Ames did not dispute his son's chronology, recalling that his son made such complaints to him "multiple times". (*See* Ex. C, Christopher Ames ("C. Ames") Dep., Tr. 67, 94; Ex. D, C. Ames Sworn Statement, Tr. 11-12.) Chris Ames further conceded that, whenever his son made those complaints to him, he understood their significance and, consequently, spoke to both his wife and Scott Hanson about the situation. (Ex. C, C. Ames Dep., Tr. 59-72.) And yet, he continued to permit Scott Hanson to sleep in the same bed with his son:

> Q.  So you knew that there was a risk that [sexually inappropriate touching] might be happening?
> A.  There's always a risk.
>         * * *
> Q.  And indeed, whatever mental incapacity you say you had at the time, you had a sufficient understanding of it that you told your wife that something should be done about this, "I don't want Scott here. I don't want Scott spending the night here anymore."
> A.  That's correct.
>         * * *

---

[1] All cited deposition pages and documents are submitted as exhibits to the Rosenthal Affidavit. For the sake of brevity, citations in the text will refer to the "Ex." designation only.

4

> Q. So whatever mental incapacity you had, you had enough ability to function that you spoke to Scott Hanson about David's discomfort; correct?
> A. Correct.
>   \* \* \*
> Q. But he did continue to sleep in your house, didn't he?
> A. I believe so, yes.

(*Id.* at Tr. 59, 69, 71-72.)

Indeed, after David complained to his father, on several occasions, David went into his father's bedroom to escape Scott Hanson. When Scott Hanson followed David, Chris Ames allowed both David and Scott Hanson to sleep in his bed. Aware of David's concerns, Chris Ames put himself between the other two but Scott Hanson later moved so he was up against David. (*Id.*, Tr. 76.) And still, Chris Ames did nothing to stop Scott Hanson from sleeping with his son. (*Id.* at Tr. 77.)

In any event, there is no claim that Kathy Ames was mentally incapacitated or otherwise unable to appreciate the obvious danger of her son sleeping in the same bed with a 36 year-old man. Plaintiff's disputed chronology argument is a red herring.[2]

---

[2] Likewise, Plaintiff's contention that Bishop Braby should have reported Scott Hanson is a false issue. First, Bishop Braby was trying to balance two conflicting obligations: his legal and religious duty of confidentiality owed to Kami Hanson and his statutory duty to report allegations of child abuse (*See* N.J.S.A. § 2A:84A-23 (1994); N.J.S.A. § 9:6-8.10 (1987).) If Kami Hanson reported, both obligations would be satisfied. Second, he did warn Kathy Ames of Kami Hanson's concerns. (Ex. E, James Braby ("J. Braby") Dep., Tr. 76-77; Ex. F, Kathleen Ames ("K. Ames") Dep., Tr. 122-23.) And third, if DYFS had been put on notice a few weeks earlier, it would have made no difference since DYFS found no cause for action when it did investigate -- in part because Kathy Ames said David was not at risk from Scott Hanson. (Ex. G, Jeff Kline ("J. Kline") Dep., Tr. 49-54.) *See, e.g., Watkins v. Myers*, 12 N.J. 71, 74 (1953) (without proof of compensable injury, a negligence claim fails).

### B. The So-Called "Trust" Issue

Plaintiff's Memorandum also argues that Chris and Kathy Ames ignored all the warning signs because Scott Hanson had the "imprimatur" of the Church. (Pl. Mem. at 16-17, 29-30.) Once again, the evidence is to the contrary.

It is undisputed that all of Scott Hanson's abuse of David Ames occurred through his role as a family friend. (*See* Ex. H, Defendant [Church's] Rule 56 Statement of Undisputed Facts, No. 35 ("Scott Hanson never sexually abused David Ames on Church property or in connection with any Blazer activity or home teaching visit") *and* Ex. I, Plaintiff's Response to Defendant [Church's] Rule 56 Statement of Undisputed Facts, No. 35 ("Admitted.")).

Even Chris Ames conceded that it was obvious that Scott Hanson's Church calling was no guarantee he was not a sexual predator and the Ames parents had an obligation to protect their son from sexual predators:

> Q. You didn't believe that the fact that you met Scott Hanson through the Church meant that he could never be a danger to your son, did you?
> A. I never said that.
>      * * *
> Q. And you knew as a father that you had an obligation to protect your son from sexual predators; correct?
> A. Uh-huh.

(Ex. C, C. Ames Dep., Tr. 41, 61.)

Moreover, to suggest that Kathy Ames saw nothing unusual here because other men had slept over at the Ames' home (Pl. Memo at 19) strains credulity past the breaking point. As Kathy Ames admitted, the others who slept over were her daughter's boyfriends and she does not recall either of them sleeping in bed with David. (Ex. F, K. Ames Dep., Tr. 83-84.)

6

### C. Plaintiff's Key Cases Are Inapposite, At Best

Plaintiff's Memorandum cites two cases for the proposition that it is a jury question whether a parent's negligence in failing to protect a child from sexual abuse is an intervening cause. (Pl. Mem. at 26-28.) Neither of those cases holds anything of the sort.

For example, *Haselhorst v. Nebraska*, 240 Neb. 891 (1992) did not involve any claim that the parents' negligence was an intervening cause. *Haselhorst* has nothing to do with this case.

*Doe v. Garcia*, 131 Idaho 578, 961 P.2d 1181 (1998), is not even good law in Idaho. In *Doe*, the trial court twice granted summary judgment in favor of the hospital, not because any negligence by the parents was an intervening cause but rather because, *inter alia*, the trial court found no duty or proximate cause after the perpetrator left the hospital's employ. 131 Idaho at 592, 961 P.2d at 1195. In an expansive reading of duty and proximate cause, the Idaho Supreme Court reversed, without mentioning intervening cause. *Id.*, 131 Idaho at 581, 961 P.2d at 1184. *Doe* is irrelevant to the intervening cause issue here.

In any event, in *Hunter v. Dep't of Corrections,* 138 Idaho 44, 57 P.3d 755 (2002), the Idaho Supreme Court effectively overruled *Doe v. Garcia*. In *Hunter*, an employer was sued because an employee, who was on probation after a forcible rape conviction, raped and murdered a 17 year-old former employee, whom he met while both were working for the defendant. The jury apportioned damages 1% to the victim's father, 4% to the victim, 20% to the defendant-employer, 35% to the State and 40% to the murderer.

The Idaho Supreme Court reversed as a matter of law, holding that *Doe v. Garcia* went too far in extending the duty of an employer to protect against consequences outside the employment relationship. As the *Hunter* court concluded:

> The verdict in this case exemplifies the results that may occur when employers are called upon to foresee the conduct of their

7

> employees off the job. [The employer] was found to have half as much responsibility for Hunter's death as Hood who actually killed her. That defies common sense. The man who actually killed Hunter had virtually all, if not all the responsibility for her death. <u>Finding otherwise illustrates the hazards of putting an emotionally charged issue to an understandably sympathetic jury.</u>

*Id.* at 50, 57 P.3d at 761. (emphasis added).

So, too, here, Plaintiff is asking this Court to hold the Church potentially responsible for sexual abuse by a member of another member, in the context of a family friendship and despite David Ames' parents' unique knowledge of the troubling relationship between their son and Scott Hanson. This is not a case where Scott Hanson held a Church clergy position or even where he abused David Ames while performing a Church function. Concepts of duty and proximate cause cannot be stretched so far as to hold the Church responsible in these circumstances.

## II.  PLAINTIFF'S PUNITIVE DAMAGES CLAIMS FAIL AS A MATTER OF LAW

Plaintiff argues that a jury could award punitive damages because Bishop Hansen acted in wanton and willful disregard of the consequences to potential future victims by conducting a sham investigation of 1986-87 sex abuse charges against Scott Hanson and not imposing Church discipline against him. (*See* Pl. Mem. at 5-12, 30-34.) Those arguments fail because (1) they are barred by the First Amendment; and (2) they are contradicted by the record evidence.

### A.  <u>Claims of Clergy Malpractice Are Not Justiciable</u>

Plaintiff contends that Bishop Hansen recklessly failed to comply with Church directives during his investigation and that, under Church doctrine, he should have convened a Church court and disciplined Scott Hanson. (*See* Pl. Mem. at 10-12.) That sort of clergy malpractice claim, however, has long been held to be barred by the First Amendment and not justiciable, precisely because it would require a civil court to establish a standard of care for a cleric. *See,*

8

*e.g., Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724-25 (1976) (civil courts may not second guess decisions of church discipline); *St. Matthew's Slovak Roman Catholic Congregation v. Wuerl*, 106 Fed. Appx. 761, 768 (3d Cir. 2004) ("It is not the province of the federal courts to interpret and apply Canon Law."); *Klagsbrun v. Va'ad Harabonim*, 53 F. Supp. 2d 732, 742 (D.N.J. 1999) (dismissing slander suit because "resolution of the factual disputes would require this court to inquire into religious doctrine and practice," which the Establishment Clause does not permit); *see also Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198, 204 (Utah 2001) ("[C]ourts throughout the United States have uniformly rejected claims for clergy malpractice under the First Amendment.").

Here, as Plaintiff's Memorandum makes clear, Plaintiff's contention is that Bishop Hansen recklessly breached a standard of care established by Church publications for Church clergy. That is a claim that this Court is not permitted to resolve under the First Amendment.

### B.   Plaintiff's Claim that Bishop Hansen Conducted a Sham Investigation is Made Up Out of Whole Cloth

Plaintiff's contention that "Bishop Hansen essentially admitted that he looked only for exculpating evidence and did not consider incriminating evidence" is shameful. (*See* Pl. Mem. at 9.) As detailed in Bishop Hansen's deposition, taken by Plaintiff's counsel, Bishop Hansen did not pre-judge Scott Hanson's guilt or innocence and arrived at the conclusion that Hanson was innocent of child sex abuse in good faith only after consideration of substantial evidence. Thus, Bishop Hansen:

- immediately directed Scott Hanson to "have no interaction with young people, either in our ward or elsewhere, as this unfolded" (*See* Ex. J, Robert Hansen ("R. Hansen") Dep., Tr. 24);

- "didn't discount the charges or allegations, although with Scott they greatly surprised [him]. [He] felt like [he] -- [he] needed to investigate" (*id.*, Tr. 26);

9

- interviewed between 15 and 25 boys in his ward to determine if Scott Hanson had ever done or said anything sexually inappropriate with them. Those interview questions were prepared in advance after Bishop Hansen considered relevant publications from Church leadership and college textbooks he still had on interviewing techniques. His questions included open-ended inquiries (*id.*, Tr. 89-95);

- "was looking for anything [in those interviews] that would give me some indication that [Scott] was guilty as accused" (*id.*, Tr. 103);

- interviewed Scott Hanson at length and learned that the police claimed he had confessed to molesting multiple boys while giving them backrubs and some detail about the allegations concerning David Custer and Ryan Schill (*id.*, Tr. 13-14, 40, 101);

- was informed by Bishop Pederson, David Custer's bishop, that Custer had recanted his allegations (*id.*, Tr. 29, 41, 113-14);

- learned from Scott Hanson's attorney, Robert Moody, that the prosecutor had agreed to drop the felony child sex abuse charges and allow Scott Hanson to plead to a misdemeanor lewdness charge (that, by definition, did not amount to sex abuse) (*id.*, Tr. 144);

- learned from Mr. Moody that Scott Hanson had been administered a plethysmograph exam and evidenced no pedophiliac tendencies (*id.*, Tr. 123-25).[3]

In short, the notion that Bishop Hansen only looked for exculpatory evidence is indisputably wrong. The deposition answer on which Plaintiff relies actually says only that if Bishop Hansen could re-do his investigation he would ask to see the police Incident Report so that he could consider "all" of that Report, "[t]he positives and the negatives". (*Id.*, Tr. 129-30.) That is a far cry from Plaintiff's mischaracterization of that answer.[4]

---

[3] Plaintiff disparages Bishop Hansen for never reading the experts' reports. (Pl. Mem. at 11.) The report of Dr. Howell, however, did conclude that "There were many slides o[f] young boys and some tapes of young boys, but [Scott] failed to show any arousal to these." (Ex. K, Expert Report of Robert J. Howell, Ph.D., p. 6.)

[4] Plaintiff also criticizes Bishop Hansen for not interviewing the alleged victims, their families, the police or the prosecutor. (Pl. Mem. at 8.) Of course, if Bishop Hansen had done any of those things, Plaintiff would be accusing him of interfering with the criminal prosecution. Plaintiff also asserts that the sex abuse charges against Scott Hanson were dropped solely because his

10

Indeed, the only evidence Plaintiff cites for the assertion that Bishop Hansen was wrong in concluding that Scott Hanson was innocent of the 1986-87 child sex abuse charges is the police Incident Report -- *which Plaintiff concedes is inadmissible hearsay and cannot be offered for the truth.* (*See* Pl. Mem. at 2, n.1.) There is no admissible evidence that Scott Hanson sexually abused anyone in 1986-87, which fatally undercuts Plaintiff's punitive damages claim.

### C.  The Opinions of Plaintiff's Experts Are Irrelevant

Plaintiff also cites the opinions of two of his experts, Dr. Eli Newberger and Dr. Martha Beck, in support of his punitive damages claim. (Pl. Mem. at 13-14.) Those opinions are irrelevant to the inquiry.

As an initial matter, neither expert offers any new or different facts that would alter the legal analysis of whether Bishop Hansen's conduct could be found to be malicious, willful or wanton, as mandated by New Jersey's Punitive Damages Act. N.J.S.A. § 2A:15-5.12 (1995).

Moreover, neither expert is qualified to opine on punitive damages. Dr. Newberger is a pediatrician; he has no apparent experience in conducting investigations like the one Bishop Hansen undertook. And Dr. Beck's opinion will surely be struck on *Daubert* grounds, since (1) her own co-authored article on which she relies cautions that its findings are not subject to extrapolation;[5] (2) that article involved only adult female victims who were abused as children, a fact pattern unrelated to this case; and (3) Dr. Beck's hypotheses about Mormon Church leaders

---

alleged confession was suppressed. (Pl. Mem. 3.) But there is no such evidence in the record. And that surely would not be the case if the alleged victims were available to testify.

[5] "These nonrandom sampling techniques do not allow the numbers in this study or other studies mentioned in this article to be extrapolated beyond the research population." Ex. L, Beck, et al., *Betrayal of Sacred Trust: Sanctuary Trauma in Sexual Abuse Survivors*, Social Work Today, (Apr. 1, 2002), 7-11, at 8; *see also* Ex. M, Beck, et al., *Adult Survivors of Childhood Sexual Abuse: The Case of Mormon Women*, Affilia, Vol. 11, No. 1 (Spring 1996), 39-60, at 49 ("Because the women volunteered to participate, these numbers cannot be extrapolated beyond this sample.").

11

are entirely untested -- and untestable. *See, e.g., Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999).

## **CONCLUSION**

For the reasons set forth above, and in Defendant's moving papers, Defendant's motion for summary judgment should be granted.

Dated:  April 28, 2008

Respectfully submitted,

LATHAM & WATKINS LLP

By: \_\_\_\_/s/ Alan E. Kraus_____
Alan E. Kraus
Attorneys for Defendant Corporation of the President of The Church of Jesus Christ of Latter-day Saints